**<u>Exhibit 1</u>**

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AVENGER FLIGHT GROUP, LLC, *et al.*, | Case No. 26-10183 (    ) |
| Debtors.[1] | (Joint Administration Requested) |

### INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

Upon the motion, dated February 11, 2026 (the "Motion") of the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), seeking entry of an interim order (this "Interim Order")[2] and, subsequently, a Final Order (as defined herein) pursuant to sections 105, 361, 362, 363, 364, 503, 507, and 552 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure

---

[1] The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are: Avenger Flight Group, LLC (1216); AFG Dallas III, LLC (5615); AFG Dallas IV, LLC (5558); AFG Dallas, LLC (3418); AFG EU Operations Corp. (9406); AFG FLL, LLC (6470); AFG Latam Holding Corp. (6475); AFG Latam Sim Holdings II, LLC (0473); AFG Latam Sim Holdings III, LLC (2592); AFG Latam Sim Holdings IV, LLC (0093); AFG Latam Sim Holdings, LLC (6475); AFG Latam, LLC (9545); AFG Mexico Corp. (1402); AFG Orlando, LLC (8409); AFG Sanford, LLC (6661); AFG Sim Holding Corp. (3325); Avenger Flight Group Europe, Corp. (5908); Avenger Flight Group Topco, LLC (5643); Avenger Flight Training, LLC (5640); Avenger Flight Group Mexico II, S. de R.L. de C.V, (N/A); and Papi Flight Training, LLC (6206). The location of the Debtors' corporate headquarters and the Debtors' service address is Avenger Flight Group LLC, 1450 Lee Wagener Blvd., Fort Lauderdale, FL 33315.

[2] Capitalized terms used in this Interim Order but not defined herein shall have the meanings given to them in the DIP Term Sheet (as defined below).

(the "Local Rules") of the United States Bankruptcy Court for the District of Delaware (the "Court"), *inter alia*:

      (i)    authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis (the "DIP Facility" and the loans thereunder, the "DIP Loans") consisting of (a) a new money multiple draw term loan facility in the aggregate principal amount of $14,500,000 consisting of (1) up to $8,000,000 in the form of a DIP Loan to be made available to the Debtors in one or more draws upon entry of the Interim Order (the "Interim Amount"), and (2) up to an additional $6,500,000 in the form of a DIP Loan to be made available in one or more draws upon entry of the Final Order (the "Final Amount" and together with the Interim Amount, the "New Money Amount"), (b) upon entry of the Interim Order, a roll-up of certain Bridge Loan Obligations (as defined below) in the Interim Roll-Up Amount (as defined below) of $6,000,000 on a cashless dollar-for-dollar basis into DIP Loans under the DIP Facility, and (c) upon entry of the Final Order, a roll-up of certain Prepetition Term Loan Obligations (as defined below) in the Final Roll-Up Amount (as defined below) for a total roll-up of $29,000,000 on a cashless dollar-for-dollar basis into DIP Loans under the DIP Facility, in each case pursuant to the terms and conditions of this Interim Order, the Final Order, the Approved Budget (as defined below), and that certain term sheet attached hereto as **Exhibit A** (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "DIP Term Sheet"), by and among Avenger Flight Group, LLC, as borrower, the Guarantors, Wilmington Trust, National Association, as administrative and collateral agent (in such capacity, the "DIP Agent"), and the lenders party thereto from time to time (the "DIP Lenders," and together with the DIP Agent, the "DIP Secured Parties");

(ii)      approving the terms of and authorizing the Debtors to execute and deliver the DIP

Term Sheet and any other agreements, instruments, and documents related thereto (together with

the DIP Term Sheet, the "DIP Documents"), which shall be on terms consistent with the terms set

forth in the DIP Term Sheet and otherwise in form and substance acceptable to the Required DIP

Lenders (as defined below) (or as otherwise provided in the DIP Documents), and to perform such

other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)      authorizing the Debtors to enter into the DIP Term Sheet and to incur all obligations

owing thereunder and under the DIP Documents to the DIP Secured Parties, including the Roll-

Up Obligations (as defined below) (collectively, the "DIP Obligations"), and granting the DIP

Agent and DIP Lenders allowed superpriority administrative expense claim status in each of the

Chapter 11 Cases and any Successor Cases (as defined below), subject to the Carve-Out (as defined

below);

(iv)      granting to the DIP Agent (on behalf of the DIP Secured Parties) automatically

perfected security interests in and liens on all of the DIP Collateral (as defined below), including,

without limitation, all property constituting "cash collateral" as such term is defined in

section 363(a) of the Bankruptcy Code (including, without limitation, all cash and cash equivalents

and other amounts from time to time on deposit or maintained by the Debtors in any deposit or

securities account or accounts as of the Petition Date) or any cash or cash equivalents received by

the Debtors after the Petition Date as proceeds of the Prepetition Term Loan Collateral (together,

"Cash Collateral"), which liens shall be in accordance with the relative priorities set forth in

**Exhibit C** to this Interim Order;

(v)      authorizing the Debtors to use proceeds of the DIP Facility and Cash Collateral to:

(a) provide financing for working capital and other general corporate purposes, including for

bankruptcy-related costs and expenses, all to the extent provided in, and in accordance with, the Approved Budget, this Interim Order, and the DIP Documents; (b) make permitted adequate protection payments as specified below; (c) pay the principal, interest, fees, expenses, and other amounts payable and reimbursable under the DIP Documents or this Interim Order as such become due, including, without limitation, the DIP Fees (as defined below) and the fees and disbursements of the DIP Professionals (as defined below), and (d) any other purpose agreed upon in the DIP Documents, in each case solely in accordance with the Approved Budget, this Interim Order, and the DIP Documents;

(vi)    authorizing the Debtors to use the Prepetition Term Loan Collateral, including the Cash Collateral on an interim basis in accordance with both the Approved Budget and the DIP Documents, and providing, among other things, adequate protection to the Prepetition Term Loan Secured Parties (as defined below) for any Diminution (as defined below) of their interests in the Prepetition Term Loan Collateral, including the Cash Collateral;

(vii)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order;

(viii)    authorizing the DIP Agent, at the direction of the DIP Lenders holding, in aggregate, a majority in principal amount of the outstanding DIP Loans and unfunded DIP Term Loan Commitments (the "Required DIP Lenders") (or as otherwise provided in the DIP Documents), upon the occurrence of an Event of Default (as defined below): to (1) terminate the funding obligations under the DIP Documents; (2) declare the DIP Obligations to be immediately due and payable in full, in accordance with this Interim Order; and (3) subject to this Interim Order, be granted relief from the automatic stay to foreclose on the DIP Liens and DIP Collateral;

(ix)    approving certain stipulations in paragraph G of this Interim Order by the Debtors with respect to the Prepetition Term Loan Documents (as defined below) and the liens and security interests arising therefrom subject to the Challenge Period described in paragraph 44 of this Interim Order;

(x)    authorizing payment of the DIP Fees;

(xi)    waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order and providing for the immediate effectiveness of this Interim Order;

(xii)    scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing; and

(xiii)    granting related relief.

The Court having considered the Motion, the exhibits attached thereto, the *Declaration of Lawrence Perkins in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), the DIP Term Sheet, and any other DIP Documents, and the evidence submitted and argument made at the interim hearing (the "Interim Hearing"); and notice of the Interim Hearing having been provided in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and all applicable Local Rules, and it appearing that no other or further notice is necessary; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates (the "Estates") pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their Estates and all parties in interest, and is essential for the continued operation of the Debtors' business and

the preservation of the value of the Debtors' assets; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the Debtors' entry into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

Based upon the record established at the Interim Hearing, the Court makes the following findings of fact and conclusions of law:[3]

A.    <u>Disposition</u>.  The relief requested in the Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry, and any applicable stay (including under Bankruptcy Rule 6004) is waived to permit such effectiveness.

B.    <u>Petition Date</u>.  On February 11, 2026 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court.

C.    <u>Debtors-in-Possession</u>.  The Debtors are operating their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee or examiner has been appointed.

D.    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  This Court may

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

enter a final order consistent with Article III of the United States Constitution.  Venue for the

Chapter 11 Cases and the proceedings on the Motion is proper in this District pursuant to 28 U.S.C.

§§ 1408 and 1409.  The bases for the relief sought in the Motion are sections 105, 361, 362, 363,

364, 503, 506, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004,

and 9014, and Local Rules 2002-1(b), 4001-2, 9006-1, and 9013-1.

E.     Committee.  As of the date hereof, no statutory committee has been appointed in

these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

F.     Notice.  Notice of the Motion and the Interim Hearing has been provided in

accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other

or further hearing regarding the entry of this Interim Order and the relief set forth herein is

necessary or required.  The interim relief granted herein is necessary to avoid immediate and

irreparable harm to the Debtors and their Estates pending a Final Hearing.

G.     Debtors' Stipulations.  Subject to paragraph 44 hereof: (i) each stipulation,

admission, and agreement contained in this Interim Order, including, without limitation, the

Debtors' Stipulations (as defined below), shall be binding upon the Debtors, their Estates, and any

successors thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or

elected for any of the Debtors) under all circumstances and for all purposes, and (ii) the Debtors

are deemed to have irrevocably waived and relinquished all Challenges (as defined herein) as of

the Petition Date.  Without prejudice to the rights of parties in interest as expressly set forth in

paragraph 44 herein, the Debtors, in requesting the DIP Facility, and in exchange for and as a

material inducement to the DIP Secured Parties to provide the DIP Facility, on their own behalf

and on behalf of their Estates and all representatives of such Estates, admit, stipulate, acknowledge,

and agree as follows (paragraphs G(i) through G(iii) below are referred to, collectively, as the "Debtors' Stipulations"):

(i)     *Prepetition Term Loan Facility*.  Pursuant to that certain Credit Agreement, dated as of June 25, 2021 (as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Prepetition Credit Agreement" and collectively with all other agreements, instruments, and documents executed or delivered in connection therewith, each as may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Prepetition Term Loan Documents"), among (a) Avenger Flight Group, LLC, as the borrower, (b) Avenger Flight Group Topco, LLC ("Holdings"), (c) the other guarantors party thereto from time to time, (d) Wilmington Trust, National Association, as administrative and collateral agent (in such capacity, together with any successor thereto, the "Prepetition Term Loan Agent"), and (e) the lenders party thereto from time to time (the "Prepetition Term Loan Lenders" and together with the Prepetition Term Loan Agent, collectively, the "Prepetition Term Loan Secured Parties"), the Prepetition Term Loan Lenders provided a secured term loan facility to the Debtors (the "Prepetition Term Loan Facility").

(ii)     *Prepetition Term Loan Obligations*.  As of the Petition Date, the Credit Parties (as defined in the Prepetition Credit Agreement) were indebted and jointly and severally liable to the Prepetition Term Loan Secured Parties in the aggregate principal amount outstanding under the Prepetition Term Loan Facility of not less than $273,051,488.11 (together with accrued and unpaid interest, any fees, expenses, and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts,

and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations in connection with the Prepetition Term Loan Facility pursuant to the Prepetition Term Loan Documents, the "Prepetition Term Loan Obligations"). As of the Petition Date, the Prepetition Term Loan Obligations include no less than $8,013,535.57 in principal amount outstanding of bridge financing provided in September and December 2025 (together with accrued and unpaid interest, any fees, expenses, and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations in connection with the Prepetition Term Loan Facility pursuant to the Prepetition Term Loan Documents, the "Bridge Loan Obligations").

(iii)    *Prepetition Term Loan Liens and Prepetition Term Loan Collateral.* As more fully set forth in the Prepetition Term Loan Documents, prior to the Petition Date, the Credit Parties (as defined in the Prepetition Credit Agreement) granted to the Prepetition Term Loan Agent, for the benefit of the Prepetition Term Loan Secured Parties, a security interest in and continuing lien (the "Prepetition Term Loan Liens") on all Collateral (as defined in the Prepetition Term Loan Documents) (including Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition Term Loan Collateral"). [4]

---

[4]    The Prepetition Term Loan Collateral includes the CAE Inc. A320 flight simulator unit bearing manufacturer's serial number 115493 and all other Collateral (as defined in the Prepetition Term Loan Documents) owned by AFG SIM Holdings II, LLC.

(iv)      *Validity, Extent, Perfection, and Priority of Prepetition Term Loan Liens and Prepetition Term Loan Obligations.*  As of the Petition Date: (a) the Prepetition Term Loan Liens on the Prepetition Term Loan Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Term Loan Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Term Loan Liens were senior in priority over any and all other liens on the Prepetition Term Loan Collateral, subject only to certain liens senior by operation of law and otherwise permitted by the Prepetition Term Loan Documents (solely to the extent any such permitted liens (x) (1) were in existence on the Petition Date, (2) are valid, unavoidable, and properly perfected as the Petition Date or perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, (3) are senior in priority to the Prepetition Term Loan Obligations, and (4) are permitted to be incurred as senior priority liens under the applicable Prepetition Term Loan Documents, or (y) are expressly identified on Schedule 1 hereto, collectively the "Prepetition Permitted Liens"); (c) the Prepetition Term Loan Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Term Loan Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature, whether arising at law or in equity, to any of the Prepetition Term Loan Liens or Prepetition Term Loan Obligations exist, and no portion of the Prepetition Term Loan Liens or Prepetition Term Loan Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their Estates have no claims, objections, challenges, causes of action, or choses in action, including, without limitation, avoidance claims under chapter 5 of the

Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Term Loan Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, consultants, directors, and employees arising out of, based upon, or related to the Prepetition Term Loan Facility; (f) the Debtors have waived, discharged, and released any right to, and are forever barred from bringing, any Challenge (as defined below) to any of the Prepetition Term Loan Obligations, the priority of the Prepetition Term Loan Obligations, and the legality, validity, extent, and priority of the Prepetition Term Loan Liens; and (g) the Prepetition Term Loan Obligations constitute allowed secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(v)      *No Control*.   None of the DIP Secured Parties or Prepetition Term Loan Secured Parties controls the Debtors or their properties or operations, has authority to determine the manner in which any of the Debtors' operations are conducted, or is a control person or insider (as defined in the Bankruptcy Code) of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Facility, the DIP Liens, the DIP Obligations, the DIP Documents, the Prepetition Term Loan Facility, the Prepetition Term Loan Liens, the Prepetition Term Loan Obligations, the Prepetition Term Loan Documents, or the transactions contemplated hereunder or thereunder.

(vi)      *Credit Bidding*.   No Debtor or any controlled affiliate of any Debtor (or any successor to any of the foregoing) shall object to any DIP Secured Party's or Prepetition Term Loan Secured Party's right to credit bid up to the full amount of its DIP Obligations, Prepetition Term Loan Obligations, and Term Loan Adequate Protection Obligations, in each case including, without limitation, any accrued interest and expenses, in any sale of the DIP Collateral or Prepetition Term Loan Collateral under section 363 or section 1129 of the Bankruptcy Code (a

"363 Sale"), as applicable, whether such 363 Sale (as applicable) is effectuated through section 363 of the Bankruptcy Code, under section 1129 of the Bankruptcy Code, by a chapter 11 trustee, or otherwise.

H.    EDC Facility.

(i)    Without acknowledging the validity, priority, enforceability, extent, or allowance of such claims and liens, the Debtors make reference to (i) that certain Loan Agreement, dated as of November 1, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "EDC LATAM Loan Agreement" and collectively with all other agreements, instruments, and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "EDC LATAM Loan Documents"), among AFG LATAM Sim Holdings, LLC, a Florida limited liability company ("LATAM"), Export Development Canada, a corporation established by an Act of Parliament of Canada ("EDC"), as loan agent for the lenders (in such capacity, the "EDC Loan Agent"), as a lender (in such capacity, a "EDC Lender"), and as security trustee (in such capacity, the "EDC Security Trustee" and together with the EDC Loan Agent and EDC Lender, the "EDC Secured Parties"), and (ii) that certain Loan Agreement, dated as of July 11, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "EDC LATAM IV Loan Agreement" and collectively with all other agreements, instruments, and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "EDC LATAM IV Loan

Documents"), among AFG LATAM Sim Holdings IV, LLC, a Florida limited liability company ("LATAM IV") and the EDC Secured Parties.

(ii)    Pursuant to the EDC LATAM Loan Documents, the EDC Secured Parties provided loans to certain of the Debtors for the purchase of one TRU Simulation + Training Canada Inc. A320 flight simulator unit bearing manufacturer's serial number SN-00002635 and certain related assets (the "EDC LATAM Facility"), and the EDC LATAM Facility is purportedly secured by such assets and certain other related assets, including the equity interests of LATAM, substantially all assets of LATAM, and the rights and interests of LATAM and certain of its subsidiaries in certain leases and subleases related to such assets (collectively, the "EDC LATAM Collateral").  Pursuant to the EDC LATAM IV Loan Documents, the EDC Secured Parties provided loans to the Debtors for the purchase of one TRU Simulation + Training Canada Inc. A320 flight simulator unit bearing manufacturer's serial number SN-00002659 and certain related assets (the "EDC LATAM IV Facility"), and the EDC LATAM IV Facility is purportedly secured by such assets and certain other related assets, including the equity interests of LATAM IV, substantially all assets of LATAM IV, and the rights and interests of LATAM IV and certain of its subsidiaries in certain leases and subleases related to such assets (collectively, the "EDC LATAM IV Collateral" and together with EDC LATAM Collateral, the "EDC Collateral" and the liens and security interests purportedly granted thereon in favor of the EDC Secured Parties, the "EDC Liens"). [5]

---

[5]    The DIP Secured Parties, the Prepetition Secured Parties, and the Debtors each expressly reserve all rights, claims, defenses, and causes of action with respect to the existence, validity, priority, perfection, extent, enforceability, and avoidability of any liens, security interests, or other interests that any of the EDC Secured Parties may purport to hold in any property or assets of the Debtors, including the EDC Collateral and any proceeds or products thereof, whether arising under the Bankruptcy Code, applicable non-bankruptcy law, or otherwise.

I.    <u>Releases</u>.  Subject to paragraph 44 hereof, the Debtors, on behalf of themselves and their respective Estates (including any successor trustee or other estate representative in the Chapter 11 Cases and any Successor Cases (as defined herein), and any party acting by, through, or under the Debtors or their Estates), hereby stipulate and agree that they absolutely and unconditionally release and forever and irrevocably discharge and acquit each of the DIP Secured Parties, the Prepetition Term Loan Secured Parties, and their respective affiliates and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals (solely in their respective capacities as such) and the respective successors and assigns thereof (collectively, the "<u>Released Parties</u>") from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, disputes, liabilities, allegations, suits, controversies, proceedings, actions, and causes of action arising prior to the date of this Interim Order of any kind, nature, or description, whether known or unknown, foreseen or unforeseen, or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or regulation or otherwise, arising out of or related to (as applicable) the DIP Documents, the Prepetition Term Loan Documents, the negotiation thereof, the transactions contemplated thereby, or the obligations owing and the financial obligations made thereunder, or otherwise related to the Debtors, in each case that the Debtors or their Estates at any time had, now have, or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause, or thing whatsoever arising at any time on or prior to the date of this Interim Order. The Debtors further waive and release any defense, right of counterclaim, right of setoff, or

deduction to the payment of the Prepetition Term Loan Obligations that the Debtors may now have or may claim to have against the Released Parties, arising out of, connected with, or relating to any and all acts, omissions, or events occurring prior to this Court entering this Interim Order.

(i)     *Cash Collateral*.  All or substantially all of the Debtors' cash and cash equivalents, including cash on deposit in any account or accounts as of the Petition Date, cash obtained at any time thereafter (including proceeds of the DIP Facility), securities, or other property, wherever located, whether subject to control agreements or otherwise, whether as original collateral or proceeds of other Prepetition Term Loan Collateral, constitutes Cash Collateral of the Prepetition Term Loan Secured Parties.

J.     Findings Regarding Postpetition Financing.

(i)     *Request for Postpetition Financing*.  The Debtors seek authority to (a) enter into the DIP Facility on the terms described herein and in the DIP Documents, and (b) use Cash Collateral on the terms described herein to administer their Chapter 11 Cases and fund their operations in accordance with the Approved Budget (as defined below), DIP Term Sheet, and other DIP Documents.  At the Final Hearing, the Debtors will seek final approval of the proposed postpetition financing and use of Cash Collateral arrangements pursuant to a proposed final order, which shall be in form and substance acceptable to the Required DIP Lenders and the DIP Agent (the "Final Order").  Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

(ii)     *Priming of the Prepetition Term Loan Liens*.  The priming of the Prepetition Term Loan Liens on the Prepetition Term Loan Collateral under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Documents and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses to the benefit of their

Estates and creditors, and the Debtors would not be able to obtain debtor-in-possession financing in a sufficient amount without granting such priming liens. Consistent with the requirements of section 364(d) of the Bankruptcy Code, the Prepetition Term Loan Secured Parties shall receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, against any post-petition diminution in value of the Prepetition Term Loan Secured Parties' respective liens and interests in the Prepetition Term Loan Collateral (including Cash Collateral) resulting from, among other things, (i) the use, sale, or lease by the Debtors of such collateral, (ii) the market value decline of such collateral, (iii) the use of Cash Collateral by each of the Debtors, (iv) the imposition of the automatic stay, (v) the subordination of the Prepetition Term Loan Liens and Prepetition Term Loan Obligations to the Carve-Out, the DIP Liens, and the DIP Obligations, in each case, as set forth in this Interim Order, and (vi) any other act or omission which causes diminution in the value of their respective liens or interests in the Prepetition Term Loan Collateral (including Cash Collateral) (collectively, the "Diminution").

