## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| AVENGER FLIGHT GROUP, LLC, *et al.*, | Case No. 26-10183 (___) |
| Debtors.[1] | (Joint Administration Requested) |

### MOTION FOR (I) AN ORDER (A) APPROVING BID PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS; (B) APPROVING CERTAIN BID PROTECTIONS IN CONNECTION WITH THE DEBTORS' ENTRY INTO STALKING HORSE APA; (C) SCHEDULING THE AUCTION AND SALE HEARING; (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (E) GRANTING RELATED RELIEF; AND (II) AN ORDER OR ORDERS (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES; AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby file this Motion (the "Motion") for entry of an order, pursuant to sections 105(a), 363, 365, 503, 507, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), substantially in the proposed form attached hereto as **Exhibit A** (the "Bid Procedures Order"):

---

[1]    The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are:  Avenger Flight Group, LLC (1216); AFG Dallas III, LLC (5615); AFG Dallas IV, LLC (5558); AFG Dallas, LLC (3418); AFG EU Operations Corp. (9406); AFG FLL, LLC (6470); AFG Latam Holding Corp. (6475); AFG Latam Sim Holdings II, LLC (0473); AFG Latam Sim Holdings III, LLC (2592); AFG Latam Sim Holdings IV, LLC (0093); AFG Latam Sim Holdings, LLC (6475); AFG Latam, LLC (9545); AFG Mexico Corp. (1402); AFG Orlando, LLC (8409); AFG Sanford, LLC (6661); AFG Sim Holding Corp. (3325); Avenger Flight Group Europe, Corp. (5908); Avenger Flight Group Topco, LLC (5643); Avenger Flight Training, LLC (5640); Avenger Flight Group Mexico II, S. de R.L. de C.V, (N/A); and Papi Flight Training, LLC (6206). The location of the Debtors' corporate headquarters and the Debtors' service address is Avenger Flight Group LLC, 1450 Lee Wagener Blvd., Fort Lauderdale, FL  33315.

i.       establishing and approving bid procedures (the "Bid Procedures"), substantially in the form attached as Exhibit 1 to the Bid Procedures Order, in connection with the sale or sales (each, a "Sale") of the Debtors' assets (the "Assets") pursuant to section 363 of the Bankruptcy Code;

ii.      authorizing the Debtors to designate the Stalking Horse Bidder (as defined below) in accordance with the Bid Procedures Order;

iii.     scheduling an auction or auctions for a Sale or Sales (each, an "Auction") and approving the form and manner of notice thereof (the "Bid Procedures/Auction Notice");

iv.     authorizing the Debtors to enter into and perform under the *Asset Purchase Agreement* (the "Stalking Horse APA") with a designee(s) of the Prepetition Term Loan Secured Parties and/or DIP Secured Parties (the "Stalking Horse Bidder") for a Sale of substantially all of the Debtors' Assets (the "Stalking Horse Bid");

v.      authorizing the Debtors to provide the Stalking Horse Bidder with an expense reimbursement of its actual expenses not to exceed $2,000,000 (the "Expense Reimbursement");

vi.     establishing certain procedures relating to the assumption, assumption and assignment, or transfer of executory contracts and unexpired leases (the "Transferred Contracts") in connection with any Sale(s) (the "Contract and Lease Procedures"), and approving the form and manner of notice (the "Cure Notice") of the potential assumption, assumption and assignment, or transfer of executory contracts and unexpired leases (the "Potential Assumed/Assigned Contracts");

vii.    setting a hearing for approval of any Sale(s) (the "Sale Hearing"); and

viii.   granting related relief.

In support of this Motion, the Debtors rely upon and refer this Court to the *Declaration of Lawrence Perkins in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration")[2] and the *Declaration of Michael Cox in Support of Motion for (I) An Order (A) Approving Bid Procedures for the Sale of the Debtors' Assets; (B) Approving Certain Bid Protections in Connection With the Debtors' Entry Into Stalking Horse APA; (C) Scheduling The Auction and Sale Hearing; (D) Approving the Form and Manner of Notice Thereof; and (E)*

---

[2]    A capitalized term used but not defined herein shall have the meaning ascribed to it in the First Day Declaration.

*Granting Related Relief; and (II) An Order or Orders (A) Approving the Sale of the Debtors'*
*Assets Free and Clear of All Encumbrances; and (B) Approving the Assumption and Assignment*
*of Executory Contracts and Unexpired Leases* (the "Cox Declaration"), filed contemporaneously
herewith and incorporated herein by reference.  In further support of the Motion, the Debtors
respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Debtors have entered chapter 11 with a clear plan: to establish and execute
upon a process for the value-maximizing sale of all or substantially all of their Assets for the
benefit of all of their stakeholders.  The Debtors have therefore filed this Motion to facilitate the
marketing and sale of their Assets through an open process that protects the best interests of the
Debtors' estates and creditors and preserves the Debtors' ability to exercise its fiduciary duties
throughout the Sale process (the "Sale Process").  To that end, the Debtors have entered into the
Stalking Horse APA with the Stalking Horse Bidder, which, as described more fully below, will
serve as the baseline for all prospective bidders and will be subject to higher or otherwise better
bids for the Assets pursuant to the Bid Procedures.

2.      As part of the Debtors' efforts to ensure that they secure a value-maximizing
transaction or transactions for the Assets, prior to the Petition Date, the Debtors retained Seabury
Securities LLC ("Seabury"), an experienced and well-known investment banker with particular
expertise in the aviation industry.  Seabury is commencing a robust process to market the Assets
and obtain the highest or otherwise best value for them, using the Stalking Horse Bidder as a
baseline.  Seabury has populated a comprehensive data room (the "Data Room") and is in the

process of sending a teaser to no fewer than 65 parties that may be interested in engaging in a Sale with the Debtors (each, a "Potential Bidder") for all or a portion of the Debtors' Assets.

3.      The Bid Procedures provide the formal framework for a Sale or Sales and have been structured to elicit value-maximizing bids for the Assets.  Among other things, the Bid Procedures: (a) formalize marketing efforts that set forth a timeline for the Sale Process that is reasonable and appropriate to produce value-maximizing bids for the Debtors' Assets and are consistent with the milestones set forth in contemplated by the order(s) approving the Debtors' proposed DIP financing (the "DIP Orders"); (b) establish the basic rules for submitting bids for the purchase of any or all of the Debtors' Assets; (c) approve the selection of the Stalking Horse Bidder; and (d) provide major creditor groups (the "Consultation Parties")[3] with consultation rights at various stages in the process.  The proposed Bid Procedures comply with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and, therefore, should be approved.

4.      Consistent with the Debtors' needs to consummate a Sale or Sales as efficiently as possible, the Debtors propose the following key dates and deadlines for the Sale Process:

| Date[4] | Event |
|---|---|
| **February 26, 2026 at 5:00 p.m.** | Deadline to Object to Bid Procedures Motion |
| **March 5, 2026** | Bid Procedures Hearing |
| **March 9, 2026** | Deadline to File and Serve Cure Notice |

---

[3]      The Consultation Parties are (a) counsel to the official committee of unsecured creditors, if appointed, and (b) in the event that the Stalking Horse Bidder terminates its credit bid, the Required DIP Lenders (as defined in the DIP Order)

[4]      All times are prevailing Eastern time.  The Debtors, after consultation with the Consultation Parties, may extend the deadlines set forth herein; *provided* that the Bid Deadline for Assets subject to the Stalking Horse Bid shall not be extended beyond fifty (50) days after the Petition Date without the consent of the Stalking Horse Bidder.

| Date[4] | Event |
|---|---|
| **March 23, 2026 at 5:00 p.m.** | Contract Objection Deadline (including Stalking Horse Adequate Assurance Objection Deadline) |
| **March 27, 2026 at 5:00 p.m.** | Deadline to Submit Qualified Bids |
| **April 1, 2026** | Deadline to Designate Qualified Bids and File Auction Notice |
| **April 2, 2026 at 10:00 a.m.** | Auction (if necessary) |
| **April 3, 2026** | Deadline to File Notice of Successful Bidder(s) and Back-Up Bidder(s) |
| **April 6, 2026 at 12:00 p.m.** | Deadline to Object to Sale(s) |
| **April 6, 2026 at 12:00 p.m.** | Non-Stalking Horse Adequate Assurance Objection Deadline |
| **April 7, 2026** | Sale Hearing |
| **April 12, 2026** | Deadline to Close Sale(s) |

5.     In addition, as listed in the key dates above and set forth in more detail below, the Debtors seek to establish certain procedures relating to the assumption, assumption and assignment, or transfer of executory contracts and unexpired leases in connection with the Sale(s). Accordingly, as discussed in detail herein, the Debtors respectfully request entry of the Bid Procedures Order.

## JURISDICTION AND VENUE

6.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution. The Debtor confirms its consent, pursuant to Rule 9013-1(f) of the Local Rules, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that

the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The statutory bases for the relief requested herein are sections 105, 363, and 365 of the Bankruptcy Code; Bankruptcy Rules 2002, 6004, 6006, and 9008; and Local Rules 2002-1 and 6004-1.

## BACKGROUND

### A.      Case Background

9.      On the date hereof (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases, and no committees have been appointed or designated.

10.      A detailed description of the Debtors' business and facts precipitating the filing of the Debtors' chapter 11 proceedings is set forth in the First Day Declaration.

### B.      The Debtors' Marketing Process

11.      The Debtors' Sale Process is being managed by their investment banker, Seabury. Seabury was retained by the Debtors in December 2025 to, among other things, assist the Debtors in marketing their Assets.  To that end, prior to the Petition Date, Seabury worked closely with the Debtors' management to analyze the Debtors' current financial position, prepare marketing and diligence materials, and populate the Data Room for prospective purchasers interested in purchasing all or any portion of the Debtors' Assets.

12.     Upon the filing of these Chapter 11 Cases, Seabury will send a teaser regarding the opportunity to purchase the Assets to at least fifteen (15) strategic parties and at least fifty (50) financial investors (collectively, "Potential Bidders") with experience in the Debtors' industry and potential interest in purchasing the Assets.  Upon their execution of a Confidentiality Agreement, subject to the Bid Procedures, Potential Bidders will be granted immediate access to the Data Room.

## RELIEF REQUESTED

13.     By this Motion, the Debtors seek the entry of the Bid Procedures Order: (i) approving the Bid Procedures; (ii) approving various forms and the manner of notice thereof; (iii) authorizing the Debtors to designate the Stalking Horse Bidder and to provide the Expense Reimbursement in connection therewith; (iv) establishing the Contract and Lease Procedures, and approving the form and manner of notice of the Cure Notice; (v) scheduling the Auction and a Sale Hearing; and (vi) granting related relief.

