**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>AVENGER FLIGHT GROUP, LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-10183 (___)<br><br>(Joint Administration Requested) |

**DECLARATION OF MICHAEL B. COX IN SUPPORT OF MOTION FOR (I) AN ORDER (A) APPROVING BID PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS; (B) APPROVING THE CONTRACT AND LEASE PROCEDURES IN CONNECTION WITH A SALE OR OTHER TRANSACTION; (C) APPROVING CERTAIN BID PROTECTIONS IN CONNECTION WITH THE DEBTORS' ENTRY INTO STALKING HORSE APA; (D) SCHEDULING THE AUCTION AND SALE HEARING; (E) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (F) GRANTING RELATED RELIEF; AND (II) AN ORDER OR ORDERS (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES; AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

I, Michael B. Cox, pursuant to section 1726 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1.     I am the Vice Chairman of Seabury Aviation Partners, LLC ("Seabury"), the proposed investment banker to the above-captioned debtors and debtors in possession (the "Debtors"). I submit this declaration (this "Declaration") in support of the *Motion for (I) An Order (A) Approving Bid Procedures for the Sale of the Debtors' Assets; (B) Approving the Contract and Lease Procedures in Connection with a Sale or Other Transaction; (C) Approving Certain Bid*

---

[1] The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are: Avenger Flight Group, LLC (1216); AFG Dallas III, LLC (5615); AFG Dallas IV, LLC (5558); AFG Dallas, LLC (3418); AFG EU Operations Corp. (9406); AFG FLL, LLC (6470); AFG Latam Holding Corp. (6475); AFG Latam Sim Holdings II, LLC (0473); AFG Latam Sim Holdings III, LLC (2592); AFG Latam Sim Holdings IV, LLC (0093); AFG Latam Sim Holdings, LLC (6475); AFG Latam, LLC (9545); AFG Mexico Corp. (1402); AFG Orlando, LLC (8409); AFG Sanford, LLC (6661); AFG Sim Holding Corp. (3325); Avenger Flight Group Europe, Corp. (5908); Avenger Flight Group Topco, LLC (5643); Avenger Flight Training, LLC (5640); Avenger Flight Group Mexico II, S. de R.L. de C.V, (N/A); and Papi Flight Training, LLC (6206). The location of the Debtors' corporate headquarters and the Debtors' service address is Avenger Flight Group LLC, 1450 Lee Wagener Blvd., Fort Lauderdale, FL 33315.

*Protections in Connection With the Debtors' Entry Into Stalking Horse APA; (D) Scheduling The Auction and Sale Hearing; (E) Approving the Form and Manner of Notice Thereof; and (F) Granting Related Relief; and (II) An Order or Orders (A) Approving the Sale of the Debtors' Assets Free and Clear of All Encumbrances; and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases* (the "<u>Motion</u>"), filed contemporaneously herewith.[2]

2.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information learned from my review of the relevant documents, and information I have received from members of the Debtors' management and the Debtors' advisors, including my team at Seabury (as defined below). I am over the age of 18 and, if I were called to testify, I could and would testify competently to the facts set forth herein.

## **Professional Qualifications**

3.  Seabury was engaged by the Debtors in December 2025 to act as their investment banker in connection with the exploration of a potential sale or other restructuring transaction. In the time prior to the Petition Date, Seabury acquired significant knowledge of the Debtors' business, including their financial affairs, debt structure, business operations, key stakeholders, key customers, and related matters. Following the Petition Date, I understand that the Debtors will seek to retain Seabury to serve as its investment banker and to continue to run, among other things, an extensive marketing process for the sale of all or substantially all of the Debtors' assets.

4.  Seabury is recognized for its expertise in providing investment banking and financial advisory services to airlines and other aviation industry participants in financially distressed situations, including advising debtors, creditors and other constituents in chapter 11

---

[2] Capitalized terms used but not defined herein are intended to have the meanings ascribed to them in the Motion.

cases and serving as financial advisor or investment banker in numerous such cases. Seabury has served as advisor with respect to corporate transformations, financial restructurings and new capital raises, as well as provided M&A advisory services, aircraft and other equipment advisory services and aviation consulting services.  Seabury has completed financial advisory assignments to airlines and others on a global basis for more than 30 years.

5. I joined Seabury's principal advisory practice in April of 1998.  I have over 35 years of airline corporate and financial advisory experience covering aviation finance, planning, cash management, business planning, and crisis management.  At Seabury, I have advised numerous clients in the aviation industry on a variety of projects, including business planning and valuation, mergers, acquisitions and divestitures, corporate finance transactions, fleet financing, and airline restructuring in general.  I have been involved in over 30 restructurings (in court and out of court proceedings), including the following chapter 11 cases: American Airlines, Northwest Airlines, US Airways (1 and 2), Air Canada (CCAA), Gemini Air Cargo, Frontier Airlines, Kitty Hawk Air Cargo, Pinnacle Airlines, Republic Airlines, Continental Airlines, Zetta Jet, CHC Helicopters, Philippines Airlines, Waypoint Leasing, and SAS AB.  In addition, I have been a leader in airline restructuring cases around the world, including Air Nostrum, Malaysian Airlines, Air Mauritius, Norwegian Airlines, South African Airways, Kuwait Airways, and Gulf Air, and have advised on numerous merger and acquisition assignments, including the sale of Seaborne Airlines, LOBO Leasing, SAS AB, and US Airways.

