## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AVENGER FLIGHT GROUP, LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-10183 (MFW)<br><br>(Joint Administration Requested) |

## DECLARATION OF LAWRENCE PERKINS IN SUPPORT
## OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Lawrence Perkins, pursuant to section 1726 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer (the "CRO") of Avenger Flight Group LLC ("AFG LLC") and its debtor affiliates in the above-captioned cases (together with AFG LLC, the "Debtors").  I have served as CRO of the Debtors since January 20, 2026, and previously served as independent manager of Avenger Flight Group Topco, LLC ("Topco") from November 12, 2025 to January 12, 2026 and as the independent manager of AFG LLC from August 26, 2025 to January 12, 2026 (as discussed further below).

2.      I have been personally and directly involved in the Debtors' restructuring process, both as an independent director and independent manager and as CRO, including negotiations with funding sources and prospective buyers of the Debtors' assets and the preparation of projections,

---

[1]      The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are:  Avenger Flight Group, LLC (1216); AFG Dallas III, LLC (5615); AFG Dallas IV, LLC (5558); AFG Dallas, LLC (3418); AFG EU Operations Corp. (9406); AFG FLL, LLC (6470); AFG Latam Holding Corp. (6475); AFG Latam Sim Holdings II, LLC (0473); AFG Latam Sim Holdings III, LLC (2592); AFG Latam Sim Holdings IV, LLC (0093); AFG Latam Sim Holdings, LLC (6475); AFG Latam, LLC (9545); AFG Mexico Corp. (1402); AFG Orlando, LLC (8409); AFG Sanford, LLC (6661); AFG Sim Holding Corp. (3325); Avenger Flight Group Europe, Corp. (5908); Avenger Flight Group Topco, LLC (5643); Avenger Flight Training, LLC (5640); Avenger Flight Group Mexico II, S. de R.L. de C.V, (N/A); and Papi Flight Training, LLC (6206). The location of the Debtors' corporate headquarters and the Debtors' service address is Avenger Flight Group LLC, 1450 Lee Wagener Blvd., Fort Lauderdale, FL 33315.

negotiations with vendors, lessors and counterparties, development of operational and profitability improvement plans, general management and preparation of budgets, and liquidity analyses for the Debtors.

3.      I also have personal experience and knowledge related to corporate turnaround and restructuring. I am the Chief Executive Officer and Founder of SierraConstellation Partners, LLC ("SCP"), a national interim management and advisory firm. I have over 20 years of experience in the turnaround industry that has included investment banking and turnaround consulting for middle market companies across the United States. Among other things, I have served as a chief restructuring officer, chief executive officer, board member turnaround advisor, and crisis manager in many industries, including manufacturing, technology, automotive, consumer products, financial services, healthcare, retail, and telecommunications. Representative engagements include serving as chief restructuring officer of New Age, Inc.; Tricida, Inc, Clarus Therapeutics, PhaseBio, Wave Computing, Inc.; Quanergy Systems, Inc. among others.

4.      On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case (collectively, the "Chapter 11 Cases") under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court for the District of Delaware (the "Court"), and they will continue to operate their business and manage their properties as debtors in possession.

5.      I am generally familiar with the Debtors' day-to-day operations, business affairs, books and records, and restructuring efforts. Except as otherwise indicated herein, the facts set forth in this declaration (this "Declaration") are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of or advisors to the Debtors, or my opinion based upon my experience, knowledge, and information concerning the Debtors'

operations.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

6.    To minimize any adverse effects of filing the bankruptcy petitions (the "<u>Petitions</u>") and to preserve value for the benefit of all stakeholders, the Debtors have filed a number of motions requesting various forms of "first day" relief (collectively, the "<u>First Day Pleadings</u>").  I submit, and am authorized by the Debtors to submit, this Declaration in support of the Petitions and the First Day Pleadings.  The relief requested in the First Day Pleadings is necessary to preserve and maximize the value of the Debtors' estates and allow them to sustain their current operations in chapter 11.

7.    This Declaration is intended to provide a summary overview of the Debtors' businesses and the circumstances leading to the commencement of these Chapter 11 Cases, and support the relief the Debtors seek in the First Day Pleadings.  I have organized this Declaration as follows:

- **Part II** provides a general overview of the Company's history and business operations.

- **Part III** describes the Company's corporate and capital structure.

- **Part IV** describes the circumstances leading to the commencement of these Chapter 11 Cases.

- **Part V** sets forth the evidentiary basis for the relief requested in each of the First Day Pleadings.

I.    **Preliminary Statement**[2]

8.    AFG LLC and its affiliates (collectively, "<u>Avenger</u>" or the "<u>Company</u>") operate as a global leader in commercial aviation simulation and flight training.  Avenger provides a full suite of advanced flight simulator training solutions to their customers, which include blue-chip

---

[2] Capitalized terms used but not defined in this Preliminary Statement are intended to have the meanings ascribed *infra*.

DE:4905-2029-9383.19 05863.00001

passenger airlines, low cost carriers ("LCCs"), regional airlines, charter operators, and training operators.  As of the Petition Date, the Company operates across 11 training centers in four (4) countries, specifically (a) 50 full-flight simulators ("FFS"), of which 23 are owned by the Company, 12 are leased, 11 are housed and maintained, and four (4) are subject to servicing agreements; and (b) 15 flight training devices ("FTD"), of which six (6) are owned and nine (9) are serviced by the Company.

9.      Avenger holds a critical and strategic position in the "pilot pipeline."  After pilots reach their required minimum flight hours to join an airline, nearly all subsequent training is conducted in advanced simulators.  Because it can cost as much as 25 times more to train in physical aircraft, commercial airlines use regulatory-approved advanced simulators to provide their crews with mandated initial courses, recurrent training, and upgrade training.  Commercial airlines have increasingly used third-party simulator providers like Avenger to avoid the capital outlay associated with purchasing from a limited supply of simulators and to quickly add or reduce training capacity based on need.  And, with more than 250,000 estimated new pilots that will be needed worldwide by 2032 to account for pilot retirements and industry growth, with its experience and track record, Avenger is well-placed to serve an essential market need for years to come.



DE:4905-2029-9383.19 05863.00001

10.     However, the Company has faced both internal and external challenges, including a high debt load, general industry headwinds, and the bankruptcies of some of its major customers. To help address these challenges, in the months leading up to the Petition Date, the Debtors engaged with many of their major stakeholders—including the Prepetition Term Loan Secured Parties, SIM International, and key equipment lessors—regarding a holistic restructuring to be effectuated through the chapter 11 process.