(iii)    *Need for Postpetition Financing and Use of Cash Collateral.* The Debtors have an immediate and critical need to obtain the financing pursuant to the DIP Facility and to continue to use the Prepetition Term Loan Collateral (including Cash Collateral) in order to, among other things, (i) pay the fees, costs, and expenses incurred in connection with the Chapter 11 Cases, (ii) fund any obligations benefitting from the Carve-Out, (iii) permit the orderly continuation of the operation of their businesses, (iv) maintain business relationships with customers, vendors, and suppliers, (v) make payroll, and (vi) satisfy other working capital and operational needs. The incurrence of new debt under the DIP Documents and use of Cash Collateral is necessary and vital to the preservation and maintenance of the going concern value of the Debtors. Immediate and irreparable harm will be caused to the Debtors and their Estates if immediate financing is not

obtained and permission to use Cash Collateral is not granted.  The terms of the proposed financing are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.  The adequate protection provided in this Interim Order and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code.

(iv)    *No Credit Available on More Favorable Terms*.  The DIP Facility is the best source of debtor-in-possession financing available to the Debtors.  Given their current financial condition, financing arrangements, capital structure, and the circumstances of these Chapter 11 Cases, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility.  Further, the Prepetition Term Loan Secured Parties are adequately protected and have consented to the Debtors incurring debtor-in-possession financing, the priming of the Prepetition Term Loan Liens, and the use of Cash Collateral, only on the terms and subject to the conditions set forth in the DIP Documents and this Interim Order.  The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors have also been unable to obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their Estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their Estates that is subject to a lien.  Financing on a postpetition basis is not otherwise available without granting the DIP Secured Parties: (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein;

(2) superpriority claims and priming liens to the extent set forth in this Interim Order, the DIP Term Sheet, and the other DIP Documents; and (3) the other protections set forth in this Interim Order.

(v)     *Use of Cash Collateral and Proceeds of the DIP Facility*.  As a condition to the Debtors' entry into the DIP Documents, the extension of credit under the DIP Facility, and the authorization to use Prepetition Term Loan Collateral, including Cash Collateral, the Debtors have agreed that Cash Collateral and the proceeds of the DIP Facility shall be used solely in accordance with the terms and conditions of this Interim Order and the DIP Documents and in accordance with the Approved Budget (as defined below), subject to Permitted Variances (as defined below).

(vi)     *Application of Proceeds of Collateral*.  As a condition to entry into the DIP Documents, the extension of credit under the DIP Facility, and authorization to use Cash Collateral, the Debtors have agreed that, as of and commencing on the date of entry of this Interim Order, the Debtors shall apply the proceeds of DIP Collateral in accordance with this Interim Order and the DIP Documents, and in accordance with the relative lien priorities set forth in **Exhibit C** to this Interim Order.

(vii)  *Roll-Up of Prepetition Term Loan Obligations Into DIP Obligations*.  Upon entry of the Interim Order, Bridge Loan Obligations in the amount of $6,000,000 (the "Interim Roll-Up Amount") shall be converted on a cashless dollar-for-dollar basis into principal obligations constituting DIP Obligations, without any further action by the Debtors or any other party (the "Interim Roll-Up Obligations").  Upon entry of the Final Order, additional Prepetition Term Loan Obligations in the amount of $23,000,000 (the "Final Roll-Up Amount" and together with the Interim Roll-Up Amount, the "Roll-Up Amount") shall be converted on a cashless dollar-for-dollar basis into principal obligations constituting DIP Obligations, without any further action by the Debtors or any other party (the "Final Roll-Up Obligations" and together with the Interim

Roll-Up Obligations, the "Roll-Up Obligations"). The conversion (or "roll-up") shall be authorized as compensation for, in consideration for, and solely on account of the agreement of the Prepetition Term Loan Lenders as DIP Lenders to fund amounts and provide other consideration to the Debtors under the DIP Facility and not as payments under, adequate protection for, or otherwise on account of any Prepetition Term Loan Obligations. Notwithstanding any other provision of this Interim Order or the DIP Documents, all rights of the Prepetition Term Loan Secured Parties shall be fully preserved. The Roll-Up Obligations are an inextricable component of the DIP Facility, and the Prepetition Term Loan Secured Parties would not otherwise consent to the use of their Cash Collateral or the subordination of the Prepetition Term Loan Liens to the DIP Liens, and the DIP Secured Parties would not be willing to provide the DIP Facility or extend credit to the Debtors thereunder without the inclusion of the Roll-Up Obligations in the DIP Obligations. The Roll-Up Obligations will enable the Debtors to obtain urgently needed financing to administer these Chapter 11 Cases and fund their operations.

K.    Adequate Protection. In exchange for their consent to (i) the priming of the Prepetition Term Loan Liens by the DIP Liens and (ii) the use of Cash Collateral to the extent set forth in this Interim Order, the Prepetition Term Loan Secured Parties shall receive adequate protection to the extent of any Diminution of their interests in the Prepetition Term Loan Collateral, as more fully set forth in this Interim Order.

L.    Good Faith of the DIP Secured Parties.

(i)    *Willingness to Provide Financing.* The DIP Secured Parties have committed to provide financing to the Debtors subject to: (a) entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility and those set forth in the DIP Documents; (c) satisfaction of the closing conditions set forth in the DIP Documents; and

(d) findings by this Court that the DIP Facility is essential to the Debtors and their Estates, that the DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Secured Parties' claims, superpriority claims, security interests and liens, and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

(ii)    *Business Judgment and Good Faith Pursuant to Section 364(e)*.  Based on the Motion, the First Day Declaration, and the record presented to the Court at the Interim Hearing, (i) the terms of the financing embodied in the DIP Facility, including the Roll-Up Obligations, fees, expenses, and other charges paid and to be paid thereunder or in connection therewith, (ii) the adequate protection authorized by the Interim Order and DIP Documents, and (iii) the terms on which the Debtors may continue to use the Prepetition Term Loan Collateral (including Cash Collateral), in each case pursuant to this Interim Order and the DIP Documents, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, constitute reasonably equivalent value and fair consideration, and represent the best financing and terms available under the circumstances.

(iii)    *Good Faith Pursuant to Section 364(e)*.  The terms and conditions of the DIP Facility and the use of Cash Collateral were negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition Term Loan Secured Parties with the assistance and counsel of their respective advisors.  The use of Cash Collateral and credit to be extended under the DIP Facility shall be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Secured Parties and the Prepetition Term Loan Secured Parties within the meaning of section 364(e) of the Bankruptcy Code.

(iv)     *Consent to DIP Facility and Use of Cash Collateral.* The Prepetition Term Loan Secured Parties have consented to the Debtors' use of Cash Collateral and the other Prepetition Term Loan Collateral, and to the Debtors' entry into the DIP Documents, solely in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents.

M.     <u>Good Cause</u>.  Good cause has been shown for immediate entry of this Interim Order, and the entry of this Interim Order is in the best interests of the Debtors, the Estates, and their stakeholders.  Among other things, the relief granted herein will minimize disruption of the Debtors' business and permit the Debtors to fund payroll obligations, to  satisfy amounts owing to stakeholders critical to ongoing operations, including the payment of premiums on insurance policies, and other expenses necessary to maximize the value of the Estates, in each case in accordance with the Approved Budget.  The terms of the Debtors' DIP Facility, use of Cash Collateral and proposed adequate protection arrangements, as set forth in this Interim Order, are fair and reasonable under the circumstances and reflect the Debtors' exercise of prudent business judgment.

N.     <u>Immediate Entry</u>.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Rules.

Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.     <u>DIP Financing Approved</u>.  On an interim basis, entry into the DIP Term Sheet and other DIP Documents is authorized and approved, and the use of Cash Collateral is authorized, in

each case, subject to the terms and conditions set forth in this Interim Order. All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits. This Interim Order shall become effective immediately upon its entry.

DIP Facility Authorization

2.    <u>Authorization of the DIP Financing</u>. The Debtors are expressly and immediately authorized and empowered to enter into, execute, and deliver the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to enter into, execute, deliver, and perform under all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Documents and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Documents. The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, any principal, interest, fees, expenses, and other amounts described in the DIP Documents and this Interim Order, as such amounts become due and owing, without need to obtain further Court approval (except as otherwise provided herein or in the DIP Documents), subject to and in accordance with the terms hereof and thereof, including, without limitation, any closing fees and commitment fees, as well as any reasonable and documented fees and disbursements of Proskauer Rose LLP, Landis Rath & Cobb LLP, Alston & Bird LLP, and one local counsel to the DIP Agent as DIP Professionals (as defined below), as set forth herein and in the DIP Documents, whether or not such professional fees and disbursements arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, to implement all applicable reserves and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order and

22

the DIP Documents. Upon execution and delivery, the DIP Documents shall represent legal, valid, and binding obligations of the Debtors, enforceable against each of the Debtors and their Estates in accordance with their terms. Each manager, member, or officer of the Debtors acting individually is hereby authorized to execute and deliver each of the DIP Documents, such execution and delivery to be conclusive evidence of such manager's, member's, or officer's respective authority to act in the name of and on behalf of the applicable Debtor; *provided that* the DIP Term Sheet shall be deemed to have been executed and delivered upon entry of this Interim Order.

3.      <u>Authorization to Borrow</u>.  To prevent immediate and irreparable harm to the Debtors' Estates, and to enable the Debtors to continue to operate their business and preserve and maximize the value of their Estates, subject to the terms and conditions set forth in the DIP Documents and this Interim Order, the Debtors are hereby authorized to borrow the Interim Amount, subject to any limitations on, or conditions to, borrowing under the DIP Documents, which borrowings shall be used solely for purposes permitted under the DIP Documents, including, without limitation, to provide working capital for the Debtors and to pay interest, fees, costs, charges and expenses, in each case, in accordance with this Interim Order, the DIP Documents, and the Approved Budget.

4.      <u>DIP Obligations</u>.  The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations.  All DIP Obligations shall be enforceable against the Debtors, their Estates, and any successors thereto, including, without limitation, any trustee appointed in the Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>").  Upon entry

of this Interim Order, the DIP Obligations will include all loans, guarantees, reimbursement obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Secured Parties, including, without limitation, all principal, accrued interest, costs, charges, fees, expenses, and other amounts under the DIP Documents.  The Debtors shall be jointly and severally liable for the DIP Obligations.  The DIP Obligations shall become due and payable, without notice or demand, on the Termination Date (as defined below).  No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Lien) to the DIP Secured Parties shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), claim, counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

5.     <u>DIP Collateral</u>.  To secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent (for the benefit of the DIP Lenders) is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition first priority and other security interests in and liens (collectively, the "<u>DIP Liens</u>") on the DIP

Collateral in accordance with the relative lien priorities set forth in **Exhibit C** to this Interim Order and all cash and non-cash proceeds, rents, profits, and offspring of DIP Collateral.[6]

6.      <u>DIP Liens</u>.  The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority to the Prepetition Term Loan Liens on the Prepetition Term Loan Collateral, and superior to any security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral (whether currently existing or hereafter created), except that the DIP Liens shall be subject only to (i) the Carve-Out, (ii) the  Prepetition Permitted Liens, and (iii) any liens expressly identified in **Exhibit C** to this Interim Order to be senior to the DIP Liens on the collateral specified therein.  Other than as expressly set forth herein (including **Exhibit C** hereto), the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), or upon the dismissal of any of the Chapter 11 Cases or Successor

---

[6]  "<u>DIP Collateral</u>" means all property of the Estates under section 541 of the Bankruptcy Code, including all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of the Debtors, including: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including all of the issued and outstanding capital stock of each of its subsidiaries), hedge agreements, real estate, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) subject to entry of a Final Order providing for such relief, the proceeds of any avoidance actions brought pursuant to chapter 5 of the Bankruptcy Code or applicable state law equivalents; (c) proceeds from the Debtors' exercise of rights under section 506(c) and 550 of the Bankruptcy Code ("<u>Avoidance Proceeds</u>"); (d) all Prepetition Term Loan Collateral, (e) all EDC Collateral, (f) all property of the Debtors that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date, and (g) all proceeds from the sale, assignment, or other disposition of any leased real property.  Notwithstanding the foregoing, DIP Collateral shall not include the Debtors' real property leases (but shall include all proceeds of such leases) solely to the extent that the grant of a DIP Lien is prohibited or restricted by the terms of such real property lease or applicable nonbankruptcy law to attach to any such real property lease.

Cases.  The DIP Liens shall not be subject to section 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of any Estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

7.    <u>DIP Superpriority Claims</u>.  Subject to the Carve-Out, upon entry of this Interim Order, the DIP Secured Parties are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Cases (collectively, the "<u>DIP Superpriority Claims</u>") for all DIP Obligations: (a) except as expressly set forth herein (including with respect to the Carve-Out), with priority over any and all administrative expense claims and unsecured claims against the Debtors or their Estates in any of the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code; and (b) which shall at all times be senior to the rights of the Debtors and their Estates, and any successor trustee or other estate representative to the extent permitted by law; *provided that* the DIP Superpriority Claims shall not be payable from Avoidance Proceeds pending entry of the Final Order.

8.    <u>DIP Roll-Up Obligations</u>.  Immediately upon entry of the Interim Order, Prepetition Term Loan Obligations in an aggregate amount equal to the Interim Roll-Up Amount shall be converted on a cashless dollar-for-dollar basis into principal obligations constituting DIP Obligations without any further action by the Debtors or any other party.  Immediately upon entry of the Final Order, additional Prepetition Term Loan Obligations in an aggregate amount equal to the Final Roll-Up Amount shall be converted on a cashless dollar-for-dollar basis into principal

obligations constituting DIP Obligations without any further action by the Debtors or any other party.

9.      No Obligation to Extend Credit.  The DIP Secured Parties shall have no obligation to make any loan or advance under the DIP Documents unless all of the conditions precedent under the DIP Documents and this Interim Order have been satisfied in full or waived by the Required DIP Lenders in their sole discretion in accordance with the terms of the DIP Documents.

10.     Use of Proceeds of DIP Facility.  From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP Documents, and only in compliance with the Approved Budget (subject to the Permitted Variances (as defined below)) and the terms and conditions in this Interim Order and the DIP Documents (a) to pay transaction costs, fees and expenses that are incurred in connection with the DIP Facility, (b) to pay professional fees of the Debtors and their Estates and the Committee, if any, (c) for working capital and other general corporate purposes permitted by the DIP Documents, and (d) to pay Statutory Fees (as defined herein).  Upon entry of the Interim Order, the deemed proceeds of the DIP Facility shall be used to refinance (on a cashless basis) the Interim Roll-Up Amount of the Bridge Loan Obligations held by the DIP Lenders in their capacity as Prepetition Term Loan Lenders (or their affiliates) reducing the amount of the "Obligations" (as defined in the Prepetition Credit Agreement) by such amount.  Subject to and upon entry of the Final Order, the deemed proceeds of the DIP Facility shall be used to refinance (on a cashless basis) the Final Roll-Up Amount of the Prepetition Term Loan Obligations held by the DIP Lenders in their capacity as Prepetition Term Loan Lenders (or their affiliates) reducing the amount of the "Obligations" (as defined in the Prepetition Credit Agreement) by such amount.

11.     <u>No Monitoring Obligation</u>.  The DIP Secured Parties shall have no obligation or responsibility to monitor the Debtors' use of the DIP Facility, and the DIP Secured Parties may rely upon the Debtors' representation that the use of the DIP Facility at any time is in accordance with the requirements of this Interim Order and the DIP Documents and in compliance with the Approved Budget (subject to the Permitted Variances).

Authorization to Use Cash Collateral

12.     <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Interim Order and the DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variances), the Debtors are authorized to use Cash Collateral until the expiration of the Remedies Notice Period (as defined below) following the Termination Date.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as expressly permitted by this Interim Order and the DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variances).

13.     <u>Consent of Prepetition Term Loan Secured Parties</u>.  The Prepetition Term Loan Secured Parties hereby consent to (a) the provisions of this Interim Order, including the Debtors' entry into the DIP Facility on an interim basis, (b) the granting of the DIP Liens and DIP Superpriority Claims on the terms and subject to the conditions set forth herein (including the Carve-Out), and (c) the Approved Budget.

14.     <u>Adequate Protection for Prepetition Term Loan Secured Parties</u>.  As adequate protection for any Diminution of the Prepetition Term Loan Secured Parties' interests in the Prepetition Term Loan Collateral, the Prepetition Term Loan Agent shall receive, for the benefit of

28

the Prepetition Term Loan Secured Parties, the following (collectively, the "Term Loan Adequate

Protection Obligations"):

       (i)     continuing valid, binding, enforceable, and perfected postpetition

replacement liens pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code (the

"Term Loan Replacement Liens") on the DIP Collateral, which shall be subject only to the Carve-

Out and those liens expressly identified as senior in right of priority in **Exhibit C** to this Interim

Order and which (x) shall otherwise be senior to all other security interests in, liens on, or claims

against the DIP Collateral, and (y) shall not be made subject to or *pari passu* with any other lien

or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor

Cases, and shall be valid and enforceable against any trustee appointed in any of the Chapter 11

Cases or any Successor Cases, and shall not be subject to sections 510, 549, or 550 of the

Bankruptcy Code;

       (ii)    administrative superpriority expense claims in each of the Chapter 11 Cases

(the "Term Loan Adequate Protection Superpriority Claims"), subject only to the Carve-Out and

the DIP Obligations (including the DIP Superpriority Claims), pursuant to section 507(b) of the

Bankruptcy Code with priority over any and all other administrative expenses, administrative

expense claims, and unsecured claims against the Debtors or their Estates, now existing or

hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections

503(b) and 507(b) of the Bankruptcy Code; *provided that* the Term Loan Adequate Protection

Superpriority Claims shall not be payable from Avoidance Proceeds pending entry of the Final

Order;

       (iii)   subject to the procedures set forth in paragraph 38 of this Interim Order,

monthly payment of the Prepetition Term Loan Secured Parties' respective reasonable and

documented fees, costs, and expenses when due and payable in accordance with this Interim Order,

including the professional fees and disbursements of Proskauer Rose LLP, Landis Rath & Cobb

LLP, Alston & Bird LLP, and any other Prepetition Term Loan Professionals (as defined below),

in each case without the need for the filing of formal fee applications, including as to any amounts

arising before or after the Petition Date; and

(iv)    subject to entry of the Final Order, the unqualified and unconditional right

to credit bid the Prepetition Term Loan Obligations in connection with any sale or other disposition

of Prepetition Term Loan Collateral, including, without limitation, as set forth in paragraph 40

hereof.

15.    <u>Adequate Protection Reservation</u>.    Nothing herein shall impair or modify the

application of section 507(b) of the Bankruptcy Code in the event that the adequate protection

provided to the Prepetition Term Loan Secured Parties hereunder is insufficient to compensate for

any Diminution of their respective interests in the Prepetition Term Loan Collateral during the

Chapter 11 Cases or any Successor Cases.    The receipt by the Prepetition Term Loan Secured

Parties of the adequate protection provided herein shall not be deemed an admission that the

interests of the Prepetition Term Loan Secured Parties are adequately protected, and this Interim

Order shall not prejudice or limit the rights of the Prepetition Term Loan Secured Parties to seek

additional relief with respect to the use of Cash Collateral or for additional adequate protection.

<u>Provisions Common to DIP Financing and Use of Cash Collateral</u>

16.    <u>Amendment of the DIP Documents</u>.    The Debtors irrevocably waive any right to

seek any amendment, modification, or extension of this Interim Order without the prior written

consent of the Required DIP Lenders, which they may grant in their discretion.    The Debtors and

the DIP Agent and Required DIP Lenders (or as otherwise provided in the DIP Documents) may

enter into one or more amendments, waivers, consents, or other modifications to and under the DIP Documents, in each case in accordance with the terms of the applicable DIP Documents and in such form as the Debtors, the DIP Agent, and the Required DIP Lenders (or as otherwise provided in the DIP Documents) agree, in such applicable DIP Lenders' sole discretion, and no further approval of this Court shall be required for any amendment, waiver, consent, or other modification to and under the DIP Documents (and any fees paid in connection therewith) that does not materially and adversely affect the Debtors or which does not (i) shorten the maturity of the DIP Facility, (ii) increase the principal amount of or the rate of interest on the DIP Facility, or (iii) change any event of default, add any covenants, or amend the covenants to be materially more restrictive; *provided*, *however*, any such material amendment, waiver, consent, or other modification shall be subject to further Court approval; *provided*, *further*, that no motion is required to be filed to effectuate any such material amendment, waiver, consent, or other modification, and the requirements of Bankruptcy Rule 4001 and any applicable Local Rules are waived.  Copies of all amendments and modifications to and under the DIP Documents, regardless of materiality, shall be provided to the U.S. Trustee and the Committee, if any.  No consent to any such amendment, waiver, consent, or modification shall be implied by any action, inaction, or acquiescence of the DIP Secured Parties or the Prepetition Term Loan Secured Parties, as applicable.