14.     Additionally, by this Motion, the Debtors further request that, at the Sale Hearing, the Court enter an order or orders approving the Sale(s) of the Assets free and clear of all Encumbrances and any other interest in such property of an entity other than the Debtors' estates.[5]

---

[5]     As used herein, "Encumbrance" and "Encumbrances" include all of the following, in each case, to the extent against or with respect to any Debtor, or in, on, or against, or with respect to any of the Assets: liens (including as defined in section 101(37) of the Bankruptcy Code, and whether consensual, statutory, possessory, judicial, or otherwise), claims (as defined in section 101(5) of the Bankruptcy Code) ("Claims"), debts (as defined in section 101(12) of the Bankruptcy Code), encumbrances, obligations, liabilities, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, or interests of any kind or nature whatsoever, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to, on, or subsequent to, the commencement of these Chapter 11 Cases, and in each case, whether imposed by agreement, understanding, law, equity, or otherwise, including, but not limited to: (i) mortgages, security deeds, deeds of trust, pledges, charges, security interests, levies, hypothecations, encumbrances, easements, servitudes, leases, subleases, licenses, rights-of-way, encroachments, restrictive covenants, restrictions on transferability, voting, sale, transfer or other similar restrictions, rights of setoff (except for setoffs validly exercised before the Petition Date, or preserved in a timely filed proof of claim or motion filed with the

4927-3170-8294.10 05863.00001

B.   **Bid Procedures**

15.   To maximize the value of their Assets for the benefit of the Debtors' estates and creditors, the Debtors seek to implement a competitive bidding process to culminate in one or more Sales. As described more fully in the Bid Procedures and the Bid Procedures Order, the Debtors seeks approval to sell the Assets to one or more Qualified Bidders (as defined below) that make the highest or otherwise best offers for the Assets. The Debtors request that competing bids for

---

Court), rights of use or possession, conditional sale arrangements, deferred purchase price obligations, profit sharing interest, or any similar rights; (ii) all Claims, including, without limitation, all rights or causes of action (whether in law or equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff (except for setoffs validly exercised before the Petition Date, or preserved in a timely filed proof of claim or motion filed with the Court), indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of a Debtor or any other Person, consent rights, options, contract rights, covenants, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity, or otherwise; (iii) all debts, liabilities, obligations, contractual rights and claims, including labor, employment, and pension claims; (iv) any rights that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or consents, or termination of a Debtor's or the Successful Bidder(s)' interest in the Assets, or any similar rights; (v) any rights under labor or employment agreements; (vi) any rights under pension, multiemployer plan (as such term is defined in section 3(37) or section 4001(a)(3) of the Employment Retirement Income Security Act of 1974 (as amended, "ERISA")), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of a Debtor or any multiemployer plan to which a Debtor has at any time contributed to or had any liability or potential liability; (vii) any other employee claims related to worker's compensation, occupation disease, or unemployment or temporary disability, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and the Age Discrimination in Employment Act, each as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Internal Revenue Code of any similar state law, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) any other state or federal benefits or claims relating to any employment with a Debtor or any of its predecessors, or (l) the WARN Act (29 U.S.C. §§ 2101, et seq.) or any state or other laws of similar effect; (viii) any bulk sales or similar law; (ix) any tax statutes or ordinances or other laws of similar effect, including, without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Assets before the closing of a Sale; (x) any unexpired and executory contract or unexpired lease to which a Debtor is a party that is not an Transferred Contract; (xi) any other excluded liabilities under the Purchase Agreement; and (xii) Encumbrances arising under or in connection with any acts, or failures to act, of a Debtor or any of its predecessors, affiliates, or subsidiaries, including, but not limited to, Encumbrances arising under any doctrines of successor liability (to the greatest extent permitted by applicable law), or transferee or vicarious liability, violation of the Securities Act, the Exchange Act, or other applicable securities laws or regulations, breach of fiduciary duty, or aiding or abetting breach of fiduciary duty, or any similar theories under applicable law or otherwise.

the Assets be governed by the Bid Procedures and Bid Procedures Order, which, among other

things, collectively establish:

    a.    the requirements that an Interested Party must satisfy to be entitled to participate in the bidding process and become a Potential Bidder [Bid Procedures at § I.A.2];

    b.    the requirements for Potential Bidders to submit bids and the method and criteria by which such bids become Qualified Bids [Bid Procedures at §§ I.B and I.C];

    c.    the designation of the Stalking Horse Bid [Bid Procedures at § I.B.1];

    d.    the deadline by which bids must be submitted [Bid Procedures at § I.C.1]; and

    e.    certain procedures related to the assumption and assignment or transfer of executory contracts and unexpired leases [Bid Procedures at § I.J].

    16.    Pursuant to Local Rule 6004-1(c), the Debtors highlight the following provisions

of the Bid Procedures and Bid Procedures Order:[6]

    (a)    ***Provisions Governing Qualification of Bidders*** *[L.R. 6004-1(c)(i)(A); Bid Procedures § I.A.2 – 3; Bid Procedures Order ¶ 2, 3]*.  To participate in the bidding process and receive due diligence information, including full access to the Debtors' electronic data room (the "Data Room") and additional non-public information regarding the Debtors (the "Diligence Materials"), parties interested in receiving due diligence information to participate in the bidding process (each, an "Interested Party") must deliver or have previously delivered to the Debtors, if determined to be necessary by the Debtors in their sole discretion, the Preliminary Bid Documents (as defined herein) to the following parties (the "Recipient Parties"):

        (i)    proposed counsel to the Debtors: (a) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE 19899-8705 (Courier 19801), Attn: Richard Pachulski (rpachulski@pszjlaw.com) and Steven Golden (sgolden@pszjlaw.com); and (b) Pachulski Stang Ziehl & Jones LLP, 1700 Broadway, 36th Floor, New York, NY 10019, Attn: Gregory Demo (gdemo@pszjlaw.com); and

        (ii)    investment banker to the Debtors: Seabury Securities LLC, Carnegie Hall Tower, 152 W. 57th Street, Suite 5300, New York, NY 10019, Attn:

---

[6]    These provisions are excerpted from the Bid Procedures and Bid Procedures Order.  However, to the extent any inconsistencies between this summary and the Bid Procedures and/or Bid Procedures Order exist, the Bid Procedures Order shall govern.

Layne Grindal (lgrindal@seaburysecurities.com) and Michael Cox (mcox@seaburysecurities.com).

The "Preliminary Bid Documents" that must be submitted to the Recipient Parties include: (a) an executed confidentiality agreement using the Debtors' form, as may be amended, on terms reasonably acceptable to the Debtors, to the extent not already executed (a "Confidentiality Agreement"); (b) a statement and/or other factual support demonstrating to the Debtors' satisfaction in the exercise of its reasonable business judgment that the Interested Party has a *bona fide* interest in purchasing all or any portion of the Assets; and (c) a statement detailing whether the person or entity is partnering with or otherwise working with any other interested party in connection with the potential submission of a joint Bid, including the identity of any such party or parties and a concise description of the nature of such partnership or joint Bid.  Any Interested Party who, in the Debtors' determination, qualifies for access to the Diligence Materials shall be deemed a "Potential Bidder."  For the avoidance of doubt, the Stalking Horse Bidder (as defined herein) shall be a Potential Bidder and does not need to submit the Preliminary Bid Documents.

The Debtors shall grant the Stalking Horse Bidder and, upon execution of a valid Confidentiality Agreement and up to and including the Bid Deadline, any Potential Bidder, access to the Data Room or additional information allowing such Potential Bidder to conduct due diligence on the potential acquisition of some or all of the Assets.  Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets: (a) to any person or entity who (i) is not a Potential Bidder, (ii) does not comply with the participation requirements set forth above, or (iii) in the case of competitively sensitive information, is a competitor of the Debtors; and (b) if and to the extent doing so would (1) violate any law to which the Debtors are subject, including any privacy law, (2) result in the disclosure of any trade secrets of third parties in breach of any contract with such third party, (3) violate any legally-binding obligation of any Debtor with respect to confidentiality, non-disclosure, or privacy, or (4) jeopardize protections afforded to any Debtor under the attorney-client privilege or the attorney work product doctrine (provided that, in the case of each of clauses (1) through (4), the Debtors shall use commercially reasonable efforts to (x) provide such access as can be provided (or otherwise convey such information regarding the applicable matter as can be conveyed) without violating such privilege, doctrine, contract, obligation or law and (y) provide such information in a manner without violating such privilege, doctrine, contract, obligation or law). Notwithstanding the foregoing, the Debtors reserve the right, in their discretion, to withhold or limit access to any information that the Debtors determine to be sensitive or otherwise not appropriate to disclose to any Potential Bidder.  The Debtors shall provide the Stalking Horse Bidder with any information provided to a Potential Bidder that has not already been provided to the Stalking Horse Bidder.

The Debtors may terminate access to the Data Room and any other non-public information in their reasonable discretion and after consultation with the

10

Consultation Parties at any time, including if (a) a Potential Bidder fails to become a Qualified Bidder (as defined herein) or (b) these Bid Procedures are terminated. The Potential Bidder shall return or destroy any non-public information the Debtors or their advisors provided to the Potential Bidder in accordance with the terms of the confidentiality agreement executed by the Debtors and the Potential Bidder.

Each Interested Party, Potential Bidder, and Qualified Bidder (as defined herein) (each, a "<u>Bidder</u>" and, collectively, the "<u>Bidders</u>") shall comply with all requests for additional information and due diligence access by the Debtors or their advisors regarding such Bidder and its contemplated Sale. Failure by a Potential Bidder to comply with requests for additional information and due diligence access will be a basis for the Debtors to determine that the Potential Bidder is not a Qualified Bidder. Failure by a Qualified Bidder to comply with such requests for additional information and due diligence access will be a basis for the Debtors to determine that a bid made by a Qualified Bidder is not a Qualified Bid.

(b) ***Provisions Governing Qualified Bids*** *[L.R. 6004-1(c)(i)(B), Bid Procedures § I.C; Bid Procedures Order ¶¶ 2, 3, 7]*. To be eligible to participate in the Auction and to be eligible for consideration as a Qualified Bidder, a Potential Bidder (other than the Stalking Horse Bidder) must deliver a Bid, so as to be received by the Recipient Parties on or before the Bid Deadline, that meets the following requirements (collectively, the "<u>Bid Conditions</u>"):

    a. <u>Purpose and Identity of Assets to be Purchased</u>. Each Bidder must state that the Bid includes an offer by the Bidder to effectuate a Sale and identify with specificity which Assets are included in the Bid. Each Bidder must specify whether the Bid is conditioned on purchasing all Assets included in the Bid or whether the Bid should be viewed as separate Bids for one or more sets of Assets (in which case, the Bid must specify such sets).

    b. <u>Good Faith Deposit</u>. Each Bid must be accompanied by a cash deposit (the "<u>Good Faith Deposit</u>") in the form of a wire transfer, certified check, or cash payable to the order of counsel pursuant to instructions to be provided by the Debtors equal to 10% of the Bidder's proposed Purchase Price (as defined herein), which will be held in a non-interest bearing escrow or trust account.

    c. <u>Purchase Price</u>. Each Bid must clearly set forth the cash purchase price (the "<u>Cash Consideration</u>") and identify any non-cash consideration included in such Bid (together with the Cash Consideration, the "<u>Purchase Price</u>") including, without limitation, which executory contracts and unexpired leases the Bidder expects the Debtors to assume and assign to the Bidder (the "<u>Transferred Contracts</u>") and which liabilities, if any, of the Debtors the Bidder is agreeing to assume (the "<u>Assumed Liabilities</u>"). The Purchase Price associated with each Bid may include only cash and/or other consideration acceptable to the Debtors after consultation with the Consultation Parties. The Cash Consideration of any Qualified Bid with

respect to all or any portion of the Assets must be no less than an amount necessary to satisfy the Expense Reimbursement, as defined herein, and be a Topping Bid with respect to the applicable Assets.  In order for the Bid to qualify as a "<u>Topping Bid</u>," it must provide for consideration at Closing (as defined herein) that is equal to or in excess of the sum of: (i) the Stalking Horse Bid; (ii) the Expense Reimbursement; and (iii) the Minimum Increment (as defined herein).