6. I received an M.B.A. in Finance and Accounting from the University of Texas, Austin and a B.B.A. in Business Management, *magna cum laude*, from Texas A&M University. I am a FINRA registered representative with Series 7, 63 and 79 designations.

**The Debtors' Sale and Marketing Efforts**

7. Seabury is managing the Debtors' Sale Process. Seabury was retained by the Debtors in December 2025 to, among other things, assist the Debtors in marketing their Assets. To that end, prior to the Petition Date, Seabury worked closely with the Debtors' management to analyze the Debtors' current financial position, prepare marketing and diligence materials, and populate the Data Room for prospective purchasers interested in purchasing all or any portion of the Debtors' Assets.

8. Seabury will be sending, as soon as practicable after the Petition Date, a teaser regarding the opportunity to purchase the Assets to at least fifteen (15) strategic parties and at least fifty (50) financial investors with experience in the Debtors' industry and potential interest in purchasing the Assets or otherwise engaging in a Transaction (collectively, "Potential Bidders"). Upon their execution of a Confidentiality Agreement, subject to the Bid Procedures, Potential Bidders will be granted immediate access to the Data Room.

**The Bid Procedures and Sale Timeline**

9. I believe that the Bid Procedures provide an appropriate framework for the Debtors to review, analyze, and compare bids for the Assets and to engage with bidders on an arm's length basis to work to improve the quality of their bids for the benefit of all parties in interest. I believe the Bid Procedures were carefully designed to facilitate a robust and competitive bidding process with significant flexibility. If approved, I believe the Bid Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or best offer for the Assets on a schedule consistent with the milestones and the Debtors' chapter 11 strategy.

10. I believe the timeline negotiated with the Stalking Horse Bidder is appropriate and balances the Debtors' need to run a complete process with an efficient timeframe to avoid creating

undue risk of loss and unnecessary administrative expense. I believe that conducting the sale, marketing, and public auction process within the time periods set forth in the Bid Procedures is reasonable and will provide parties with sufficient time and information necessary to formulate and submit bids to purchase the Assets or otherwise engage in a value-maximizing Transaction with the Debtors.

11. I further believe completion of the sale process in a timely manner will also maximize the value of the Debtors' Assets. The proposed dates governing the sale, marketing, and auction process are within the milestones required under the DIP Financing. Failure to adhere to these milestones could compromise the Debtors' ability to maximize the value of their assets as a going concern.

### Designation of the Stalking Horse Bidder

12. I believe that the Stalking Horse Bid provides the best opportunity to maximize value for the Assets for the benefit of all of the Debtors' stakeholders. The Debtors' entry into the Stalking Horse APA permits the Debtors to conduct a value-maximizing process, to be run by Seabury, that is backstopped by the Stalking Horse Bid. In that regard, the Debtors' ultimate consummation of the Stalking Horse APA is subject to higher or otherwise better offers that the Debtors may receive for the Assets pursuant to the Bid Procedures. I believe that there is a strong business justification for the Debtors to enter into the Stalking Horse APA. I further believe that the presence of the Stalking Horse Bidder will set a floor for the value of the Assets and attract other potential buyers to bid for such assets, thereby maximizing the realizable value of the Assets for the benefit of the Debtors' estates, their creditors, and all other parties in interest.

13. Furthermore, the Stalking Horse APA is premised upon the Debtors and Seabury conducting its marketing process during these Chapter 11 Cases, allowing for the discovery of any

Bid or combination of Bids that might result in value for the Debtors' estates in excess of that provided by the Stalking Horse Bid. Thus, I believe that the Stalking Horse APA is fair and reasonable and reflects the market terms for this type of transaction.

14. Further, based on my communications with the Debtors' legal advisors, I understand that the Expense Reimbursement was integral to the Stalking Horse Bidder's willingness to serve in such capacity and that the Stalking Horse Bidder is not willing to proceed in such capacity without the Expense Reimbursement.

15. I believe that the Expense Reimbursement of $2,000,000, the payment of which is subject to a number of conditions, including that it is payable solely from the proceeds of an "Alternative Transaction" (as defined in the Stalking Horse APA), is reasonable and appropriate in light of the nature of the proposed transaction and other precedent transactions. Indeed, it is my experience that stalking horse bidders generally request and receive bankruptcy court approval of more bid protections than are included in the Stalking Horse Bid, including break-up fees. The Expense Reimbursement negotiated with the Stalking Horse Bidder was the result of good faith, arms'-length negotiations between the Debtors and the Stalking Horse Bidder.

16. Based on the foregoing, the facts and circumstances of these Chapter 11 Cases, and the events leading to the commencement thereof, I believe that the Expense Reimbursement is (a) a necessary inducement for the Stalking Horse Bidder to enter into the Stalking Horse APA; (b) commensurate with the value and benefits conferred upon the Debtors' estates by the Stalking Horse Bidder; and (c) reasonable and appropriate in light of the nature of the proposed Transaction, the commitments made, and the efforts that have been and will be expended by the Stalking Horse Bidder. To date, the Stalking Horse Bid constitutes the highest or otherwise best offer received for the Assets.

17. I believe that approval of the Stalking Horse Bid and the proposed Bid Procedures Order, including the Expense Reimbursement, are in the best interest of, and provide a benefit to, the Debtors' estates, and that there is a strong business justification for the Debtors' decision to seek such approval.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: February 11, 2026

*/s/ Michael B. Cox*
Michael B. Cox