11.     To that end, as of the Petition Date, the Debtors secured a commitment for a $43.5 million senior secured superiority debtor in possession financing facility, which includes $14.5 million in new money (the "<u>DIP Facility</u>") to be provided by the Prepetition Term Loan Secured Parties and secured by liens on substantially all of the Debtors' assets.  The DIP Facility is designed to bridge the Debtors to the closing of a value-maximizing sale.  In addition, the Debtors have filed the Bid Procedures Motion (as defined herein) seeking, among other things, approval of procedures for the marketing and ultimate sale of their assets and for a designee(s) of the Prepetition Term Loan Secured Parties (the "<u>Stalking Horse Bidder</u>") to serve as stalking horse bidder, pursuant to a credit bid, for the purchase of substantially all of the Debtors' assets, subject to a court-approved overbidding process designed to maximize the realizable value for the Debtors' assets for the benefit of all stakeholders.

12.     In sum, the Debtors' decision to file these Chapter 11 Cases and pursue the sale process has been informed by the challenges they face and several months of exploration and deliberation by the Company's board of directors and management, with the assistance of their advisors, and only after all other alternatives were first considered.  The Debtors believe that their significant efforts to reach consensus prior to the Petition Date provide a clear path to realizing a

DE:4905-2029-9383.19 05863.00001

value-maximizing going concern transaction through these Chapter 11 Cases for the benefit of all of their stakeholders.

## II. The Company's Corporate Structure, History, and Operations

### A. Pilot Training and the "Pilot Pipeline"

13. Across the globe, regulators like the Federal Aviation Administration ("<u>FAA</u>") and the European Union Aviation Safety Agency ("<u>EASA</u>") mandate extensive flight training for all airline pilots ("<u>Mandatory Flight Training</u>").  These training requirements generally fall into three types:

- *Initial pilot training* is designed for crewmembers operating a new type of aircraft for the first time.  Initial training is a preliminary course that provides the essential skills and knowledge for a pilot, covering areas like aircraft systems and emergency procedures.

- *Recurrent pilot training* is ongoing mandatory training to maintain and update a pilot's skills and knowledge after their initial certification.  Recurrent pilot training happens at regular intervals—typically every six to twelve months for commercial pilots and every 24 months for general aviation pilots—and includes both ground school and simulator sessions covering normal procedures, abnormal situations, and emergencies.  The goal of recurrent pilot training is to reinforce safety, correct deviations in routine, and ensure pilots are well-prepared for a wide range of scenarios.

- *Upgrade pilot training* is the training required for a flight crew member who has served as a second in command on a specific type of aircraft to become a pilot in command of that same type of aircraft.  Upgrade pilot training includes the knowledge and skills necessary for a pilot to serve as a pilot in command, including proper control of the aircraft and adherence to procedures.

In addition, many commercial airlines require their flight crews to undergo airline-specific training that focuses on company-specific operating procedures, proprietary safety protocols, customer service expectations, and coordination within the airline's unique operational environment.

14. Ensuring pilots complete all Mandatory Flight Training is essential to the airline industry; if a crew member does not timely complete Mandatory Flight Training, they cannot fly. The specific requirements for Mandatory Flight Training vary by aircraft make and model and

6

regulatory authority.  For example, the below chart shows the Mandatory Flight Training required by each of the FAA and the EASA for two of the most common commercial aircraft: the Airbus A320 and the Boeing 737.

| Aircraft Type | Authority | Program Type | Ground School Hours | FTD Hours | FFS Hours | Total Hours |
|---|---|---|---|---|---|---|
| A320 | FAA | Initial | 60–70 | 8–12 | 32–36 | ≈100–115 |
| | | Recurrent (per year) | 8–12 | — | 8 (2×4-hr) | ≈16–20 |
| | | Upgrade | 24–30 | 4–6 | 16–20 | ≈45–55 |
| | EASA | Initial | 80–90 | 8–12 | 36–40 | ≈125–140 |
| | | Recurrent (per year) | 10–12 | — | 8 (2×4-hr) | ≈18–22 |
| | | Upgrade | 28–36 | 4–6 | 18–22 | ≈55–65 |
| B737 | FAA | Initial | 60–70 | 8–10 | 32–36 | ≈100–115 |
| | | Recurrent (per year) | 8–10 | — | 8 (2×4-hr) | ≈16–18 |
| | | Upgrade | 24–28 | 4–6 | 16–20 | ≈45–55 |
| | EASA | Initial | 75–85 | 8–12 | 36–40 | ≈120–135 |
| | | Recurrent (per year) | 10–12 | — | 8 (2×4-hr) | ≈18–22 |
| | | Upgrade | 28–36 | 4–6 | 18–22 | ≈55–65 |

15.    The aviation industry faces many pilot retirements over the next decade, with approximately 4% of the pilot workforce retiring each year.  At the same time, the airline industry continues to grow, with approximately 16,000 new business and commercial aircraft[3] expected to join the active civil aviation fleet by 2032.  As a result, industry experts project that over 250,000 new commercial airline pilots will be needed and will enter the "pilot pipeline" by 2032.

16.    Airlines, particularly LCCs, have increasingly turned to third-party simulator providers to avoid the high initial capital outlay associated with purchasing the limited supply of FTDs and FFSes necessary for Mandatory Flight Training.  Third-party simulator providers,

---

[3]    With each new commercial aircraft delivered to an airline, five new crews (with ten pilots) will need to be trained.

however, are themselves highly regulated.  The process for third-party providers to obtain an FAA certification in the United States under 14 CFR Part 142 ("Part 142"), for example, involves a large capital outlay and rigorous evaluations and inspections, with Part 142 setting high standards for flight training curriculum, facilities, equipment, instructor qualifications, and safety protocols.

### B.    The Company's History and Operations

17.    Avenger was founded in 2012 with the aim of delivering cost-effective training solutions to rapidly expanding airlines like Spirit.  Avenger began with a single location and two FFSes in Fort Lauderdale, expanding to a second location (and two more FFSes) in Las Vegas by 2015.  To meet the needs of its growing customer base, over the next decade, Avenger established additional domestic facilities (some in an airline customer's existing facilities) in Fort Worth, Irving, Orlando, and Minneapolis, and overseas facilities in Monterrey, Madrid, Cancun (closed in 2024), Mexico City (at the AeroMexico Training Center), Medellin,[4] Rome (closed in 2022),[5] Warsaw (sold in 2025),[6] Frankfurt, and Tel Aviv (sold in 2025).[7]

18.    Although the Company has an international footprint (and opportunities for additional growth in emerging markets), it remains headquartered in Fort Lauderdale, Florida, where it was founded.

19.    As of the Petition Date, AFG LLC employs approximately 97 employees (the "Employees") across the United States as follows:

---

[4]    Avenger's operations in Colombia were in partnership with Viva Air Colombia.  In February 2023, Viva Air Columbia commenced bankruptcy proceedings in Colombia and ceased operations and, as a result, Avenger has not had any operations in Medellin for over two years, although two FFSes subject to the EDC Facilities remain in Colombia as of the Petition Date.