17.    Approved Budget.

(i)      Attached to this Interim Order as **Exhibit B** is a 13-week budget approved by the Required DIP Lenders, which sets forth, among other things, projected cash receipts and cash disbursements (the "Approved Budget").  The Debtors may propose updates to the Approved Budget as needed, and if such updated budget is in form and substance satisfactory to the Required

DIP Lenders or the DIP Agent (acting at the direction of the Required DIP Lenders), and upon (and subject to) the approval in writing of any such updated budget by the Required DIP Lenders or the DIP Agent (acting at the direction of the Required DIP Lenders), it shall become the "Approved Budget" for purposes of the DIP Documents, this Interim Order, and the Final Order (together with the Interim Order, the "DIP Orders").  Any amendments, supplements, or modifications to the Approved Budget or an Approved Variance Report (as defined below) shall be subject to the prior written approval of the Required DIP Lenders or the DIP Agent (acting at the direction of the Required DIP Lenders) prior to the implementation thereof.  Until any such updated budget, amendment, supplement, or modification has been approved by the Required DIP Lenders or the DIP Agent (acting at the direction of the Required DIP Lenders), the Debtors shall be subject to and be governed by the terms of the Approved Budget then in effect.  For the avoidance of doubt, there shall be an Event of Default upon the expiration of the Approved Budget then in effect.

(ii)     The Approved Budget is approved on an interim basis.  The proceeds of the DIP Facility and Cash Collateral under this Interim Order shall be used by the Debtors solely in accordance with the Approved Budget (subject to Permitted Variances), this Interim Order, and the DIP Documents.

(iii)     Other than with respect to the Carve-Out, none of the DIP Secured Parties' and the Prepetition Term Loan Secured Parties' consent to, or acknowledgement of, the Approved Budget shall be construed as consent to use the proceeds of the DIP Facility beyond the Maturity Date or the Termination Date (as defined below), as applicable, or the use of Cash Collateral beyond the expiration of the Remedies Notice Period (as defined below) following the Termination Date, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

(iv)    Notwithstanding anything to the contrary herein, the Debtors shall pay the fees, costs, and expenses of the DIP Professionals (as defined below) in accordance with the DIP Documents and this Interim Order without reference to the Approved Budget.

18.    <u>Budget Reporting</u>.    The Debtors shall at all times comply with the Approved Budget, subject to the Permitted Variances (as defined below).  By not later than 5:00 p.m. (Eastern Time) on Wednesday after the second full calendar week following the Petition Date (the "<u>First Testing Date</u>"), no later than 5:00 p.m. (Eastern Time) on Wednesday after the third full calendar week following the Petition Date (the "<u>Second Testing Date</u>"), and no later than 5:00 p.m. (Eastern Time) on each Wednesday thereafter (together with the First Testing Date and Second Testing Date, each a "<u>Testing Date</u>"), the Debtors shall deliver to the DIP Agent a variance report for the applicable Testing Period (as defined below) in form and detail acceptable to the Required DIP Lenders (which acceptance may be communicated by the DIP Agent at the direction of the Required DIP Lenders) (an "<u>Approved Variance Report</u>") showing comparisons of (a) actual cumulative cash receipts for such Testing Period compared to the projected cumulative cash receipts on a line by line basis of the Debtors for such Testing Period as set forth in the Approved Budget (any such difference, a "<u>Receipts Variance</u>"), and (b) actual cumulative cash disbursements on a line by line basis of the Debtors for such Testing Period compared to the projected cumulative cash disbursements on a line by line basis for such Testing Period as set forth in the Approved Budget (any such difference, a "<u>Disbursements Variance</u>").  The term "<u>Testing Period</u>" means the two-week period beginning on Sunday and ending on the Saturday immediately prior to the First Testing Date, the three-week period beginning on Sunday and ending on the Saturday immediately prior to the Second Testing Date, and on a rolling four-week period beginning on Sunday and ending on the Saturday immediately prior to the applicable Testing Date thereafter.

19.    <u>Budget Testing</u>.  Each Approved Variance Report shall indicate whether there are any adverse variances that exceed the Permitted Variances (as defined below) and shall provide a written explanation for such variances.  "<u>Permitted Variances</u>" shall mean, as of any Testing Date, a Receipts Variance up to 15% in the aggregate for all line items contained in the Approved Budget or a Disbursement Variance up to 15% for each line item contained in the Approved Budget (including professional fees of the Debtors and the Committee, if any (including any holdback)), in each case calculated weekly commencing as of the Petition Date; *provided that* to the extent (i) the Debtor's actual operating disbursements or actual capital expenditures are less than the projected disbursements provided for such line items in the Approved Budget, or (ii) the Debtor's actual receipts are greater than the projected receipts on an aggregate basis in the Approved Budget, such positive variance may be rolled forward (to the applicable line item with respect to positive variances in clause (i) and on an aggregate basis with respect to positive variances in clause (ii))  to any succeeding week for purposes of compliance with this Interim Order and the DIP Term Sheet; *provided*, *further*, that any such rolled forward positive variance shall only be applied once.

20.    <u>Modification of Automatic Stay</u>.   The automatic stay of section 362 of the Bankruptcy Code is hereby modified and vacated to the extent necessary to permit the Debtors, the DIP Secured Parties, and the Prepetition Term Loan Secured Parties to accomplish the transactions contemplated by this Interim Order.

21.    <u>Perfection of DIP Liens and Term Loan Replacement Liens</u>.  This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the DIP Liens and the  Term Loan Replacement Liens, subject to the priorities set forth in **<u>Exhibit C</u>** to this Interim Order, without the necessity of filing or

recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Term Loan Replacement Liens or to entitle the DIP Secured Parties and the Prepetition Term Loan Secured Parties to the priorities granted herein.   Notwithstanding the foregoing, the DIP Agent (for the benefit of the DIP Secured Parties) and the Prepetition Term Loan Agent (for the benefit of the Prepetition Term Loan Secured Parties) are each authorized, but not required, to file, as each deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or otherwise to evidence the DIP Liens and the Term Loan Replacement Liens, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided*, *however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Term Loan Replacement Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Agent and the Prepetition Term Loan Agent all such financing statements, mortgages, notices, and other documents as each may reasonably request. The DIP Agent and the Prepetition Term Loan Agent may each file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien, or similar instruments.  To the extent that the Prepetition Term Loan Agent is, with respect to the DIP Collateral, the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, credit card processor notices or agreements, bailee letters, custom broker

agreements, financing statements, account control agreements, or any other Prepetition Term Loan Documents or is listed as loss payee, lenders' loss payee, or additional insured under any of the Debtors' insurance policies, the DIP Agent (for the benefit of the DIP Secured Parties) shall also be deemed to be the secured party or mortgagee, as applicable, under such documents or to be the loss payee or additional insured, as applicable.  The Prepetition Term Loan Agent shall act as agent for the DIP Secured Parties solely for purposes of perfecting the DIP Secured Parties' liens on all DIP Collateral that, without giving effect to the Bankruptcy Code and this Interim Order, is of a type such that perfection of a lien therein may be accomplished only by possession or control by a secured party (including any deposit account control agreement), and, subject to the relative lien priorities set forth in **Exhibit C** to this Interim Order, all of the Prepetition Term Loan Agent's respective rights in such DIP Collateral shall inure to the benefit of and be exercisable exclusively by the DIP Agent until the DIP Obligations have been indefeasibly repaid in full in cash; *provided* that the DIP Agent may, in its sole discretion and acting at the direction of the Required DIP Lenders, require the Debtors and the Prepetition Term Loan Agent to (and the Debtors and  the Prepetition Term Loan Agent shall) use commercially reasonable efforts to provide the DIP Agent with such possession or control as is necessary to perfect the DIP Obligations and DIP Liens. Notwithstanding the foregoing, in the event any of the Chapter 11 Cases or Successor Cases are dismissed prior to the indefeasible payment in full of the DIP Obligations, such order dismissing any Chapter 11 Cases or Successor Cases shall not be effective for five (5) business days to permit the DIP Agent and the Prepetition Term Loan Agent to enter into any agreements or file any documents (including credit agreements, financing statements, mortgages, or other notices or documents) evidencing the DIP Obligations and the perfection and priority of the DIP Liens and Term Loan Replacement Liens consistent with this Interim Order, and during such period, the

Debtors shall comply with all reasonable requests of the DIP Agent and the Prepetition Term Loan Agent to ensure the perfection of the DIP Liens and the Term Loan Replacement Liens, as applicable.

22.     <u>Access to Books and Records</u>.  The Debtors will (i) maintain books, records, and accounts to the extent and as required by the DIP Documents, (ii) cooperate with, consult with, and provide to the DIP Agent and the DIP Lenders all such information and documents that any or all of the Debtors are obligated to provide under the DIP Documents or the provisions of this Interim Order or as otherwise reasonably requested by the DIP Agent or any of the DIP Lenders, (iii) during normal business hours, upon reasonable advance notice, permit consultants, advisors and other representatives (including third party representatives) of the DIP Agent and the DIP Lenders to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective assets, inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective business affairs, finances, properties, business operations, and accounts with their respective senior management and independent public accountants as often as may reasonably be desired, and (iv) permit the DIP Secured Parties, the Prepetition Term Loan Secured Parties, and their respective consultants, advisors, and other representatives, to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations, and assets, as provided for in the DIP Documents or as otherwise reasonably requested.

23.     <u>Proceeds of Subsequent Financing</u>.  If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to sections 364(b), 364(c) or 364(d)

of the Bankruptcy Code or in violation of the DIP Documents or this Interim Order at any time prior to the indefeasible repayment in full in cash of all DIP Obligations and the termination of the DIP Lenders' obligation to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' Estates, and such facilities are secured by any DIP Collateral, then all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent (for the benefit of the DIP Secured Parties) to be distributed in accordance with this Interim Order and the DIP Documents.  For the avoidance of doubt, if the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in the Chapter 11 Cases, or any Successor Cases, shall obtain credit or incur debt (other than the DIP Facility) pursuant to section 364(d) of the Bankruptcy Code at any time prior to the indefeasible repayment in full in cash of the Prepetition Term Loan Obligations, the Prepetition Term Loan Secured Parties' rights to object to the Debtors' use of Cash Collateral and assert a lack of adequate protection shall be fully preserved.

24.    <u>Cash Management</u>.  The Debtors shall maintain their cash management system consistent with the terms and conditions of the Cash Management Order (as defined below), the DIP Documents, and this Interim Order.  Unless authorized by the Interim Order or otherwise agreed to in writing by the Required DIP Lenders, the Debtors shall not maintain any deposit accounts except those identified in any interim or final order granting the Debtors authorization to continue their cash management system and certain related relief (as amended, supplemented, or otherwise modified, the "<u>Cash Management Order</u>"), which Cash Management Order shall be in form and substance acceptable to the Required DIP Lenders.

25.    <u>Maintenance of DIP Collateral</u>.  Until the indefeasible payment in full in cash of all DIP Obligations, all Prepetition Term Loan Obligations, and the termination of the DIP Lenders'

obligation to extend credit under the DIP Facility, the Debtors shall: (a) insure the DIP Collateral as required under the DIP Documents or the Prepetition Term Loan Documents, as applicable; and (b) maintain the cash management system consistent with the terms and conditions of the Cash Management Order, the DIP Documents, and this Interim Order.

26. <u>Disposition of DIP Collateral</u>. The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral or Prepetition Term Loan Collateral (or enter into any binding agreement to do so), other than in the ordinary course of business or as otherwise permitted by the DIP Documents, without the prior written consent of the Required DIP Lenders, or pursuant to a sale of all or substantially all of the Debtors' assets in accordance with the Sale Motion and Sale Transaction (each as defined in the DIP Term Sheet). The Debtors are authorized and directed to make the Mandatory Prepayments as set forth in the DIP Term Sheet, and, upon the closing of a sale of any of the DIP Collateral, immediately to pay all cash proceeds of any such sale to the DIP Agent (for the benefit of the DIP Secured Parties) or the Prepetition Term Loan Agent (for the benefit of the Prepetition Term Loan Secured Parties to be applied in accordance with the Prepetition Term Loan Documents), as applicable, subject to the lien priorities set forth in **<u>Exhibit C</u>** of this Interim Order, and any order approving the sale of such DIP Collateral shall provide that the sale is conditioned upon payment of the cash proceeds in accordance with the lien priorities set forth in **<u>Exhibit C</u>** of this Interim Order; *provided that* any prepayment made pursuant to romanette (ii) or (iii) of the Mandatory Prepayments section of the DIP Term Sheet shall be applied to the Roll-Up Obligations or to the Prepetition Term Loan Obligations as determined by the Required DIP Lenders.

27.    <u>Termination Date</u>.  On the Termination Date (as defined below), all DIP Obligations shall be immediately due and payable, and all commitments to extend credit under the DIP Facility will terminate other than as permitted by the Carve-Out.

28.    <u>Events of Default</u>.  Until the DIP Obligations are indefeasibly paid in full in cash and all commitments thereunder are terminated in accordance with the DIP Documents, the occurrence of any of the following events, unless waived by the Required DIP Lenders (or as otherwise provided in the DIP Documents) in writing (which may be by email) and in accordance with the terms of the DIP Documents, shall constitute an event of default (collectively, the "<u>Events of Default</u>"): (a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order, including, without limitation, failure to make any payment under this Interim Order when due, the failure to comply with any Milestone (as defined in the DIP Term Sheet), or the failure to comply with the Approved Budget (subject to the Permitted Variances); and (b) the occurrence and continuation of any Event of Default under, and as defined in, the DIP Term Sheet or any other DIP Documents (subject to any notice and cure periods set forth therein).

29.    <u>Milestones</u>. As a condition to the DIP Facility and the use of Cash Collateral, the Debtors have agreed to the Milestones.  For the avoidance of doubt, unless waived, modified, or extended in writing by the Required DIP Lenders, the failure of the Debtors to meet the Milestones by the Specified Deadlines (as defined in the DIP Term Sheet) shall constitute an Event of Default under the DIP Documents and this Interim Order.

30.    <u>Rights and Remedies Upon Event of Default</u>.  Upon the occurrence and during the continuation of any Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the

Court, other than, subject to the terms of this Interim Order: (a) the Required DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders, or as otherwise provided in the DIP Documents) may send a written notice to counsel to the Debtors, counsel to the Committee (if any), and the U.S. Trustee (any such declaration shall be referred to herein as a "Termination Declaration"), which shall be filed on the docket of the Chapter 11 Cases, declaring (1) all DIP Obligations owing under the DIP Documents and this Interim Order to be immediately due and payable, (2) the commitment of each DIP Lender to make DIP Loans to be terminated, whereupon such commitment and obligation shall be terminated to the extent any such commitment remains under the DIP Facility, (3) the termination of the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (4) the application of the Carve-Out has occurred following the delivery of the Carve-Out Trigger Notice (as defined below) to the Borrower; (b) interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Documents; and (c) upon delivery of the Termination Declaration, the Required DIP Lenders or the DIP Agent (at the direction of  the Required DIP Lenders) shall be deemed to have declared a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, other than to pay expenses set forth in the Approved Budget that are necessary to avoid immediate and irreparable harm to the Debtors' Estates absent further order of the Court.  The earliest date on which a Termination Declaration is delivered by the Required DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders) and filed on the docket of the Chapter 11 Cases shall be referred to herein as the "Termination Date."  Following the Termination Date, no DIP Secured Party or Prepetition Term Loan Secured Party shall be required to consent to the use of any Cash Collateral or provide any loans or other financial accommodations under the DIP Facility.  The

Termination Declaration shall be given by email (or other electronic means) to counsel to the Debtors, counsel to the Committee (if any), and the U.S. Trustee.

31.     <u>No Waiver by Failure to Seek Relief</u>.  The rights and remedies of the DIP Secured Parties and the Prepetition Term Loan Secured Parties are cumulative and not exclusive of any rights or remedies that the DIP Secured Parties or the Prepetition Term Loan Secured Parties may have under the DIP Documents, the Prepetition Term Loan Documents, applicable law, or otherwise.  The failure or delay on the part of any of the DIP Secured Parties or the Prepetition Term Loan Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition Term Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights or be deemed as an admission that no Event of Default has occurred.  No delay on the part of any party in the exercise of any right or remedy under this Interim Order, the DIP Documents, or the Prepetition Term Loan Documents shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy.  Except as expressly set forth herein, none of the rights or remedies of any party under this Interim Order, the DIP Documents, and the Prepetition Term Loan Documents shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing, and signed by the requisite parties under the DIP Documents and the requisite parties under the Prepetition Term Loan Documents, as applicable.  No consents required hereunder by any of the DIP Secured Parties or the Prepetition Term Loan Secured Parties shall be implied by any inaction or acquiescence by any of the DIP Secured Parties or the Prepetition Term Loan Secured Parties (as applicable).

32.     <u>Emergency Hearing</u>.  Upon the delivery of a Termination Declaration, the Debtors, the Committee, if any, the DIP Secured Parties, and the Prepetition Term Loan Secured Parties

consent to a hearing on an expedited basis. During the five (5) days following the date a Termination Declaration is delivered (such five (5) day period, the "Remedies Notice Period"), the Debtors shall continue to have the right to use Cash Collateral in accordance with the terms of this Interim Order, solely to pay necessary expenses set forth in the Approved Budget to avoid immediate and irreparable harm to the Estates. At the end of the Remedies Notice Period, unless the Court has entered an order to the contrary, the Debtors' right to use Cash Collateral shall immediately cease, and the DIP Secured Parties shall have the rights set forth immediately below.

33.    Certain Rights and Remedies Following Termination Date. Following a Termination Date and upon either the expiration of the Remedies Notice Period or pursuant to a further order of the Court (which may authorize the remedies set forth in this paragraph or any other appropriate remedy as then determined by the Court) upon an emergency motion by the Required DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders) to be heard, subject to the Court's availability, on no less than three (3) business days' notice (and the Debtors shall not object to such shortened notice) (the "Termination Enforcement Order"), the Required DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders) shall be entitled to exercise all rights and remedies in accordance with the DIP Documents, the DIP Orders, and applicable law and shall be permitted to satisfy the relevant DIP Obligations and DIP Liens based on the relative priorities set forth in **Exhibit C** to this Interim Order. Following expiration of the Remedies Notice Period or entry of the Termination Enforcement Order, except as otherwise ordered by the Court (including in any Termination Enforcement Order): (a) subject to the lien priorities set forth in **Exhibit C** to this Interim Order, the Debtors are hereby authorized and directed to, with the exclusion of the Carve-Out, remit to the DIP Agent (for the benefit of the DIP Secured Parties) one hundred percent (100%) of all collections, remittances, and proceeds of the

DIP Collateral in accordance with the DIP Documents; (b) the Required DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders or as otherwise provided in the DIP Documents) may compel the Debtors to seek authority to (i) sell or otherwise dispose of all or any portion of the DIP Collateral (or any other property of the Debtors to the extent a lien is not permitted by law to attach to such property, the proceeds of which are DIP Collateral) pursuant to section 363 of the Bankruptcy Code (or any other applicable provision) on terms and conditions pursuant to sections 363, 365, and other applicable provisions of the Bankruptcy Code, and (ii) assume and assign any lease or executory contract included in the DIP Collateral to the designees of the DIP Agent (at the direction of the Required DIP Lenders) in accordance with and subject to section 365 of the Bankruptcy Code; (c) the Required DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders) may direct the Debtors to (and the Debtors shall comply with such direction without the need for any further or additional corporate approvals under applicable state or federal law to) dispose of or liquidate the DIP Collateral (or any other property of the Debtors to the extent a lien is not permitted by law to attach to such property, the proceeds which are DIP Collateral) via one or more sales of such DIP Collateral or property or the monetization of other DIP Collateral or property, including pursuant to a strict foreclosure in accordance with applicable state law; (d) the Required DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders) may, or may direct the Debtors to (and the Debtors shall comply with such direction to), collect any and all accounts receivable, without setoff by any account debtor; (e) the Required DIP Lenders or DIP Agent (for the benefit of the DIP Secured Parties) shall be authorized to succeed to any and all of the Debtors' rights and interests under any licenses for the use of any intellectual property in order to complete the production and sale of any inventory with respect to the DIP Collateral; and (f) the Debtors shall take all action that is

reasonably necessary to cooperate with the DIP Secured Parties in the exercise of their rights and remedies and to facilitate the realization of the DIP Collateral by the DIP Secured Parties in a manner consistent with the priorities set forth in **Exhibit C** to this Interim Order and in the DIP Documents.