d.  <u>Binding and Irrevocable</u>.  Each Bid must include a signed writing stating that it is binding and irrevocable until the selection of the Successful Bidder, provided that if such Bidder is selected as the Successful Bidder or the Back-Up Bidder, its offer shall remain irrevocable until the closing of the Sale with the Successful Bidder or, as applicable, the Back-Up Bidder (the "<u>Closing</u>").

e.  <u>Contemplated Transaction Documents</u>.  Each Bid must include an executed Purchase Agreement marked against the Stalking Horse APA pursuant to which the Qualified Bidder proposes to effectuate the contemplated Sale including: (i) a redlined copy of the Purchase Agreement marked to show all changes requested by the Qualified Bidder against the Stalking Horse APA; and (ii) any changes to any exhibits or schedules to the Purchase Agreement (collectively, the "<u>Contemplated Transaction Documents</u>"). The terms and conditions of the Contemplated Transaction Documents must be, in the aggregate, not materially more burdensome to the Debtor than the provisions contained in the Stalking Horse APA.  A Bid must identify with particularity each and every condition to Closing and all Transferred Contracts pursuant to the Contemplated Transaction Documents.  All Bids must provide that all Cure Amounts will be paid by such Bidder.  ***The Contemplated Transaction Documents must include a commitment to close by no later than April 12, 2026***.  A Bid shall contain a detailed description of how the Potential Bidder intends to treat current employees of the Debtors.

f.  <u>Contingencies</u>.  A Bid may not be conditioned on obtaining financing, any internal approval, on the outcome or completion of due diligence, or of any other contingency; *provided* that it may be subject to the accuracy in all material respects at Closing of representations and warranties at or before Closing or the satisfaction in all material respects of customary representations and warranties for transactions of similar size and nature at or before Closing or the satisfaction in all material respects of customary conditions for transactions of similar size and nature at or before Closing. A Bid must disclose any regulatory or governmental approval required for the Potential Bidder to consummate the Sale and the time period within which the Potential Bidder expects to receive such regulatory or governmental approval.

g. <u>No Collusion</u>.  Each Bid must include a representation that the Bidder has not engaged in any collusion with respect to its Bid submission (though Potential Bidders are permitted to make joint bids to the extent such joint bid was previously disclosed to the Debtors in accordance with these Bid Procedures) and that the Bidder will not engage in any collusion with respect to any Bids, the Auction, or the Sale Process.

h. <u>Authorization to Bid and Identity of Bidder</u>.  Each Bid must include evidence of authorization and approval from such Potential Bidder's board of directors (or comparable governing body, or a statement as to why such approval is unnecessary) with respect to the submission, execution, delivery, and closing of the Contemplated Transaction Documents.  A Bid must also fully disclose the identity of the entity that is submitting the Bid, including the identity of the ultimate beneficial owners of the Bidder and the identity of any person or entity providing debt or equity financing for the Bid.

i. <u>Financing Sources</u>.  Each Bid must include written evidence that demonstrates the Potential Bidder has the necessary financial ability to close the contemplated Sale and provide adequate assurance of future performance under all Transferred Contracts.  Such information may include, *inter alia*, the following:

   i. the Potential Bidder's current financial statements (audited, if they exist);

   ii. contact names, telephone numbers, and e-mail addresses for verification of financing sources;

   iii. evidence of the Potential Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated Sale (including confirmation that the funding of such commitments is not subject to any contingency);

   iv. proof by the Potential Bidder of its financial capacity to close its proposed Sale(s), which may include written representations of the Potential Bidder's financial wherewithal or financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring all or any portion of the Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors (including in consultation with its advisors); and

   v. any other form of financial disclosure of credit-quality support information acceptable to the Debtors demonstrating that such Potential Bidder has the ability to close the contemplated Sale.

j.  Adequate Assurance of Future Performance.  Each Bid must demonstrate, in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, that the Potential Bidder can provide adequate assurance of future performance to the applicable counterparty under all Transferred Contracts as required by section 365 of the Bankruptcy Code.

k.  No Fees Payable to Qualified Bidder.  Other than the Stalking Horse Bidder, a Bidder may not request any break-up fee, termination fee, expense reimbursement, or any similar type of payment.  Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code relating in any way to the submission of its Bid, compliance with the Bid Procedures, or participation in the Sale Process.

l.  Payment of the Expense Reimbursement.  A Bid must allow for the payment of the Expense Reimbursement to the Stalking Horse Bidder from the first proceeds of the cash portion of the Purchase Price of such Bid upon Closing to the extent the Bid overlaps with the Stalking Horse Bid in regard to the Assets included in such Bid.  The Expense Reimbursement will only be earned by the Stalking Horse Bidder if the Successful Bidder has Overbid the Stalking Horse Bidder on the same Assets included in the Stalking Horse Bid, and will only be payable at the Closing of the applicable Sale to the Successful Bidder.

m.  Non-Reliance.  A Bid must include an acknowledgement and representation of the Potential Bidder that it has had an opportunity to conduct any and all due diligence regarding the Assets (as applicable to its Bid) and Assumed Liabilities prior to making its Bid, that it has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid, and that it did not rely upon any written or oral statements, representations, warranties, or guaranties, express, implied, statutory or otherwise, regarding the Assets, the financial performance of the Assets or, as applicable, the physical condition of the Assets, the Assumed Liabilities, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Contemplated Transaction Documents.

n.  As Is, Where Is.   A Bid must include an acknowledgement and representation of the Potential Bidder that it understands that any Sale Transaction shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents, or their estates except to the extent set forth in the Purchase Agreement of the Successful Bidder.

A Bid received from a Potential Bidder shall constitute a "Qualified Bid" if the Debtors believe, after consultation with the Consultation Parties, that such Bid would be consummated if selected as the Successful Bid.  The Debtors shall have

14

the right to reject any and all Bids (other than the Stalking Horse Bid) that they believe, after consultation with the Consultation Parties, do not comply with the Bid Procedures.  In the event that any Potential Bidder is determined by the Debtors not to be a Qualified Bidder, the Potential Bidder shall be refunded its Good Faith Deposit.

(c)     ***Stalking Horse Bidder and Bid Protections*** *[L.R. 6004-1(c)(i)(C); Bid Procedures §§ I.B.1, I.C.2(xii), I.D.3(a); Bid Procedures Order ¶¶ 4 – 6].*  The Debtors have entered into an asset purchase agreement (the "Stalking Horse APA") with AFG Topco, LP (the "Stalking Horse Bidder") for the purchase of substantially all of the Assets (the "Stalking Horse Bid") pursuant to, in part, a credit bid.  The Stalking Horse Bidder is a Qualified Bidder, the Stalking Horse Bid is a Qualified Bid, and the Stalking Horse Bidder shall not be required to provide a Good Faith Deposit.

A Bid must allow for the payment of the Expense Reimbursement to the Stalking Horse Bidder from the first proceeds of the cash portion of the Purchase Price of such Bid upon Closing to the extent the Bid overlaps with the Stalking Horse Bid in regard to the Assets included in such Bid.  The Expense Reimbursement will only be earned by the Stalking Horse Bidder if the Successful Bidder has Overbid the Stalking Horse Bidder on the same Assets included in the Stalking Horse Bid, and will only be payable at the Closing of the applicable Sale to the Successful Bidder.

During the Auction, bidding shall begin with the Baseline Bid.  Due to the potential combinations of Assets that may be included in any Bid, the Debtors reserve all rights with respect to the comparison of Qualified Bids to Stalking Horse Bid and the determination of the Baseline Bid(s) subject to the rights of the Consultation Parties as provided for herein.  In consultation with the Consultation Parties, the initial Overbid after the Baseline Bid (the "Initial Overbid") shall be made in an increment of $500,000 (the "Minimum Increment") *plus*, solely in the event the Baseline Bid is the Stalking Horse Bid, the Expense Reimbursement in cash.  Any Overbids subsequent to the Initial Overbid shall be made in increments of at least the applicable Minimum Increment; *provided, however*, that any Overbids by the Stalking Horse Bidder(s) shall only be required to be equal to the sum of (x) (1) the Baseline Bid or the then existing highest Bid *plus* (2) the Minimum Increment *less* (y) the amount of the Expense Reimbursement applicable to the Assets included in the Bid. After setting the Minimum Increment, such amount may be adjusted in response to bidding activity.

Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless the Debtors, after consultation with the Consultation Parties, accept a higher Qualified Bid as an Overbid.

(d)     ***Modification of Bid and Auction Procedures*** *[L.R. 6004-1(c)(i)(D); Bid Procedures §§ I.D.2, I.D.4, I.K; Bid Procedures Order ¶ 21].*  The Debtors may, in consultation with the Consultation Parties, announce at the Auction additional procedural rules (e.g., the amount of time to make Overbids, the amount of the

Minimum Increment, or the requirement that parties submit "best and final" Bids) for conducting the Auction or otherwise modify these Bid Procedures; *provided* that such rules are disclosed to each Qualified Bidder during the Auction.

The Debtors, after consultation with the Consultation Parties, may (a) determine which Qualified Bid or Qualified Bids, if any, is the highest or best offer for all or any portion of the Assets, (b) reject at any time before entry of an order of the Court approving a Sale of all or any portion of the Assets pursuant to a Qualified Bid (other than the Stalking Horse Bid), any Bid that is (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the Bid Procedures Order; or (iii) contrary to the best interest of the Debtors, their estates, and their creditors, (c) modify the Bid Procedures in response to the bidding activity at the Auction.

Without prejudice to the rights of the Stalking Horse Bidder under the Stalking Horse APA, the Debtors, in consultation with the Consultation Parties, reserve the right to modify these Bid Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein (provided that the Bid Deadline for Assets subject to the Stalking Horse Bid shall not be extended beyond fifty (50) days after the Petition Date without the consent of the Stalking Horse Bidder), modify bidding increments, waive terms and conditions set forth herein with respect to any or all Potential Bidders, impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and/or adjourn the Sale Hearing; *provided* that the Debtors may not amend these Bid Procedures to reduce or otherwise modify its obligations to consult with any Consultation Party without the consent of such Consultation Party or further order of the Court; *provided further* that notwithstanding anything to the contrary herein, any such modification (including, for the avoidance of doubt, any extension of the Bid Deadline, postponement of the Auction, cancellation of the Auction, termination of the proposed Sale, or postponement of any other deadline) shall not override any milestones set forth in the DIP Order or the DIP Loan Documents. The Debtors shall consult with the Consultation Parties as provided for in these Bid Procedures; *provided, however*, that the Debtors shall not be required to consult with any Consultation Party (or its advisors) regarding any particular issue, selection, or determination if the Debtors determine in good faith on advice of counsel that such consultation would be inconsistent with the exercise of their fiduciary duties.

Notwithstanding anything to the contrary herein, the Bid Procedures shall not be modified to permit Qualified Bids that propose consideration that does not include sufficient cash specifically designated to pay the Stalking Horse Bidder's credit bid amount and the amount of the Expense Reimbursement or to require the Stalking Horse Bidder to provide a Good Faith Deposit.

(e)    ***Closing with Backup Bidders*** *[L.R. 6004-1(c)(i)(E); Bid Procedures § I.G]*.  If any Successful Bidder fails to consummate an approved Sale in accordance with its applicable Purchase Agreement or such Purchase Agreement is terminated, the

4927-3170-8294.10 05863.00001

Debtors, after consultation with the Consultation Parties, shall be authorized, but not required, to deem the applicable Back-Up Bid, as disclosed at the Sale Hearing, as the Successful Bid, and the Debtors, after consultation with the Consultation Parties, shall be authorized, but not required, to consummate the sale with the Back-Up Bidder submitting the next highest Bid for any Assets without further order of the Court.