[5]    In 2019, Avenger entered into an agreement with Aviomar concerning Aviomar's use of a B737NG FFS to be housed at Aviomar's premises in Rome.  In 2022, Avenger informed Aviomar that it was terminating the agreement and relocated the FFS.

[6]    In June 2025, Avenger's joint venture partner in Poland, Enter Air, purchased Avenger's interest in the joint venture.

[7]    In December 2025, Avenger sold its Israeli assets to El Al, its customer in Tel Aviv.

8

| Location | # of Employees |
|---|---|
| Dallas – Fort Worth | 49 |
| Fort Lauderdale | 26 |
| Las Vegas | 9 |
| Orlando | 7 |
| Minneapolis – St. Paul | 6 |

20.     Avenger offers its customers several optimized contract structures that not only suit individual customers' needs, but maximize the use (and therefore revenue generated from) the Company's simulators:

- ***Dedicated Provider*** contracts are those in which Avenger's airline customer commits to exclusivity with the Company for advanced flight simulator training purposes.  Among Avenger's customers with such contracts are Spirit Airlines, Viva Aerobus, Aeromexico, and El Al.

- ***Take-or-Pay*** contracts are those in which Avenger's customers, often legacy airlines or airlines with some in-house flight training, pay a fixed monthly rate for the ability to use the Company's advanced flight simulators.  Among Avenger's customers with such contracts are Viva Aerobus.

- ***Minimum Guarantee*** contracts are those in which an airline partners with Avenger to utilize the Company's advanced flight simulators for a minimum number of hours per year.  Among Avenger's customers with such contracts are Frontier Airlines.

- ***Power by the Hour Contracts*** are those in which airlines and other training providers can utilize Avenger's excess hourly capacity.  Among Avenger's customers with such contracts are Avelo, Iberia Express, Air Europa, and DHL Europe.

21.     In addition to providing its customers with access to state-of-the-art FFSes and FTDs, Avenger offers its customers other related services, including cabin crew training.

DE:4905-2029-9383.19 05863.00001



### C.    Governance and Management

22.    As of the Petition Date, and as discussed in additional detail below, Hooman

Yazhari serves as the sole Independent Manager of Topco and AFG LLC.  AFG LLC's senior

management is, as of the Petition Date, as follows:[8]

| | |
|---|---|
| **Chief Restructuring Officer** | Lawrence Perkins |
| **Deputy Chief Restructuring Officer** | Ben Smith |
| **Chief Executive Officer** | Eduardo Carrasco |
| **Chief Financial Officer** | Marc Sullivan |
| **Senior Vice President and General Counsel** | Elsa Gagnon |

### D.    Corporate Structure

23.    Topco is the direct or indirect parent of each of the Debtors and Foreign Non-

Debtor Subsidiaries,[9] as shown on the diagram of the Company's organizational structure attached

---

[8]    I and Mr. Smith also serve as Chief Restructuring Officer and Deputy Chief Restructuring Officer, respectively, of each of the other Debtors.  Mr. Carrasco and Ms. Gagnon also serve as director or manager (as applicable) of each of the Debtors except for Topco and AFG LLC.

[9]    The "Foreign Non-Debtor Subsidiaries" are, collectively: Avenger Flight Group España, S.L. ("Avenger Spain"); Avenger Flight Group Germany GmbH ("Avenger Germany"); AFG FTD Germany GmbH ("FTD Germany"); FTD Asset Espana, S.L. ("FTD Spain"); Avenger Flight Group India Pvt. Ltd. ("Avenger India"); Avenger Flight Group Italia, S.r.L. ("Avenger Italy"); Avenger Flight Group Israel Holdings Ltd. ("Avenger Israel"); Avenger Flight Group 737 Ltd. ("Avenger Israel 737"); Avenger Flight Group Colombia S.A.S. ("Avenger Colombia"); Avenger México Management, S. de R.L. de C.V. ("Mexico Management"); and Avenger Flight Group México, S. de R.L. de C.V. ("Avenger Mexico").

DE:4905-2029-9383.19 05863.00001

hereto as **Exhibit A**.  The Company's principal operating entity is AFG LLC, although certain of the Company's domestic and foreign operations, assets, and liabilities lie with other Debtors and Foreign Non-Debtor Subsidiaries.

24.     ***United States***.  Certain of the Debtors (the "U.S. SPV Debtors")[10] were created to hold the Company's interests in specific FFSes in accordance with the Company's lending or lease facilities.  None of the U.S. SPV Debtors have any employees.

25.     In addition to the U.S. SPV Debtors, Debtor Avenger Flight Training, LLC ("AFT") holds the Debtors' FAA Part 142 certifications and qualifications.  As of the Petition Date, AFT has four (4) employees.

26.     ***EMEA***.  To facilitate Avenger's operations in Europe and Asia, the Company formed subsidiaries in, among other countries, Germany, Spain, and Israel (collectively, the "EMEA Non-Debtor Subsidiaries"),[11] each of which is directly or indirectly wholly-owned by Debtor Avenger Flight Group Europe Corp. ("AFG Europe") which is, in turn, wholly-owned by Debtor AFG SIM Holding Corp. ("SIM Holding").[12]

---

[10]    The U.S. SPV Debtors are (i) AFG Dallas, LLC ("AFG Dallas"); (ii) AFG Dallas III, LLC ("AFG Dallas III"); (iii) AFG Dallas IV, LLC ("AFG Dallas IV"); (iv) AFG Orlando, LLC ("AFG Orlando"); (v) AFG Sanford, LLC ("AFG Sanford"); and (iv) AFG FLL, LLC ("AFG FLL").

[11]    The EMEA Non-Debtor Subsidiaries are Avenger Spain, Avenger Germany, FTD Germany, FTD Spain, Avenger India, Avenger Italy, Avenger Israel, and Avenger Israel 737.  As of the Petition Date, Avenger India and Avenger Italy have no assets, liabilities, or operations.  Similarly, as of the Petition Date, Avenger Israel 737 has no assets, liabilities, or operations, except certain limited liabilities with respect to SIM International in connection with the purchase of an undelivered FFS that is no longer required for the Company's business.

[12]    In addition to SIM Holding, AFG Europe, and the EMEA Non-Debtor Subsidiaries, Debtor AFG EU Operations Corp. ("EU Operations") was formerly used as part of the Company's European operations but, as of the Petition Date, has no assets, liabilities, or operations.

DE:4905-2029-9383.19 05863.00001

27.    ***Central and South America***.  Certain of the Debtors (the "SCA SPV Debtors")[13] were created to hold the Company's interests in specific FFSes located in Mexico and Colombia in accordance with the Company's lending or lease facilities.  Certain of the SCA SPV Debtors lease FFSes to Debtor AFG LATAM Holding Corp. ("LATAM Holding Corp.") which, in turn, subleases the FFSes to either non-Debtor Avenger Mexico or non-Debtor Avenger Colombia. ("AFG Colombia").  Non-Debtor Mexico Management (together with Avenger Mexico and Avenger Colombia, the "SCA Non-Debtors") employs the Company's twelve (12) employees that are located in Mexico.  Each of the SCA Non-Debtors is wholly-owned by Debtor AFG LATAM, LLC.