34.     Access to DIP Collateral.    Notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Secured Parties under the Interim Order, the DIP Documents and applicable law, after the occurrence of the Termination Date and upon either the expiration of the Remedies Notice Period or the entry of a Termination Enforcement Order, for the purpose of exercising any remedy with respect to any of the DIP Collateral, the Required DIP Lenders or the DIP Agent (or any of their respective employees, agents, consultants, contractors, or other professionals) (collectively, the "Enforcement Agents") shall have the right (to be exercised at the direction of the Required DIP Lenders), at the sole cost and expense of the Debtors, to: (i) enter upon, occupy, and use any real or personal property, fixtures, equipment, leasehold interests, or warehouse arrangements owned or leased by the Debtors; (ii) enter into the premises of any Debtor in connection with the orderly sale or disposition of the DIP Collateral (including, without limitation, to complete any work in process); (iii) exercise any rights of the Debtors to access any DIP Collateral (including inventory) held by any third party; *provided*, *however*, the Enforcement Agents may only be permitted to do so in accordance with (a) existing rights under applicable non-bankruptcy law, including, without limitation, applicable leases, (b) any prepetition (and, if applicable, post-petition) landlord waivers or consents, or (c) further order of this Court on motion and notice appropriate under the circumstances; and (iv) use any and all trademarks, tradenames, copyrights, licenses, patents, equipment, or any other similar assets of the Debtors, or assets which are owned by or subject to a lien of any third party

and which are used by the Debtors in their businesses; *provided*, *however*, the Enforcement Agents may use such assets to the extent permitted by applicable non-bankruptcy law.

35.    Carve-Out.  Except as otherwise provided in **Exhibit C** to this Interim Order, each of the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Prepetition Term Loan Obligations, the Prepetition Term Loan Liens, the Term Loan Replacement Liens, and the Term Loan Adequate Protection Superpriority Claims shall be subject to payment of the Carve-Out.

(i)    "Carve-Out" means the following fees and expenses: (a) all statutory fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a); (b) all reasonable fees and expenses incurred by a trustee, if any, under section 726(b) of the Bankruptcy Code in an aggregate amount not exceeding $25,000 (the amounts in these clauses (a) and (b), the "Statutory Fees"); (c) subject in all cases to the Approved Budget, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees, disbursements, costs, and expenses (including any restructuring, sale, success, or other transaction fee allowed and payable by the Debtors to Seabury Aviation Partners pursuant to that certain engagement letter dated December 19, 2025, and excluding any restructuring, sale, success, or other transaction fee of any other investment bankers or financial advisors retained by the Debtors or the Committee (if any)) (the "Professional Fees") incurred by persons or firms retained by the Debtors or the Committee pursuant to section 327, 328, 363, or 1103 of the Bankruptcy Code (the "Professional Persons") at any time before or on the first business day following delivery by the Required DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders) of a Carve-Out Trigger Notice (as defined below); and (d) Professional Fees of the Debtors not to exceed $150,000 and Professional Fees of the Committee (if any) not to exceed $50,000, in each case incurred after the first business day following delivery by the Required DIP

Lenders or the DIP Agent (at the direction of the Required DIP Lenders) of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (d) being the "Post-Carve-Out Trigger Notice Cap"). For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Required DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders) to the Debtors, their lead restructuring counsel, the U.S. Trustee, and lead restructuring counsel to the Committee (if any), which notice may be delivered, at the direction of the Required DIP Lenders, following the occurrence and during the continuation of an Event of Default, stating that the Post-Carve-Out Trigger Notice Cap has been invoked. No portion of the Carve-Out, any Cash Collateral, any other DIP Collateral, or any proceeds of the DIP Facility, including any disbursements set forth in the Approved Budget or obligations benefitting from the Carve-Out, shall be used for the payment of Professional Fees, disbursements, costs, or expenses incurred by any person, including, without limitation, any Committee, in connection with challenging the DIP Secured Parties' or the Prepetition Term Loan Secured Parties' liens or claims, preventing, hindering, or delaying any of the DIP Secured Parties' or the Prepetition Term Loan Secured Parties' enforcement or realization upon any of the DIP Collateral or the Prepetition Term Loan Collateral, or initiating or prosecuting any claim or action against any DIP Secured Party or Prepetition Term Loan Secured Party; *provided that*, notwithstanding anything herein to the contrary, proceeds from the DIP Facility or Cash Collateral not to exceed $25,000 in the aggregate (the "Investigation Budget") may be used on account of Professional Fees incurred by Professional Persons of the Committee (if any) during the Challenge Period (as defined below) in connection with the investigation of avoidance actions or any other claims or causes of action (but not the prosecution of such actions) on account of the Prepetition Term Loan

Obligations, the Prepetition Term Loan Liens, and Prepetition Term Loan Secured Parties (but not the DIP Facility and DIP Secured Parties).

(ii)    <u>Professional Fee Reserve</u>.  Prior to the delivery of the Carve-Out Trigger Notice, on a weekly basis, the Debtors shall fund from the DIP Facility or cash on hand, into a trust account of the Debtors' lead counsel (the "<u>Funded Reserve Account</u>") held for the benefit of Professional Persons, an amount equal to the aggregate amount of the estimated accrued fees of Professional Persons based on and subject in all cases to the Approved Budget, to the extent remaining unpaid as of the Friday of the preceding week (and not previously funded to the Funded Reserve Account).  Upon the delivery of the Carve-Out Trigger Notice, the Carve-Out Trigger Notice shall (a) be deemed a request by the Debtors to use DIP Loans or Cash Collateral, in an amount equal to (i) the sum of the aggregate unpaid amount of the total budgeted weekly fees of Professional Persons incurred before or on the first business day following delivery by the Required DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders) of a Carve-Out Trigger Notice (to the extent not previously funded to the Funded Reserve Account) based on and subject in all cases to the Approved Budget, and (ii) the Post-Carve-Out Trigger Notice Cap (less any amounts already funded into the Funded Reserve Account in respect of such amounts) (any such amounts actually advanced shall constitute DIP Loans); and (b) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the amounts set forth in clauses (a)(i) and (ii) (less any amounts already funded into the Funded Reserve Account in respect of such amounts).  For the avoidance of doubt, in no event shall any DIP Lender be required to fund any amount in excess of its then-outstanding commitments under the DIP Facility.

(iii)    The Debtors shall use funds held in the Funded Reserve Account exclusively to pay Professional Fees included within the Carve-Out as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any interim or final orders of the Court; *provided that* when all Professional Fees and the other obligations that are a part of the Carve-Out have been paid in full (regardless of when such Professional Fees are allowed by the Court), any funds remaining in the Funded Reserve Account shall revert to the DIP Agent for the benefit of the DIP Secured Parties. Funds transferred to the Funded Reserve Account shall be subject to the DIP Liens, DIP Superpriority Claims, Term Loan Replacement Liens, and Term Loan Adequate Protection Superpriority Claims granted hereunder; *provided* that, for the avoidance of doubt, such liens and claims shall be subject in all respects to the Carve-Out.

(iv)    Notwithstanding anything to the contrary in the DIP Documents, this Interim Order, or any other Court order, the Funded Reserve Account and the amounts on deposit in the Funded Reserve Account shall be available and used only to satisfy Professional Fees benefitting from the Carve-Out and the other obligations that are a part of the Carve-Out until such amounts have been satisfied in full. The failure of the Funded Reserve Account to satisfy Professional Fees in full shall not affect the priority of the Carve-Out; *provided* that, to the extent that the Funded Reserve Account is actually funded, the Carve-Out shall be reduced by such funded amount on a dollar-for-dollar basis.

(v)    No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees. None of the DIP Secured Parties or Prepetition Term Loan Secured Parties shall be responsible for the direct payment or reimbursement of any fees or disbursements of any of the Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be

construed to obligate any of the DIP Secured Parties or Prepetition Term Loan Secured Parties in any way to compensate, or to reimburse expenses of, any of the Professional Persons, or to guarantee that the Debtors or their Estates have sufficient funds to pay such compensation or reimbursement.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any Committee, any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of any party to object to the allowance and payment of any such fees and expenses.

36.     <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>.  The DIP Secured Parties and the Prepetition Term Loan Secured Parties have acted in good faith in connection with this Interim Order and are entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, the DIP Secured Parties and Prepetition Term Loan Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code.   Any such modification, amendment, or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim, or priority authorized or created hereby.

37.     <u>Approval of DIP Fees</u>.  In consideration for the DIP Facility and the consent to the use of Cash Collateral in accordance with the terms of this Interim Order, the DIP Secured Parties shall be paid all fees, expenses, and other amounts payable under the DIP Documents as such become due, including, without limitation, the Upfront Fee and the Exit Fee (subject to entry of the Final Order, solely with respect to the Exit Fee), and all reasonable and documented fees, costs,

and expenses, including legal fees of the DIP Agent (limited to one lead counsel and one local counsel) and the DIP Lenders, financial advisor fees of the DIP Lenders, and similar fees, costs, and expenses of the DIP Lenders incurred in connection with the DIP Facility and the Chapter 11 Cases, including, without limitation, the reasonable and documented fees, costs, and expenses of (a) counsel to the DIP Lenders (limited to one lead counsel and one local counsel), and (b) specialty or local counsel to the DIP Lenders in each relevant jurisdiction (all such fees, collectively, the "DIP Fees").  The DIP Fees shall be fully earned and payable in accordance with the terms of the DIP Documents, without the need for any further order of this Court.  The DIP Fees shall be part of the DIP Obligations.  Any and all DIP Fees paid prior to the Petition Date by any of the Debtors to the DIP Secured Parties in connection with or with respect to the DIP Facility in each case are hereby approved in full.

38.    Lender Professionals' Fees.  Professionals for the DIP Secured Parties (the "DIP Professionals") and professionals for the Prepetition Term Loan Secured Parties (the "Prepetition Term Loan Professionals" and together with the DIP Professionals, the "Lender Professionals") shall not be required to comply with the U.S. Trustee fee guidelines or file applications or motions with, or obtain approval of, this Court for compensation and reimbursement of fees and expenses. The Lender Professionals shall submit copies of summary invoices (which may be redacted to the extent necessary to protect any information subject to attorney-client privilege, attorney work product, or other applicable privilege) to counsel for the Debtors, the U.S. Trustee, and counsel for any Committee.  The summary invoices shall provide only the total aggregate number of hours billed and a summary description of services provided and the expenses incurred by the applicable party or professionals, and shall be subject to all applicable privilege and work product doctrines. If the Debtors, U.S. Trustee, or any Committee objects to the reasonableness of the fees and

expenses of any Lender Professional and cannot resolve such objection within fourteen (14) days after receipt of such invoices, then the Debtors, U.S. Trustee, or the Committee, as the case may be, shall file with this Court and serve on such Lender Professional an objection (the "Fee Objection"), and any failure by any such party to file a Fee Objection within such fourteen (14) day period shall constitute a waiver of any right of such party to object to the applicable invoice. Notwithstanding any provision herein to the contrary, any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth in a professional fee invoice in respect of the Lender Professionals shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection. The Debtors shall timely pay in accordance with the terms and conditions of this Interim Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed, and (b) all fees, costs, and expenses on any invoice to which no Fee Objection has been timely filed.

39.   Indemnification.  The Debtors shall indemnify and hold harmless the DIP Secured Parties, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees past, present, and future (solely in their respective capacities as such), and their respective heirs, predecessors, successors, and assigns in accordance with, and subject to, the terms and conditions of this Interim Order and the DIP Documents except to the extent resulting solely from such party's actual fraud or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction.

40.     <u>Right to Credit Bid</u>.  Subject to entry of the Final Order, in connection with any sale or other disposition of the DIP Collateral or Prepetition Term Loan Collateral including any sales occurring under or pursuant to section 363 of the Bankruptcy Code, any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code (any of the foregoing sales or dispositions, a "<u>Sale</u>"), the DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition Term Loan Agent (at the direction of the Required Lenders (as defined in the Prepetition Credit Agreement)) shall be authorized subject to section 363(k) of the Bankruptcy Code to credit bid on a dollar-for-dollar basis any or all of the full amount of the respective outstanding DIP Obligations (including the Roll-Up Obligations) and Prepetition Term Loan Obligations (and any other applicable obligations) up to the full amount of the DIP Obligations and Prepetition Term Loan Obligations (and any other applicable obligations held by the DIP Lenders and Prepetition Term Loan Secured Parties), respectively, including any accrued interest, expenses, and fees, in a Sale (including any deposit in connection with such sale) of any DIP Collateral or Prepetition Term Loan Collateral, whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, without the need for further court authorization.  The DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition Term Loan Agent (at the direction of the Required Lenders (as defined in the Prepetition Credit Agreement)) shall each have the absolute right to assign, transfer, sell, or otherwise dispose of their respective rights to credit bid to any acquisition vehicle formed in connection with such bid or other designee.

41.     <u>Proofs of Claim</u>.  Neither the DIP Secured Parties nor the Prepetition Term Loan Secured Parties will be required to file proofs of claim in any of the Chapter 11 Cases or Successor

Cases for any claim arising under the DIP Documents or the Prepetition Term Loan Documents, including any claim for adequate protection by the Prepetition Term Loan Secured Parties. The Debtors' stipulations, admissions, and acknowledgments and the provisions of this Interim Order shall be deemed to constitute timely filed proofs of claim for the DIP Secured Parties and the Prepetition Term Loan Secured Parties with regard to all claims arising under the DIP Documents and the Prepetition Term Loan Documents, and, as a result, the DIP Obligations and the Prepetition Term Loan Obligations shall be deemed allowed for all purposes in accordance with section 502(a) of the Bankruptcy Code.

42.     <u>Limitations on Use of DIP Proceeds, Cash Collateral, and Carve-Out</u>.  Except as otherwise permitted in this Interim Order and the Approved Budget (including with respect to the Investigation Budget), the DIP Collateral, the Prepetition Term Loan Collateral, the Cash Collateral, and the Carve-Out may not be used in connection with: (a) preventing, hindering, or delaying the DIP Secured Parties or the Prepetition Term Loan Secured Parties' enforcement or realization upon any of the DIP Collateral or Prepetition Term Loan Collateral; (b) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral outside the ordinary course of business without the prior written consent of the Required DIP Lenders; (c) outside the ordinary course of business, using or seeking to use any insurance proceeds constituting DIP Collateral without the prior written consent of the Required DIP Lenders; (d) incurring any indebtedness without the prior written consent of the Required DIP Lenders; (e) seeking to amend or modify any of the rights granted to the DIP Secured Parties or the Prepetition Term Loan Secured Parties under this Interim Order, the DIP Documents, or the Prepetition Term Loan Documents; (f) objecting to or challenging in any way the DIP Liens, the DIP Obligations, the Prepetition Term Loan Liens, the Prepetition Term Loan Obligations, the DIP Collateral (including

Cash Collateral) or, as the case may be, Prepetition Term Loan Collateral, or any other claims or liens, held by or on behalf of any of the DIP Secured Parties or the Prepetition Term Loan Secured Parties, respectively; (g) asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, applicable state law equivalents, any so-called "lender liability" claims and causes of action, or other actions to recover or disgorge payments against the DIP Secured Parties, the Prepetition Term Loan Secured Parties, or any of their respective affiliates, successors, and assigns and their partners, shareholders, controlling persons, directors, officers, employees, agents, attorneys, advisors, and professionals; (h) litigating, objecting to, challenging, contesting in any manner, or raising any defenses to the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Prepetition Term Loan Liens, the Prepetition Term Loan Obligations, or any other rights or interests of the DIP Secured Parties or the Prepetition Term Loan Secured Parties; or (i) seeking to Challenge (as defined below), subordinate, recharacterize, disallow, or avoid the DIP Obligations or the Prepetition Term Loan Obligations.

43.    _Turnover_.    Prior to the indefeasible payment in full in cash and the complete satisfaction of all DIP Obligations and termination of the commitments in accordance with the DIP Documents, any party who holds a lien or security interest in DIP Collateral that is junior or subordinate to the DIP Liens or a claim that is subordinate to the DIP Superpriority Claims (including any of the Prepetition Term Loan Secured Parties) receives or is paid the proceeds of any DIP Collateral other than as expressly permitted in the DIP Documents and this Interim Order (whether in connection with the exercise of any right or remedy (including setoff), payment or distribution from the Debtors, mistake or otherwise), such party shall be deemed to have received, and shall hold, such proceeds or payments in trust for the DIP Secured Parties and shall

immediately turn over such amounts to the DIP Agent, in the same form as received, with any necessary endorsements, for distribution to the DIP Lenders to repay the DIP Obligations in accordance with the DIP Documents and this Interim Order until indefeasibly paid in full in cash.

44.     <u>Effect of Stipulations on Third Parties</u>.  The Debtors' Stipulations contained in paragraph G and releases in paragraph I hereof (the "<u>Debtors' Releases</u>") shall be binding in all circumstances upon the Debtors upon entry of this Interim Order, and upon their Estates and any successor thereto in all circumstances for all purposes immediately upon the Challenge Period Termination Date (as defined below).  The Debtors' Stipulations and Debtors' Releases shall be binding upon each other party-in-interest, including a Committee (and each member of such Committee), except to the extent such party in interest *first* obtains standing (including any chapter 11 trustee or if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period, the chapter 7 trustee in such Successor Case), by no later than the date that is the earlier of (x) subject to entry of the Final Order, one business day before the hearing to consider approval of a sale of all or substantially all of the Debtors' assets, and (y) seventy-five (75) calendar days following the date of entry of this Interim Order (such time period established by the earlier of clauses (x) and (y) or as such period may be extended with the prior written consent of the Required Lenders (as that term is defined in the Prepetition Credit Agreement) shall be referred to as the "<u>Challenge Period</u>," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly file a contested matter, adversary proceeding, or other matter challenging or otherwise objecting to the admissions, stipulations, findings, or releases set forth in this Interim Order, including the Debtors' Stipulations and the Debtors' Releases (each, a "<u>Challenge</u>"), such Challenge is fully and

finally adjudicated, with the applicable date established by clauses (i) and (ii), the "Challenge Period Termination Date"), and *second* obtains a final, non-appealable order in favor of such party-in-interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "Successful Challenge").  The filing of a motion by any Committee seeking standing to file a Challenge before expiration of the Challenge Period, which attaches a proposed Challenge, shall extend the Challenge Period solely with respect to such Committee until two (2) business days after the Court approves the standing motion, or such other time period ordered by the Court in approving the standing motion and solely with respect to the Challenges asserted in the complaint.  Except as otherwise expressly provided herein, from and after the Challenge Period Termination Date and for all purposes in these Chapter 11 Cases and any Successor Cases (and after the dismissal of these Chapter 11 Cases or any Successor Cases), and without further notice, motion, or application to, order of, or hearing before this Court, (i) any and all payments made to or for the benefit of the Prepetition Term Loan Secured Parties or otherwise authorized by this Interim Order (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, setoff, subordination, recharacterization, defense, disallowance, recovery, or avoidance by any party in interest, (ii) any and all such Challenges by any party-in-interest shall be deemed to be forever released, waived, and barred, (iii) all of the Prepetition Term Loan Obligations shall be deemed to be fully allowed claims within the meaning of section 506 of the Bankruptcy Code, and (iv) the Debtors' Stipulations and Debtors' Releases shall be binding on all parties in interest in these Chapter 11 Cases and any Successor Cases, including any Committee or chapter 11 or chapter 7 trustee; *provided* that any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors in these Chapter 11 Cases or any

Successor Cases before expiration of the Challenge Period shall not be bound by the Stipulations until 10 days after such trustee's appointment or election.  Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors' Stipulations, the Debtors' Releases, and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee (including the members thereof) and on any other party-in-interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations, Debtors' Releases, or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge; *provided* that all other stipulations and releases (other than those subject to a Successful Challenge) shall remain binding on any Committee (including the members thereof) and all other parties in interest.  Notwithstanding any provision to the contrary herein, nothing in this Interim Order shall be construed to grant standing on any party in interest, including any Committee, to bring any Challenge on behalf of the Debtors' Estates.  The failure of any party in interest, including any Committee, to obtain an order of this Court prior to the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' Estates shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date as required under this paragraph 44 or to require or permit an extension of the Challenge Period Termination Date.  To the extent any such Challenge is timely and properly commenced, the Prepetition Term Loan Agent and any other Prepetition Term Loan Secured Party shall be entitled to payment of the related costs and expenses, including but not limited to reasonable attorneys' fees, incurred in defending themselves and the other Prepetition Term Loan Secured Parties in any such proceeding as adequate protection, except if a Challenge results in a determination that any part of the Prepetition Term Loan Liens are invalid.  Notwithstanding

anything to the contrary herein, Challenges may be brought against the Roll-Up Obligations prior to the Challenge Period Termination Date, and the Court may order appropriate relief in the event of any Successful Challenge to the Roll-Up Obligations. Nothing herein shall limit the Committee's (or other party in interest's) ability to (x) file a motion in respect of any timely Challenge for which it may not be able to obtain standing as a matter of law because the applicable Debtor is a limited liability company (an "LLC Challenge Motion"), and (y) seek pursuant to such LLC Challenge Motion a mechanism by which to prosecute such Challenge. In the event the Committee or other party in interest files an LLC Challenge Motion for which it may not be able to obtain standing, the expiration of the Challenge Period solely for the specific Challenge set forth in the LLC Challenge Motion shall be tolled pending further order of the Court, and applicable parties shall meet and confer with respect to an appropriate process for the prosecution of any such Challenge.

45.    No Third-Party Rights.  Except as explicitly provided for herein or in any of the DIP Documents, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or direct, indirect, or incidental beneficiary.