## C.    The Stalking Horse APA

17.    Following arms'-length and good-faith negotiations, the Debtors and the Stalking Horse Bidder have agreed upon the Stalking Horse APA whereby the Stalking Horse Bidder will purchase the Assets.  A true and correct copy of the Stalking Horse APA is attached hereto as **Exhibit B**.  The Debtors submit that the Stalking Horse APA promotes competitive bidding and maximizes value by establishing a baseline bid for the Assets, which is subject to higher or otherwise better offers at the Auction.

18.    The material terms of the Stalking Horse APA are summarized as follows:[7]

| Parties<br><br>*See* Recitals<br>L.R. 6004-1(b)(iv)(A) | Buyer: AFG Topco, LP<br>Sellers: Avenger Flight Group, LLC and the Additional Sellers |
|---|---|
| Consideration<br><br>*See* § 3.2 | The aggregate consideration for the Acquired Assets (the "**Purchase Price**") shall consist of: (i) a credit bid by Buyer, on a dollar-for-dollar basis, pursuant to section 363(k) of the Bankruptcy Code, of all DIP Obligations outstanding as of the Closing Date and an amount of Pre-Petition Obligations such that the total credit bid equals an aggregate amount of one hundred twenty-five million dollars ($125,000,000) (together, the "**Credit Bid**" and the Purchase Price set forth in this clause (i), collectively, the "**Credit Bid Amount**"); (ii) Buyer's assumption of the Assumed Liabilities; and (iii) Buyer's agreement to terminate its Liens on the Excluded Cash as of the Closing.  The payment of the Purchase Price shall be subject to withholding or deduction as required by applicable Tax Law; <u>provided</u>, <u>however</u>, that Buyer shall use commercially reasonable efforts to (x) give Sellers at least five (5) days written notice of any Taxes that Buyer or its Affiliates intend to withhold and (y) cooperate with Sellers in attempting to minimize any such withholdings.  To the extent any amounts are so withheld and paid over to the appropriate Governmental Authority, Sellers shall be treated as receiving such amounts under this Agreement. |

---

[7]    Any summary of the Stalking Horse APA contained herein is qualified in its entirety by the actual terms and conditions of the Stalking Horse APA.  To the extent that there is any conflict between the summary contained herein and the actual terms and conditions of the Stalking Horse APA, the terms and conditions of the Stalking Horse APA shall control in all respects.  Further, solely with respect to usage in this table (and not elsewhere in this Motion), capitalized terms used but not defined in this table shall have the meanings ascribed to such terms in the Stalking Horse APA.

4927-3170-8294.10 05863.00001

| | |
|---|---|
| **Transferred Assets**<br><br>*See* § 2.1 | On the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall (or shall cause a Buyer Designee to) purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Buyer (or a Buyer Designee), pursuant to and in accordance with the Sale Order, all of Sellers' right, title and interest in, to and under the Acquired Assets, free and clear of all Liens, claims (as defined in section 101(5) of the Bankruptcy Code) and interests other than the Permitted Liens and Assumed Liabilities. "**Acquired Assets**" means all of Sellers' assets (other than the Excluded Assets), including the assets set forth as follows:<br><br>(a)  all Equity Securities held by any Seller in any Acquired Entity listed on Schedule 1.1(a), as such schedule may be amended from time to time by Buyer pursuant to **Error! Reference source not found.** (the "**Acquired Equity Interests**").<br><br>(b)  cash, cash equivalents, all prepayments (including all prepayments made to third party vendors), deferred assets, refunds, cash held in reserve, deposits made by Sellers to any third parties, credits or overpayments, except for the Excluded Cash;<br><br>(c)  all Contracts identified as Assigned Contracts on Schedule 1.1(c), as such schedule may be amended from time to time by Buyer pursuant to **Error! Reference source not found.** (the "**Assigned Contracts**");<br><br>(d)  all Accounts Receivables;<br><br>(e)  all Inventory;<br><br>(f)  all furniture, fixtures, equipment, marketing materials, merchandise and other personal property;<br><br>(g)  to the extent transferable pursuant to applicable Law, all Permits required for Sellers to conduct the Business as currently conducted or for the ownership, operation, use, maintenance, or repair of any of the Acquired Assets;<br><br>(h)  all Books and Records;<br><br>(i)  all Intellectual Property;<br><br>(j)  all General Intangibles;<br><br>(k)  all guarantees, representations, warranties and indemnities associated with the operation of the Business, including in respect of any Assumed Liabilities;<br><br>(l)  all insurance policies of Sellers and any claims thereunder to the extent such policies relate to the operation of the Business or to any Assumed Liabilities except to the extent included as an Excluded Asset in **Error! Reference source not found.**;<br><br>(m) all goodwill associated with, or relating to, the Business or the Acquired Assets; |

| | |
|---|---|
| | (n) all claims, causes of action, choses in action, rights of recovery, rights of set off, and rights of recoupment (including any such item relating to the payment of Taxes) relating to the Acquired Assets set forth in <u>Sections 1.1(a)-0</u>; |
| | (o) all claims and causes of action arising under sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b), or 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state-law equivalents or the proceeds of such claims, causes of action or avoidance actions; <u>provided</u> that Buyer shall not pursue or assert any such claims against those directors or officers of TopCo or any Target Company that were directors or officers of Buyer or any of its Subsidiaries on or following the Petition Date; |
| | (p) all refunds, rebates, abatements, credits, prepayments or overpayments or other receivables for Taxes, including Pre-Closing Straddle Period Taxes, that may be due for Pre-Closing Tax Periods (other than any refunds, rebates, abatements, credits, prepayments, overpayments, or other receivables with respect to Taxes paid by Sellers after the Closing); |
| | (q) all employee and personnel records with respect to the Transferred Employees, including all current employment eligibility verification form and related records, documents and papers; |
| | (r) all rights in or under the Benefit Plans that are maintained, sponsored, or contributed or required to be contributed to by Company Group for the benefit of any Transferred Employee that are identified by Buyer, in its sole discretion, following the date hereof and prior to the Closing Date on <u>Section 1.1(r)</u> (each, an "**Assumed Seller Plan**"), including all pre-payments, deposits and refunds thereunder and any assets maintained pursuant thereto or in connection therewith; |
| | (s) all claims of any Seller against any Excluded Subsidiary or other Group Company and any claim of any nature by any Seller against any present or former officer, director, employee, partner, member, Representative or agent of any member of any Seller, whether arising by way of counterclaim or otherwise; <u>provided</u> that Buyer shall not pursue or assert any such claims against those directors or officers of TopCo or any Target Company that were directors or officers of Buyer or any of its Subsidiaries on or following the Petition Date; and |
| | rights with respect to proofs of claim filed by or on behalf of any of Sellers in any bankruptcy case other than the Bankruptcy Cases of Sellers. |
| **Excluded Assets**<br><br>*See* § 2.2 | Notwithstanding anything in this Agreement to the contrary, Buyer shall not acquire and shall not be deemed to have acquired, any Excluded Assets and Sellers and their Affiliates shall retain all right, title and interest to, in and under the Excluded Assets. "**Excluded Assets**" means Sellers' properties and assets set forth as follows:<br><br>(a) any properties, rights and assets under any Benefit Plan;<br><br>(b) any Contracts of Sellers that are not Assigned Contracts (each, a "**Excluded Contract**"); |

| | |
|---|---|
| | (c) unless and until otherwise designated by Buyer as Acquired Equity Interests pursuant to <u>Section 1.1(a)</u>, Equity Securities of the Sellers and Excluded Subsidiaries; |
| | (d) any confidential personnel and medical records pertaining to any Employee who is not a Transferred Employee ("**Excluded Employees**"); |
| | (e) rights of Sellers under this Agreement (including the Purchase Price); |
| | (f) subject to the DIP Facility, retainers held by any professional retained by Sellers, and any funds of Sellers held in escrow or reserve with respect to the fees and expenses of any professional retained by Sellers; |
| | (g) Sellers' (i) Fundamental Documents and stock and minute books, and (ii) documents protected by any applicable privilege, including attorney-client or attorney work product privilege; |
| | (h) Excluded Cash; |
| | (i) Sellers' director and officer insurance policies, fiduciary policies or employment practices policies (in each case of the foregoing, including any tail policies or coverage thereon) and any proceeds thereof; and |
| | any other insurance policy of Seller which (i) relates solely to the Excluded Assets or Excluded Liabilities, (ii) are required to cover claims or expenses in the Bankruptcy Case or (iii) are required to be retained by Seller in connection with the Wind-Down. |
| **Assumed Liabilities**<br><br>*See* **§ 2.3** | On the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall (or shall cause Buyer Designee to) assume and be responsible for, effective as of the Closing, and thereafter pay, honor, perform and discharge as and when due, all of the Assumed Liabilities. "**Assumed Liabilities**" means the liabilities and obligations of Sellers set forth as follows:<br><br>(j) all Liabilities of Sellers relating to or arising under Assigned Contracts, but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date and to the extent such Liabilities do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Sellers or their Affiliates on or prior to the Closing (other than as it pertains to the Cure Costs as set forth in <u>Section 1.1(p)</u>);<br><br>(k) all Liabilities of Sellers (other than in respect of Taxes) relating to, or arising in respect of, the Acquired Assets accruing, arising out of or relating to events, occurrences, acts or omissions occurring or existing after the Closing Date or the operation of the Business or the Acquired Assets after the Closing Date;<br><br>(l) (i) Taxes with respect to the Acquired Assets or the Business for any taxable period beginning after the Closing Date and for any Straddle Period (other than Pre-Closing Straddle Period Taxes) and (ii) the Transaction Taxes;<br><br>(m) all Liabilities of Sellers relating to Transferred Employees accruing from and after the Closing Date, to the extent arising out of or relating to their |

| | employment by Buyer or any of its Affiliates (excluding, for the avoidance of doubt, any Excluded Employee Liabilities); |
|---|---|
| | (n)  all Liabilities of Sellers relating to accrued and unpaid vacation or paid time off obligations of Transferred Employees; |
| | (o)  to the extent lawfully transferable, all obligations, commitments and Liabilities under any Permits assigned to Buyer hereunder; |
| | (p)  all Liabilities of Sellers under the Revolving Credit Note; _provided_ that Buyer may, at Buyer's option, pay such Liabilities in cash at Closing or agree to another arrangement acceptable to Buyer and the Revolving Credit Note Lender; and |
| | all Cure Costs owed in connection with the Assigned Contracts. |
| **Excluded Liabilities**<br><br>_See_ § 2.4 | Notwithstanding anything in this Agreement to the contrary, Buyer shall not assume, and shall be deemed not to have assumed, any Liabilities relating to the Business of Sellers or any Affiliate of Sellers and Sellers and their Affiliates shall be solely and exclusively liable with respect to all such Liabilities, other than the Assumed Liabilities (collectively, the "**Excluded Liabilities**"), including those Liabilities set forth as follows:<br><br>(q)  any Liability of any Seller relating to any Excluded Asset;<br><br>(r)  all Liabilities under Indebtedness for borrowed money of the Sellers (including any Indebtedness or accounts payable owing from any Seller to any Affiliate of any Seller);<br><br>(s)  all accounts payable including to the extent not yet paid and overdue by more than 60 days from the date originally required for payment thereof, other than Cure Costs;<br><br>(t)  except for any Liabilities for Taxes that are Assumed Liabilities, all Tax Liabilities for Pre-Closing Tax Periods, including Pre-Closing Straddle Period Taxes, and any Tax Liabilities of Sellers arising from the transactions contemplated by this Agreement;<br><br>(u)  all Excluded Employee Liabilities;<br><br>(v)  all Liabilities of Sellers arising out of, relating to or with respect to (i) the employment or performance of services, or termination of employment or services by any Seller of any employee, or independent contractor on or before the close of business on the Closing Date, (ii) employment or labor Actions accruing either directly or indirectly against Seller that relate to the period on or before the close of business on the Closing Date, irrespective of whether such claims are made prior to or after the Closing and (iii) any Benefit Plan (including all Liabilities to the IRS or Department of Labor);<br><br>(w)  all Rejection Damages Claims;<br><br>(x)  any tort Liabilities of any Seller based on any acts, omissions, or conditions occurring or existing prior to the Closing Date;<br><br>(y)  all Environmental Liabilities relating to, resulting from, caused by or arising out of ownership, operation or control of the Business, to the extent |