## III.    The Debtors' Capital Structure

### A.    Secured Debt[14]

#### 1.    Prepetition Term Loan Facility

28.    Pursuant to that certain Credit Agreement, dated as of June 25, 2021 (as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Prepetition Credit Agreement", and collectively with all other agreements, instruments and documents executed or delivered in connection therewith, each as may be amended, amended and restated, supplemented, otherwise modified from time to time in accordance with the terms thereof, the "Prepetition Term Loan Documents"), among (a) Avenger Flight Group, LLC, as the borrower, (b) Topco, (c) the other guarantors party thereto from time to

---

[13]    The SCA SPV Debtors are: (i) AFG LATAM SIM Holdings, LLC ("LATAM SIM Holdings"); (ii) AFG LATAM SIM Holdings II, LLC ("LATAM SIM Holdings II"); (iii) AFG LATAM SIM Holdings III, LLC ("LATAM SIM Holdings III"); (iv) AFG LATAM SIM Holdings IV, LLC ("LATAM SIM Holdings IV"); (v) AFG Mexico Corp.; and (vi) Avenger Flight Group México II, S. de R.L. de C.V ("AFG Mexico II").  Each of the SCA SPV Debtors, except AFG Mexico II, is incorporated in Florida.

[14]    The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

time, (d) Wilmington Trust, National Association, as administrative and collateral agent (in such capacity, together with any successor thereto, the "Prepetition Term Loan Agent"), and (e) the lenders party thereto from time to time (the "Prepetition Term Loan Lenders," and together with the Prepetition Term Loan Agent, collectively, the "Prepetition Term Loan Secured Parties"), the Prepetition Term Loan Lenders provided a secured term loan facility to certain of the Debtors (the "Prepetition Term Loan Facility").

29.    As of the Petition Date, the Credit Parties (as defined in the Prepetition Credit Agreement) were indebted and jointly and severally liable to the Prepetition Term Loan Secured Parties in the aggregate principal amount outstanding under the Prepetition Term Loan Facility of not less than $273,051,488.11 (together with accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations in connection with the Prepetition Term Loan Facility pursuant to the Prepetition Term Loan Documents, the "Prepetition Term Loan Obligations").

30.    As discussed below, the Prepetition Term Loan Obligations include rescue financing advanced to the Debtors by the Prepetition Term Loan Secured Parties in September and December 2025 (the "Rescue Financing"). The Rescue Financing provided critical liquidity to support the Debtors' operations, meet the Debtors' payroll and vendor obligations, and provide the Company with the necessary runway to negotiate with their key stakeholders in the months leading up to the filing of the Chapter 11 Cases. As a result of the Rescue Financing, therefore, the Debtors were afforded a more orderly transition into bankruptcy, including negotiated

resolutions with key stakeholders. The Rescue Financing reduced the need for a debtor-in-possession financing facility on a dollar-for-dollar basis.

31.     As more fully set forth in the Prepetition Term Loan Documents, in connection with the Prepetition Term Loan Facility, the Credit Parties (as defined in the Prepetition Credit Agreement) granted to the Prepetition Term Loan Agent for the benefit of the Prepetition Term Loan Secured Parties, a security interest in and continuing lien (the "Prepetition Term Loan Liens") on all Collateral (as defined in the Prepetition Term Loan Documents) (including Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition Term Loan Collateral").

### 2.    SIM International Agreements

32.     Certain of the Debtors are party to agreements (collectively, the "SIM International Agreements") with SIM International B.V. and its affiliates (collectively, "SIM International") related to the construction (by SIM International) and lease (from SIM International to the Debtors) of FFSes.  As of the Petition Date, the Lessees under the SIM International Agreements are Avenger Spain, Avenger Germany, AFG Dallas IV, AFG Orlando, AFG Sanford, and AFG FLL. The Debtors' obligations under each of the SIM International Agreements are guaranteed by AFG LLC and secured by, among other things, each Lessee's rights in the applicable FFSes.

33.     As set forth on the chart attached hereto as **Exhibit B**, as of the Petition Date, the Debtors are party to SIM International Agreements related to eleven (11) FFSes.  As described in further detail below, the Company, SIM International, and the Prepetition Term Loan Lenders entered into a settlement agreement on February 12, 2026 (the "SIM International Settlement"), which provides for a comprehensive settlement of the Company's obligations under the SIM International Agreements and provides for a clear path forward for the critical ongoing relationship

14

between SIM International and the Company (and the proposed Stalking Horse Bidder or other purchaser of its assets).

### 3.    EDC Financing

34.     Without acknowledging the validity, priority, enforceability, extent, or allowance of such claims and liens, the Debtors make reference to (i) that certain Loan Agreement, dated as of November 1, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "EDC LATAM Loan Agreement" and collectively with all other agreements, instruments and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, otherwise modified from time to time prior to the Petition Date, the "EDC LATAM Loan Documents"), among LATAM Sim Holdings, a Florida limited liability company, Export Development Canada, a corporation established by an Act of Parliament of Canada ("EDC"), as loan agent for the lenders (in such capacity, the "EDC Loan Agent"), as a lender (in such capacity, a "EDC Lender"), and as security trustee (in such capacity, the "EDC Security Trustee" and together with the EDC Loan Agent and EDC Lender, the "EDC Secured Parties"), and (ii) that certain Loan Agreement, dated as of July 11, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "EDC LATAM IV Loan Agreement" and collectively with all other agreements, instruments and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, otherwise modified from time to time prior to the Petition Date, the "EDC LATAM IV Loan Documents"), among LATAM Sim Holdings IV, a Florida limited liability company, and the EDC Secured Parties.

35.     Pursuant to the EDC LATAM Loan Documents, the EDC Secured Parties provided loans to certain of the Debtors for the purchase of one TRU Simulation + Training Canada Inc.

DE:4905-2029-9383.19 05863.00001

A320 flight simulator unit bearing manufacturer's serial number SN-00002635 and certain related assets (the "EDC LATAM Facility"), and the EDC LATAM Facility is purportedly secured by such assets and certain other related assets, including the equity interests of LATAM SIM Holdings, substantially all assets of LATAM SIM Holdings, and the rights and interests of LATAM SIM Holdings and certain of its subsidiaries in certain leases and subleases related to such assets (collectively, the "EDC LATAM Collateral").  Pursuant to the EDC LATAM IV Loan Documents, the EDC Secured Parties provided loans to the Debtors for the purchase of one TRU Simulation + Training Canada Inc. A320 flight simulator unit bearing manufacturer's serial number SN-00002659 and certain related assets (the "EDC LATAM IV Facility" and, together with the EDC LATAM Facility, the "EDC Facilities"), and the EDC LATAM IV Facility is purportedly secured by such assets and certain other related assets, including the equity interests of LATAM SIM Holdings IV, substantially all assets of LATAM SIM Holdings IV, and the rights and interests of LATAM SIM Holdings IV and certain of its subsidiaries in certain leases and subleases related to such assets (collectively, the "EDC LATAM IV Collateral" and together with EDC LATAM Collateral, the "EDC Collateral" and the liens and security interests purportedly granted thereon in favor of the EDC Secured Parties, the "EDC Liens").