46.    No Lender Liability.  In determining to make any loan (whether under the DIP Documents or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents or taking any other act permitted under this Interim Order and the DIP Documents, none of the DIP Secured Parties or Prepetition Term Loan Secured Parties shall (i) be considered or deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the *United States Comprehensive Environmental Response, Compensation and*

*Liability Act*, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal, state, or local statute or regulation), (ii) shall be considered or deemed to be a joint employer with any of the Debtors, or (iii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates. Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or the Prepetition Term Loan Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

47.    <u>Section 506(c) Claims</u>.  Subject to entry of the Final Order and the provisions of the Carve-Out and as a further condition of the DIP Facility and any obligation of the DIP Lenders to make credit extensions pursuant to the DIP Documents (and the prior written consent of the DIP Secured Parties to the payment of the Carve-Out to the extent provided herein and the prior written consent of the Prepetition Term Loan Secured Parties of the priming of the Prepetition Term Loan Liens by the DIP Facility and the use of Cash Collateral): (a) no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases shall be charged against or recovered from or against any or all of the DIP Secured Parties or the Prepetition Term Loan Secured Parties with respect to the DIP Collateral or the Prepetition Term Loan Collateral, in each case pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Secured Parties or the Prepetition Term Loan Secured Parties, as applicable; and (b) no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties or the Prepetition Term Loan Secured Parties.

48.    <u>No Marshaling</u>.  Subject to entry of the Final Order, the DIP Secured Parties and the Prepetition Term Loan Secured Parties shall not be subject to the equitable doctrine of

"marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Term Loan Collateral, as applicable.

49.     <u>Section 552(b)</u>.  Subject to entry of the Final Order, the DIP Secured Parties and the Prepetition Term Loan Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties or the Prepetition Term Loan Secured Parties, as applicable, with respect to proceeds, product, offspring, or profits of any of the DIP Collateral or Prepetition Term Loan Collateral, as applicable.

50.     <u>Limitation on Liability</u>.  Nothing in this Interim Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or Prepetition Term Loan Secured Parties any liability for any claims arising from the prepetition or postpetition activities of the Debtors, including with respect to the operation of their businesses, in connection with their restructuring efforts or administration of these Chapter 11 Cases.  In addition: (a) the DIP Secured Parties shall not in any way or manner be liable or responsible for (i) the safe-keeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any Diminution thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person; and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.

51.     <u>Release of DIP Secured Parties</u>.  Upon entry of this Interim Order, the Debtors, on their own behalf and on behalf of their Estates, forever and irrevocably: (i) release, discharge, and acquit each of the DIP Secured Parties and each of their former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors-in-

interest (solely in their respective capacities as such) of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation and entry into the DIP Documents; and (ii) waive, discharge, and release any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations.

52.    <u>Insurance Proceeds and Policies</u>.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent (for the benefit of the DIP Secured Parties) shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

53.    <u>Binding Effect of Interim Order</u>.  Immediately upon entry of this Interim Order by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Secured Parties, the Prepetition Term Loan Secured Parties, all other creditors of any of the Debtors, any Committee (or any other court appointed committee) appointed in the Chapter 11 Cases, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case.

54.    <u>Discharge</u>.  Except as otherwise agreed in writing by the Required DIP Lenders (or the DIP Agent (acting at the direction of the Required DIP Lenders)) and the Prepetition Term Loan Agent (acting at the direction of the Required Lenders, as that term is defined in the

Prepetition Credit Agreement), the DIP Obligations and the obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash (and, in the case of DIP Obligations, indefeasibly paid in full as provided by the DIP Documents (including by credit bid)), on or before the effective date of such confirmed plan of reorganization. If any of the Debtors propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment (including by credit bid) of the DIP Obligations, and the payment of the Debtors' obligations with respect to the adequate protection provided for herein, in full in cash within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization or sale) (a "Non-Consensual Plan or Sale") without the prior written consent of the Required DIP Lenders or the DIP Agent (acting at the direction of the Required DIP Lenders) and the Prepetition Term Loan Agent (acting at the direction of the Required Lenders (as defined in the Prepetition Credit Agreement)), the Debtors' proposal or support of a Non-Consensual Plan or Sale, or the entry of an order with respect thereto, shall constitute an Event of Default hereunder and under the DIP Documents.

55.     Joint and Several.  The Debtors shall be jointly and severally liable for the DIP Obligations and all other obligations hereunder in accordance with the terms of this Interim Order and the DIP Documents.

56.     Survival.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of

reorganization or liquidation in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Chapter 11 Cases or Successor Cases.  The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the DIP Secured Parties and the Prepetition Term Loan Secured Parties pursuant to this Interim Order and the DIP Documents, shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until: (i) in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP Documents and this Interim Order, have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility are terminated; and (ii) in respect of the Prepetition Term Loan Facility, all of the Prepetition Term Loan Obligations pursuant to the Prepetition Term Loan Documents and this Interim Order have been indefeasibly paid in full in cash.  The terms and provisions concerning the indemnification of the DIP Secured Parties shall continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of the Chapter 11 Cases or any Successor Cases, and following termination of the DIP Documents or the indefeasible repayment of the DIP Obligations.  In addition, the terms and provisions of this Interim Order shall continue in full force and effect for the benefit of the Prepetition Term Loan Secured Parties notwithstanding the repayment in full or termination of the DIP Obligations until such time as the Prepetition Term Loan Obligations have been indefeasibly paid in full in cash.

57.    <u>Priority of Terms</u>.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Documents, the Motion, or the Cash Management Motion, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as set forth in" any of the DIP Documents, the Prepetition Credit Agreement, or other agreement or document, the terms and provisions of this Interim Order shall govern.

58.    <u>Final Hearing</u>.  **The Final Hearing on the Motion shall be held on [_____], 2026, at [__]:00 [__].m. (Eastern Time)**; *provided that* the Final Hearing may be adjourned or otherwise postponed upon the Debtors filing a notice of such adjournment with the written consent of the DIP Agent (acting at the direction of the Required DIP Lenders).  The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court.  **Any objections or responses to entry of the Final Order must be filed with the Court on or before 4:00 p.m. (Eastern Time) on [_____], 2026** and served on the following parties: (i) the Debtors, Avenger Flight Group, LLC, 1450 Lee Wagener Blvd., Fort Lauderdale, FL 33315 (Attn: Chief Financial Officer); (ii) proposed counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19801 (Attn: Richard M. Pachulski (rpachulski@pszjlaw.com), Gregory V. Demo (gdemo@pszjlaw.com), and Mary F. Caloway (mcaloway@pszjlaw.com)); (iii) the U.S. Trustee, J. Caleb Boggs Federal Building, 844 King Street, Room 2207, Wilmington, Delaware 19801 (Attn: Jonathan W. Lipshie (Jon.Lipshie@usdoj.gov)); (iv) counsel to the DIP Lenders, (a) Proskauer Rose LLP, Eleven Times Square, New York, New York 10036 (Attn: David M. Hillman (dhillman@proskauer.com) and Matthew R. Koch (mkoch@proskauer.com)),

and (b) Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, Delaware 19801 (Attn: Matthew B. McGuire (mcguire@lrclaw.com)); (v) counsel to the DIP Agent, Alston & Bird LLP, 90 Park Avenue, New York, New York 10016 (Attn: William Hao (william.hao@alston.com) and Dylan S. Cassidy (dylan.cassidy@alston.com); and (vi) counsel to any statutory committee appointed in these Chapter 11 Cases. If no objections to entry of the Final Order are timely received, the Court may enter the Final Order without the need for the Final Hearing.

59.     _Necessary Action_. The Debtors are authorized to take any and all such actions and to make, execute, and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Interim Order and the transactions contemplated hereby.

60.     _Enforceability_. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules, any applicable Local Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

61.     _Headings_. The headings in this Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Interim Order.

62.     _Retention of Jurisdiction_. This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

## EXHIBIT A

(DIP Term Sheet)

*Execution Version*

# AVENGER FLIGHT GROUP, LLC

## Senior Secured Superpriority DIP Financing Term Sheet

THIS TERM SHEET (INCLUDING ALL SCHEDULES, ANNEXES AND EXHIBITS HERETO, THE "TERM SHEET") DESCRIBES THE PRINCIPAL TERMS AND CONDITIONS OF A PROPOSED SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT FACILITY TO BE PROVIDED BY THE DIP LENDERS (AS DEFINED BELOW) TO AVENGER FLIGHT GROUP, LLC (THE "BORROWER") IN CONNECTION WITH THE CASES (THE "CHAPTER 11 CASES") FILED BY THE BORROWER AND CERTAIN OF ITS DIRECT AND INDIRECT SUBSIDIARIES (COLLECTIVELY, THE "DEBTORS" OR THE "COMPANIES") IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "BANKRUPTCY COURT") PURSUANT TO CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (AS AMENDED, THE "BANKRUPTCY CODE") ON FEBRUARY 11, 2026 (THE "PETITION DATE"). THE DIP FACILITY (AS DEFINED BELOW) IS BEING PROVIDED BY THE DIP LENDERS IN RELIANCE UPON THE PROSECUTION AND CONSUMMATION OF THE 363 SALE PROCESS (AS DEFINED BELOW).

THIS TERM SHEET IS BEING PROVIDED ON A CONFIDENTIAL BASIS AND IT, ALONG WITH ITS CONTENTS AND EXISTENCE, MAY NOT BE DISTRIBUTED, DISCLOSED, OR DISCUSSED WITH ANY OTHER PARTY BUT MAY BE FILED WITH THE BANKRUPTCY COURT IN CONNECTION WITH THE CHAPTER 11 CASES. THIS TERM SHEET IS NOT AN OFFER FOR THE PURCHASE, SALE, OR SUBSCRIPTION OR INVITATION OF ANY OFFER TO BUY, SELL, OR TO SUBSCRIBE FOR ANY SECURITIES. THE TERMS AND CONDITIONS SET FORTH IN THIS TERM SHEET DO NOT CONSTITUTE OR CREATE AN AGREEMENT, OBLIGATION, OR COMMITMENT OF ANY KIND BY OR ON BEHALF OF ANY PARTY, UNLESS AND UNTIL THE INTERIM ORDER (AS DEFINED BELOW) IS ENTERED IN THE CHAPTER 11 CASES BY THE BANKRUPTCY COURT.

| | |
|---|---|
| *Borrower:* | Avenger Flight Group, LLC, as debtor and debtor-in-possession under the Bankruptcy Code. |
| *Guarantors:* | Each of (a) the other Credit Parties (as defined in the Prepetition Credit Agreement (as defined below)), (b) any other subsidiary or affiliate of the Borrower that has commenced a bankruptcy case related to the Chapter 11 Cases, and (c) any other subsidiary of the Borrower, currently party to the Prepetition Credit Agreement (collectively, the "Guarantors" and, together with the Borrower, the "DIP Loan Parties").[1] |
| *Prepetition Credit Agreement:* | The Borrower is a party to that certain Credit Agreement, dated as of June 25, 2021 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Credit Agreement")[2], by and |

---

[1]  The Guarantors shall include: Avenger Flight Group Topco, LLC, AFG Dallas, LLC, AFG Dallas III, LLC, AFG Dallas IV, LLC, AFG Orlando, LLC, AFG Sanford, LLC, Avenger Flight Training, LLC, PAPI Flight Training, LLC, AFG FLL, LLC, AFG Sim Holding Corp., AFG EU Operations Corp., Avenger Flight Group Europe, Corp., AFG LATAM Holding Corp., AFG Latam SIM Holdings, LLC, AFG Latam SIM Holding III, LLC, AFG Latam SIM Holdings IV, LLC, AFG Mexico Corp., Avenger Flight Group Mexico II, S. de R.L. de C.V., AFG Latam, LLC, and AFG Latam SIM Holdings II, LLC.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Prepetition Credit Agreement.

among, *inter alia*, the Borrower, Avenger Flight Group Topco, LLC ("Holdings"), together with certain subsidiaries of Holdings, as guarantors, the lenders from time to time party thereto (the "Prepetition Term Loan Lenders"), and Wilmington Trust, National Association, as Administrative Agent and Collateral Agent (the "Prepetition Agent" and, together with the Prepetition Term Loan Lenders, the "Prepetition Secured Parties"). The debt facilities outstanding under the Prepetition Credit Agreement consist of (a) First Out Term Loans in an aggregate principal amount of not less than $149,275,017.35 (together with all accrued and unpaid interest, fees, expenses and other amounts), (b) Sixteenth Amendment Incremental Term Loans in an aggregate principal amount of not less than $2,208,720.84 (together with all accrued and unpaid interest, fees, expenses and other amounts) and (c) Second Out Term Loans in an aggregate principal amount of not less than $121,567,749.92 (together with all accrued and unpaid interest, fees, expenses and other amounts) (collectively, the "Prepetition Term Loans"). The Prepetition Term Loans include not less than $8,013,535.57 in principal amount outstanding as of the Petition Date of bridge financing provided in September and December 2025 (together with all accrued and unpaid interest, fees, expenses and other amounts) (collectively, the "Bridge Loans").

| | |
|---|---|
| *DIP Facility:* | A senior secured superpriority debtor-in-possession multi-draw term loan credit facility (the "DIP Facility" and the obligations thereunder, the "DIP Obligations"), consisting of (a) new money commitments in an aggregate principal amount of up to $14,500,000 (the "DIP Term Loan Commitments" and the loans pursuant thereto, the "DIP Term Loans"), of which up to $8,000,000 of the DIP Term Loan Commitments shall be funded upon or following entry of the interim order approving the DIP Facility, which order shall be satisfactory to the Required DIP Lenders (as defined below) (the "Interim Order"), and the remainder of the DIP Term Loan Commitments being funded upon or following entry of the final order approving the DIP Facility, which order shall be satisfactory to the Required DIP Lenders (the "Final Order", and together with the Interim Order, the "DIP Orders"), (b) immediately upon entry of the Interim Order, a deemed "roll-up" on a cashless basis of $6,000,000 of the Bridge Loans held by the DIP Lenders (or their affiliates) on a *pro rata* basis according to their DIP Term Loan Commitments, in each case, to be deemed incurred as of the date of entry of the Interim Order (the "Interim Roll-Up Loans" and the obligations thereunder, the "Interim Roll-Up Obligations"), and (c) immediately upon entry of the Final Order, a deemed "roll-up" on a cashless basis of an additional $23,000,000 of the Prepetition Term Loans held by the DIP Lenders (or their affiliates) on a *pro rata* basis according to their DIP Term Loan Commitments, in each case, to be deemed incurred as of the date of entry of the Final Order (the "Final Roll-Up Loans" and together with the Interim Roll-Up Loans, the "Roll-Up Loans" and the obligations thereunder, the "Final Roll-Up Obligations" and together with the Interim Roll-Up Obligations, the "Roll-Up Obligations"; the Roll-Up Loans, collectively with the DIP Term Loans, the "DIP Loans"); *provided* that after giving effect to the principal balance of all DIP Term Loans, the aggregate principal balance of all DIP Term Loans shall not exceed the DIP Term Loan Commitment; |

<table>
<tr>
<td></td>
<td>

*provided*, *further*, that no DIP Lender shall be obligated to make DIP Term Loans in an amount in excess of the portion of the DIP Term Loan Commitment set forth next to such DIP Lender's name in the table set forth on Exhibit A hereto.

The deemed proceeds of the Roll-Up Loans shall be applied on a cashless, dollar-for-dollar basis to refinance, exchange, and replace an amount of the Prepetition Term Loans held by the DIP Lenders (or their affiliates), with such refinancing occurring in the following order of priority: (i) *first*, to Obligations due in respect of the Sixteenth Amendment Incremental Term Loans, (ii) *second*, to Obligations due in respect of the Fifteenth Amendment Incremental Term Loans, (iii) *third*, to Obligations due in respect of the remaining First Out Term Loans, and (iv) *finally*, to Obligations due in respect of the Second Out Term Loans, in each of (i) through (iv) first to Obligations constituting accrued and unpaid interest and then to Obligations constituting unpaid principal.

The proceeds of the DIP Term Loans shall be funded into a deposit account of the Borrower. Such account shall be subject to the DIP Liens (as defined below) in favor of the DIP Agent, which shall be automatically perfected pursuant to the DIP Orders and shall be subject to a deposit account control agreement satisfactory to the DIP Agent if required by the DIP Agent (at the direction of the Required DIP Lenders (as defined below)).

</td>
</tr>
<tr>
<td>

*DIP Loan Documentation:*

</td>
<td>

At the option of the Required DIP Lenders (as defined below), the DIP Loan Parties shall execute definitive financing documentation with respect to the DIP Facility, including, without limitation, a credit agreement (the "<u>DIP Credit Agreement</u>"), guarantees and security documents, in each case, satisfactory in form and substance to the Required DIP Lenders and the DIP Loan Parties (collectively, the "<u>DIP Documents</u>"). The provisions of the DIP Documents shall, upon execution, supersede the provisions of this Term Sheet; *provided* that if the Required DIP Lenders determine not to require the DIP Loan Parties to execute DIP Documents, the provisions of this Term Sheet and the DIP Orders shall govern the DIP Facility. The provisions of the DIP Documents shall be consistent with this Term Sheet and the DIP Orders.

The DIP Credit Agreement shall contain representations and warranties, conditions precedent, affirmative and negative covenants, indemnities, events of default, and remedies in form and substance substantially similar to the Prepetition Credit Agreement (with such modifications as are (i) set forth herein, and (ii) usual and customary for DIP financings of this type). Other DIP Documents, such as transaction documents, subordination agreements, intercreditor agreements, and other material agreements, shall be, in each case, usual and customary for DIP financings of this type and in form and substance substantially similar to the applicable documents entered into in connection with the Prepetition Credit Agreement.

The definition of "<u>Required DIP Lenders</u>" (or any equivalent term with respect to the DIP Facility) shall refer to DIP Lenders (as defined below)

</td>
</tr>
</table>

3

| | |
|---|---|
| | holding at least a majority in principal amount of the outstanding DIP Loans and unfunded DIP Term Loan Commitments. |
| *DIP Lenders:* | The Prepetition Term Loan Lenders who elect to provide DIP Term Loan Commitments (the "<u>DIP Lenders</u>").  All Prepetition Term Loan Lenders (or their affiliates) will be offered the right to participate in the DIP Facility *pro rata* with their holdings under the Prepetition Credit Agreement. |
| *DIP Agent:* | Wilmington Trust, National Association (in such capacity, the "<u>DIP Agent</u>" and, together with the DIP Lenders, the "<u>DIP Secured Parties</u>").<br><br>In connection with the DIP Documents or the Term Sheet, as applicable, the DIP Agent shall be entitled to all of the rights, protections, immunities and indemnities set forth in **Exhibit C** hereto.<br><br>The DIP Agent may be removed or replaced in accordance with the terms set forth in Section 1.5 of **Exhibit C**. |
| *Interest Rate:* | <u>DIP Term Loans</u>: Term SOFR+ 9.00% per annum, compounded monthly, paid in kind.<br><br><u>Roll-Up Loans</u>: Term SOFR + 9.50% per annum, compounded monthly, paid in kind.<br><br>As soon as practicable after 10:00 a.m. (Eastern Standard Time) on each Interest Rate Determination Date, the DIP Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to each of the SOFR Loans for which an interest rate is then being determined and shall promptly give notice thereof in writing to the Borrower and each DIP Lender.<br><br>Interest payable shall be computed on the basis of a year of three hundred sixty (360) days, in each case for the actual number of days elapsed in the period during which it accrues.  In computing interest on any DIP Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan, as the case may be, shall be excluded; provided, if a Loan is repaid on the same day on which it is made, one (1) day's interest shall be paid on that Loan.<br><br>Interest on each DIP Loan shall accrue and shall be payable in kind by being capitalized to the principal balance of the DIP Loans on each Interest Payment Date.<br><br>Upon the expiration of any Interest Period applicable to any SOFR Loan, such SOFR Loan shall automatically continue as a SOFR Loan.<br><br>"<u>Business Day</u>" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close and when used in |

connection with a SOFR Loan, shall also be a U.S. Government Securities Business Day.

"Floor" means a rate of interest equal to 1.00%.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank and any group or body charged with setting financial accounting or regulatory capital rules or standards).

"Interest Payment Date" means (a) the last Business Day of each calendar month, commencing the first calendar month after entry of the Interim Order, and (b) the Maturity Date.

"Interest Period" means, in connection with a SOFR Loan, an interest period of one (1) month, commencing on the date the applicable DIP Loan is advanced or rolled-up in accordance with the DIP Orders; provided, that (i) the initial Interest Period for such SOFR Loan will run from the date the DIP Loan was made to the next succeeding Interest Payment Date, and each Interest Period thereafter will run for one (1) month, (ii) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day, (iii) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (iv) of this definition, end on the last Business Day of a calendar month, and (iv) no Interest Period shall extend beyond the Maturity Date.

"Interest Rate Determination Date" means, with respect to any Interest Period, the date that is two (2) Business Days prior to the first day of such Interest Period.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Loan" means a DIP Loan that bears interest at a rate based on Term SOFR.