4927-3170-8294.10 05863.00001

|  | accruing, arising out of or relating to events, occurrences, acts or omissions occurring or existing prior to the Closing Date;<br><br>(z) all Actions against each Seller, any of their respective assets, the Business and any of their past or present operations or activities;<br><br>(aa) any Liabilities or obligations in respect of Taxes of any Group Company other than the Acquired Entities and their Subsidiaries;<br><br>(bb) those Liabilities specifically set forth on <u>Schedule 1.1(bb)</u>; and<br><br>all Indemnification Claims. |
|---|---|
| **Sale to Insider**<br><br>**L.R. 6004-1(b)(iv)(A)** | Not applicable.[8] |
| **Agreements with Management**<br><br>**L.R. 6004-1(b)(iv)(B)** | Not applicable. |
| **Releases**<br><br>*See* **§ 1.1 (definition of "Sale Order")**<br>**L.R. 6004-1(b)(iv)(C)** | The Debtors expect the Sale Order to include a provision providing for mutual releases between and among Buyer and the Sellers. |
| **Private Sale/No Competitive Bidding**<br><br>**L.R. 6004-1(b)(iv)(D)** | Not applicable. |
| **Closing**<br><br>*See* **§ 10.1(b)**<br>**L.R. 6004-1(b)(iv)(E)** | This Agreement may be terminated and the Sale contemplated in this Agreement may be abandoned at any time prior to the Closing Date, notwithstanding the fact that any requisite authorization and approval of the Sale shall have been received by Buyer or Sellers, if the Closing has not occurred prior to 60 days following the Petition Date; provided, however, that (i) such date may be extended by Buyer in its sole discretion and (ii) the right to terminate this Agreement under this **Error! Reference source not found.** shall not be available to any party whose breach of this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur by such date. |
| **Good Faith Deposit**<br><br>**L.R. 6004-1(b)(iv)(F)** | Not applicable. |
| **Interim Arrangements with Proposed Buyer**<br><br>**L.R. 6004-1(b)(iv)(G)** | Not applicable. |
| **Use of Proceeds**<br><br>**L.R. 6004-1(b)(iv)(H)** | Not applicable. |
| **Tax Exemption**<br><br>**L.R. 6004-1(b)(iv)(I)** | Not applicable. |

[8] The Stalking Horse Bidder and its affiliates are not "insiders," as that term is defined in section 101(35) of the Bankruptcy Code.  As set forth in detail in the First Day Declaration, in August 2025, after the occurrence of certain undisputed events of default, the Prepetition Term Loan Agent exercised post-default rights with respect to interests in AFG LLC.  However, at all times thereafter, the Debtors have been managed by independent managers.

4927-3170-8294.10 05863.00001

| | |
|---|---|
| **Record Retention**<br><br>*See* § 7.4<br>**L.R. 6004-1(b)(iv)(J)** | Following the Closing, for the purposes (i) preparing or reviewing Tax Returns or participating in any Tax Proceeding, (ii) monitoring or enforcing rights or obligations under this Agreement, (iii) defending third-party lawsuits or complying with the requirements of any Governmental Authority, or (iv) any other reasonable business purpose of Sellers, including assistance with the wind-down and closing of the Bankruptcy Cases, the dissolution of Sellers, and related tax and other administrative matters, (x) upon reasonable notice, Buyer shall permit Sellers, their counsel, and other professionals reasonable access to all premises, information, properties, personnel, Books and Records, and Contracts or Leases, which access shall include (1) the right to copy such documents and records as they may request, and (2) Sellers' copying and delivering such documents or records as requested, (y) Buyer shall provide reasonable access to Buyer's personnel during regular business hours to assist Sellers in their post-Closing activities (including preparation of Tax Returns and requirements in the Bankruptcy Cases), provided that such access does not unreasonably interfere with Buyer's operations and (z) Buyer shall provide reasonable access to Buyer's employees and systems during regular business hours, at no expense to Sellers, to assist Sellers in managing payments and benefits to non-Transferred Employees. |
| **Sale of Avoidance Actions**<br><br>*See* § 2.1(o)<br>**L.R. 6004-1(b)(iv)(K)** | The Acquired Assets include all claims and causes of action arising under sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b), or 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state-law equivalents or the proceeds of such claims, causes of action or avoidance actions; <u>provided</u> that Buyer shall not pursue or assert any such claims against those directors or officers of TopCo or any Target Company that were directors or officers of Buyer or any of its Subsidiaries on or following the Petition Date |
| **Successor Liability Findings**<br><br>*See* § 1.1 (definition of "Sale Order")<br>**L.R. 6004-1(b)(iv)(L)** | The Debtors contemplate a finding and ruling in the Sale Order that provides that Buyer shall not be a successor in interest to any Seller for any purpose and that the sale is free and clear of any successor liability claims. |
| **Sale Free and Clear of Unexpired Leases**<br><br>**L.R. 6004-1(b)(iv)(M)** | The Debtors intend to seek entry of a Sale Order that provides, among other things, Court approval of the sale of the Purchased Assets free and clear of all Encumbrances pursuant to, among other provisions, sections 105, 363, and 365 of the Bankruptcy Code. |
| **Credit Bid**<br><br>*See* § 3.2(i)<br>**L.R. 6004-1(b)(iv)(N)** | The Purchase Price includes a credit bid by Buyer, on a dollar-for-dollar basis, pursuant to section 363(k) of the Bankruptcy Code, of all DIP Obligations outstanding as of the Closing Date and an amount of Pre-Petition Obligations such that the total credit bid equals an aggregate amount of one hundred twenty-five million dollars ($125,000,000) (together, the "**Credit Bid**" and the Purchase Price set forth in this clause (i), collectively, the "**Credit Bid Amount**") |
| **Relief from Bankruptcy Rule 6004(h)**<br><br>**L.R. 6004-1(b)(iv)(O)** | To maximize the value received for the [Purchased Assets], the Debtors seek to close the Sale as soon as possible after the Sale Hearing. Accordingly, the Debtors request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d). |

19.    As set forth above, the Stalking Horse APA contains certain key provisions, each of which were specifically negotiated by the Stalking Horse Bidder and which are a condition required by the Stalking Horse Bidder for the deal encapsulated in the Stalking Horse APA. As

4927-3170-8294.10 05863.00001

set forth in the Cox Declaration, the Debtors, following arm's-length negotiations with the Stalking Horse Bidder, concluded that these provisions were necessary to secure the Stalking Horse Bidder's commitment to acquire the Assets in accordance with the terms of the Stalking Horse APA.

20.     The Debtors submit that the terms set forth above and in the Bid Procedures Order are the result of extensive, good-faith, arm's-length negotiations, and that the Stalking Horse Bid is currently the highest and best proposal.  Accordingly, the Debtors' proposed entry into the Stalking Horse APA is in the best interest of the Debtors' estates, constitutes a sound exercise of the Debtors' business judgment, and should be approved.

### D.     Procedures Related to the Assumption and Assignment or Transfer of Contracts

21.     The Debtors are seeking approval of (i) the Contract and Lease Procedures for notifying counterparties to executory contracts and unexpired leases (the "Contract Counterparties") of, among other things, proposed Cure Amounts (as defined below) with respect to the Potential Assumed/Assigned Contracts; and (ii) procedures with respect to a Successful Bidder's provision of adequate assurance of future performance of a Transferred Contract.

### i.     *Cure and Assumption/Assignment Procedures*

22.     By **March 9, 2026**, the Debtors will file a notice (the "Cure Notice") identifying the Potential Assumed/Assigned Contracts (such list, the "Cure Schedule"),[9] substantially in the form attached as Schedule A to Exhibit 3 to the Bid Procedures Order, and will serve such notice on all Contract Counterparties to the Potential Assumed/Assigned Contracts.  The Cure Notice served on each Contract Counterparty shall: (i) identify the Potential Assumed/Assigned

---

[9]     For the avoidance of doubt, the Debtors reserve all rights to remove any executory contract or unexpired lease from the Cure Schedule prior to the closing of any Sale(s).

4927-3170-8294.10 05863.00001

Contracts; (ii) list the proposed cure amounts, if any, that the Debtors believe must be paid to cure all defaults outstanding under each Potential Assumed/Assigned Contract (the "Cure Amounts") as of such date; (iii) include a statement that assumption, assumption and assignment, or transfer of such Potential Assumed/Assigned Contract is not required or guaranteed; and (iv) inform such Contract Counterparty of the requirement to file any Contract Objection (as defined below) by the Contract Objection Deadline (as defined below). Service of the Cure Notice, including the Cure Schedule, upon a Contract Counterparty does not constitute an admission that a particular Potential Assumed/Assigned Contract is an executory contract or unexpired lease, or confirm that the Debtors are required to assume, assume and assign, and/or transfer such contract or lease.[10]

23.     The Debtors further request that a Contract Counterparty must file any objection to the Cure Amount and/or the assumption, assumption and assignment, and/or transfer of such Potential Assumed/Assigned Contract by **March 23, 2026 at 5:00 p.m. (Eastern Time)** (the "Contract Objection Deadline").

24.     In addition, if the Debtors identify additional executory contracts or unexpired leases that they wish to add to or remove from the Cure Schedule (each an "Additional Contract") the Debtors shall, as soon as practicable after making such a determination, send a supplemental Cure Notice (an "Additional Cure Notice") to the applicable Contract Counterparties to such Additional Contracts.

25.     The Debtors request that the Court require that any objections to a proposed Cure Amount (a "Cure Objection"), any other objections to the assumption, assumption and assignment, and/or transfer of any of the Potential Assumed/Assigned Contracts, and/or any Adequate

---

[10]     The Debtors reserve all rights concerning the characterization of the Potential Assumed/Assigned Contracts in all respects.

Assurance Objection (as defined below) solely as to the Stalking Horse Bidder (an "Assumption/Assignment Objection" and, together with a Cure Objection, a "Contract Objection") must: (i) be made in writing and filed on the docket for these Chapter 11 Cases no later than the Contract Objection Deadline; (ii) state the basis of such objection with specificity, including, without limitation, the Cure Amount alleged to be due by such Contract Counterparty, and include complete contact information for such Contract Counterparty (including address, telephone number, and email address) and appropriate documentation in support of the objection; (iii) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; and (iv) be served upon the Core Notice Parties (as defined in the Cure Notice), so as to be actually received by such parties on or before the Contract Objection Deadline.