### B. Unsecured Debt

#### 1. Shareholder Notes

36.   AFG LLC is the borrower under a series of interest-bearing unsecured promissory notes (the "Shareholder Notes") issued to certain parties (the "Unsecured Noteholders"), as detailed below.

| Unsecured Noteholder | Date of Shareholder Note | Principal | Amount Outstanding |
|---|---|---|---|
| Pedro Sors | 6/4/2020 | $300,000 | $303,000 |
| Pedro Sors | 12/1/2020 | $150,000 | $159,000 |
| Pedro Sors | 7/15/2024 | $1,850,000 | $1,961,000 |

DE:4905-2029-9383.19 05863.00001

| John Pincavage | 5/31/2019 | $200,000 | $212,000 |
|---|---|---|---|
| John Pincavage | 6/11/2019 | $100,000 | $106,000 |
| John Pincavage | 7/15/2024 | $500,000 | $530,000 |
| Elsa Gagnon | 5/31/2019 | $150,000 | $159,000 |
| Angela Andrea Restrepo P.A. | 12/29/2020 | $200,000 | $212,000 |
| Alison Sors | 12/1/2020 | $750,000 | $795,000 |
| Vida Mar Enterprises, LLC | 7/15/2024 | $200,000 | $212,000 |
| Bardoli Holdings Corp. | 4/9/2021 | $3,120,000 | $474,000 |

37.     Pursuant to that certain *Subordination Agreement* dated as of June 25, 2021, as amended and restated on July 15, 2024 (the "Note Subordination Agreement"), each of the Unsecured Noteholders (except for Bardoli Holdings Corp.) subordinated the debt payable to them under the Shareholder Notes to the Prepetition Term Loan Secured Parties.

## 2.     Real Property Leases

38.     As of the Petition Date, the Debtors are party to eleven (11) real property leases (collectively, the "Real Property Leases") with nine (9) different landlords (collectively, the "Lessors"). The Real Property Leases relate to the Company's locations in Fort Lauderdale, Fort Worth, Irving, Las Vegas, Madrid, Orlando, Minneapolis, Monterrey, and Medellin (the "Leased Premises"). The Company subleases portions of nine (9) of the Leased Premises to certain of its customers.

39.     The Debtors pay approximately $370,000 per month in rent on account of the Real Property Leases and receive approximately $140,000 per month in rent from sublessors of the Leased Premises. As of the Petition Date, the Debtors owe approximately $255,000 to certain of the Lessors on account of the Debtors' obligations under the Real Property Leases.

## IV.    Events Leading to the Petition Date

### A.     Challenges Facing the Company

40.     From its formation, Avenger sought to capitalize on an underserved opportunity in the aviation industry—providing outsourced aviation simulation to commercial airlines, in

DE:4905-2029-9383.19 05863.00001

particular the growing "low cost carrier" market, and flight training schools, becoming the sole provider for the largest flight training school in the United States.  Indeed, Avenger's rapid growth largely tracked the explosive growth[15] of Spirit Airlines though, at the same time, the Company established strong relationships with other domestic LCCs like Allegiant, Avelo, and Sun Country.  As Avenger began to grow, it also established relationships with international LCCs like Viva Aerobus, Wizz Air, Iberia Express, and Condor, necessitating the Company to establish foreign footprints.

41.    Avenger's rapid growth, however, was accompanied by a burgeoning debt load.  With a limited supply of new FFSes (by some estimates, only approximately 50 new FFSes are made yearly) and high initial capital costs—potentially in excess of $10 million for a new FFS—the Company's debt load associated with its growth has become unsustainable.  With a rationalized balance sheet and focused geographic footprint, Avenger's long-term prospects are strong; for example, new FFSes can hold value in excess of 60% of initial cost over a decade after acquisition and, with proper maintenance and certification renewals, may have a service life in excess of a quarter century.

42.    However, the Company has also faced some unexpected industry headwinds, creating further pressure on its balance sheet.  Avenger focused on operating FFSes for the Airbus A320, the most popular aircraft type ever and the one used most commonly by the Company's LCC customer base; indeed, as of the Petition Date, over 55% of the Company's owned and operated FFSes are A320s.  Unfortunately, on July 25, 2023, RTX Corporation, the parent company of Pratt & Whitney, announced that it had determined that a condition in the

---

[15]    *See, e.g.,* Richard Maslen, "Spirited Growth Continues at the Fastest Growing Airline in the US," *Aviation Week* (Feb. 20, 2015), *available at* https://aviationweek.com/air-transport/airports-networks/spirited-growth-continues-fastest-growing-airline-us.

DE:4905-2029-9383.19 05863.00001

manufacturing of certain engine parts used in the PW1100G-JM geared turbofan engines—the engines used to power A320neo aircraft—required accelerated inspection and repair.  As a result, hundreds of A320neo aircraft have been (and are expected to be) grounded for inspection and repair.  And, in turn, the airline industry has temporarily decreased hiring new crews to fly the A320, causing decreased demand for commercial aviation training for that make and model of aircraft.

43.     In addition, headwinds in the LCC airline industry have put strain on the Debtors' operations.  Of particular importance were the two chapter 11 filings of Avenger's once-largest customer, Spirit Airlines, in 2024[16] and 2025.[17]  The Company also exited Cancun in 2024, as its main customer at that location, Interjet, was adjudicated bankrupt in Mexico in 2022.  Further, in early 2023, Viva Air Colombia, the Company's partner in Colombia, suddenly commenced bankruptcy proceedings and liquidated.  As a result, Avenger has had no operations in Medellin for nearly three years, although it continues to accrue liabilities related to the Leased Premises and two FFSes subject to the EDC Secured Facilities.

44.     *Termination of the Revolving Facility*.  In January 2025, pursuant to that certain *Loan Agreement* (collectively with all other agreements executed or delivered in connection therewith, the "Revolving Loan Agreement") between AFG LLC, as Borrower, and Oxford Commercial Finance (the "Revolving Lender"), as Lender, AFG LLC obtained access to a revolving credit facility of up to $5 million in principal (the "Revolving Facility"), secured by the Collateral (as defined in the Revolving Loan Agreement).  However, on December 29, 2025, the

---

[16]    *In re Spirit Airlines, Inc.*, Case No. 24-11988 (SHL) (Bankr. S.D.N.Y.).