"Term SOFR" means, for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business

| | |
|---|---|
| | Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; _provided_, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day; _provided_, further, that if Term SOFR as so determined shall ever be less than the Floor, then Term SOFR shall be deemed to be the Floor. |
| | "_Term SOFR Administrator_" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the DIP Agent in its reasonable discretion). |
| | "_Term SOFR Reference Rate_" means the forward-looking term rate based on SOFR. |
| | "_U.S. Government Securities Business Day_" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities. |
| _Default Rate:_ | At all times following the occurrence and during the continuance of an Event of Default and notice from the Required DIP Lenders to the Borrower and DIP Agent, principal, interest, and all other amounts due on the DIP Loans shall bear interest at a rate equal to 2.00% per annum in excess of the interest rate set forth under "Interest Rate" above. |
| _Mechanics for DIP Term Loans:_ | Amounts repaid on the DIP Term Loans may not be reborrowed. |
| | Whenever the Borrower desires that the DIP Lenders make a DIP Term Loan, the Borrower shall deliver to the DIP Agent a fully executed Funding Notice with respect to such DIP Term Loan, no later than 11:00 a.m. ET four (4) business days prior to the requested funding date for such draw (or such later time as the Required DIP Lenders and the DIP Agent may agree). Except as otherwise provided herein, any Funding Notice for any DIP Loans that are SOFR Loans shall be irrevocable on and after the related Interest Rate Determination Date, and the Borrower shall be bound to make a borrowing in accordance therewith. |
| | Notice of receipt of each Funding Notice in respect of each DIP Loan, together with the amount of each DIP Lender's DIP Term Loan Commitment percentage thereof and the applicable interest rate, shall be |

6

|  | provided by the DIP Agent to each applicable DIP Lender in writing with reasonable promptness. |
|  | Each DIP Lender shall make its DIP Term Loan Commitment percentage of the requested DIP Term Loan available to the DIP Agent not later than 11:00 a.m. on the applicable date the DIP Term Loan was requested to be made by wire transfer of same day funds in Dollars at the account designated by the DIP Agent in writing.  Except as provided herein, upon satisfaction or waiver of the applicable conditions precedent specified herein, the DIP Agent shall make the proceeds of such DIP Loan available to the Borrower on the applicable date by causing an amount of same day funds in Dollars equal to the proceeds of all DIP Loans received by the DIP Agent in connection with the DIP Loan borrowing from the DIP Lenders to be credited to the account of the Borrower. |
|  | "<u>Funding Notice</u>" means a notice in form and substance substantially similar to <u>Exhibit 2.1</u> of the Prepetition Credit Agreement (with such modifications as are (i) set forth herein, and (ii) usual and customary for DIP financings of this type). |
| *Security and Priority:* | The DIP Secured Parties shall be granted, pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected, post-petition first-priority security interests and liens (the "<u>DIP Liens</u>") on all tangible, intangible, real and personal property of the DIP Loan Parties (including, without limitation, all prepetition and post-petition property and assets of the DIP Loan Parties and all equity interests owned by the DIP Loan Parties), and all other property of the DIP Loan Parties of whatever kind, nature, or description, whether acquired or created prepetition or post-petition to secure the DIP Obligations, and the proceeds, rents, profits, and offspring of each of the foregoing (the "<u>DIP Collateral</u>"), other than contracts, leases and licenses solely to the extent a lien is not permitted by law to attach to such property, in which case the proceeds of such contracts, leases, and other licenses shall be DIP Collateral; *provided, however*, the DIP Liens shall be subject to validly perfected, enforceable, and non-avoidable liens existing as of the Petition Date to which the liens securing the obligations under the Prepetition Credit Agreement were subject or which are listed on a schedule to the DIP Orders (the "<u>Prepetition Permitted Liens</u>") and shall be in accordance with the relative lien priorities set forth in **Exhibit C** to the DIP Order (the "<u>Lien Priority Exhibit</u>"). |
|  | Notwithstanding the foregoing, the DIP Liens shall not extend to, and the DIP Collateral shall not consist of, avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents, but (subject to entry of the Final Order) shall include the proceeds therefrom ("<u>Avoidance Proceeds</u>"). |
|  | For the avoidance of doubt, the DIP Liens shall prime and be senior to the liens of the Prepetition Term Loan Lenders.  The DIP Liens granted under Section 364(d)(1) of the Bankruptcy Code shall not be *pari passu* with, or subordinated to, any other liens or security interests (whether currently |

| | |
|---|---|
| | existing or hereafter created), subject in each case only to the Carve-Out, the Prepetition Permitted Liens (if any), and the relative lien priorities set forth in the Lien Priority Exhibit.<br><br>All DIP Obligations shall also constitute allowed superpriority administrative expense claims (the "<u>Superpriority Claims</u>") in the Chapter 11 Cases and shall have priority over all other claims and administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.  However, the Superpriority Claims shall be subject to the Carve-Out (as defined below) and shall not be payable from Avoidance Proceeds pending entry of the Final Order.<br><br>The DIP Liens shall be effective and automatically perfected by the Interim Order and the Final Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements.    Notwithstanding the foregoing, the DIP Loan Parties shall take all action that may be reasonably necessary or desirable, or that the Required DIP Lenders or the DIP Agent may reasonably request, to at all times maintain the validity, perfection, enforceability, and priority of the security interests and liens of the DIP Agent in the DIP Collateral, or to enable the DIP Agent to protect, exercise, or enforce its rights hereunder, under the DIP Orders, and in the DIP Collateral. |
| *Carve-Out:* | The "Carve-Out" shall be, collectively: (a) all statutory fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee (the "<u>U.S. Trustee</u>") pursuant to 28 U.S.C. §1930(a), (b) all reasonable fees and expenses incurred by a trustee, if any, under section 726(b) of the Bankruptcy Code in an aggregate amount not exceeding $25,000, (c) subject in all cases to the Approved Budget (as defined below) and to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees, disbursements, costs, and expenses (including any restructuring, sale, success, or other transaction fee allowed and payable by the Debtors to Seabury Aviation Partners pursuant to that certain engagement letter dated December 19, 2025, and excluding any restructuring, sale, success, or other transaction fee of any other investment bankers or financial advisors retained by the Debtors or any official committee of unsecured creditors appointed in the Chapter 11 Cases (the "<u>UCC</u>") pursuant to section 327, 328, 363, or 1103 of the Bankruptcy Code at any time before or on the first business day following delivery by the Required DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders) of a Carve-Out Trigger Notice (as defined below), and (d) professional fees of the Debtors not to exceed $150,000 and professional fees of the UCC (if any) not to exceed $50,000, in each case incurred after the first business day following delivery by the Required DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders) of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise.<br><br>On a weekly basis, budgeted fees, costs and expenses of professionals retained by the Debtors and the UCC, if any, shall be funded into a |

| | |
|---|---|
| | segregated escrow account held in trust in an amount as set forth in the Approved Budget (the "<u>Professional Fee Reserve</u>").  Amounts funded into the Professional Fee Reserve shall be considered used by the Debtors at such time as they are deposited into the Professional Fee Reserve for distribution to professionals in accordance with orders of the Bankruptcy Court and the Approved Budget.    Any amounts remaining in the Professional Fee Reserve after payment of allowed fees and expenses in accordance with the Approved Budget shall be DIP Collateral.<br><br>"<u>Carve-Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the Required DIP Lenders) to the Debtors' lead counsel, the U.S. Trustee, and lead counsel to the UCC (if any), which notice may only be delivered following the occurrence and during the continuation of an event of default under the DIP Facility. |
| *Maturity Date:* | The earliest to occur of (a) the 90th day following the Petition Date, (b) the 30th day following the Petition Date if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (c) the date a sale of all or substantially all of the assets of the Debtors is consummated, (d) the termination of the Asset Purchase Agreement (as defined below) for a material breach thereof by any seller thereunder without the prior written consent of the Required DIP Lenders, (e) the effective date of a plan of reorganization or liquidation, (f) entry of an order by the Bankruptcy Court approving (i) a motion seeking conversion or dismissal of the Chapter 11 Cases or (ii) a motion seeking the appointment or election of a trustee, a responsible officer, or examiner with enlarged powers relating to the operation of the Debtors' business, and (g) the date any or all of the DIP Obligations are accelerated in accordance with the DIP Orders. |
| *Fees and Expenses; Indemnity:* | (i) An upfront fee of 2.00% on the principal amount of the DIP Term Loan Commitments (the "<u>Upfront Fee</u>") payable in kind; and (ii) an exit fee of 2.00% on the principal amount of the DIP Term Loan Commitments, payable on the Maturity Date, payable in kind (the "<u>Exit Fee</u>" and, together with the Upfront Fee, the "<u>DIP Financing Fees</u>").  The Borrower shall also pay to the DIP Agent, for its own account, the fees (the "<u>Agency Fees</u>") in the amounts and at the times set forth in that certain agency fee letter, dated as of the date hereof, between the Borrower and the DIP Agent.  The DIP Financing Fees and the Agency Fees shall be fully earned upon entry of the Interim Order.  The DIP Financing Fees shall be payable to each DIP Lender ratably.<br><br>The Debtors shall reimburse the DIP Agent and the DIP Lenders for reasonable and documented fees, costs and expenses incurred in connection with the DIP Facility and the Chapter 11 Cases, including, without limitation, the reasonable and documented fees, costs and expenses of (a) counsel to the DIP Agent (limited to one lead counsel and one local counsel), (b) counsel to the DIP Lenders (limited to one lead counsel and one local counsel for the DIP Lenders taken as a whole), (c) one financial advisor to the DIP Lenders taken as a whole, and (d) specialty or local counsel to the DIP Lenders taken as a whole in each |

| | |
|---|---|
| | relevant jurisdiction, whether incurred on a prepetition or postpetition basis, which shall be payable by Borrower within ten (10) days after notice thereof absent objection and without the requirement for Bankruptcy Court approval.  A copy of the summary invoice shall be provided to counsel to the Debtors, the U.S. Trustee, and counsel to the UCC, if any.<br><br>The Debtors shall indemnify and hold harmless the DIP Agent and each DIP Lender (and each of their respective directors, officers, members, employees, advisors and agents) against any loss, liability, cost, or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction).<br><br>No DIP Financing Fees shall be earned on account of any of the Roll-Up Loans. |
| *Releases* | The DIP Orders shall contain releases and exculpations for the DIP Agent, each DIP Lender, the Prepetition Agent, and the Prepetition Term Loan Lenders (in each case, in any capacity), in form and substance satisfactory to each such party, respectively, including, without limitation, releases from any avoidance actions, in each case subject to the challenge period for parties other than the DIP Loan Parties provided in the DIP Orders. |
| *Borrowing Conditions:* | The obligation of the DIP Lenders to fund DIP Term Loans shall be conditioned upon the satisfaction (or waiver in writing (email being sufficient) by the Required DIP Lenders) of the conditions precedent set forth below:<br><br>(i)  the Debtors shall have timely delivered to the DIP Lenders the Approved Budget or any update thereto required to be delivered in accordance with this Term Sheet and the DIP Orders and such other information (financial or otherwise) as may be reasonably requested by the Required DIP Lenders;<br><br>(ii) no Debtor has failed to disclose any material assumptions with respect to the Approved Budget;<br><br>(iii) the Debtors shall have delivered to the DIP Agent and the DIP Lenders a notice of borrowing in connection with such draw request no later than 11:00 a.m. ET four (4) business days prior to the requested funding date for such draw (or such later time as the Required DIP Lenders and the DIP Agent may agree);<br><br>(iv) the Interim Order or Final Order, as applicable, shall have been entered by the Bankruptcy Court in the Chapter 11 Cases (after a hearing on notice to all parties having or asserting a lien on all or any portion of the DIP Collateral), which Interim Order shall not have been reversed, modified, amended, stayed, vacated, or subject to a stay pending appeal, in each case, without the prior |

written consent of the Required DIP Lenders (email being sufficient) and the Debtors shall be in compliance in all respects with the Interim Order or Final Order, as applicable;

(v) each of the representations and warranties contained in the DIP Documents shall be true and correct in all material respects on and as of the date of such borrowing (other than any such representations and warranties that are made as of a specific date, which shall be true and correct in all material respects as of such date) (without duplication of any materiality qualifiers with respect to any such representation or warranty already qualified by materiality or Material Adverse Effect);

(vi) no default or event of default under the DIP Orders, this Term Sheet, or the DIP Documents shall have occurred and be continuing;

(vii) none of the Bankruptcy Cases shall have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

(viii) no trustee under chapter 7 or chapter 11 of the Bankruptcy Code shall have been appointed in any of the Bankruptcy Cases;

(ix) there has been no challenge to the rights, liens, or claims of any of the DIP Secured Parties or the Prepetition Secured Parties, nor has there been any reduction or adverse effect of the rights, liens, or claims of any of the DIP Secured Parties;

(x) the Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the "first day" motions, orders and related pleadings (including a cash management order encompassing the cash management arrangements currently in place under the Prepetition Credit Agreement) and all pleadings which relate to the DIP Facility shall have been reviewed in advance by each DIP Lender and shall be satisfactory in form and substance to Required DIP Lenders;

(xi) with respect to the DIP Term Loan Commitments being made available upon entry of the Final Order (the period during which such DIP Term Loan Commitments are being made available, hereinafter referred to as the "Final Availability Period"), the entry of the Final Order shall have occurred;

(xii) during the Final Availability Period, the Final Order and cash management order (each, as acceptable to the Required DIP Lenders) shall be in full force and effect and, with respect to each, shall not have been reversed, vacated, stayed, or subject to appeal, and shall not have been amended, restated, amended and restated, supplemented, or otherwise modified without the prior written consent of the Required DIP Lenders;

|  | (xiii) the Debtors shall be in compliance with the Interim Order and the Final Order, as applicable; |
|  | (xiv) the Required DIP Lenders shall be satisfied that the liens and security interests of the DIP Agent have been perfected in the DIP Collateral and shall constitute first-priority liens (subject only to the relative lien priorities set forth in the Lien Priority Exhibit); |
|  | (xv) the Debtors shall have insurance (including, without limitation, commercial general liability and property insurance) with respect to the DIP Collateral in such amounts and scope as is reasonably acceptable to the Required DIP Lenders (which shall be deemed satisfied if such insurance as required by the Prepetition Credit Agreement remains in place); |
|  | (xvi) upon entry of the Interim Order, the entry into this Term Sheet shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently; |
|  | (xvii) the DIP Lenders shall have received a copy of the fully-executed Asset Purchase Agreement (as defined below), which shall be in form and substance consistent with the terms hereof and otherwise acceptable to the Required DIP Lenders; and |
|  | (xviii) all applicable Milestones that are required to be complied with prior to or concurrently with the entry of the Interim Order or the Final Order, as applicable, and each draw shall have been complied with (or waived in writing (email being sufficient) by the Required DIP Lenders). |
| *Material Adverse Effect:* | "Material Adverse Effect" means a material adverse effect on any of (a) the operations, assets, liabilities, or condition (financial or otherwise) of the DIP Loan Parties taken as a whole, (b) the ability of the DIP Loan Parties taken as a whole to perform any of their obligations under this Term Sheet, the DIP Orders, or the DIP Documents to which they are a party, (c) the legality, validity, or enforceability of the DIP Documents, (d) the rights and remedies (taken as a whole) of the DIP Agent or any DIP Lender under the DIP Documents, or (e) the validity, enforceability, or priority of the liens or security interests purported to be created by this Term Sheet, the DIP Documents, or the DIP Orders, as applicable; provided that, solely for purposes of clause (a) above, (i) the effect of the filing of the Bankruptcy Cases and the events and conditions related to and/or leading up thereto and/or typically resulting from the filing of cases under chapter 11 of the Bankruptcy Code, (ii) any actions required to be taken under this Term Sheet, the DIP Documents, or the DIP Orders, (iii) any matters disclosed in this Term Sheet or the DIP Documents (including any schedules thereto and any disclosure letter) and/or publicly disclosed in any first day pleadings or declarations in the Bankruptcy Cases, and (iv) any matters that affect the commercial aviation simulation and training industry generally and that are not disproportionately adverse |

| | |
|---|---|
| | to the DIP Loan Parties, in each case, shall be disregarded in determining whether a "Material Adverse Effect" has occurred. |
| *Budget:* | The Debtors shall prepare and deliver to the DIP Lenders and DIP Agent a 13-week cash flow forecast beginning with the week which includes the Petition Date through the thirteenth (13th) week thereafter showing anticipated receipts and disbursements in form and substance acceptable to the Required DIP Lenders (the "Initial Budget"), it being agreed that the Initial Budget attached to the Interim Order is in form and substance acceptable to the Required DIP Lenders.  The Debtors may propose updates to the Initial Budget or any subsequent budget as needed, in all cases subject to the approval of the Required DIP Lenders (as updated, the "Updated Budget").   The Debtors shall report weekly on actual performance versus the Approved Budget (as defined below); provided that for purposes of compliance with this Term Sheet and the DIP Orders, operating disbursements, capital expenditures, non-operating disbursements (including professional fees of the Debtors and the UCC, if any (including any holdback)) shall be tested on a line-by-line basis and receipts shall be tested on an aggregate basis, in each case, over the first two weeks from the Petition Date, then the first three weeks from the Petition Date, and then on a rolling four-week basis and subject to a 15% permitted variance (a "Permitted Variance"); provided further that to the extent (i) the Debtor's actual operating disbursements or actual capital expenditures are less than the projected disbursements provided for such line items in the Approved Budget or (ii) the Debtors' actual receipts are greater than the projected receipts provided on an aggregate basis in the Approved Budget, such positive variance may be rolled forward to succeeding weeks (limited to the applicable line item with respect to positive variances in clause (i)) for purposes of compliance with this Term Sheet and the DIP Orders; provided further that any such rolled forward positive variance shall only be applied once. <br><br> For the avoidance of doubt, there shall be an Event of Default upon the expiration of the Approved Budget then in effect. <br><br> "Approved Budget" means, initially, the Initial Budget, and, thereafter, the most recent Updated Budget accepted by the Required DIP Lenders in writing (email being sufficient). <br><br> All relief sought by the Debtors pursuant to the "first day" pleadings (including any interim or final orders) shall be consistent in all respects with the Approved Budget.  Any relief sought, granted, or implemented that is inconsistent in any respect with the Approved Budget shall constitute an Event of Default. |
| *Milestones:* | The Debtors shall conduct the 363 Sale Process and the Chapter 11 Cases in accordance with the milestones set forth on **Exhibit B** hereto (each, a "Milestone") and unless waived, modified, or extended in writing by the Required DIP Lenders, the failure of the Debtors to meet the Milestones |

| | |
|---|---|
| | by the applicable specified deadlines set forth therefor shall constitute an Event of Default. |
| *363 Sale Process:* | The Debtors shall consummate a sale process with respect to all or substantially all of their assets pursuant to Section 363 of the Bankruptcy Code (a "<u>Sale</u>").  In connection with the Sale, the Debtors and one or more affiliates of the DIP Lenders (including any acquisition vehicle formed in connection with a credit bid or other designee) (the "<u>Stalking Horse Purchaser</u>") will enter into an asset purchase agreement (the "<u>Asset Purchase Agreement</u>") in form and substance satisfactory to the Required DIP Lenders.<br><br>The process set forth above, including the designation of the Stalking Horse Purchaser, shall collectively be referred to as the "<u>363 Sale Process</u>". |
| *363 Credit Bid:* | The Interim Order shall provide that the DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition Agent (at the direction of the Required Lenders (as defined in the Prepetition Credit Agreement)) shall be permitted to credit bid, pursuant and subject to section 363(k) of the Bankruptcy Code or applicable law, the DIP Term Loans and any Prepetition Term Loans, as applicable, in connection with any sale or disposition of assets in the Chapter 11 Cases.<br><br>The Final Order shall provide that the DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition Agent (at the direction of the Required Lenders (as defined in the Prepetition Credit Agreement)) shall be permitted to credit bid (pursuant to section 363(k) of the Bankruptcy Code or applicable law) the DIP Loans (including the Roll-Up Loans) and any Prepetition Term Loans (and any other applicable obligations) held by the DIP Lenders in connection with any sale or disposition of assets in the Chapter 11 Cases (including any deposit in connection with such sale) and shall not be prohibited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code. |
| *Use of Proceeds:* | Proceeds of the DIP Facility will be used in compliance with the terms of the Approved Budget (a) to pay transaction costs, fees, and expenses which are incurred in connection with the DIP Facility, (b) to pay professional fees of the Debtors and their estates and the UCC in accordance with the Approved Budget, and (c) for working capital and other general corporate purposes of the Debtors, all subject to certain restrictions to be set forth in the Interim Order or Final Order, as applicable, and the DIP Documents.<br><br>The deemed proceeds of the Roll-Up Loans shall be used to refinance an equal amount on a cashless dollar-for-dollar basis of the Prepetition Term Loans held by the DIP Lenders (or their affiliates) reducing the amount of the "Obligations" (as defined under the Prepetition Credit Agreement, the "<u>Prepetition Term Loan Obligations</u>") by such amount. |