26.     In addition, the Debtors request that the Court require that any objections from any Contract Counterparty to a proposed Cure Amount listed on an Additional Cure Notice (an "Additional Cure Objection"), any other objections to the assumption, assumption and assignment, and/or transfer of any of the Potential Assumed/Assigned Contracts listed on an Additional Cure Notice, and/or any Adequate Assurance Objection (as defined below) solely as to the Stalking Horse Bidder with respect to any Potential Assumed/Assigned Contracts listed on an Additional Cure Notice (an "Additional Assumption/Assignment Objection" and, together with an Additional Cure Objection, an "Additional Contract Objection") must: (i) be made in writing and filed on the docket by the later of (a) the Contract Objection Deadline and (b) seven (7) calendar days after the Debtors file and serve the Additional Cure Notice (as applicable, the "Additional Contract Objection Deadline"); (ii) state the basis of such objection with specificity, including, without limitation, any Cure Amount alleged by such Contract Counterparty, and include contact information for such Contract Counterparty and appropriate documentation in support of the

objection; (iii) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules; and (iv) be served upon the Core Notice Parties so as to be actually received on or before the Additional Contract Objection Deadline.

27.     The Cure Notice also provides that Contract Objections, if any, will be heard at (i) the Sale Hearing or (ii) on such other date subsequent to the Sale Hearing as the Court may designate, at the request of the Debtors with the consent of the applicable Successful Bidder, prior to, during, or after the Sale Hearing (the "Cure/Assignment Hearing").  Any Additional Contract Objections will be resolved at a hearing to be held by the Court (i) on or before seven (7) calendar days from the timely filing of the Additional Contract Objection; (ii) at the Cure/Assignment Hearing; or (iii) such other date designated by the Court.

ii.     ***Adequate Assurance of Future Performance Procedures***

28.     In addition, pursuant to this Motion, the Debtors seek to establish procedures with respect to the provision of adequate assurance of future performance with respect to a Transferred Contract by a Successful Bidder ***other than the Stalking Horse Bidder*** (a "Non-Stalking Horse Successful Bidder").  As discussed below, upon determination of the Successful Bid(s), on or before ***April 3, 2026***, the Debtors will file a Notice of Successful Bidder with the Court.  Any Contract Counterparty to a Transferred Contract seeking additional assurance of future performance than that provided by the Non-Stalking Horse Successful Bidder(s) (the "Adequate Assurance Objection") should immediately contact Steven Golden (sgolden@pszjlaw.com) and the applicable Non-Stalking Horse Successful Bidder to attempt to resolve any Adequate Assurance Objection.  All Adequate Assurance Objections must be filed and served on the Core

Notice Parties and the applicable Non-Stalking Horse Successful Bidder no later than **April 6, 2026 at 12:00 p.m. (prevailing Eastern Time)**.

29.     To the extent the parties are unable to consensually resolve an Adequate Assurance Objection (including any Adequate Assurance Objection with respect to the Stalking Horse Bidder) prior to Closing, the Court will set a hearing on the Adequate Assurance Objection to determine whether terms of the Successful Bid are compliant with section 365 of the Bankruptcy Code in providing adequate assurance of future performance to the Contract Counterparty of the applicable Transferred Contract, which may be at the Sale Hearing.  The Debtors intend to cooperate with Contract Counterparties to Transferred Contracts to attempt to reconcile any Adequate Assurance Objection.

30.     At the Sale Hearing, (i) the Successful Bidder(s) shall present evidence necessary to demonstrate adequate assurance of future performance by the Successful Bidder(s) with respect to the Transferred Contracts and (ii) the Debtors will request entry of an order approving the assumption and assignment of any or all Potential Assumed/Assigned Contracts to be assumed by the Debtors and assigned to the Successful Bidder(s).  For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of all parties-in-interest.

E.     <u>Scheduling and Notice</u>

31.     Pursuant to the milestones set forth in the Interim DIP Order, the Debtors are required to: (i) obtain entry of the Bid Procedures Order by no later than March 13, 2026, and (ii) obtain entry of an order approving the Sale(s) no later than April 7, 2026.  In addition, the terms of the Interim DIP Order requires that the Closing occur no later than April 12, 2026.

32.     Given the approximately 44-day post-petition marketing and diligence period (*i.e.*, the period from the Petition Date through the Bid Deadline) to be established by the Bid Procedures, the proposed timeline is sufficient to complete a fair and open sale process that will maximize the value received for the Assets under the circumstances while complying with the milestones established by the Interim DIP Order.  The proposed timeline will provide all Potential Bidders with sufficient time to perform due diligence.  Thus, the schedule proposed above will allow for the consummation of the Sale(s) as quickly as possible and in a manner designed to maximize the value received for the Assets.

33.     **Notice of Motion**.  On the date the notice of this Motion is filed or as soon as is practicable thereafter the Debtors will provide notice of this Motion to: (a) the Office of the U.S. Trustee for the District of Delaware, 844 King Street, Suite 2207, Lock Box 35, Wilmington, Delaware, 19801, Attn: Jon Lipshie, Esq. (jon.lipshie@usdoj.gov); (b) the holders of the 20 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Lenders and the Prepetition Term Loan Lenders (i) Proskauer Rose LLP, Eleven Times Square, New York, New York 10036 (Attn: David M. Hillman (dhillman@proskauer.com) and Matthew R. Koch (mkoch@proskauer.com)), and (ii) Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, Delaware 19801 (Attn: Matthew B. McGuire (mcguire@lrclaw.com)); (d) counsel to the DIP Agent, Alston & Bird LLP, 90 Park Avenue, New York, New York 10016 (Attn: William Hao (william.hao@alston.com) and Dylan S. Cassidy (dylan.cassidy@alston.com)); (e) the United States Attorney's Office for the District of Delaware; (f) the state attorneys general for all states in which the Debtors conduct business; (g) the Securities Exchange Commission; (h) all parties reasonably known to the Debtors that assert liens, claims, and encumbrances, and other interests with respect to the Assets; (i) all entities known to have expressed an interest in bidding on the

Assets; (j) the Internal Revenue Service, and any other federal, state or local governmental agency to the extent required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or order of the Court; and (k) any party that has requested service pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties").

34.    **Notice of Bid Procedures**. Within two (2) calendar days of the entry of the Bid Procedures Order, or as soon thereafter as practicable, the Debtors shall cause to be served, by first-class mail, postage prepaid, a notice (the "Bid Procedures Notice") setting forth, among other things, the dates established for submission of Qualified Bids, the Auction, and the Sale Hearing, substantially in the form attached to the Bid Procedures Order as Exhibit 2, upon the Sale Notice Parties and all of the Debtors' known creditors.  In addition, as soon as practicable after entry of the Bid Procedures Order, the Debtors will post the Bid Procedures Notice on their restructuring website, www.veritaglobal.net/AvengerFG, and publish the Bid Procedures Notice, with any modifications necessary for ease of publication, on one occasion in *The New York Times* (National Edition) or another publication with similar national circulation.

35.    **Cure Notice**.  On or before ***March 9, 2026***, the Debtors shall cause the Cure Notice to be filed and served by first class mail, postage prepaid, upon the Core Notice Parties and the Contract Counterparties. The Cure Notice, substantially in the form attached to the Bid Procedures Order as Exhibit 3, will include a schedule (the "Cure Schedule") identifying (i) the Potential Assumed/Assigned Contracts that may be assumed, assumed and assigned, or transferred in connection with any Sale(s) and (ii) the amount, if any, the Debtors believe is necessary to cure all monetary defaults under such Potential Assumed/Assigned Contracts pursuant to section 365 of the Bankruptcy Code.

36.      **Notice of Successful Bidder(s)**.  Following the Auction, the Debtors will promptly file with the Court a notice (the "Notice of Successful Bidder") that will inform the Court of the results of the Auction.[11]  The Notice of Successful Bidder will identify, among other things: (i) the Successful Bidder(s) as the proposed purchaser(s) of the Assets; (ii) the amount and form of consideration to be paid by the Successful Bidder(s) for the Assets; (iii) the liabilities to be assumed by the Successful Bidder(s); and (iv) the Potential Assumed/Assigned Contracts to be assumed by the Debtors and assigned to the Successful Bidder(s), or the Debtors' rights and interests therein sold and transferred to the Successful Bidder(s), as the case may be, in connection with the Sale(s) (*i.e.*, the Transferred Contracts).[12]  The Notice of Successful Bidder will also include similar information relating to the Back-Up Bidder(s) and the Back-Up Bid(s).  In addition, the Debtors will attach to the Notice of Successful Bidder: (i) the Sale Order(s) approving the Sale(s) to the Successful Bidder(s); (ii) a copy of the Purchase Agreement(s) entered into by the Debtors and the Successful Bidder(s) following the Auction; and (iii) any additional information or documentation relevant to the Successful Bid(s).  The Debtors will file the Notice of Successful Bidder on the docket for these Chapter 11 Cases as promptly as is reasonably practicable prior to the Sale Hearing, but will not be required to serve the same on any parties-in-interest in these Chapter 11 Cases.

F.      **Sale Order**

37.      The Debtors request that this Court set the Sale Hearing on **April 7, 2026** at a time to be determined by the Court.  At the Sale Hearing, the Debtors intend to seek the entry of the

---

[11]      To the extent that, in accordance with the Bid Procedures, an Auction does not occur, the Debtors will file a Notice of Successful Bidder, which notice may also provide for the cancellation of the Auction.

[12]      For the avoidance of doubt, the identification of the Transferred Contracts in the Notice of Successful Bidder may be accomplished through the attachment of any relevant schedule(s) to the Purchase Agreement(s) attached to such notice.

4927-3170-8294.10 05863.00001

Sale Order that, among other things: (a) approves the Sale(s) free and clear of all Encumbrances, and (b) authorizes the assumption and assignment or transfer of the Transferred Contracts.[13] Pursuant to the Sale Order, the Debtors will sell any Assets that are the subject of a Sale free and clear of all Encumbrances to the fullest extent possible pursuant to section 363(f) of the Bankruptcy Code (except for those Assumed Liabilities and obligations expressly assumed by the Successful Bidder(s)), and the Successful Bidder(s) will be protected from liability for and cannot be pursued for any claims or other obligations owed by any of the Debtors, except as otherwise agreed in writing by the Successful Bidder(s) and the Debtors or as expressly set forth in the Sale Order. The Bid Procedures provide proper and adequate notice for these and the other terms and conditions of the bidding, Auction, and Sale Processes.

## <u>BASIS FOR RELIEF REQUESTED</u>

A.    **Approval of the Sale(s) Is Warranted Under Section 363(b) of
the Bankruptcy Code and the Bid Procedures are Appropriate and
in the Best Interests of the Debtors' Estates and Their Creditors**

38.    Section 363(b)(1) of the Bankruptcy Code provides that the "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . . . "[14] Section 105(a) of the Bankruptcy Code further provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  A debtor may be authorized to sell assets outside of the ordinary course of business pursuant to section 363 of the Bankruptcy Code if it demonstrates a sound business purpose for doing so.[15]

---

[13]    To the extent the Debtors seek to consummate more than one Sale transaction, the Debtors reserve the right to seek the entry of multiple Sale Orders in accordance with these procedures.

[14]    11 U.S.C. § 363(b)(1).