[17]    *In re Spirit Aviation Holdings, Inc.*, Case No. 25-11897 (SHL) (Bankr. S.D.N.Y.).

DE:4905-2029-9383.19 05863.00001

Revolving Lender terminated the Revolving Loan Agreement pursuant to its terms, and, as of the Petition Date, the Debtors do not owe any amounts on the Revolving Facility.

45.    *Defaults Related to German Operations*.    When Avenger Germany entered into the applicable SIM International Agreements for the operational lease of FFSes to be located in Frankfurt, the Company lacked the liquidity to pay large down payments to SIM International for the three (3) new FFSes.    To facilitate the transactions, the Company and SIM International entered into agreements (the "SIM International Germany Agreements") pursuant to which the Company assigned its revenues generated from its Frankfurt operations to SIM International to secure the repayment of those down payments, among other things.    Avenger defaulted under the SIM International Germany Agreements, both as a result of a payment default to SIM International and due to the Company's failure to pay rent to its third-party landlord (which, under German law, gave such landlord the right to cancel the lease).    As a result, on or about August 12, 2025, SIM International notified Avenger that it was exercising its rights under the SIM International Germany Agreements to, among other things, take over the Company's German customer agreements and assets.    As of the Petition Date, the Company effectively has no German operations.[18]

### A.    Prepetition Restructuring Efforts and Chapter 11 Cases

#### 1.    Prepetition Financial, Operational, and Organizational Restructuring

46.    Beginning in 2023, Avenger began exploring opportunities to streamline its balance sheet through a recapitalization or other financing transaction.    Through 2023 and 2024, the Company received interest in such a transaction from new financing sources, though none of the proposals were actionable, as none of the proposals were close to providing sufficient financing to

---

[18]    Non-Debtor Avenger Germany's continuing obligations, including to its employees, are offset by SIM International on a monthly basis against the amounts owed by Avenger Germany to SIM International.

DE:4905-2029-9383.19 05863.00001

address the Company's existing Prepetition Term Loan Obligations. Through this process, however, Avenger reached agreement with its existing stakeholders on the terms of restructuring transactions, which were consummated in July 2024 (the "2024 Restructuring"). Through the 2024 Restructuring, among other things, Avenger refinanced its secured term loan facility with its existing lenders (i.e. the Prepetition Term Loan Secured Parties) and obtained equity financing from funds associated with Seacoast Capital Partners ("Seacoast") and Patriot Capital ("Patriot"), who previously owned approximately 45% of the equity in the Company and, after the 2024 Restructuring, owned 96.69% of the Company's equity. Following the 2024 Restructuring, Topco's board of managers (the "Board") consisted of six (6) individuals—two appointed by Seacoast (the "Seacoast Managers"), two appointed by Patriot (the "Patriot Managers"), and two appointed by the Prepetition Term Loan Lenders (the "Creditor Managers").

47.    Following the 2024 Restructuring, several members of senior management were relieved of their positions by the Company, including its former CEO, CFO, and Vice President of Finance. In March 2025, Marc Sullivan, an experienced financial professional with a substantial background in turnaround situations, was appointed as the Company's Chief Financial Officer. In April 2025, Hooman Yazhari was retained by the Company as an advisor to the Board and Board observer, and was given the title of Chairman. And in May 2025, the Company retained SCP as a consultant to assist with the preparation of cash flow models. As noted above, I served as an independent manager of AFG LLC from August 26, 2025 until January 12, 2026.

48.    Additionally, Avenger worked to right-size its operations. Between 2022 and the Petition Date, the Company's nascent and planned operations in Italy, Saudi Arabia, India, and Portugal were wound down. And in 2025, the Company sold its operations in Warsaw, Poland and Tel Aviv, Israel to its partners in each country.

DE:4905-2029-9383.19 05863.00001

49.    Shortly after their appointment, the Company's new management team discovered significant accounting irregularities that affected all financial statements, insufficient financial controls, and inadequate processes.  Since making these discoveries, the Company's management has been working to accurately restate the Company's financials and to put proper processes and controls in place.  As of the Petition Date, the Company's new management team has successfully implemented strong and proper processes and controls at all of the Debtors and continue to implement such processes and controls at certain Foreign Non-Debtor Subsidiaries.  None of the finance or accounting personnel who were responsible for the prior irregularities and lack of controls remain employed by the Company.

**2.    Discussions with Key Stakeholders and Prepetition Governance Changes**

50.    In August 2025, after the occurrence of certain undisputed events of default, the Prepetition Term Loan Agent exercised post-default rights under the *Pledge and Security Agreement*, dated as of June 25, 2021 (as amended, restated, replaced, refinanced, supplemented, or otherwise modified from time to time) and appointed me as independent manager of AFG LLC and each of its subsidiaries.[19]  After my appointment, I member-managed AFG LLC and each of its subsidiaries, while the Board continued to manage Topco.

51.    Starting around mid-October 2025, as its liquidity situation became more acute, the Company began to engage with the Prepetition Term Loan Secured Parties to discuss a comprehensive restructuring of Avenger.  To ensure the Company's operations continued without interruption, in connection with the fifteenth and sixteenth amendments to the Prepetition Credit Agreement, the Prepetition Term Loan Secured Parties provided the Debtors with $11 million in

---

[19]    I have no prior connection to the Prepetition Term Loan Secured Parties of which I am aware.  I further understand that Mr. Yazhari has no prior connection to the Prepetition Term Loan Secured Parties.

new liquidity in the form of bridge financing— $5 million in September 2025 and $6 million in December 2025.  Absent this bridge financing, the Debtors would have been required to seek a larger DIP facility and commence chapter 11 cases earlier, without the benefit of consensual resolutions with key stakeholders and in a rushed and less organized fashion.  The Debtors and the Prepetition Term Loan Secured Parties also engaged in a series of negotiations over the course of several months regarding the contours of a comprehensive restructuring of the Company involving the commencement of these Chapter 11 Cases to execute a value-maximizing sale of the Debtors' assets free and clear of all encumbrances.

52.    Concurrently, the Company engaged in arms'-length discussions with SIM International, which had noticed alleged defaults under the SIM International Agreements in February 2024 and August 2025 and, as noted above, had taken action with respect to the Company's German operations.  As a result of the Company's discussions with SIM International, the Company, SIM International, and the Prepetition Term Loan Lenders entered into the SIM International Settlement, which includes significant concessions from SIM International and secures an ongoing relationship with improved equipment to support Avenger's turnaround and growth plan.  Specifically, the SIM International Settlement, which will be the subject of a forthcoming motion, provides:[20]

- The Company will make the Lease Cure Payment to SIM International upon the closing of a Sale, which amount is equal to the aggregate remaining amount of payments due from the Company to SIM International under the SIM International Agreements as of the Petition Date.