14

| | |
|---|---|
| *Adequate Protection:* | As adequate protection for any diminution of the Prepetition Secured Parties' interest in the "Collateral" (as defined in the Prepetition Credit Agreement) including without limitation any diminution resulting from the subordination of existing liens to the DIP Liens and/or the Debtors' use of cash collateral pursuant to the DIP Orders, the Prepetition Agent shall receive, for the benefit of the Prepetition Secured Parties, the adequate protection granted to the Prepetition Secured Parties (A) pursuant to the DIP Orders (which shall include, without limitation, (i) monthly payments of the reasonable fees, costs, and expenses of the Prepetition Secured Parties (including professional fees), (ii) replacement liens on the DIP Collateral that shall be junior only to the liens as expressly set forth in the Lien Priority Exhibit, (iii) superpriority administrative expense claims with priority over any and all administrative expenses, whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(a) of the Bankruptcy Code, other than the superpriority administrative expense claims of the DIP Secured Parties and the Carve-Out and which shall not be payable from Avoidance Proceeds pending entry of the Final Order, and (iv) an acknowledgement of the unconditional right to credit bid the Prepetition Term Loan Obligations as further set forth in this Term Sheet), and (B) as otherwise required by the Bankruptcy Court pursuant to sections 361, 507, 363(e) and 364(d)(1) of the Bankruptcy Code or otherwise. |
| *Marshalling; 552(b) Waiver and Waiver of 506(c) Claims:* | Waivers of the equitable doctrine of "marshalling", surcharge claims for necessary costs and expenses of preserving or disposing of property securing an allowed secured claim pursuant to section 506(c) and the section 552 "equities of the case" exception, all as set forth in the Final Order. |
| *Mandatory Prepayments:* | Subject only to the application of proceeds of DIP Collateral in accordance with the relative lien priorities set forth in the Lien Priority Exhibit, the Debtors shall pay or prepay the DIP Loans and all other DIP Obligations (together with a cash reserve established by the DIP Agent to cover asserted contingent and indemnity obligations in an amount directed by the Required DIP Lenders) until such obligations are paid in full immediately (and upon at least (3) business days' prior written notice to the DIP Agent or such shorter notice as may be agreed by the DIP Agent in its reasonable discretion) as follows:<br><br>(i)    100% of the net cash proceeds of any sale or disposition of all or substantially all of Debtors' assets pursuant to Section 363 of the Bankruptcy Code (other than a Sale to the Stalking Horse Purchaser pursuant to the Asset Purchase Agreement) simultaneous with the consummation thereof, after funding the Carve-Out and reserving proceeds sufficient to pay (a) undisputed, accrued, unpaid, and allowed administrative expenses (as of the closing of such sale) to the extent set forth in the Approved Budget and (b) an amount negotiated in good faith by the Required DIP Lenders and the Debtors that is necessary to fund costs for the wind-down of Debtors' bankruptcy estate following the closing of such sale or disposition of all or |

substantially all of Debtors' assets;

(ii) 100% of the net cash proceeds of any other sale or other disposition by any Debtor of any assets, in a single transaction or series of related transactions (except for (a) de minimis asset sales approved by an order of the Bankruptcy Court that is in form and substance acceptable to the Required DIP Lenders or (b) sale of goods or services in the ordinary course of business);

(iii) 100% of the net cash proceeds of all assets being sold or assigned pursuant to (a) that certain Purchase Agreement for B787 Simulator entered into on December 11, 2025 by and between Avenger Flight Group Israel Holdings Ltd. and El Al Israel Airlines Ltd. ("El Al"), (b) that certain Reimbursement Agreement Relating to the 787 Boeing Data and Other Licenses entered into as of December 11, 2025 by and between Avenger Flight Group, LLC and El Al, and (c) any other related agreement; and

(iv) 100% of the net cash proceeds of extraordinary receipts (including tax refunds, indemnity payments, and insurance proceeds not included as proceeds of asset dispositions but excluding sales tax receipts contemplated to be received by the Debtors as set forth in the Approved Budget) by the Debtors.

Any amounts so paid or prepaid may not be reborrowed. No reinvestment of the proceeds of any extraordinary receipts, asset sales, or other proceeds described above shall be permitted without the prior written consent of the Required DIP Lenders.

Mandatory payments or prepayments and proceeds of DIP Collateral received by the Debtors outside the ordinary course of business will be applied in the following order of priority (unless otherwise determined by the DIP Lenders), after giving effect to the Carve-Out, the relative lien priorities set forth in the Lien Priority Exhibit, and any other payments required pursuant to the DIP Orders:

(1) first, to pay all documented out-of-pocket expenses of the DIP Agent as permitted hereunder;

(2) second, to pay all documented out-of-pocket expenses of the DIP Lenders as permitted hereunder;

(3) third, to pay an amount equal to all accrued and unpaid interest owing to the DIP Lenders holding DIP Term Loans;

(4) fourth, to repay any principal amounts outstanding in respect of the DIP Term Loans (including any amounts and interest that have been added to the principal balance);

(5) fifth, to pay an amount equal to all accrued and unpaid interest owing to the DIP Lenders holding Roll-Up Loans;

| | |
|---|---|
| | (6) <u>sixth</u>, to repay any principal amounts outstanding in respect of the Roll-Up Loans (including any amounts and interest that have been added to the principal balance); |
| | (7) <u>seventh</u>, all other amounts owing to the DIP Lenders and the DIP Agent; and |
| | (8) <u>last</u>, the balance, if any, after all of the DIP Obligations have been paid in full, to the Borrower subject in all respects to the rights, liens, and claims of the Prepetition Secured Parties. |
| | Notwithstanding the forgoing, any prepayment made pursuant to romanette (ii) or (iii) above shall be applied to the Roll-Up Obligations or to the Prepetition Term Loan Obligations as determined by the Required DIP Lenders and pursuant to direction provided to the DIP Agent and/or the Prepetition Agent, as applicable. |
| *Events of Default:* | Each of following shall constitute an "<u>Event of Default</u>": |
| | (i) the entry of an Interim Order or Final Order in form and substance that is not acceptable to the Required DIP Lenders; |
| | (ii) failure by any Debtor to be in compliance in all respects with the provisions of this Term Sheet, the DIP Documents, and/or the DIP Orders; |
| | (iii) the reversal, modification, amendment, stay, reconsideration, or vacatur (or any request therefor made by the Debtors) of a DIP Order, without the prior written consent of the Required DIP Lenders; |
| | (iv) failure of any of the Milestones to be satisfied by the Specified Deadline (as defined below); |
| | (v) failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality, in all respects) when made; |
| | (vi) the filing of any application by the Debtors (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Obligations in full in cash upon entry of the order approving such financing) for the approval of (or an order is entered by the Court approving) any claim arising under Section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest, or other lien in the Chapter 11 Cases which is *pari passu* with or senior to the DIP Liens, excluding liens arising under the DIP Orders or pursuant to any other financing agreement made with the prior written consent of the Required DIP Lenders; |
| | (vii) the commencement of any action or the filing of any pleading by the Debtors or other person against the DIP Agent or any DIP Lender or |

17

any of their respective agents and employees to subordinate or avoid any liens granted in connection with the DIP Orders;

(viii) (1) the Debtors file a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement, or otherwise modify any DIP Order, the DIP Documents, or this Term Sheet or to disallow the DIP Obligations, in whole or in part, or (2) any material provision of the DIP Orders, the DIP Documents, or this Term Sheet or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the DIP Orders), shall for any reason cease to be valid and binding (without the prior written consent of the Required DIP Lenders);

(ix) the filing with the Bankruptcy Court of a motion seeking approval of a sale under Section 363 (other than approval of a Sale pursuant to the terms of the Asset Purchase Agreement) or a plan of reorganization or liquidation in the Chapter 11 Cases that, in any such case, does not provide for indefeasible payment in full in cash to the DIP Agent and the DIP Lenders of the DIP Loans, the DIP Obligations, and all other amounts outstanding under the Term Sheet, the DIP Documents, and the DIP Orders on closing of such sale or the effective date of such plan, without the prior written consent of the Required DIP Lenders;

(x) the appointment in the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of the Debtors (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code);

(xi) the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Cases with respect to any portion of the DIP Collateral exceeding $150,000 in value in the aggregate without prior written consent of the Required DIP Lenders;

(xii) the failure to pay principal, cash interest (subject to a three (3) business day grace period, solely with respect to cash interest) or other DIP Obligations in full when due, including without limitation, on the Maturity Date;

(xiii) the payment of, or application by the Debtors for authority to pay, any prepetition claim without prior written consent of the Required DIP Lenders other than amounts set forth in the Approved Budget (subject to any Permitted Variances); and

(xiv) the failure to comply with the Approved Budget (subject to any Permitted Variances).

| | |
|---|---|
| *Remedies Upon Event of Default:* | Upon the occurrence and during the continuance of any Event of Default, subject to five (5) days' notice to counsel to the Debtors during which the Debtors may seek an emergency hearing before the Bankruptcy Court (the |

"Remedies Notice Period"), the DIP Agent may (and, at the direction of the Required DIP Lenders, shall) take all or any of the following actions without further order of or application to the Bankruptcy Court, and notwithstanding the automatic stay:

(a)    declare all DIP Obligations (including principal of, and accrued interest on, any outstanding DIP Loans) to be immediately due and payable;

(b)    terminate any further commitment to lend to the Borrower;

(c)    exercise rights and remedies pursuant to the terms of the DIP Orders, or applicable law (including, without limitation, direct the Debtors (or file a motion in the name of the Debtors)), (i) to enforce the terms and provisions of the Term Sheet or the DIP Documents, (ii) to collect accounts receivable, without setoff by any account debtor, including to direct the Debtors to collect such account receivables for the benefit of the DIP Secured Parties, (iii) to sell or otherwise dispose of any or all of the DIP Collateral on terms and conditions reasonably acceptable to the Required DIP Lenders pursuant to Sections 363, 365, and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct the Debtors (or file a motion in the name of the Debtors) to assume and assign any unexpired lease or executory contract included in the DIP Collateral to the Required DIP Lenders' designee(s) in accordance with and subject to Section 365 of the Bankruptcy Code) and (iv) enter into the premises of any Debtor in connection with the orderly sale or disposition of the DIP Collateral (including, without limitation, complete any work in process); *provided* that the Debtors shall take all action that is reasonably necessary to cooperate with the DIP Agent in the DIP Agent's exercise of its rights and remedies and facilitate the realization upon the DIP Collateral by the DIP Agent (at the direction of the Required DIP Lenders); and/or

(d)    after the expiration of the Remedies Notice Period (unless otherwise prohibited by the Bankruptcy Court during the Remedies Notice Period) and without further notice or further court order and without seeking further relief from the automatic stay under section 362 of the Bankruptcy Code, the Debtors, at the election of the Required DIP Lenders, shall facilitate a strict foreclosure under UCC section 9-620 as adopted by New York by transferring ownership and title to the DIP Collateral (as may be specified by the DIP Agent at direction of Required DIP Lenders) in full or partial satisfaction of the DIP Obligations.

| | |
|---|---|
| *Rates; General Provisions Regarding Payments; Tax Treatment; Yield Protection; Notices; Assignments; Waiver of* | 1.5 (Rates), 2.13 (General Provisions Regarding Payments), 2.18 (Tax Treatment), 2.19 (Inability to Determine Rates), 3 (Yield Protection), 11.1 (Notices; Effectiveness; Electronic Communications), 11.2(c) (Reimbursement by Lenders), 11.5(a)–(c) (Successors and Assigns Generally; Assignments by Lenders; Register), 11.10 (Severability), 11.14 (Waiver of Jury Trial); 11.17 (Counterparts; Integration; Effectiveness), |

| | |
|---|---|
| *Jury Trial; Counterparts; Electronic Execution of Assignments and Other Documents* | 11.19 (Electronic Execution of Assignments and Other Documents) of the Prepetition Credit Agreement are hereby incorporated (with such modifications as are (i) set forth herein, and (ii) usual and customary for DIP financings of this type); *provided that* the consent of the Borrower (or any other DIP Loan Party) shall not be required at any time with respect to the provisions of Section 11.5(a)–(c) incorporated herein by reference. |
| *Counterparts*: | This Term Sheet may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Term Sheet by electronic imaging means (e.g. "pdf" or "tif" format) shall be effective as delivery of a manually executed counterpart of this Term Sheet. |
| *Amendments and Waivers:* | No provision of this Term Sheet or any other DIP Document may be amended other than by an instrument in writing signed by (i) the Required DIP Lenders, (ii) the DIP Agent, and (iii) the Debtors.

Notwithstanding the foregoing, any amendment, consent, waiver, supplement or modification to this Term Sheet or any other DIP Documents that has the effect of (i) increasing the DIP Term Loan Commitments of any DIP Lender (other than as expressly provided herein), (ii) decreasing the amount of or postponing the payment of any scheduled principal, interest or fees payable to any DIP Lender (other than as expressly provided herein), (iii) altering the pro rata nature of disbursements by or payments to DIP Lenders or the application of prepayments in this Term Sheet, (iv) amending or modifying the definition of "Required DIP Lenders" or any provision of this section "Amendments and Waivers", (v) releasing all or substantially all of the Guarantors of the DIP Obligations, or (vi) releasing all or substantially all of the DIP Collateral other than in connection with a disposition approved by an order of the Bankruptcy Court with the prior written consent of the Required DIP Lenders, in each case, shall require the written consent of each DIP Lender directly and adversely affected thereby. |
| *Governing Law/ Jurisdiction:* | State of New York, except as governed by the Bankruptcy Code.

The Bankruptcy Court shall have exclusive jurisdiction over any matters arising out of this Term Sheet.

In the event of a conflict or any inconsistency between the terms of this Term Sheet and the DIP Orders, the terms of the DIP Orders shall control. |

IN WITNESS WHEREOF, the parties have executed this Term Sheet as of the date first set forth above.

**MARATHON DISTRESSED CREDIT FUND, L.P.**, as a DIP Lender

By: Marathon Asset Management L.P., its Investment Manager

By: _____
Name: Jamie Raboy
Title: Authorized Signatory

**MARATHON STEPSTONE MASTER FUND, L.P.**, as a DIP Lender

By: Marathon Asset Management L.P., its Investment Manager

By: _____
Name: Jamie Raboy
Title: Authorized Signatory

**MCSP SUB, LLC**, as a DIP Lender
By: Marathon Asset Management L.P., its Investment Manager

By: _____
Name: Jamie Raboy
Title: Authorized Signatory

**MARATHON DISTRESSED CREDIT MASTER FUND**, as a DIP Lender
By: Marathon Asset Management L.P., its Investment Manager

By: _____
Name: Jamie Raboy
Title: Authorized Signatory

*[Signature Page to Term Sheet]*

**EVERGREEN CREDIT OPPORTUNITIES LLC**, as a DIP Lender

By: Cercano Management LLC, its
Investment Manager

By: _Albert Hwang_____

Name: Albert Hwang

Title:  Executive Vice President

**ALCOF III NUBT, L.P.**, as a DIP Lender
By: Arbour Lane Fund III GP, LLC, Its
General Partner

By: *Dan Galanter*
Name: Dan Galanter
Title: Manager

**ALCOF III UBT, L.P.**, as a DIP Lender
By: Arbour Lane Fund III GP, LLC, Its
General Partner

By: *Dan Galanter*
Name: Dan Galanter
Title: Manager

[*Signature Page to Term Sheet*]

**MIDOCEAN TACTICAL SOLUTIONS
FUND LP**, as a DIP Lender

By: MidOcean Credit Fund Management
LP, as Portfolio Manager

By: Ultramar Credit Holdings, Ltd., its
General Partner

By: _____

Name: Damion Brown
Title: Chief Operating Officer

*[Signature Page to Term Sheet]*

**DIP AGENT:**

**WILMINGTON TRUST, NATIONAL ASSOCIATION**,
as DIP Agent

By: _____

Name:    Andrew Lennon
Title:      Vice President

IN WITNESS WHEREOF, the parties have executed this Term Sheet as of the date first set forth above.

**AVENGER FLIGHT GROUP, LLC**, a Florida limited liability company, as Borrower

By:_____
Name: Elsa Gagnon
Title: SVP & General Counsel

**AFG DALLAS, LLC**, a Florida limited liability company, as a Guarantor

By:_____
Name: Elsa Gagnon
Title: Manager

**AVENGER FLIGHT TRAINING, LLC**, a Florida limited liability company, as a Guarantor

By:_____
Name: Elsa Gagnon
Title: Manager

**PAPI FLIGHT TRAINING LLC**, a Florida limited liability company, as a Guarantor

By:_____
Name: Elsa Gagnon
Title: Manager

**AFG MEXICO CORP**, a Florida corporation, as a Guarantor

By:_____
Name: Elsa Gagnon
Title: SVP

**AVENGER FLIGHT GROUP MÉXICO II, S. DE R.L. DE C.V.**, a Mexican *sociedad de responsabilidad limitada de capital variable*, as a Guarantor

By:_____
Name: Elsa Gagnon
Title: Legal Representative

**AFG SIM HOLDING CORP.**, a Florida corporation, as a Guarantor

By:_____
Name: Elsa Gagnon
Title: Director

**AFG EU OPERATIONS CORP.**, a Florida corporation, as Guarantor

By: _____

Name: Kyle Hunter

Title: Director

**AVENGER FLIGHT GROUP EUROPE, CORP**, a Florida corporation, as Guarantor

By: _____

Name: Elsa Gagnon

Title: Director

**AFG LATAM HOLDING CORP**, a Florida corporation, as Guarantor

By: _____

Name: Elsa Gagnon

Title: Director

**AFG LATAM, LLC**, a Florida limited liability company, as Guarantor

By: _____

Name: Elsa Gagnon

Title: Manager

**AFG LATAM SIM HOLDINGS, LLC**, a Florida limited liability company, as Guarantor

By: _____

Name: Elsa Gagnon

Title: Manager

**AFG LATAM SIM HOLDINGS III, LLC**, a Florida limited liability company, as Guarantor

By: _____

Name: Elsa Gagnon

Title: Manager

**AFG LATAM SIM HOLDINGS IV, LLC**, a Florida limited liability company, as Guarantor

By: _____

Name: Elsa Gagnon

Title: Manager

**AFG LATAM SIM HOLDINGS II, LLC**, a Florida limited liability company, as Guarantor

By: _____

Name: Elsa Gagnon

Title: Manager

**AFG DALLAS III, LLC**, a Florida limited liability company, as a Guarantor

By: _____

Name: Elsa Gagnon

Title: Manager

**AFG DALLAS IV, LLC**, a Florida limited liability company, as a Guarantor

By: _____

Name: Elsa Gagnon

Title: Manager

**AFG FLL, LLC**, a Florida limited liability company, as a Guarantor

By: _____

Name: Elsa Gagnon

Title: Manager

**AFG ORLANDO, LLC**, a Florida limited liability company, as a Guarantor

By: _____

Name: Elsa Gagnon

Title: Manager

**AFG SANFORD, LLC**, a Florida limited liability company, as a Guarantor

By: _____

Name: Elsa Gagnon

Title: Manager

**AFG FLIGHT GROUP TOPCO, LLC**, a Florida corporation, as a Guarantor

By: _____

Name: Elsa Gagnon

Title: Manager

**EXHIBIT A**

**(DIP Commitment Schedule)**

| DIP Lender | DIP Term Loan Commitment |
|---|---|
| ALCOF III NUBT, L.P. | $3,662,700.00 |
| ALCOF III UBT LP | $996,150.00 |
| Evergreen Credit Opportunities LLC | $2,159,050.00 |
| Marathon Distressed Credit Fund LP | $951,200.00 |
| Marathon Distressed Credit Master Fund | $5,014,100.00 |
| Marathon Stepstone Master Fund LP | $401,650.00 |
| MCSP Sub LLC | $622,050.00 |
| MidOcean Tactical Solutions Fund LP | $693,100.00 |
| **Total** | **$14,500,000.00** |

## **EXHIBIT B**

### **(Milestones)**

The Debtors shall conduct the Chapter 11 Cases in accordance with the following milestones (each, a "Milestone") and unless waived, modified, or extended in writing (email being sufficient) by the Required DIP Lenders, the failure of the Debtors to meet Milestones by the applicable specified deadlines set forth therefor (the "Specified Deadline") shall constitute an Event of Default:

(a)     no later than February 11, 2026, the Companies shall have commenced the Chapter 11 Cases;

(b)     no later than the Petition Date, the DIP Loan Parties shall have executed the Asset Purchase Agreement;

(c)     no later than one (1) business day after the Petition Date, the Debtors shall file with the Bankruptcy Court a motion, in form and substance acceptable to the Required DIP Lenders and the Debtors, seeking approval of (i) a Sale (the "Sale Motion" and, the transaction in respect thereof, the "Sale Transaction"), (ii) entry into the Asset Purchase Agreement attached to the Sale Motion, pursuant to which the Stalking Horse Purchaser will purchase substantially all assets of the Debtors free and clear of all liens, claims, interests and encumbrances, subject only to higher or otherwise better offers, and (iii) bidding procedures (the "Bidding Procedures Motion") in connection with the 363 Sale Process;

(d)     no later than three (3) business days after the Petition Date, the Interim Order approving the DIP Facility shall be entered by the Bankruptcy Court;

(e)     no later than thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered (i) an order establishing bidding procedures consistent with the Bidding Procedures Motion (such order, the "Bidding Procedures Order"), which order shall be acceptable in form and substance to the Required DIP Lenders and (ii) the Final Order approving the DIP Facility;

(f)     no later than fifty (50) calendar days after the Petition Date, the Debtors shall have held an auction, if applicable, in connection with the 363 Sale Process for which the Debtors received qualified bids;

(g)     no later than fifty-five (55) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving the sale in connection with the 363 Sale Process (the "Sale Order"), which order shall be satisfactory in form and substance to the Required DIP Lenders; and

(h)     no later than sixty (60) calendar days after the Petition Date, the Debtors shall have consummated the Sale Transaction in connection with the 363 Sale Process for which the Court has entered a Sale Order in accordance with such Sale Order that results in net proceeds allocated to the DIP Collateral sufficient to repay the DIP Obligations in full in cash or such other consideration acceptable to the Required DIP Lenders.