[15]    *See In re Fed. Mogul Glob., Inc.*, 293 B.R. 124, 126 (D. Del . 2003) (finding that a court should approve a debtor's use of assets outside ordinary course of business if debtor can demonstrate a sound business justification for proposed transaction); *see also In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 154

32

39.     Courts typically consider the following factors in determining whether a proposed sale meets this standard: (i) whether a sound business justification exists for the sale; (ii) whether adequate and reasonable notice of the sale was given to interested parties; (iii) whether the sale will produce a fair and reasonable price for the property; and (iv) whether the parties have acted in good faith.[16]  When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[17]

40.     Indeed, the paramount goal of a chapter 11 process is to maximize the proceeds received by the estate.[18]  To that end, courts have recognized that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate of

---

(Bankr. D. Del. 1999) (finding that the debtor's sound business purpose justified its sale of the assets outside of the ordinary course of business).

[16]     *In re Decora Indus., Inc.,* 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (*citing Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).

[17]     *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11) (citations omitted).

[18]     *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) ("[A] primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149 (3d Cir. 1986) (noting the fairness and reasonableness of prices); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . debtor's duty . . . is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bag Co. v. Champion Intl Corp. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)); *In re Summit Glob. Logistics, Inc.*, No. 08-11566, 2008 Bankr. LEXIS 896, at *43 (Bankr. D.N.J. Mar. 26, 2008) (describing a proposed transaction as one that "maximize[d] value and return to interested parties.").

a debtor and therefore are appropriate.[19]  With this in mind, courts have deferred to a debtor's business judgment in the context of bidding and auction procedures.[20]

41.    In exercising their fiduciary duties and in the sound exercise of their business judgment, the Debtors have determined that the Bid Procedures are the most appropriate method for encouraging competing bids that will maximize creditor recoveries and that will ensure the value received for its Assets is the highest or best the market can generate.

42.    The Bid Procedures provide a framework to facilitate and assess additional bids for the purchase of any or all of the Debtors' Assets and, if such bids are received, to conduct an Auction in an orderly yet competitive fashion, thereby encouraging bids that maximize the value realized from a Sale of the Assets.  In particular, the Bid Procedures contemplate an open and fair auction process with minimum barriers to entry and provide Bidders with sufficient time to perform due diligence and to acquire the information necessary to submit a timely and well-informed bid.

43.    The Bid Procedures provide the Debtors with an adequate opportunity to consider competing bids and select the highest or best offer(s) for the purchase of any or all of the Debtors' Assets.  The Debtors therefore believe that submitting the purchase of its Assets to a market-based

---

[19]    *See, e.g., In re Dura Auto. Sys.*, 379 B.R. 257, 263 (Bankr. D. Del. 2017); *Integrated Res.*, 147 B.R. at 659 (providing that such procedures "encourage bidding and to maximize the value of the debtor's assets."); *In re Fin. News Network Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) ("[C]ourt-imposed rules for the disposition of assets [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estate.").

[20]    *See, e.g., In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtor] to show that a sound business purpose justifies such actions.' If the [Debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale." (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *In re Trans World Airlines Inc.*, No. 01-0056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr. 2, 2001) ("It is not the function of a bankruptcy court to independently exercise a business judgment as to which proposal among competing proposals should be adopted by the debtor in effecting a § 363(b) sale.").

test will ensure maximum recovery for all stakeholders.   Accordingly, the Debtors and their stakeholders can be assured that the consideration obtained will be fair and reasonable.

44.     Similar bidding, auction, and notice procedures have been previously approved by this Court in other chapter 11 cases. *See, e.g.*, *In re Amyris, Inc.*, No. 23-11131 (TMH) (Bankr. D. Del. Oct. 16, 2023); *In re PhaseBio Pharms., Inc.*, No. 22-10995 (LSS) (Bankr. D. Del. Nov. 28, 2022); *In re Genapsys, Inc.*, No. 22-10621 (BLS) (Bankr. D. Del. Aug. 17, 2022); *In re SanityDesk, Inc.*, No. 22-10527 (JTD) (Bankr. D. Del. Aug. 3, 2022); *In re Enjoy Tech., Inc.*, No. 22-10580 (JKS) (Bankr. D. Del. July 26, 2022); *In re Hamon Holdings Corp.*, No. 22-10375 (JTD) (Bankr. D. Del. July 13, 2022); *In re Healthe, Inc.*, No. 21-11567 (MFW) (Bankr. D. Del. Mar. 21, 2022); *In re Wardman Hotel Owner, L.L.C.*, No. 21-10023 (JTD) (Bankr. D. Del. June 15, 2021); *In re MobiTV, Inc.*, No. 21-10457 (LSS) (Bankr. D. Del. Apr. 7, 2021); *In re EHT US1, Inc.*, No. 21-10036 (CSS) (Bankr. D. Del. Mar. 24, 2021); *In re RTI Holding Co., LLC*, No. 20-12456 (JTD) (Bankr. D. Del. Nov. 20, 2020); *In re BL Rests. Holding, LLC*, No. 20-10156 (MFW) (Bankr. D. Del. Feb. 28, 2020); *In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Feb. 4, 2020).[21]

45.     In sum, the Debtors believe that the proposed Bid Procedures create an appropriate framework for expeditiously establishing that the Debtors are receiving the best and highest offers for their Assets.  Accordingly, the proposed Bid Procedures are reasonable, appropriate, and within the Debtors' sound business judgment under the circumstances.

---

[21]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion.  Copies of these orders are available upon request of the Debtors' counsel.

**B.**    **The Purchased Assets Should be Sold Free and Clear of Liens, Claims, and Encumbrances Pursuant to Section 363(f) of the Bankruptcy Code**

46.    In the interest of attracting the best offers, the Debtors request authorization to sell their Assets free and clear of any and all Encumbrances in accordance with section 363(f) of the Bankruptcy Code, with any such Encumbrances attaching to the proceeds of the Sale(s) of the Assets and distributed as provided for in a further order of the Bankruptcy Court.

47.    Under section 363(f) of the Bankruptcy Code, a debtor may sell estate property free and clear of liens, claims, encumbrances, and other interests if one of the following conditions is satisfied: (i) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (ii) such entity consents; (iii) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (iv) such interest is in bona fide dispute; or (v) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.[22]  Because section 363(f) of the Bankruptcy Code is written in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens, claims, encumbrances, and other interests.[23]

48.    Furthermore, section 105(a) of the Bankruptcy Code grants the court broad discretionary powers, providing that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  This equitable power may be utilized to effectuate the provisions of section 363(f).[24]

---

[22]    11 U.S.C. § 363(f).

[23]    *See, e.g.*, *In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002); *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992).

[24]    *See, e.g., In re Trans World Airlines, Inc.*, 2001 Bankr. LEXIS 723, at *18–19 (Bankr. D. Del. Mar. 27, 2001) (highlighting bankruptcy courts' equitable authority to authorize sale of estate assets free and clear).

4927-3170-8294.10 05863.00001

49.     The Debtors will demonstrate at the Sale Hearing that the Sale(s) satisfies the requirements of section 363(f).  Accordingly, the Debtors request authorization to sell their Assets free and clear of all Encumbrances.

**C.     Successful Bidders Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code**

50.     Section 363(m) of the Bankruptcy Code provides, in relevant part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c) of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.  A good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.[25]

51.     The Debtors submit that any Successful Bidder(s), including the Stalking Horse Bidder as applicable, will be "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code, and the Stalking Horse APA with the Stalking Horse Bidder is a good-faith, arm's-length agreement entitled to the protections of section 363(m) of the Bankruptcy Code.[26] *First*, the consideration to be received by the Debtors from a Successful Bidder will be substantial, fair, and reasonable.  *Second*, any sale agreement with a Successful Bidder will be the culmination of an open and competitive auction process in which all parties will be represented by separate

---

[25]     *See, e.g., In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *Miami Ctr. Ltd. P'ship v. Bank of New York*, 838 F.2d 1547, 1554 (11th Cir. 1988); *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985).

[26]     The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder(s).  Under the Bid Procedures, any Successful Bidder will have had to present a proposal in accordance therewith.  In addition, the Debtors will not choose as a Successful Bidder or a Back-Up Bidder any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

counsel and all negotiations will be conducted on an arm's-length, good-faith basis. *Third*, at the Sale Hearing, the facts will demonstrate no fraud, collusion, or an attempt to take grossly unfair advantage of other bidders or similar conduct that would cause or permit the Sale to be avoided under section 363(n) of the Bankruptcy Code. Further, with respect to Potential Bidders, the Bid Procedures are designed to ensure that no party is able to exert undue influence over the process. *Fourth*, any Bids that the Debtors ultimately determine to be a Successful Bid will have been evaluated and approved by the Debtors in consultation with their advisors and the Consultation Parties. Accordingly, the Debtors believe that the Stalking Horse Bidder or other Successful Bidder and any Purchase Agreement associated with a Successful Bid (including the Stalking Horse APA) should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

52.     Accordingly, the Debtors request that the Sale Order include a provision that any Successful Bidder for the Debtors' Assets is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Debtors maintain that providing the Successful Bidders with such protection will ensure that the maximum price will be received by the Debtors for the Assets.

**D.      Assumption and Assignment or Transfer of
         Certain Executory Contracts and Unexpired Leases Should be Authorized**

53.     To enhance the value of the Debtors' estates, the Debtors request authority under section 365 of the Bankruptcy Code to assume and assign or transfer the Transferred Contracts to the Successful Bidder(s). The Debtors further request that the Sale Order provide that the Transferred Contracts will be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder(s) notwithstanding any provisions in such assigned contracts and/or leases, including those described in sections 365(b)(2), (f)(1), and (f)(3) of the Bankruptcy Code, that prohibit such assignments.

4927-3170-8294.10 05863.00001

54.     A debtor may, subject to court approval, assume and assign executory contracts and unexpired leases under section 365(a) of the Bankruptcy Code.  Courts routinely approve motions to assume and assign executory contracts or unexpired leases upon a showing that a debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment.[27]  The assumption and assignment of the Transferred Contracts related to the Assets is an integral component of any Sale, without which a Sale would not be a viable option.

55.     Section 365(b)(1) of the Bankruptcy Code requires that, if there has been a default in a debtor's unexpired lease or executory contract, other than certain nonmonetary defaults as set forth in the statute, such unexpired lease or executory contract may not be assumed unless, at the time of the assumption, (i) such default is cured or there is adequate assurance that such default will be cured, (ii) compensation or adequate assurance of compensation is provided for any actual pecuniary loss resulting from such default, and (iii) adequate assurance of future performance under the lease is provided.[28]  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case but should be given "practical, pragmatic construction."[29]

56.     As set forth above, the Debtors will send a Cure Notice and Additional Cure Notice, as applicable, to all Contract Counterparties to the Potential Assumed/Assigned Contracts notifying such Contract Counterparties of the potential assumption, assumption and assignment, or transfer of such contract and/or lease, including pursuant to a Sale of Assets.  The Cure Notice

---

[27]     *In re Fleming Co. Inc.*, 499 F.3d 300, 305 (3d Cir. 2007).

[28]     11 U.S.C. § 365(b)(1).

[29]     *EBG Midtown South Corp. v. McLaren/Hart Env. Eng' g Corp.* (*In re Sanshoe Worldwide*), 139 B.R. 585, 593 (S.D.N.Y. 1992); *see also In re Fleming Co. Inc.*, 499 F.3d at 305; *Cinicola v. Scharffeberger*, 248 F.3d 110, 120 (3d Cir. 2001).

and Additional Cure Notice, as applicable, will also set forth the Cure Amount, if any, owing for all such contracts and/or leases according to the Debtors' books and records.