- Upon the Closing of the SIM International Settlement Agreement, the Company's obligations under the Frankfurt SIM International Agreements will be deemed to have terminated as of August 19, 2025.

---

[20]    The summary of the SIM International Settlement herein is qualified in all respects by reference to the SIM International Settlement Agreement, which will be filed shortly.

DE:4905-2029-9383.19 05863.00001

- The Company and SIM International will mutually terminate or reject the SIM International Agreement for the FFS in Israel.

- The SIM International Agreements for the FFSes in Spain will remain in full force and effect, with the Company or NewCo (as applicable) assuming certain obligations contained in agreements related thereto.

- The Debtors will assume (and, as applicable, assign to NewCo) the SIM International Agreements related to four (4) Airbus A320 FFSes in the United States, with each party making material concessions and agreements related thereto (for example, SIM International will, at its own expense, perform upgrades to such FFSes), as set forth in the SIM International Settlement Agreement.

- The Debtors will transfer all rights in four (4) A320 FFSes to SIM International, who will perform upgrades thereon at its own expense and lease such FFSes to the Company or NewCo, as applicable, as set forth in the SIM International Settlement Agreement.

53.    Concurrent with the Company's discussions with its key stakeholders, as described above and below, Avenger experienced additional changes in its governance in the months leading to the Petition Date.  On November 14, 2025, Seacoast and Patriot abruptly informed the Company that they were exercising their put options and abandoning the equity they had received in the 2024 Restructuring and that the four Seacoast Managers and Patriot Managers were resigning from the Board.

54.    Thereafter, on November 21, 2025, the two Creditor Managers resigned and the Prepetition Term Loan Lenders appointed me as the sole independent manager of the Board.  On January 12, 2026, I resigned as the manager of the Board and was named CRO of the Company as of January 20, 2026.  As of January 13, 2026, Mr. Yazhari (the "Independent Manager") was named the sole independent manager of the Board and, in connection therewith, Mr. Yazhari resigned from all existing positions he held with the Company, including his role as Chairman, and waived all rights and claims he may have had against the Company arising prior to his appointment as Independent Manager.

DE:4905-2029-9383.19 05863.00001

### 3.   The Debtors' Need for DIP Financing and Use of Cash Collateral[21]

55.     The Debtors require immediate access to debtor in possession financing and the authority to use cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral"), to ensure that they have sufficient liquidity to continue to operate their business in the ordinary course, satisfy administrative expenses, and consummate a going-concern sale transaction.  The Debtors require debtor-in-possession financing and use of Cash Collateral to fund the proposed Sale Process and ensure the administrative solvency of their estates.  Absent the funding available under the DIP Facility and immediate access to Cash Collateral, the Debtors would be unable to sustain operations, pay their employees or vendors, or achieve a successful restructuring through the chapter 11 process.  Accordingly, the Debtors have an urgent and immediate need for entry of an order approving the DIP Motion on an interim basis (the "Interim DIP Order").

56.     The Debtors negotiated with the DIP Lenders and Prepetition Term Loan Lenders to develop a 13-week budget approved by the Required DIP Lenders, which sets forth, among other things, projected cash receipts and cash disbursements (the "Approved Budget"), a copy of which is attached as Exhibit B to the Interim DIP Order, as well as a sale timeline that would induce the DIP Lenders to commit to the DIP Facility and the Prepetition Term Loan Lenders to consent to the use of Cash Collateral in light of the Debtors' circumstances.  After good faith and arms' length negotiations, the Debtors and the DIP Lenders and Prepetition Term Loan Lenders ultimately agreed on the terms of the DIP Facility and consensual use of Cash Collateral.

57.     I believe that the financing available under DIP Facility, along with consensual access to Cash Collateral, all in accordance with the Approved Budget, will allow the Debtors to

---

[21]   Contemporaneously herewith, the Debtors filed the DIP Motion (as defined herein).  Capitalized terms used in this subsection that are not otherwise defined herein have the meanings ascribed to them in the DIP Motion.

have adequate liquidity to satisfy their accruing administrative expenses during the course of these Chapter 11 Cases while they pursue a value-maximizing Sale of their Assets, and I believe that the terms of the proposed financing are reasonable, appropriate, and consistent with market terms for comparable financing facilities.

58.     I believe that the Debtors exercised their business judgment in the selection and negotiation of the DIP Facility.  Prior to the Petition Date, the Debtors' advisors prepared a teaser describing the DIP loan opportunity and approached various alternative funding sources.  None of these potential third party lenders were prepared to offer debtor in possession financing to the Debtors, particularly on a junior basis to the existing Prepetition Term Loan Obligations.  The Debtors therefore engaged in good faith, arms-length negotiations with the DIP Lenders and Prepetition Term Loan Lenders regarding the proposed terms of the DIP Facility and use of Cash Collateral.

59.     The proposed DIP Facility and the authorization to use Cash Collateral as offered by the DIP Lenders and Prepetition Term Loan Lenders are the best financing options that the Debtors could obtain under the circumstances.  Fully unsecured postpetition financing was not available to the Debtors, and other potential sources of debtor-in-possession financing, including on a junior secured basis, were also unavailable.

60.     I believe that it is essential to the success of the Chapter 11 Cases, and the culmination of the Sale Process, that the Debtors receive immediate authority to access the DIP Facility and use Cash Collateral.

### 4.    Bid Procedures Motion[22]

---

[22]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bid Procedures Motion (defined below).

DE:4905-2029-9383.19 05863.00001

61.     I have reviewed the Bid Procedures Motion, the Bid Procedures, and the sale timeline contained within.  Further, I have been involved with negotiations with the Stalking Horse Bidder, which negotiations were conducted at arms'-length and in good faith, with each of the Debtors and the Stalking Horse Bidder represented by separate counsel.  I believe that the Bid Procedures provide an appropriate framework for the Debtors and their advisors to review, analyze, and compare bids for the Assets and to engage with bidders on an arm's length basis to work to improve the quality of their bids for the benefit of all parties in interest.  If approved, I believe the Bid Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or best offer for the Assets on a schedule consistent with the milestones and the Debtors' chapter 11 strategy.

62.     I have reviewed the Stalking Horse Bid and believe that it provides the best opportunity to maximize value for the Assets for the benefit of all of the Debtors' stakeholders. Because the Stalking Horse APA, which was negotiated at arms'-length and in good faith, permits the Debtors to conduct a value-maximizing process that is backstopped by the Stalking Horse Bid and is therefore subject to higher or otherwise better offers that the Debtors may receive for the Assets pursuant to the Bid Procedures, I believe that there is a strong business justification for the Debtors to enter into the Stalking Horse APA.