**<u>EXHIBIT C</u>**

**(Agency Provisions)**

## EXHIBIT C

Section 1.1    Appointment and Authority.

(a)    Each of the DIP Lenders hereby appoints Wilmington Trust, National Association to act on its behalf as the DIP Agent under the Term Sheet and the DIP Documents and authorizes the DIP Agent to take such actions on its behalf and to exercise such powers as are delegated to the DIP Agent by the terms of the Term Sheet and the DIP Documents, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Exhibit are solely for the benefit of the DIP Agent and the DIP Lenders, and no DIP Loan Party nor any of its subsidiaries shall have rights as a third-party beneficiary of any of such provisions.  It is understood and agreed that the use of the term "agent" in the Term Sheet or in any DIP Documents (or any other similar term) with reference to the DIP Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(b)    Notwithstanding any provision to the contrary contained elsewhere in the Term Sheet or in any DIP Document, the DIP Agent shall not have any duties or responsibilities, except those expressly set forth in the Term Sheet or such other DIP Document, nor shall the DIP Agent have or be deemed to have any fiduciary relationship with any DIP Lender or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into the Term Sheet or any DIP Document or otherwise exist against the DIP Agent.

Section 1.2    Exculpatory Provisions.

(a)    The DIP Agent shall not have any duties or obligations except those expressly set forth in the Term Sheet and in the DIP Documents, and its duties under the Term Sheet and any DIP Document shall be administrative in nature.  Without limiting the generality of the foregoing, the DIP Agent:

(i)    shall not be subject to any fiduciary or other implied duties, regardless of whether a default or Event of Default has occurred and is continuing;

(ii)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Term Sheet or by the DIP Documents that the DIP Agent is required to exercise as directed in writing by the Required DIP Lenders (or such other number or percentage of the DIP Lenders as shall be expressly provided for in the Term Sheet or in the DIP Documents); provided, that the DIP Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the DIP Agent to liability or that is contrary to the Term Sheet, any DIP Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any debtor relief law or that may effect a forfeiture, modification or termination of property of a defaulting DIP Lender in violation of any debtor relief law;

(iii)    shall not, except as expressly set forth in the Term Sheet or in the DIP Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any DIP Loan Party or any of its affiliates that is communicated to or obtained by the DIP Agent or any of its affiliates in any capacity;

(iv)    shall not be required to risk or expend its own funds in performing its obligations under the Term Sheet or any DIP Document;

(v)    shall not be responsible or liable for any failure or delay in the performance of its obligations under the Term Sheet or any DIP Document arising out of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision or any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; pandemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility;

(vi)    shall not have any responsibility for or have a duty to monitor or maintain any portion of the DIP Collateral;

(vii)    shall not have any responsibility, obligation or liability relating to the preparation or filing of any UCC financing statement or continuation statement or the correctness of any financing statement filed in connection with the Term Sheet or any DIP Document or the validity or perfection of any lien or secured interest created pursuant to the DIP Documents;

(viii)    shall not have any liability for any action taken, or errors in judgment made, in good faith by it or any of its officers, employees or agents, unless it shall have been grossly negligent in ascertaining the pertinent facts;

(ix)    shall not be liable, directly or indirectly, for any special, indirect, punitive or consequential damages, even if the DIP Agent has been advised of the possibility of such damages and regardless of the form of action;

(x)    shall not be responsible for nor have any duty to monitor the performance or any action of the DIP Loan Parties, or any of their directors, members, officers, agents, affiliates or employees, nor shall it have any liability in connection with the malfeasance or nonfeasance by such parties. The DIP Agent may assume performance by all such persons of their respective obligations.  The DIP Agent shall have no enforcement or notification obligations relating to breaches or representations or warranties of any other person;

(xi)    shall not be under any obligation to exercise any of the rights or powers vested in it by the Term Sheet or any DIP Document at the request or direction of the Required DIP Lenders, pursuant to the provisions of the Term Sheet or such other DIP Document, unless such DIP Lenders shall have offered to the DIP Agent security or indemnity (satisfactory to the DIP Agent in its sole and absolute discretion) against the costs, expenses and liabilities which may be incurred by it in compliance with such request or direction;

(b)    The DIP Agent shall not be liable for any action taken or not taken by it (i) with the written consent, direction or at the request of the Required DIP Lenders (or such other number or percentage of the DIP Lenders as shall be necessary, or as the DIP Agent shall believe in good faith shall be necessary, under the circumstances) or (ii) in the absence of its own gross negligence or willful misconduct, as determined by a court of competent jurisdiction by final and nonappealable judgment.  The DIP Agent shall be deemed not to have knowledge of any default or Event of Default unless and until an officer of the DIP Agent responsible for the administration of the Term Sheet or the applicable DIP Documents has received notice describing such default or Event of Default and conspicuously marked as a "notice of default" is given to the DIP Agent in writing by the Borrower or a DIP Lender.

(c)     The DIP Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with the Term Sheet or any DIP Document, (ii) the contents of any certificate, report or other document delivered under the Term Sheet or any DIP Document or in connection with the Term Sheet or any DIP Document, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in the Term Sheet or any DIP Document or the occurrence of any default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of the Term Sheet, any DIP Document or any other agreement, instrument or document or (v) the satisfaction of any conditions set forth in the Term Sheet or any DIP Document.

(d)     Notwithstanding anything else to the contrary set forth in the Term Sheet or any DIP Document, whenever reference is made in the Term Sheet or any DIP Document, to any discretionary action by, consent, designation, specification, requirement or approval of, notice request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the DIP Agent, or to any election, decision, opinion, acceptance, use of judgement, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the DIP Agent (including for the avoidance of doubt any such actions that are "satisfactory to the DIP Agent", "approved by the DIP Agent", "acceptable to the DIP Agent", "agreed by the DIP Agent", "consented by the DIP Agent", "as required by the DIP Agent", "as determined by the DIP Agent", "as specified by the DIP Agent", "in the DIP Agent's discretion", "selected by the DIP Agent", "the DIP Agent may establish", "as may be granted by the DIP Agent", "advisable by the DIP Agent", "deemed appropriate by the DIP Agent", and phrases of similar import authorizing and permitting the DIP Agent to approve, disapprove, determine, act or decline to act in its discretion, as applicable, under the Term Sheet or any DIP Document (other than with respect to any amendment to the Term Sheet or any DIP Document that affects the obligations, rights, protections, immunities or indemnities of the DIP Agent which shall be solely at the discretion of the DIP Agent), such provision shall refer to the DIP Agent exercising each of the foregoing at the instruction and with the sole consent of the Required DIP Lenders, and (ii) it is understood that in all cases that such permissive rights shall not be construed as a duty of the DIP Agent and the DIP Agent shall be fully justified in failing or refusing to take any such action if it shall not have received written instruction, advice or concurrence from Required DIP Lenders in respect of such action.

Section 1.3     <u>Reliance by DIP Agent</u>.  The DIP Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, report, opinion, direction, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper person.  The DIP Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper person, and shall not incur any liability for relying thereon.  In determining compliance with any condition under the Term Sheet or any DIP Document to the making of a loan that by its terms must be fulfilled to the satisfaction of a DIP Lender, the DIP Agent may presume that such condition is satisfactory to such DIP Lender unless the DIP Agent shall have received notice to the contrary from such DIP Lender prior to the making of such loan.  The DIP Agent may consult with legal counsel (who may be counsel for a DIP Loan Party or DIP Lender), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  The DIP Agent shall be entitled to request, receive and rely upon such certificates as it may reasonably determine appropriate with respect to the satisfaction of any specified circumstances or conditions precedent to such action.  The DIP Agent may rely on the Register and deem and treat the DIP Lender specified in the Register with respect to any amount owing under the Term Sheet or any DIP Document as

the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the DIP Agent.

Section 1.4    Delegation of Duties.  The DIP Agent may perform any and all of its duties and exercise its rights and powers under the Term Sheet or under any DIP Document by or through any one or more sub-agents appointed by the DIP Agent.  The DIP Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective affiliates, partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of the DIP Agent and any such sub-agent (collectively, the "Related Parties").  The exculpatory provisions of this Section shall apply to any such sub-agent and to the Related Parties of the DIP Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for in the Term Sheet or DIP Documents as well as activities as DIP Agent.  The DIP Agent shall not be responsible for the actions, omissions, negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the DIP Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 1.5    Resignation or Removal of DIP Agent.

(a)    The DIP Agent may at any time give notice of its resignation to the DIP Lenders and the Borrower.  Upon receipt of any such notice of resignation (or removal pursuant to paragraph (b) below of this Section 1.5), the Required DIP Lenders shall have the right to appoint a successor which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required DIP Lenders and shall have accepted such appointment within thirty (30) days after the retiring DIP Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required DIP Lenders) (the "Resignation Effective Date"), then the retiring DIP Agent may (but shall not be obligated to) on behalf of the DIP Lenders and at the cost and expense of the Borrower, appoint, or petition a court of competent jurisdiction to appoint, a successor DIP Agent meeting the qualifications set forth above.  Whether or not a successor has been appointed such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)    The Required DIP Lenders may, at any time, by notice in writing to the Borrower and the DIP Agent remove the DIP Agent and appoint a successor.  If no such successor shall have been so appointed by the Required DIP Lenders and shall have accepted such appointment within thirty (30) days (or such earlier day as shall be agreed by the Required DIP Lenders) (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)    Notwithstanding anything to the contrary contained in clauses (a) or (b) above, the Resignation Effective Date or Removal Effective Date, as applicable shall not become effective until, the resigning, retiring or removed DIP Agent has (i) transferred to such successor DIP Agent all sums and other items of DIP Collateral held by the resigning, retiring or removed DIP Agent under the Term Sheet and the DIP Documents, together with all records and other documents reasonably requested by such successor in connection with the performance of the duties of the successor DIP Agent under the Term Sheet and DIP Documents, and (ii) taken such actions, as may be reasonably requested by such successor DIP Agent in connection with the assignment to and continued perfection of the successor DIP Agent of the security interests created under the Term Sheet and the DIP Documents. With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (1) the retiring or removed Agent shall be discharged from its duties and obligations under the Term Sheet and under the DIP Documents

(except that in the case of any DIP Collateral security held by such DIP Agent on behalf of the DIP Lenders under the Term Sheet or any of the DIP Documents, the retiring or removed DIP Agent shall continue to hold such DIP Collateral security until such time as a successor DIP Agent is appointed) and (2) except for any indemnity payments, expenses, fees or other reimbursable payments owed to the retiring or removed DIP Agent, all payments, communications and determinations provided to be made by, to or through the DIP Agent shall instead be made by or to each DIP Lender directly, until such time as the Required DIP Lenders appoint a successor DIP Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as DIP Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring or removed DIP Agent (other than any rights to indemnity payments, expenses, fees or other reimbursable payments owed to the retiring or removed DIP Agent), and the retiring or removed DIP Agent shall be discharged from all of its duties and obligations under the Term Sheet or under the DIP Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower to a successor DIP Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring or removed DIP Agent's resignation or removal hereunder and under the other DIP Documents, the provisions of this Exhibit shall continue in effect for the benefit of such retiring or removed DIP Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed DIP Agent was acting as DIP Agent. In addition, and subject to the first sentence of this <u>Section 1.5</u>, the Required DIP Lenders may remove the DIP Agent for cause upon prior written notice to the DIP Agent and the Borrower.

(d)        Any person into which the DIP Agent may be merged or converted or with which it may be consolidated, or any person resulting from any merger, conversion or consolidation to which the DIP Agent shall be a party, or any person succeeding to the business of the DIP Agent shall be the successor of the DIP Agent without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto, except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

Section 1.6        <u>Non-Reliance on DIP Agent and Other Lenders</u>.  Each of the DIP Lenders acknowledges that it has, independently and without reliance upon the DIP Agent or any other DIP Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into the Term Sheet and the DIP Documents.  Each of the DIP Lenders also acknowledges that it will, independently and without reliance upon the DIP Agent or any other DIP Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon the Term Sheet, any DIP Document or any related agreement or any document furnished thereunder.

Section 1.7        <u>Legal Orders</u>.  If at any time the DIP Agent is served with any judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process (including orders of attachment or garnishment or other forms of levies or injunctions or stays relating to the transfer of any DIP Collateral), the DIP Agent is authorized to comply therewith in any manner as it or its legal counsel of its own choosing deems appropriate, and if the DIP Agent complies with any such judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process, the DIP Agent shall not be liable to any of the parties hereto or to any other person even though such order, judgment, decree, writ or process may be subsequently modified or vacated or otherwise determined to have been without legal force or effect.

Section 1.8    <u>DIP Agent May File Proofs of Claim</u>.  In case of the pendency of any proceeding under any debtor relief law or any other judicial proceeding relative to any DIP Loan Party, the DIP Agent (irrespective of whether the principal of any loan shall then be due and payable under the Term Sheet or any DIP Document or by declaration or otherwise and irrespective of whether the DIP Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the loans and all other obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the DIP Lenders and the DIP Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the DIP Lenders and the DIP Agent and their respective agents and counsel and all other amounts due to the DIP Lenders and the DIP Agent) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each DIP Lender to make such payments to the DIP Agent and, in the event that the DIP Agent shall consent to the making of such payments directly to the DIP Lenders, to pay to the DIP Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the DIP Agent and its agents and counsel, and any other amounts due to the DIP Agent).

**EXHIBIT B**

(Approved Budget)

**Avenger Flight Group DIP Budget**

February 11, 2026

| | DIP 59 | DIP 60 | DIP 61 | DIP 62 | DIP 63 | DIP 64 | DIP 65 | DIP 66 | DIP 67 | DIP 68 | DIP 69 | DIP 70 | DIP 71 | DIP 72 | DIP Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Ending** | 2/15/26 Fcst. | 2/22/26 Fcst. | 3/1/26 Fcst. | 3/8/26 Fcst. | 3/15/26 Fcst. | 3/22/26 Fcst. | 3/29/26 Fcst. | 4/5/26 Fcst. | 4/12/26 Fcst. | 4/19/26 Fcst. | 4/26/26 Fcst. | 5/3/26 Fcst. | 5/10/26 Fcst. | 5/17/26 Fcst. | Fcst. |
| **Total Receipts** | $910,509 | $465,366 | $387,131 | $1,024,561 | $874,561 | $1,024,561 | $477,760 | $1,027,760 | $677,760 | $527,760 | $677,760 | $1,485,155 | $1,485,155 | $- | $11,045,797 |
| Payroll & Benefits | (162,748) | (375,167) | (40,833) | (530,415) | (7,500) | (375,167) | (40,833) | (530,415) | (7,500) | (375,167) | (40,833) | (530,415) | (7,500) | (375,167) | (3,399,662) |
| Rent, Facilities & Utilities | (301,926) | (36,250) | (429,047) | (36,250) | (59,268) | (36,250) | (36,250) | (429,047) | (36,250) | (51,418) | (36,250) | (429,047) | (36,250) | - | (1,953,502) |
| SIM Leases/Expenses; Facility Builds | (326,515) | (570,321) | (945,973) | (1,059,747) | (91,649) | (206,804) | (1,961,365) | (299,599) | (238,009) | (122,813) | (266,818) | (339,656) | (252,330) | - | (6,881,598) |
| Business Insurance and Taxes | (110,000) | (1,146,029) | (82,643) | (26,610) | (110,000) | (419) | (161,604) | (40,731) | - | (110,000) | (419) | - | (26,610) | - | (1,815,066) |
| International Expenses | (225,971) | (48,153) | (228,049) | (115,893) | (303,019) | (61,327) | (20,867) | (216,345) | (391,538) | (20,867) | - | (216,345) | (85,777) | - | (1,934,151) |
| Other | (40,500) | (35,000) | (81,500) | (35,000) | (40,500) | (35,000) | (81,500) | (35,000) | (35,000) | (40,500) | (35,000) | (81,500) | (35,000) | (5,500) | (616,500) |
| **Disbursements** | ($1,167,661) | ($2,210,919) | ($1,808,045) | ($1,803,916) | ($611,936) | ($714,967) | ($2,302,419) | ($1,551,137) | ($708,297) | ($720,764) | ($379,320) | ($1,596,963) | ($443,468) | ($380,667) | ($16,400,479) |
| **Cash Flow** | ($257,153) | ($1,745,553) | ($1,420,913) | ($779,355) | $262,625 | $309,594 | ($1,824,659) | ($523,377) | ($30,538) | ($193,004) | $298,439 | ($111,807) | $1,041,688 | ($380,667) | ($5,354,682) |
| Professional Fees | (952,583) | (496,083) | (768,383) | (968,383) | (821,083) | (471,083) | (771,083) | (621,083) | (1,048,683) | (658,683) | (398,683) | (598,683) | (6,600) | (28,600) | (8,609,700) |
| US Trustee, Filing and Other Fees | (34,760) | (38,750) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (219,201) | (347,711) |
| Employee/ Other Obligations | (125,000) | (140,000) | - | - | - | - | - | - | - | - | - | - | (625,000) | - | (890,000) |
| **Bankruptcy Costs** | ($1,112,343) | ($674,833) | ($773,383) | ($973,383) | ($826,083) | ($476,083) | ($776,083) | ($626,083) | ($1,053,683) | ($663,683) | ($403,683) | ($603,683) | ($636,600) | ($247,801) | ($9,847,411) |
| **Net Cash Flow** | ($1,369,496) | ($2,420,387) | ($2,194,297) | ($1,752,738) | ($563,459) | ($166,489) | ($2,600,743) | ($1,149,461) | ($1,084,221) | ($856,688) | ($105,244) | ($715,491) | $405,088 | ($628,468) | ($15,202,092) |
| | **INTERIM** | | | | **FINAL** | | | | | | | | | | |
| Opening Cash Balance | $1,088,720 | $7,719,224 | $5,298,837 | $3,104,541 | $1,351,802 | $7,288,344 | $7,121,854 | $4,521,112 | $3,371,651 | $2,287,430 | $1,430,742 | $1,325,498 | $610,008 | $1,015,095 | $1,088,720 |
| Net Cash Flow | (1,369,496) | (2,420,387) | (2,194,297) | (1,752,738) | (563,459) | (166,489) | (2,600,743) | (1,149,461) | (1,084,221) | (856,688) | (105,244) | (715,491) | 405,088 | (628,468) | (15,202,092) |
| DIP Draw | 8,000,000 | - | - | - | 6,500,000 | - | - | - | - | - | - | - | - | - | 14,500,000 |
| Payment of PIK'ed Fees and Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Closing Cash Balance (Book)** | $7,719,224 | $5,298,837 | $3,104,541 | $1,351,802 | $7,288,344 | $7,121,854 | $4,521,112 | $3,371,651 | $2,287,430 | $1,430,742 | $1,325,498 | $610,008 | $1,015,095 | $386,628 | $386,628 |
| | **INTERIM** | | | | **FINAL** | | | | | | | | | | **DIP Total** |
| DIP Loan Commitment (Rounded) | - | 14,000,000 | 14,000,000 | 14,000,000 | 14,000,000 | 43,500,000 | 43,500,000 | 43,500,000 | 43,500,000 | 43,500,000 | 43,500,000 | 43,500,000 | 43,500,000 | 43,500,000 | - |
| Beginning Balance | - | 14,000,000 | 14,000,000 | 14,000,000 | 14,000,000 | 43,500,000 | 43,500,000 | 43,500,000 | 43,500,000 | 43,500,000 | 43,500,000 | 43,500,000 | 43,500,000 | 43,500,000 | - |
| Roll-Up DIP (2x DIP) | 6,000,000 | - | - | - | 23,000,000 | - | - | - | - | - | - | - | - | - | 29,000,000 |
| DIP Financing - Interest and Fees[1] | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Petition Cash Flow | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Financing | 8,000,000 | - | - | - | 6,500,000 | - | - | - | - | - | - | - | - | - | 14,500,000 |
| Ending Balance | 14,000,000 | 14,000,000 | 14,000,000 | 14,000,000 | 43,500,000 | 43,500,000 | 43,500,000 | 43,500,000 | 43,500,000 | 43,500,000 | 43,500,000 | 43,500,000 | 43,500,000 | 43,500,000 | 43,500,000 |

[1] The Budget does not include accrued DIP fees and interest charges that are payable at maturity.

**EXHIBIT C**

(Relative Lien Priorities: DIP Collateral)

| Priority | Prepetition Term Loan Collateral | EDC Collateral | Other DIP Collateral |
|---|---|---|---|
| 1. | Prepetition Permitted Liens | Prepetition Permitted Liens | Carve-Out |
| 2. | Carve-Out | Carve-Out | DIP Liens |
| 3. | DIP Liens | EDC Liens | Term Loan Replacement Liens |
| 4. | Term Loan Replacement Liens | DIP Liens | |
| 5. | Term Loan Liens | Term Loan Replacement Liens | |

69

## Schedule 1

(Prepetition Permitted Liens)

None.