57.     Contract Counterparties to Potential Assumed/Assigned Contracts will be given sufficient time to object to the proposed Cure Amounts, if any, set forth in the Cure Notice.  If no objection is filed with regard to a particular Cure Amount and the Potential Assumed/Assigned Contract is a Transferred Contract pursuant to a proposed Sale of Assets, such Cure Amount shall be binding on the Debtors, the Successful Bidder(s), and the applicable Contract Counterparty. The payment of the Cure Amounts specified in the Cure Notice or Additional Cure Notice (or a different amount, either agreed to by the Debtors or resolved by this Court as a result of a timely-filed objection by the relevant Contract Counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the Contract Counterparties for any pecuniary losses under the applicable Transferred Contracts pursuant to section 365(b)(1) of the Bankruptcy Code, unless the Debtors determine, before the Sale Hearing, that a particular lease or contract is not executory or unexpired, and does not need to be cured to transfer the Assets to the relevant Successful Bidder.

58.     Section 365(f) of the Bankruptcy Code states that a debtor may assign its unexpired leases and executory contracts if, *inter alia,* the assignee provides "adequate assurance of future performance."[30]  If necessary, the Successful Bidder(s) must submit, among other things, written evidence of the ability to provide adequate assurance of future performance under the applicable contracts or leases as set forth above and in the Bid Procedures Order.  The affected Contract Counterparties will also be able to challenge the ability of the Successful Bidder(s) to provide adequate assurance as provided in the Bid Procedures Order.

---

[30]     11 U.S.C. § 365(f)(2)(B).

59. Any assumption and assignment or transfer of the Transferred Contracts will be subject to all of the provisions of such contract and/or lease, to the extent required by applicable law and in accordance with applicable provisions of the Bankruptcy Code. The Bid Procedures are designed to ensure that any Successful Bidder(s) is financially able and prepared to undertake all of the relevant obligations under the Transferred Contracts. The Debtors, together with the relevant Successful Bidder, will establish, as necessary, at the Sale Hearing, the requisite adequate assurance of future performance pursuant to section 365 of the Bankruptcy Code with respect to the potential assumption and assignment or transfer of the applicable Transferred Contracts. Consequently, assumption and assignment of the Transferred Contracts in connection with the Sale(s) is appropriate under the circumstances.

E. **Entry into the Stalking Horse APA
Has a Sound Business Purpose and Should Be Approved**

60. The Court should authorize the Debtors' entry into the Stalking Horse APA. To determine whether a debtor's sale of assets outside of the ordinary course of business satisfies the "business judgement" standard under section 363(b) of the Bankruptcy Code, courts consider whether "(1) there is a sound business purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has acted in good faith."[31] If a debtor demonstrates a valid business justification for a decision, such as preserving the value of the estate for the benefit of all stakeholders, "courts will generally not entertain

---

[31] *In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008) (citing *In re Delaware Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991)); *see also In re Elpida Memory, Inc.*, 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 20, 2012) ("The section 363(b) standard is well-settled. A debtor may sell assets outside the ordinary course of business when it has demonstrated that the sale of such assets represents the sound exercise of business judgment.").

objections" and "a strong presumption follows that the agreement was negotiated in good faith and is in the best interests of the estate."[32]

61.    The Debtors' entry into the Stalking Horse APA is a sound exercise of the Debtors' business judgment.  The use of a stalking horse bidder in a public auction process for the sale of a debtor's assets is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value."[33]

62.    In addition, the Debtors submit that the Expense Reimbursement is a normal and necessary component of transactions outside the ordinary course of business under section 363 of the Bankruptcy Code.   In particular, such a protection encourages a potential transaction counterparty to invest the requisite time, money, and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process.[34] The Debtors believe that the presence of Stalking Horse Bidder will set a floor for the value of the Assets and attract other potential buyers to bid for such Assets, thereby maximizing the realizable value of such assets for the benefit of the Debtors' estates, their creditors, and all other parties-in-

---

[32]    *In re Culp*, 545 B.R. 827, 844 (D. Del. 2016), *aff'd*, 681 F. App'x 140 (3d Cir. 2017).

[33]    *Off. Comm. of Unsecured Creditors v. Interforum LLC*, No. 11-CV-219, 2011 WL 2671254, at *1 (E.D. Wis. Jul. 7, 2011).

[34]    *See, e.g., In re Integrated Res., Inc.*, 147 B.R. 650, 660 (S.D.N.Y. 1992) (noting that fees may be legitimately necessary to convince a "white knight" to offer an initial bid by providing some form of compensation for the expenses such bidder incurs and the risks such bidder faces by having its offer held open, subject to higher and better offers); *In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's. . . due diligence"); *In re Marrose Corp.*, 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "agreements to provide reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"); *In re 995 Fifth Ave. Assocs.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citations omitted).

interest.  The Expense Reimbursement will only be paid out of the cash proceeds of a Sale arising from a Topping Bid or Overbid, as applicable.

63.    A proposed bidding incentive, such as the Expense Reimbursement, should be approved when it is in the best interest of the estate.[35]  Typically, this requires that the bidding incentive provide some benefit to the debtor's estate.[36]  In *O'Brien Environmental Energy*, the United States Court of Appeals for the Third Circuit found that whether breakup fees and expenses could be paid to a "stalking horse" bidder depended on whether such fees were necessary to preserve the value of the estate.[37]  Providing such protections would be appropriate, the court held, where the bidder provides a benefit to the debtor's estate by promoting competitive bidding or researching the value of the assets at issue to increase the likelihood that the selling price reflected the true value of the company.[38]  The Debtors believe that the approval of the Stalking Horse APA, including the Expense Reimbursement, will promote a competitive bidding process.

64.    The Debtors believe that the proposed Expense Reimbursement—which was negotiated at arms'-length between the Debtors and the Stalking Horse Bidder— is fair and reasonably compensates the Stalking Horse Bidder for taking actions that will benefit the Debtors' estates.  The Expense Reimbursement compensates the Stalking Horse Bidder for diligence and professional fees incurred in negotiating and documenting the terms of the Stalking Horse APA on an expedited timeline.

---

[35]    *See In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); *see also In re America West Airlines, Inc.*, 166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Indus., Inc.*, 140 B.R. 191 (Bankr. N.D. Ohio 1992).

[36]    *Calpine Corp. v. O'Brien Envtl. Energy, Inc.* (*In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

[37]    *See* 181 F.3d at 536.

[38]    *Id.* at 537.

65.     The Debtors do not believe that the Expense Reimbursement will have a chilling effect on the Sale Process.  Rather, the Debtors believe that the Stalking Horse Bidder will increase the likelihood that the Debtors will receive the best possible price for the Assets by permitting other Qualified Bidders to rely on the diligence performed by the Stalking Horse Bidder, and moreover, by allowing Qualified Bidders to utilize the Stalking Horse APA as a platform for negotiations and modifications in the context of a competitive bidding process.  Accordingly, the Expense Reimbursement satisfies the requirements for approval in this Circuit and should be approved.  Moreover, the amount of the Expense Reimbursement is well within (and indeed less than) the range of bid protections typically paid in sale transactions that have been recently approved by courts in this District.[39]  Notably, there is no breakup fee.

66.     Further, the Stalking Horse Bidder should be authorized to credit bid on the Assets under section 363(k) of the Bankruptcy Code, which provides that, unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of a sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."[40]  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such

---

[39]     *See, e.g.*, *In re Am. Eagle Del. Holding Co., LLC*, Case No. 22-10028 (JKS) (Bankr. D. Del. Mar. 8, 2022) (approving a breakup fee of 3% of the cash consideration of the stalking horse bid plus expense reimbursements equal to a maximum of 1.25% of the cash consideration of the stalking horse bid); *In re Makeup Liquidating Holdings, LLC*, Case No. 22-10050 (CSS) (Bankr. D. Del. Feb. 18, 2022) (approving breakup fee equal to 4% of the cash consideration of the stalking horse bid plus expense reimbursements equal to a maximum of approximately 3.5% of the cash consideration of the stalking horse bid); *In re Sequential Brands Grp., Inc.*, Case No. 21-11194 (JTD) (Bankr. D. Del. Sept. 24, 2021) (approving a break-up fee of 3.65% of the purchase price); *In re Knotel, Inc.*, Case No. 21-10146 (MFW) (Bankr. D. Del. Case 22-10367 Mar. 11, 2021) (approving a break-up fee of 3% of the purchase price).

[40]     11 U.S.C. § 363(k).

secured creditor to bid the full face value of its claim and does not limit the credit bid to the claim's economic value.[41]

67.     As a result, the Debtors propose that the Stalking Horse Bidder be entitled to credit bid all or a portion of its secured claims then outstanding under section 363(k) of the Bankruptcy Code and as provided for in the Bidding Procedures.

## F.    The Proposed Notices are Appropriate Under Bankruptcy Rule 2002

68.     The notices contemplated by the Bid Procedures give notice of the proposed Sale Process including a disclosure of the time, place, and methodology of the Auction, the terms and conditions for being a Qualified Bidder, the necessary terms to be included in any proposed Sale(s), and the deadline for filing any objections to the Sale Process or any part thereof.  The Debtors submit that the notice procedures comply with Bankruptcy Rule 2002 and include information regarding the Bid Procedures necessary to enable interested Bidders to participate in the Auction, and constitute good and adequate notice of the Bid Procedures and the other components of the Sale Process.  Therefore, the Debtors respectfully request that this Court approve the proposed notice procedures.

## G.    Relief from Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

69.     Under Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen (14) days after entry of the order.  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented.[42] Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory

---

[41]     *See Cohen v. KB Mezzanine Fund II, LP* (*In re Submicron Sys. Corp.*), 432 F.3d 448, 459-60 (3d Cir. 2006).

[42]     *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

4927-3170-8294.10 05863.00001

contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for fourteen (14) days, unless the court orders otherwise.

70.    To preserve the value of the Debtors' estates and limit the costs of administering and preserving the Assets, it is critical that the Debtors close the Sale(s) of the Assets as soon as possible after all closing conditions have been met or waived.  Accordingly, the Debtors hereby request that the Court waive the fourteen (14) day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## NO PRIOR REQUEST

71.    No prior request for the relief sought in this Motion has been made to this or any other court.

## NOTICE

72.    The Debtors will provide notice of this Motion to the Sale Notice Parties.  The Debtors respectfully submit that no other or further notice is required.

**WHEREFORE**, the Debtors respectfully request that the Court enter the Bid Procedures Order, granting the relief requested herein, and such other and further relief as this Court deems appropriate.

4927-3170-8294.10 05863.00001

Dated:   February 11, 2026          **PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Steven W. Golden*

Richard M. Pachulski, Esq. (*pro hac vice* forthcoming)
Steven W. Golden, Esq. (DE Bar No. 6807)
Mary F. Caloway, Esq. (DE Bar No. 3059)
919 North Market Street, 17th Floor
Wilmington, DE 19801
Telephone:     (302) 652-4100
Facsimile:     (302) 652 4400
Email:         rpachulski@pszjlaw.com
               sgolden@pszjlaw.com
               mcaloway@pszjlaw.com

- and -

Gregory V. Demo, Esq. (*pro hac vice* forthcoming)
Cia H. Mackle, Esq. (*pro hac vice* forthcoming)
1700 Broadway, 36th Floor
New York, NY 10019
Telephone:     (212) 561-7700
Facsimile:     (212) 561-7777
Email:         gdemo@pszjlaw.com
               cmackle@pszjlaw.com

*Proposed Counsel to the Debtors and Debtors-in-Possession*