63.     I believe the timeline negotiated with the Stalking Horse Bidder is appropriate and balances the Debtors' need to run a complete process with an efficient timeframe to avoid creating undue risk of loss and unnecessary administrative expense.  I further believe completion of the sale process in a timely manner will also maximize the value of the Debtors' Assets.  The proposed dates governing the sale, marketing, and auction process are within the milestones required under

DE:4905-2029-9383.19 05863.00001

the DIP Financing.  I believe that failure to adhere to these milestones could compromise the Debtors' ability to maximize the value of their assets as a going concern.

64.    Finally, I believe that the Expense Reimbursement of $2,000,000, the payment of which is subject to a number of conditions, including that it is payable solely from the proceeds of an "Alternative Transaction" (as defined in the Stalking Horse APA), is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.  The Expense Reimbursement negotiated with the Stalking Horse Bidder was the result of good faith, arms'-length negotiations between the Debtors and the Stalking Horse Bidder.

**V.    <u>First Day Pleadings</u>**

65.    Contemporaneously herewith, the Debtors have filed a number of First Day Pleadings seeking orders granting various forms of relief intended to stabilize the Debtors' business operations and facilitate the efficient administration of these Chapter 11 Cases, including the following:

   a.  Debtors' Motion for Order Directing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only

   b.  Debtors' Application for Authorization to Employ and Retain Kurtzman Carson Consultants, LLC d/b/a Verita Global as Claims and Noticing Agent Effective as of the Petition Date

   c.  Motion for Entry of an Order: (I) Authorizing the Debtors To: (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, and (C) Redact Certain Personally Identifiable Information for Individual Creditors; and (II) Granting Related Relief

   d.  Motion for Entry of Interim and Final Orders: (I) Approving Proposed form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections By Utility Companies; (III) Prohibiting Utility Companies From Altering, Refusing, Or Discontinuing Service; and (IV) Granting Related Relief

   e.  Motion for Entry of Interim and Final Orders: (I) Authorizing the Payment of Certain Taxes and Fees; and (II) Granting Related Relief

28

f.   Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtors to Pay Prepetition Claims of Critical Vendors, Foreign Vendors, 503(b)(9) Claimants, and Lien Claimants; (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders; (III) Authorizing all Financial Institutions to Honor all Related Payment Requests; and (IV) Granting Related Relief

g.   Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Maintain Their Insurance Policies and Programs, (B) Honor all Insurance Obligations, (C) Renew, Amend, Supplement, Extend, or Purchase and Finance Insurance Policies; (II) Authorizing Continuation of Insurance Premium Financing Agreement; and (III) Granting Related Relief

h.   Motion for Entry of Interim and Final Orders: (I) Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief

i.   Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Operating Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Granting Related Relief

j.   Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief (the "<u>DIP Motion</u>")

k.   Motion for (I) An Order (A) Approving Bid Procedures for the Sale of the Debtors' Assets; (B) Approving Certain Bid Protections in Connection With the Debtors' Entry Into Stalking Horse APA; (C) Scheduling The Auction and Sale Hearing; (D) Approving the Form and Manner of Notice Thereof; and (E) Granting Related Relief; and (II) An Order or Orders (A) Approving the Sale of the Debtors' Assets Free and Clear of All Encumbrances; and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases (the "<u>Bid Procedures Motion</u>")

66.     I am familiar with the contents of each First Day Pleading (including the exhibits and other attachments thereto) and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First Day Pleading: (a) will enable the Debtors to sustain operations while in chapter 11; (b) is critical to the Debtors' ability to maximize the value of their estates; and (c) serves the best interests of the Debtors' estates and creditors.  Further, it is my belief that the

relief sought in the First Day Pleadings is in each case narrowly-tailored and necessary to achieve the goals identified above.

67.    Several of the First Day Pleadings request authority to pay certain prepetition claims. I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. I believe such circumstances exist with the Debtors' requests herein for immediate authority. Other relief will be deferred for consideration at a later hearing.

68.    I have consulted with the Debtors' advisors regarding the relief requested in the First Day Pleadings. To the best of my knowledge and belief, the factual statements contained in each of the First Day Pleadings are true and accurate, and each such factual statement is incorporated herein by reference.

69.    I believe that the relief requested in the First Day Pleadings is necessary, in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will allow the Debtors to operate with minimal disruption and maximize value preservation during the pendency of these Chapter 11 Cases. Failure to grant the relief requested in any of the First Day Pleadings may result in immediate and irreparable harm to the Debtors, their businesses, and their estates. Accordingly, for the reasons set forth herein and in each respective First Day Pleading, the Court should grant the relief requested in each of the First Day Pleadings.

DE:4905-2029-9383.19 05863.00001

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: February 12, 2026

/s/ Lawrence Perkins
Lawrence Perkins
Chief Restructuring Officer

DE:4905-2029-9383.19 05863.00001

**<u>Exhibit A</u>**

Organizational Chart

DE:4905-2029-9383.19 05863.00001



**Exhibit B**
SIM International Agreements

|   | Date | Lessee[1] | Guarantor | Collateral [Location] |
|---|------|-----------|-----------|----------------------|
| 1 | 9/24/2019 | Avenger Spain | AFG LLC | A320 CEO FFS (SN 11049) [Madrid] |
| 2 | 1/17/2020 | Avenger Spain | AFG LLC | A330 NEOCEO FFS (SN 31019) [Madrid] Pledge of AFG Europe's interest in Avenger Spain |
| 3 | 2/18/2020 | Avenger Spain | AFG LLC | B737NG FFS (SN 08/5) [Madrid] |
| 4 | 5/25/2021 | AFG Dallas IV | AFG LLC | A320 CEO FFS (SN 11059) [Irving, TX] Pledge of AFG LLC's membership interest in AFG Dallas IV Revenue Sharing Agreement |
| 5 | 6/2/2021 | AFG Orlando | AFG LLC | A320 NEOCEO FFS (SN 11060) [Orlando] Pledge of AFG LLC's membership interest in AFG Orlando |
| 6 | 6/2/2021 | AFG Sanford | AFG LLC | A320 CEO FFS (SN 11071) [Orlando] Pledge of AFG LLC's membership interest in AFG Sanford |
| 7 | 2/1/2022 | Avenger Spain | AFG LLC | A330 CEO FFS (SN 31039) [Madrid] Pledge of AFG Europe's interest in Avenger Spain |
| 8 | 11/14/2022 | Avenger Germany | AFG LLC | A320 NEOCEO FFS (SN 11123) [Frankfurt] |
| 9 | 11/14/2022 | AFG FLL | AFG LLC | A320 NEOCEO FFS (SN 11102) [Fort Lauderdale] Pledge of AFG LLC's membership interest in AFG FLL |
| 10 | 11/14/2022 | Avenger Germany | AFG LLC | A320 NEOCEO FFS (SN 11143) [Frankfurt] |
| 11 | 11/14/2022 | Avenger Germany | AFG LLC | A330 NEO FFS (SN 31043) [Frankfurt] |

[1] As of the Petition Date.

33