**EXHIBIT A**
**PROPOSED ORDER**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AVENGER FLIGHT GROUP, LLC, *et al.*, | Case No. 26-10183 (MFW) |
| Debtors.[5] | (Joint Administration Requested) |
| | **Ref Docket No. ___** |

## ORDER APPROVING SETTLEMENT AGREEMENT

The Court having considered the *Debtors' Motion for Entry of Order (I) Authorizing Debtors to Enter into Settlement Agreement with SIM International B.V. and Lenders, and (II) Granting Related Relief* (the "Motion");[6] and the district court having jurisdiction under 28 U.S.C. § 1334, which was referred to this Court under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors'

---

[5] The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are: Avenger Flight Group, LLC (1216); AFG Dallas III, LLC (5615); AFG Dallas IV, LLC (5558); AFG Dallas, LLC (3418); AFG EU Operations Corp. (9406); AFG FLL, LLC (6470); AFG Latam Holding Corp. (6475); AFG Latam Sim Holdings II, LLC (0473); AFG Latam Sim Holdings III, LLC (2592); AFG Latam Sim Holdings IV, LLC (0093); AFG Latam Sim Holdings, LLC (6475); AFG Latam, LLC (9545); AFG Mexico Corp. (1402); AFG Orlando, LLC (8409); AFG Sanford, LLC (6661); AFG Sim Holding Corp. (3325); Avenger Flight Group Europe, Corp. (5908); Avenger Flight Group Topco, LLC (5643); Avenger Flight Training, LLC (5640); Avenger Flight Group Mexico II, S. de R.L. de C.V, (N/A); and Papi Flight Training, LLC (6206). The location of the Debtors' corporate headquarters and the Debtors' service address is Avenger Flight Group LLC, 1450 Lee Wagener Blvd., Fort Lauderdale, FL 33315.

[6] All capitalized terms used but not defined herein have the meanings given to them in the Motion, the Settlement Agreement, or the Term Sheet, as applicable.

notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Settlement Agreement attached hereto as **Exhibit 1** (including the Term Sheet attached thereto)[7] is approved in its entirety pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 105, 363, and 365. The Settlement Agreement is the product of extensive, good faith, arms' length and hard-fought negotiations between the parties thereto.

2.      The Debtors are authorized to enter into and to perform all their respective obligations under the Settlement Agreement, including payment of the Lease Cure Payment (as defined in the Term Sheet), to enter into the ancillary documentation described in the Settlement Agreement and to enter into such further agreements and take any and all actions necessary to carry out, effectuate or otherwise enforce the terms, conditions and provisions of the Settlement Agreement and this Order.

3.      All of SIM's performance obligations under this Order and the Settlement Agreement  are subject to the terms of the Settlement Agreement, including, *inter alia*,  Section

---

[7] Section 2(a) of the Settlement Agreement is incorporated herein as if fully set forth herein. As set forth in Section 2 of the Settlement Agreement, the Term Sheet is incorporated in its entirety into and constitutes part of the Settlement Agreement. Accordingly, references to "Settlement Agreement" herein shall refer to the Term Sheet, as context requires. Notwithstanding the foregoing, for ease of reference defined terms capitalized herein but not defined herein will include reference to the specific document in which the definition appears (*i.e.*, the Settlement Agreement or the Term Sheet, as applicable). In the event of any conflict between the terms of this Order and the terms of the Settlement Agreement or the Term Sheet, as applicable, the terms of the Settlement Agreement or the Term Sheet, as applicable, shall control.

7(e) of the Settlement Agreement, the "Non-Severability" provision set forth in the Term Sheet, satisfaction of the Conditions Precedent and the occurrence of Closing (as defined in the Term Sheet).

4.    **Lease Transactions**. At Closing and subject to paragraphs 2 and 3 above:

i.    <u>Lease Cure Payment</u>. The Debtors shall pay the Lease Cure Payment to SIM, which payment shall not be subject to avoidance under 11 U.S.C. §§ 542, 547 or 548 of the Bankruptcy Code or other applicable law.

ii.    <u>SIM USA FFS Leases</u>. The SIM USA FFS Leases (as defined in the Term Sheet) are hereby deemed assumed by the Debtors and assigned to NewCo pursuant to 11 U.S.C. § 365.

iii.    <u>Spanish Leases</u>. The Debtors and Newco (as applicable) shall assume the obligations under the existing guaranty and share pledge agreements of the Company lessee under the Spanish Leases (as defined in the Term Sheet). Notwithstanding anything herein to the contrary, the Spanish Lease will continue in full force and effect from and after the date hereof.

iv.    <u>Transfer and Leaseback of SIM Industries A320 FFSs</u>. The SIM Industries A320 FFSs (as defined in the Term Sheet) are hereby transferred to SIM, as a good faith purchaser under 11 U.S.C. § 363(m), free and clear of any encumbrances, liens and any other third party rights and/or interests pursuant to 11 U.S.C. §§ 363 and 365, and the Debtors (and/or NewCo) are authorized to enter into a 10-year operational lease for each of the SIM Industries A320 FFSs.

5.    **Releases**. Effective upon Closing:

i.    to the maximum extent permitted by law, each Avenger entity and each Lender (in its capacity as such) on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, affiliates, shareholders, agents, participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, SIM and its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, affiliates, shareholders, agents, participants, subsidiaries, parents, successors, designees, and assigns (the "<u>SIM Released Parties</u>"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of

whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, relating to the SIM Leases or Avenger arising on or prior to the Closing (the "SIM Released Claims"); *provided that* nothing in this Order or the Settlement Agreement shall release any SIM Released Party from any claims or causes of action relating to fraud, gross negligence, or willful misconduct.

ii.     to the maximum extent permitted by law, SIM, on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, affiliates, shareholders, agents, participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, each Avenger entity, each Lender (in its capacity as such), and each of their respective current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, affiliates, shareholders, agents, participants, subsidiaries, parents, successors, designees, and assigns (the "Debtor/Lender Released Parties" and together with the SIM Released Parties, the "Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, relating to the SIM Leases or Avenger arising on or prior to the Closing (the "Debtor/Lender Released Claims" and together with the SIM Released Claims, the "Released Claims"); *provided that* nothing in this Order or the Settlement Agreement shall release any Debtor/Lender Released Parties from any claims or causes of action relating to fraud, gross negligence, or willful misconduct.

iii.    to the maximum extent permitted by law, the Parties (as defined in the Settlement Agreement) waive the benefit of any statute or other principle of law or equity that limits the applicability of a release with respect to claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release. Each Party hereby agrees that the provisions of any such federal or state law, rights, rules or legal principles, legal or equitable, that limit the applicability of a release with respect to claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release, in each case solely to the extent such provisions apply, **ARE HEREBY KNOWINGLY AND**

**VOLUNTARILY WAIVED AND RELINQUISHED BY EACH PARTY**, in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each Party hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Order and the Settlement Agreement, without which the consideration provided would not have been given. In connection with such waiver and relinquishment, each Party acknowledges that it is aware that it may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein. Nevertheless, it is the intent of each Party in executing the Settlement Agreement and consenting to the entry of this Order to fully, finally, and forever to settle and release all such matters, and all claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

  iv.    each Party covenants and agrees that he, she, or it will not institute or prosecute any action, suit, or proceeding, in law, in equity or otherwise, against any Released Party to recover, enforce, or collect any Released Claim and will not (i) induce, encourage or direct any other party to do so or (ii) act in concert with or assist (financially or otherwise) any other party in doing so.

  v.    the releases set forth herein do not apply to the duties, rights, or obligations of any Party under this Order, the Settlement Agreement, or any agreement entered into in connection therewith.

6.    The Settlement Agreement, including the Debtors' obligations thereunder, shall not be discharged, modified or otherwise affected by any plan of reorganization or liquidation in these Chapter 11 Cases.

7.    The Bankruptcy Court shall maintain jurisdiction over any dispute arising under or in connection with the Settlement Agreement.

8.    Notice of the Motion as provided therein shall be deemed good and sufficient notice of such motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

9.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

## Exhibit 1

Settlement Agreement

EXECUTION VERSION

## SETTLEMENT AGREEMENT AND RELEASE

This *Settlement Agreement and Release* (the "Agreement") is entered into as of February 12, 2026, by and among (a) Avenger Flight Group, LLC ("AFG") and its Debtor and non-Debtor affiliates set forth on the signature pages hereto (collectively, "Avenger"); (b) SIM International B.V. and its affiliates set forth on the signature pages hereto (collectively, "SIM"); and (c) the Lenders. Each of the foregoing are sometimes referred to herein collectively as the "Parties" and individually as a "Party." Capitalized terms used but not defined in this Agreement have the meanings given to them in the Term Sheet (as defined below).

## RECITALS

**WHEREAS,** certain of the Avenger entities entered into the SIM Leases pursuant to which they leased full flight simulators for use in their domestic and foreign operations;

**WHEREAS,** AFG, among other Avenger entities, entered into the Credit Agreement;

**WHEREAS,** various defaults and breaches occurred under the SIM Leases prior to the date hereof (the "SIM Claims") and the Credit Agreement prior to the date hereof;

**WHEREAS**, on February 12, 2026, the Parties entered into that certain *Restructuring Term Sheet*, attached as **Exhibit A** hereto, (the "Term Sheet"), which sets forth a proposed resolution and global settlement of the SIM Claims;

**WHEREAS,** on February 11, 2026, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (such cases collectively, the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), jointly administered under Case No. 26-10183;

**WHEREAS**, the Parties desire to enter into this Agreement to implement the agreements contained in the Term Sheet and the full and final resolution of the SIM Claims; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein and in the Term Sheet, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1.      **Definitions.** The following capitalized terms used in this Agreement shall have the meanings given to them below:

(a)      "Plan" means a plan of reorganization that is consistent in all material respects with the Lease Transactions and this Agreement.

(b)      "Required Lenders" has the meaning given to it in the Credit Agreement.

2.    **Term Sheet Incorporated by Reference.**

(a)    Except as set forth in Section 2(b) below, the Term Sheet is incorporated herein in its entirety and constitutes part of this Agreement. The terms of this Agreement shall not amend, modify or supersede any of the terms of the Term Sheet. In the event of any inconsistency between (i) the terms of this Agreement and the terms of the Term Sheet, the Term Sheet shall govern, and (ii) the Exhibits to the Term Sheet and this Agreement or the Term Sheet, the Exhibits shall govern.

(b)    Section 3 of this Agreement shall supersede the section of the Term Sheet entitled "Mutual Release of Liabilities".

3.    **Releases; Covenants Not to Sue.**

(a)    Effective upon Closing, and to the maximum extent permitted by law, each Avenger entity and each Lender (in its capacity as such) on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, affiliates, shareholders, agents, participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, SIM and its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, affiliates, shareholders, agents, participants, subsidiaries, parents, successors, designees, and assigns (the "SIM Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, relating to the SIM Leases or Avenger arising on or prior to the Closing (the "SIM Released Claims"); *provided that* nothing in this Agreement shall release any SIM Released Party from any claims or causes of action relating to fraud, gross negligence, or willful misconduct.

(b)    Effective upon Closing, and to the maximum extent permitted by law, SIM, on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, affiliates, shareholders, agents, participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, each Avenger entity, each Lender (in its capacity as such), and each of their respective current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, affiliates, shareholders, agents, participants, subsidiaries, parents, successors, designees, and assigns (the "Debtor/Lender Released Parties" and together with the SIM Released Parties, the "Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in

equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, relating to the SIM Leases or Avenger arising on or prior to the Closing (the "Debtor/Lender Released Claims" and together with the SIM Released Claims, the "Released Claims"); *provided that* nothing in this Agreement shall release any Debtor/Lender Released Parties from any claims or causes of action relating to fraud, gross negligence, or willful misconduct.

(c)      Effective upon Closing, and to the maximum extent permitted by law, the Parties waive the benefit of any statute or other principle of law or equity that limits the applicability of a release with respect to claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release. Each Party hereby agrees that the provisions of any such federal or state law, rights, rules or legal principles, legal or equitable, that limit the applicability of a release with respect to claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release, in each case solely to the extent such provisions apply, **ARE HEREBY KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY EACH PARTY**, in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each Party hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given. In connection with such waiver and relinquishment, each Party acknowledges that it is aware that it may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein. Nevertheless, it is the intent of each Party in executing this Agreement to fully, finally, and forever to settle and release all such matters, and all claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

(d)      Subject to Closing, each Party covenants and agrees that he, she, or it will not institute or prosecute any action, suit, or proceeding, in law, in equity or otherwise, against any Released Party to recover, enforce, or collect any Released Claim and will not (i) induce, encourage or direct any other party to do so or (ii) act in concert with or assist (financially or otherwise) any other party in doing so.

(e)      Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to the duties, rights, or obligations of any Party under this Agreement, the Term Sheet, or any agreement entered into in connection herewith.

4.      **Representations and Warranties**.

(a)      Avenger represents and warrants that (i) it has full authority to enter into this Agreement and to release the SIM Released Claims and has not sold, transferred, or assigned any SIM Released Claim to any other person or entity and (ii) no person or entity other than Avenger has been, is, or will be authorized to bring, pursue, or enforce any SIM Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) Avenger;

(b)      Each Lender represents and warrants, severally and not jointly, that (i) they have full authority to enter into this Agreement and to release the SIM Released Claims and have not

sold, transferred, or assigned any SIM Released Claim to any other person or entity and (ii) no person or entity other than the Lenders has been, is, or will be authorized to bring, pursue, or enforce any SIM Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) the Lenders; and

(c)     SIM represents and warrants to Avenger and the Lenders that (i) it has full authority to enter into this Agreement and to release the Debtor/Lender Released Claims and (ii) no person or entity other than SIM has been, is, or will be authorized to bring, pursue, or enforce any Debtor/Lender Released Claims on behalf of, for the benefit of, or in the name of (whether directly or derivatively) SIM.

5.     **Agreement and Plan Support.**

(a)     Each Lender and each SIM entity, severally, and not jointly and severally, agrees to:

(i)     support and consummate the Plan, if applicable, proposed by the Debtors with the consent and support of the Required Lenders that includes the Lease Transactions and is materially consistent with the terms of this Agreement and timely take all actions contemplated thereby and as necessary to support and achieve the consummation and intent of this Agreement and the efficient wind down or liquidation of the Debtors;

(ii)     act in good faith and support this Agreement and the Plan, including, without limitation, instructing any applicable trustees, administrative agents, and the collateral agents as needed, including to vote and exercise any powers or rights available to it (including in any creditors' meeting or in any process requiring voting or approval to which such Party is legally entitled to participate), in each case in favor of any matter requiring approval to the extent necessary to implement this Agreement and the Plan and within the timeframe outlined herein and not change or withdraw (or cause to be changed or withdrawn) any such vote, and take such actions as may be reasonably necessary to give effect to the DIP Facility and the related collateral arrangements;

(iii)     use commercially reasonable efforts to cooperate with and assist the Debtors, as may be reasonably requested by the Debtors, to obtain additional support for this Agreement and any Plan;

(iv)     use commercially reasonable efforts to (1) assist Avenger with (A) implementation of the Lease Transactions and (B) overcoming any material issues under local law that arise in connection with consummating the Lease Transactions and (2) obtain such governmental approvals and/or third-party approvals for the Lease Transactions as are reasonably necessary or advisable to effectuate the consummation of this Agreement and the Plan; and

(v)     consider in good faith any appropriate additional or alternative provisions or agreement necessary to address any legal, financial, or structural impediment that may arise that would prevent, hinder, impede, delay or are necessary to effectuate the consummation of this Agreement and the Plan.

*provided, however,* that SIM's obligation to support a Plan under this Section 5(a) shall be limited to voting in favor of such Plan (if applicable) and agreement not to oppose such Plan.

(b)     The Parties' obligations under this Section 5 shall automatically terminate upon the occurrence of any of the following: (i) the termination of this Agreement; (ii) the effective date of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in these Chapter 11 Cases, or (iv) the failure of the Bankruptcy Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

6.     **Further Assurances.** Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters specified in this Agreement, as may be reasonably appropriate or necessary from time to time, to effectuate the intent hereof; *provided, however,* that such additional documents are consistent with the terms hereof and do not include any additional liabilities or obligations of the Lenders or SIM, without the prior written consent of each impacted Lender and/or SIM, as applicable.

7.     **Miscellaneous.**

(a)     <u>No Admission of Liability</u>. The Parties acknowledge that there is a bona fide dispute with respect to the SIM Claims. Nothing in this Agreement will imply an admission of liability, fault or wrongdoing by Avenger, SIM, the Lenders, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of Avenger, SIM, the Lenders, or any other person.

(b)     <u>Successors-in-Interest.</u> This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

(c)     <u>Notice</u>. Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**AVENGER:**

c/o Avenger Flight Group, LLC
Attention: Elsa Gagnon, Esq., General Counsel
1450 Lee Wagener Blvd.
Fort Lauderdale, FL 33315
E-mail: elsagagnon@afgsim.com

<u>with a copy (which shall not constitute notice) to</u>:

Pachulski Stang Ziehl & Jones LLP

Attention: Gregory Demo, Benjamin Wallen
1700 Broadway, Suite 36
New York, NY 10019
E-mail: gdemo@pszjlaw.com, bwallen@pszjlaw.com

**SIM:**

SIM International B.V.
Attention: Corporate Secretary
Wattstraat 7a
2171 TP Sassenheim
The Netherlands
E-mail: frank@sim-international.com

with a copy (which shall not constitute notice) to:

Freshfields US LLP
Attention: Mark Liscio, Alexander Rich, Ali Muffenbier
3 World Trade Center
175 Greenwich Street
New York, NY 10007
E-mail: mark.liscio@freshfields.com; alexander.rich@freshfields.com;
ali.muffenbier@freshfields.com

(and)

Lemstra Van der Korst N.V.
Attention: Rufus Abeln, Martijn Werker
Oranje Nassaulaan 1
1075 AH Amsterdam
the Netherlands
E-mail: r.abeln@lvdk.com; m.werker@lvdk.com

**LENDERS:**

Marathon Asset Management LP, on behalf of certain funds it manages
Attention: Brent Wilson
One Bryant Park, Floor 38
New York, NY 10036
E-mail: bwilson1@marathonfund.com, legalteam@marathonfund.com

Arbour Lane Fund III GP, LLC, on behalf of certain funds it manages
Attn: Ken Hoffman, Mike Petrick, Marisa Kodes, and TradeOps
700 Canal Street, 4th Floor
Stamford, CT 06902
Email: KHoffman@alcmlp.com, MPetrick@alcmlp.com, MKodes@alcmlp.com, and
TradeOps@alcmlp.com

Evergreen Credit Opportunities LLC
Attn: Mauro Castro
1110 112th Ave NE, Suite 202
Bellevue, Washington, 98004, USA
Email: mauroc@cercanolp.com, privatecredit@cercanolp.com

MidOcean Tactical Solutions Fund LP
Attn: MidOcean Credit Partners Desk, Michael Odell, Robert Sullivan, and Shawn Patel
245 Park Avenue, 38th Floor
New York, NY 10167
Email: ops@midoceanpartners.com, modell@midoceanpartners.com,
rsullivan@midoceanpartners.com, and spatel@midoceanpartners.com

<u>with a copy (which shall not constitute notice) to</u>:

Proskauer Rose LLP
Attention: David M. Hillman, Matthew R. Koch
Eleven Times Square
New York, NY 10036
E-mail: dhillman@proskauer.com; mkoch@proskauer.com

(d)      <u>Amendments</u>. The terms of this Agreement shall not be modified, waived, or amended except by subsequent written agreement by each of the Parties.

(e)      <u>Non-Severability</u>. Unless otherwise agreed in writing by each of the Parties, the Parties hereto agree that transactions set forth in this Agreement must be approved by the Bankruptcy Court in their entirety on the terms contained herein and that, if, for any reason, the Bankruptcy Court does not approve all of such transactions on all of the terms contained herein, Closing will not occur and none of the Parties will have any obligations under this Agreement; *provided, however*, that, if the Bankruptcy Court does not approve the payment of the Lease Cure Payment, (i) the Frankfurt Leases and the Frankfurt Lease Obligations will continue in full force and effect until such time as the Lease Cure Payment has been paid to SIM under the Frankfurt Leases at which point they will be deemed terminated without any further action by any Party and (ii) SIM shall still execute the Servicing Agreement.

(f)      <u>No Third-Party Beneficiaries</u>. Other than as expressly set forth herein, this Agreement shall not confer any rights or remedies upon any person other than the Parties and their respective successors and permitted assigns; *provided, however,* that any Released Party that is not otherwise a signatory to this Agreement will be entitled to enforce the release and covenants set forth in Section 3 of this Agreement as if he, she, or it were a party hereto.

(g)      <u>Advice of Counsel</u>. Each Party represents that it has: (i) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (ii) executed this Agreement upon the advice of such counsel; (iii) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (iv) had the opportunity to have this

Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

(h)    Entire Agreement. Subject to Section 2 (*Term Sheet Incorporated by Reference*), this Agreement contains the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter. Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement. The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.

(i)    No Party Deemed Drafter. The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

(j)    Counterparts. This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

(k)    GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE CHOSEN STATE, WITHOUT GIVING EFFECT TO ITS CONFLICT OF LAWS PRINCIPLES. Each Party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (i) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party to this Agreement; *provided that* this clause (k) applies only to this Agreement and the Term Sheet and not any of the other documents addressed herein or attached hereto, including, *inter alia,* the SIM Leases.

(l)    TRIAL BY JURY WAIVER. EACH PARTY TO THIS AGREEMENT IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

(m)     <u>Independence</u>. Notwithstanding anything herein to the contrary, Avenger acknowledges and agrees that SIM, which includes, without limitation, SIM International B.V., and Avenger Flight Group Germany GmbH are not, and have never been, affiliates or partners.

(n)     <u>No Assignment</u>. No Party may assign, delegate or transfer its rights, interests and obligations hereunder to any other person, except as contemplated by this Agreement or the Term Sheet, without the prior written consent of each other Party.

*[Remainder of Page Intentionally Blank]*

This Agreement has been duly executed by the duly authorized representatives of the Parties on the date set forth above:

**AVENGER FLIGHT GROUP, LLC**

By: _____
Name: Elsa Gagnon
Title:

**AVENGER FLIGHT GROUP GERMANY GMBH**

By: _____
Name: Elsa Gagnon
Title:

**AVENGER FLIGHT GROUP ESPAÑA, SL**

By: _____
Name: Elsa Gagnon
Title:

**AFG DALLAS III, LLC**

By: _____
Name: Elsa Gagnon
Title:

**AFG DALLAS IV, LLC**

By: _____
Name: Elsa Gagnon
Title:

**AFG DALLAS, LLC**

By: _____
Name: Elsa Gagnon
Title:

**AFG EU OPERATIONS CORP**

By: _____
Name: Kyle Hunter
Title:

**AFG FLL, LLC**

By: _____
Name: Elsa Gagnon
Title:

**AFG LATAM HOLDING CORP.**

By: _____
Name: Elsa Gagnon
Title:

**AFG LATAM SIM HOLDINGS II, LLC**

By: _____
Name:
Title:

**AFG LATAM SIM HOLDING III, LLC**

By: _____
Name: Elsa Gagnon
Title:

**AFG LATAM SIM HOLDINGS IV, LLC**

By: _____
Name:
Title:

CONFIDENTIAL COMMUNICATION; FOR DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408 AND SIMILAR PROTECTIONS
PSZJ Draft 2.10.2026

**AFG LATAM SIM HOLDINGS, LLC**

By: _____
Name: Elsa Gagnon
Title: Manager

**AFG LATAM, LLC**

By: _____
Name: Elsa Gagnon
Title: Manager

**AFG MEXICO CORP**

By: _____
Name: Elsa Gagnon
Title: Director

**AFG ORLANDO, LLC**

By: _____
Name: Elsa Gagnon
Title: Manager

**AFG SANDFORD, LLC**

By: _____
Name: Elsa Gagnon
Title: Manager

**AFG SIM HOLDING CORP**

By: _____
Name: Elsa Gagnon
Title: Director

**AVENGER FLIGHT GROUP EUROPE, CORP.**

By: _____
Name: Elsa Gagnon
Title: Director

**AVENGER FLIGHT GROUP TOPCO, LLC**

By: _____
Name: Elsa Gagnon
Title:

**AVENGER FLIGHT TRAINING, LLC**

By: _____
Name: Elsa Gagnon
Title: Manager

**AVENGER FLIGHT GROUP MEXICO II, S. DE R.L. DE CV**

By: _____
Name: Elsa Gagnon
Title:

**PAPI FLIGHT TRAINING, LLC**

By: _____
Name: Elsa Gagnon
Title: Manager

**AVENGER FLIGHT GROUP COLOMBIA S.A.S**

By: _____
Name: Elsa Gagnon
Title:

CONFIDENTIAL COMMUNICATION; FOR DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408 AND SIMILAR PROTECTIONS
PSZJ Draft 2.10.2026

**AVENGER MEXICO MANAGEMENT, S. DE R.L. DE C.V.**

By: _____
Name: Elsa Gagnon
Title:

**AVENGER FLIGHT GROUP MEXICO, S. DE R.L. DE C.V.**

By: _____
Name: Elsa Gagnon
Title:

**FTD ASSET ESPAÑA, S.L.**

By: _____
Name: Elsa Gagnon
Title:

**AFG FTD GERMANY GMBH**

By: _____
Name: Elsa Gagnon
Title:

**AVENGER FLIGHT GROUP INDIA PVT. LTD.**

By: _____
Name: Elsa Gagnon
Title:

**AVENGER FLIGHT GROUP ITALIA, S.R.L.**

By: _____
Name: Elsa Gagnon
Title:

**AVENGER FLIGHT GROUP ISRAEL HOLDINGS LTD.**

By: _____
Name: Elsa Gagnon
Title:

**AVENGER FLIGHT GROUP 737 LTD.**

By: _____
Name: Elsa Gagnon
Title:

**SIM INTERNATIONAL B.V.**

By: _Frank Uit den Bogaard_
FUDB Management B.V.
Name: Frank Uit den Bogaard
Title: Director

**SIM INTERNATIONAL LEASE B.V.**

By: _Frank Uit den Bogaard_
FUDB Management B.V.
Name: Frank Uit den Bogaard
Title: Director

**SIM INTERNATIONAL LEASE I B.V.**

By: _Frank Uit den Bogaard_
FUDB Management B.V.
Name: Frank Uit den Bogaard
Title: Director

**SIM INTERNATIONAL LEASE II B.V.**

By: _Frank Uit den Bogaard_
FUDB Management B.V.
Name: Frank Uit den Bogaard
Title: Director

**SIM INTERNATIONAL LEASE III B.V.**

By: _Frank Uit den Bogaard_
FUDB Management B.V.
Name: Frank Uit den Bogaard
Title: Director

**SIM INTERNATIONAL LEASE IV B.V.**

By: _Frank Uit den Bogaard_
FUDB Management B.V.
Name: Frank Uit den Bogaard
Title: Director

**SIM INTERNATIONAL LEASE VII B.V.**

By: _Frank Uit den Bogaard_
FUDB Management B.V.
Name: Frank Uit den Bogaard
Title: Director

**SIM INTERNATIONAL LEASE VIII B.V.**

By: _Frank Uit den Bogaard_
FUDB Management B.V.
Name: Frank Uit den Bogaard
Title: Director

**SIM INTERNATIONAL LEASE XV B.V.**

By: *Frank Uit den Bogaard*
_____
FUDB Management B.V.
Name: Frank Uit den Bogaard
Title: Director

**SIM INTERNATIONAL TRAINING
GERMANY B.V.**

By: *Frank Uit den Bogaard*
_____
FUDB Management B.V.
Name: Frank Uit den Bogaard
Title: Director

**FFS LEASE B.V.**

By: *Frank Uit den Bogaard*
_____
FUDB Management B.V.
Name: Frank Uit den Bogaard
Title: Director

**MARATHON DISTRESSED CREDIT FUND, L.P.**, as a Lender

By: Marathon Asset Management L.P., its
Investment Manager

By: _____
Name: Jamie Raboy
Title: Authorized Signatory

**MARATHON STEPSTONE MASTER FUND, L.P.**, as a Lender

By: Marathon Asset Management L.P., its
Investment Manager

By: _____
Name: Jamie Raboy
Title: Authorized Signatory

**MCSP SUB, LLC**, as a Lender
By: Marathon Asset Management L.P., its
Investment Manager

By: _____
Name: Jamie Raboy
Title: Authorized Signatory

**MARATHON DISTRESSED CREDIT MASTER FUND**, as a Lender
By: Marathon Asset Management L.P., its
Investment Manager

By: _____
Name: Jamie Raboy
Title: Authorized Signatory

**EVERGREEN CREDIT OPPORTUNITIES LLC**, as a Lender

By: Cercano Management LLC, its
Investment Manager

By: _____

Name: Albert Hwang

Title: Executive Vice President

**ALCOF III NUBT, L.P.**, as a Lender
By: Arbour Lane Fund III GP, LLC,
Its General Partner

By: *Dan Galanter*
Name: Dan Galanter
Title: Manager

**ALCOF III UBT, L.P.**, as a Lender
By: Arbour Lane Fund III GP, LLC,
Its General Partner

By: *Dan Galanter*
Name: Dan Galanter
Title: Manager

**MIDOCEAN TACTICAL SOLUTIONS
FUND LP**, as a Lender

By: MidOcean Credit Fund Management
LP, as Portfolio Manager

By: Ultramar Credit Holdings, Ltd., its
General Partner

By: _____
Name: Damion Brown
Title: Chief Operating Officer

# EXHIBIT A

**EXECUTION VERSION**

## RESTRUCTURING TERM SHEET

### Avenger Flight Group, LLC

### February 12, 2026

The transactions (the "**Restructuring Transactions**") set out in this indicative term sheet (this "**Term Sheet**") are not intended to describe or include all of the terms and conditions of the restructuring of the indebtedness and other obligations of Avenger Flight Group, LLC ("**AFG**") and its affiliated Chapter 11 debtors[1] (collectively, the "**Debtors**", and together with AFG's non-Debtor affiliates and direct or indirect subsidiaries, the "**Company**") or to set forth the definitive contractual language of any provisions summarized below. This Term Sheet sets forth the principal terms of the Restructuring Transactions. The Restructuring Transactions will be subject to the terms and conditions of this Term Sheet and to definitive documentation.

*This Term Sheet and communications concerning it are being provided in furtherance of settlement discussions entered into by AFG and the undersigned parties hereto (collectively, the "**Parties**" and individually a "**Party**"), and it is entitled to the protections from use or disclosure afforded by Fed. R. Evid. 408 and any similar U.S. state, federal or other applicable rule that restricts or prohibits use. All statements made in this Term Sheet or in communications concerning it are in the nature of settlement discussions and compromise, are not intended to be and do not constitute representations of any fact or admissions of any liability, are to be used only for the purpose of attempting to reach a consensual compromise and settlement, are subject to and governed by the terms and conditions of existing confidentiality agreements, and are not admissible in any court. In the event of a conflict between the terms and conditions of this Term Sheet, including this paragraph, and any existing confidentiality agreement, the terms and conditions of such confidentiality agreement shall govern.*

***This Term Sheet is not an offer with respect to any securities, or a solicitation of acceptances of any chapter 11 plan within the meaning of section 1125 of the Bankruptcy Code (as defined below) or any other plan of reorganization, scheme of arrangement, or similar process under any other applicable law. Any such offer or solicitation will comply with all applicable laws, and provisions of the Bankruptcy Code. No Party shall be bound with respect to any transaction until the agreement, execution, and delivery of definitive documentation after obtaining all necessary internal approvals.***

### CONSUMMATION OF RESTRUCTURING TRANSACTIONS

| | |
|---|---|
| **Implementation:** | To implement the Lease Transactions (as defined below), the Debtors anticipate filing voluntary petitions (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware |

---

[1] The Debtors are Avenger Flight Group, LLC; AFG Dallas III, LLC; AFG Dallas IV, LLC; AFG Dallas, LLC; AFG EU Operations Corp.; AFG FLL, LLC; AFG Latam Holding Corp.; AFG Latam Sim Holdings II, LLC; AFG Latam Sim Holdings III, LLC; AFG Latam Sim Holdings IV, LLC; AFG Latam Sim Holdings, LLC; AFG Latam, LLC; AFG Mexico Corp.; AFG Orlando, LLC; AFG Sanford, LLC; AFG Sim Holding Corp.; Avenger Flight Group Europe, Corp.; Avenger Flight Group Topco, LLC; Avenger Flight Training, LLC; Avenger Flight Group Mexico II, S. de R.L. de C.V.; and Papi Flight Training, LLC.

| | |
|---|---|
| | (the "**Bankruptcy Court**") on or around February 11, 2026 (the date of such filing, the "**Petition Date**"). The Chapter 11 Cases will provide for the consummation of the Lease Transactions and the simultaneous sale of all or substantially all of the Debtors' assets by way of a credit bid by an acquisition vehicle formed by the Lenders[2] or their designee ("**NewCo**") or such higher or better topping bid and/or a plan of reorganization (the "**Sale**"). It is contemplated that the sequence of events shall be as follows: <br><br> • The Bankruptcy Court shall approve the terms of the Lease Transactions. <br><br> • The Bankruptcy Court shall approve the Sale. <br><br> • The Lease Transactions and the Sale shall close simultaneously upon satisfaction of the Conditions Precedent (the "**Closing**"). |
| **DIP Facility:** | The Lenders will provide up to $43.5 million (USD) of financing in the form of a senior secured, administrative super-priority debtor-in-possession, multi-draw term credit facility of which $14.5 million will be new money (the "**DIP Facility**"). The DIP Facility, together with cash on hand, will be used to fund the Chapter 11 Cases and, among other things, to consummate the Lease Transactions. The term sheet for the DIP Facility is attached hereto as **Appendix I**. |

**TREATMENT OF SIM LEASES**

| | |
|---|---|
| **Global Settlement; Approval of Lease Transactions:** | The Debtors will file with the Bankruptcy Court a motion, and use best efforts to obtain the approval thereof, that, among other things, seeks entry of an order by the Bankruptcy Court (the "**Lease Transactions Order**"), which shall be acceptable to SIM International B.V. and certain of its affiliates (the "**Lessor**") and Required Lenders (as defined in the Credit Agreement), approving a global settlement between the Company and the Lessor with respect to the terms of this Term Sheet, including the simulators and the lease agreements described herein (such lease agreements collectively, the "**SIM Leases**"), as set forth on Schedule I hereto, that will include the following (collectively, the "**Lease Transactions**"), each of which shall occur or be consummated at, and is subject to, Closing: |

---

[2] The "**Lenders**" are the lenders under that certain *Credit Agreement*, dated as of June 25, 2021, among Avenger Flight Group, LLC, as borrower, Avenger Flight Group Holdings LLC, as holdings, certain subsidiaries of Avenger Flight Group Holdings LLC, as guarantors, the Lenders, as lenders, and Wilmington Trust, as administrative agent and collateral agent, as amended and modified from time to time (the "**Credit Agreement**").

**A. <u>Lease Cure Payment</u>**

- The Company shall pay to the Lessor €626,173.77 (EUR) (the "**<u>Lease Cure Payment</u>**"), which amount represents the aggregate remaining amount of all payments due and owing from the Company to the Lessor and its affiliates in respect of the SIM Leases through the Petition Date.

**B. <u>Treatment of Frankfurt and Israeli Leases</u>**

- Lessor will, in its sole discretion, direct Avenger Flight Group Germany GmbH ("**<u>Avenger Germany</u>**") to either (i) assume and assign the Frankfurt leases governing the A330 SIM FFS (serial # 31043) and A320 SIM FFSs (serial # 11143 and 11123) (collectively, the "**<u>Frankfurt Leases</u>**") to SIM International Training Germany B.V. ("**<u>SIM Germany</u>**"), or (ii) terminate the Frankfurt Leases effective as of August 19, 2025. In each case, all further lease payments under the Frankfurt Leases (the "**<u>Frankfurt Lease Obligations</u>**") that may otherwise have become due as from the moment all Conditions Precedent have been satisfied will immediately cease.

- Following the Petition Date and prior to the Closing, the Company shall fulfill without any set-off, deduction, suspension or withholding whatsoever on whatever basis (a) all of its obligations under the Frankfurt Leases that arise after the Petition Date, including the Frankfurt Lease Obligations, and (b) all payment obligations to the Frankfurt employees, for the avoidance of doubt, excluding any margin (collectively, the "**<u>Frankfurt Payments</u>**"). The Frankfurt Payments from the Petition Date to Closing will decrease the Lease Cure Payment Euro for Euro.

- The Company and the Lessor will consensually terminate the lease for the Boeing 737NG SIM (serial #21022) in Israel.

**C. <u>Treatment of Spanish Leases</u>**

- The Company agrees that the SIM Leases governing the Airbus A320 SIM FFS (serial # 11049), Airbus A330 SIM FFSs (serial # 31019 and 31039) and B737NG SIM FFS (serial # 08/5) (the "**<u>Spanish Leases</u>**") will remain in full force and effect, and the Company will take no actions to terminate or modify the Spanish Leases. The Company and NewCo (as applicable) will assume the obligations under the existing guaranty and share pledge agreements of the Company lessee under the Spanish Leases.

- Following the Petition Date and prior to the Closing, the Company shall fulfill all of its obligations, other than any obligation to provide audited financial statements, under the Spanish Leases that arise after the Petition Date, including payment obligations without any set-off, deduction, suspension or withholding whatsoever on whatever basis; *provided that* the Company shall continue to provide unaudited financial statements under the Spanish Leases, as applicable.

### D. Treatment of Frankfurt Employees

- The Lessor will not assume any obligations or liabilities of AFG Germany GmbH and there shall be no automatic transfer of employment or Betriebsübergang under §613a BGB. The Lessor and the Company (or NewCo) will enter into a servicing agreement pursuant to which Lessor will, among other things, reimburse Company (or NewCo) the cost of employing the identified five (5) technicians plus one (1) supervisor working in Dreieich (the "**Servicing Agreement**") in the form attached hereto as **Exhibit A**.

- The Company shall continue to provide maintenance and QMS services during the period between signing and Closing.

- The Company and NewCo shall hold Lessor harmless for any liabilities arising in respect of any Frankfurt employees (a) with respect to unpaid vacation and holiday pay up to €100,000.00 (EUR) and (b) with respect to any other liabilities up to €1,000,000.00 (EUR) should Lessor be held liable for such liabilities.

### E. Assumption of Leases (Airbus A320 SIM FFSs (serial # 11060, 11071, 11102 and 11059))

- The Debtors will assume the SIM Leases governing the Airbus A320 SIM FFSs (serial # 11060, 11071, 11102 and 11059) (collectively, the "**SIM USA FFSs**") on agreed terms and then assign such amended leases (the "**SIM USA FFS Leases**") to NewCo, in each case in the form attached hereto as **Exhibit B-1, Exhibit B-2, Exhibit B-3 and Exhibit B-4**.

- The Debtors and the Lessor will terminate the obligation to pay the Euribor premium on the SIM USA FFS with serial # 11102.

- The Lessor, at the Company's expense, will move the SIM USA FFS with serial # 11102 in turnkey condition (for the avoidance of doubt, not including upgrading) from Fort Lauderdale to any location inside the United States at a

maximum cost of €398,000 (EUR), which amount includes legal expenses and support for recertification.

- The Lessor, at its own cost and expense, will upgrade the SIM USA FFSs to Airbus A320 Std 3.0/3.1 inclusive of: (a) the Airbus hardware and data modifications and (b) the addition of a warranty for the duration of the operational lease (so no more separate warranty costs) ((a) and (b) together an "**SIM USA FFS Upgrade**"). NewCo shall be obligated to provide, at its own cost and expense, the Lessor with all reasonable access to such equipment and make its employees reasonably available as necessary to enable the Lessor to timely complete the SIM USA FFS Upgrade.

- Assuming reasonable Company (or NewCo, as applicable) access and cooperation is received for the stated upgrade, the Lessor will complete the SIM USA FFS Upgrade within six months of the Lessor's receipt of both (i) the Company's or NewCo's, as applicable, written direction to begin such upgrades and (ii) the upgrade materials provided by the OEMs for the applicable upgrades.

- The applicable rent for each respective SIM USA FFS for which the SIM USA FFS Upgrade has been completed will increase to [redacted] (EUR) per month (subject to a 3% annual increase beginning the first month after the Closing) after the earlier of the following occurs for such relevant unit:

  - the utilization of the upgrade of that particular SIM USA FFS exceeds 4,000 hours for that particular unit over a consecutive period of 12 months; or

  - such time as the Lenders, in the aggregate, hold less than (a) 50.1% of the Company's (or NewCo's) issued and outstanding equity and a manufacturer of flight simulators holds any portion of the balance or (b) 35% of the Company's (or NewCo's) issued and outstanding equity and no portion of the balance is held by a manufacturer of flight simulators.

- All agreements related to security interests and/or other contractual obligations associated with the SIM Leases, including any share pledge agreements, shall be amended, modified or restated, at the sole reasonable cost and expense of the Company (or NewCo) to give full effect to the Lease Transactions and Sale in accordance with this Term Sheet, for purposes of in all respects maintaining such security interests and contractual obligations.

- The Lessor shall consent to the Debtors' assumption and assignment of the SIM Leases for each of the SIM USA FFSs to NewCo.

- Following the Petition Date and prior to the Closing, the Company shall fulfill all of its obligations under the SIM USA FFS Leases that arise after the Petition Date, including payment obligations without any set-off, deduction, suspension or withholding whatsoever on whatever basis.

**F. Transfer and Leaseback of Leases** (SIM Industries A320 SIMs (serial # 12-6, 10-3, 13-06, 13-07))

- The Debtors will transfer all right, title, and interest of the SIM Industries A320 FFSs (serial # 12-6, 10-3, 13-06 and 13-07) (collectively, the "**SIM Industries A320 FFSs**") free from any encumbrance, lien, and any other third party right and/or interest to the Lessor for a purchase price of €1 (EUR) per SIM Industries A320 FFS, in each case pursuant to the purchase agreement in the form attached hereto as **Exhibit C.**

- The Lessor, at its own cost and expense, and following receipt of title to the SIM Industries A320 FFSs, will upgrade the SIM Industries A320 FFSs to A321 Std 3.0/3.1, inclusive of (a) the necessary Airbus hardware and data modifications, (b) renewal of all computers, (c) visual to 4K, (d) new motion cabinets/refurbishment of motion legs, (e) upgrade I/O system, (f) removal of obsolete parts (g) adding of warranty for the duration of the operational lease (so no more separate warranty costs) ((a)-(g) together a "**SIM Industries A320 FFS Upgrade**"). NewCo shall be obligated to provide, at its own reasonable cost and expense, the Lessor with all reasonable access to such equipment and make its employees reasonably available as necessary to enable the Lessor to timely complete the SIM Industries A320 FFS Upgrade.

- The Lessor and the Company (and/or NewCo) shall enter into a 10-year operational lease for each of the SIM Industries A320 FFSs, in the form attached hereto as **Exhibit D-1, Exhibit D-2, Exhibit D-3,** and **Exhibit D-4**.

- Assuming reasonable Company (or NewCo, as applicable) access and cooperation is received for the stated upgrade, the Lessor will complete the SIM Industries A320 FFS Upgrade within seven months of the Lessor's receipt of both (i) the Company's or NewCo's, as applicable, written direction to begin such upgrades and (ii) the upgrade materials provided by the OEMs for the applicable upgrades.

6

- The applicable rent for each respective SIM Industries A320 FFS will be ███ per month, until the earlier of the following occurs for such relevant unit:

  - the SIM Industries A320 FFS Upgrade has been completed for that particular SIM Industries A320 FFS;

  - such time as the Lenders, in the aggregate, hold less than (a) 50.1% of the Company's (or NewCo's) issued and outstanding equity and a manufacturer of flight simulators holds any portion of the balance or (b) 35% of the Company's (or NewCo's) issued and outstanding equity and no portion of the balance is held by a manufacturer of flight simulators; or

  - four years after signing of the operational lease contract for that particular SIM Industries A320 FFS as set forth above.

- Thereafter, the rent will increase for each relevant SIM Industries A320 FFS to ███ (EUR) per month (subject to a 3% annual increase beginning the first month after the Closing).

### G. Agreements Related to the SIM Leases

- All agreements related to and/or associated with the SIM Leases shall be amended, modified, or restated, assumed, and/or assumed and assigned by the Debtors, to the extent applicable, in order to give full effect to the Lease Transactions and Sale in accordance with this Term Sheet.

### H. Business Plan

- The Debtors have developed, and all Parties have approved, a business plan for the operation of all of the simulators currently leased by the Company, or to be leased in accordance with this Term Sheet, from Lessor that includes (i) a pro forma balance sheet, (ii) an income statement, (iii) cash flow projections for the period ended December 31, 2026, and (iv) identity of senior management at Closing (the "**Business Plan**"), in the form attached hereto as **Exhibit E.**

| | |
|---|---|
| **Mutual Release of Liabilities:** | These provisions are set forth in the Settlement Agreement. |
| **Exculpation and Release in Future Chapter 11 Plan** | To the extent the Debtors propose a chapter 11 plan, the Debtors shall use commercially reasonable efforts, if legally permissible, to obtain an exculpation and customary releases for the Lessor (and all of its affiliated companies and subsidiaries, as well as all |

| | |
|---|---|
| | directors, officers, owners, advisors, etc. of the Lessor and of its affiliated companies and subsidiaries). |
| **Milestones:** | The Company shall implement the Lease Transactions in accordance with the following milestones (the "**Milestones**"), each of which may be waived in writing (with email from counsel being sufficient) jointly by each of the Lessor and the Required Lenders or extended in writing (with email from counsel being sufficient) as follows: (a) with respect to clause (i) below, jointly by each of the Lessor and the Required Lenders and (b) with respect to clause (ii) or (iii) below, solely by the Required Lenders; *provided that* any extension of a Milestone set forth in clause (ii) or (iii) below beyond one hundred and twenty (120) days after the Petition Date shall also require the Lessor's written consent; *provided, further* that any such extension set forth in this clause (b) will be subject to a representation in writing (email from counsel being sufficient) to the Lessor from the Required Lenders that they are continuing efforts in good faith to close the Sale and the Lease Transactions: |
| | i.   No later than five (5) business days after the Petition Date, the Debtors shall have filed the motion to approve the Lease Transactions, which will include, among other things, the definitive documentation approving this settlement, including the Business Plan and terms of the Servicing Agreement, all lease amendments and/or restatements and such other documents necessary to effectuate the Lease Transactions. |
| | ii.  No later than fifty-five (55) days after the Petition Date, the Bankruptcy Court shall have entered (a) the Lease Transactions Order and (b) the order approving the Sale (the "**Sale Order**"). |
| | iii. Closing shall occur no later than sixty (60) days after the Petition Date. |
| **Termination Events:** | This Term Sheet may be terminated by the Lessor or Required Lenders upon written notice to the Company that there has occurred and is continuing any of the following events, in each case which remains uncured for four (4) business days after the receipt by the Company of written notice (email to counsel being sufficient): |
| | i.   Any of the Milestones have not been achieved, unless such Milestones were previously extended or waived in writing in accordance with the Milestones above. |
| | ii.  The occurrence of a material breach by the Company and/or any of the Lenders of any of their material representations, warranties, covenants, or other |

obligations, or any other material provision of this Term Sheet.

iii. The Company enters into a binding agreement with respect to a sale of a material portion of assets, a plan proposal or any other transaction of similar effect (in each case, outside of the ordinary course of business), other than strictly in accordance with or in direct furtherance of the Lease Transactions.

iv. Any acceleration of obligations under the DIP Facility.

v. Any definitive document entered into by the Company, or any related order entered by the Bankruptcy Court adversely affects the ability of the Company or any other party to fulfill all of its obligations under, and consummate, the Lease Transactions as reasonably determined by the Lessor.

vi. Any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Term Sheet to be unenforceable.

vii. The issuance by any governmental authority, including any regulatory authority, the Bankruptcy Court, or another court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling, or order that, in each case, would have the effect of preventing consummation of the Lease Transactions; provided, that the Company shall have thirty (30) calendar days after issuance of such injunction, judgment, decree, charge, ruling, or order to obtain relief that would allow consummation of the Lease Transactions.

viii. Without the prior consent of the Lessor, the Company or any entity comprising the Company (i) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official, trustee, or a trustee pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases, (ii) makes a general assignment or arrangement for the benefit of creditors, or (iii) takes any corporate action for the purpose of authorizing any of the foregoing.

ix. In each case prior to the Closing the (a) conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (b) dismissal of any of the Chapter 11 Cases, or (c) appointment of a trustee or an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code for the Chapter 11 Cases, in each case of clauses (a), (b), and (c), without

| | |
|---|---|
| | the prior written consent of the Lessor and which order in each case has not been reversed, stayed, or vacated within (3) three business days. |
| **Conditions Precedent:** | It shall be a condition to the Closing and all of the Lessor's performance obligations that the following conditions shall have been satisfied in form and substance reasonably satisfactory to the Lessor and the Required Lenders or waived in writing jointly by each of the Lessor and the Required Lenders (as defined in the Credit Agreement) at or prior to the Closing (the "**Conditions Precedent**"): |

    i. This Term Sheet shall not have been terminated as to any Party and shall be in full force and effect.

    ii. The Bankruptcy Court shall have entered the Lease Transactions Order, which order shall be materially consistent with the terms of this Term Sheet and in form and substance reasonably acceptable to the Lessor and the Required Lenders.

    iii. The Bankruptcy Court shall have entered the Sale Order which order shall be materially consistent with the terms of this Term Sheet and in form and substance reasonably acceptable to the Lessor and the Required Lenders.

    iv. The Lease Cure Payment shall have been received by the Lessor in full in cash.

    v. The Spanish Leases shall be in full force and effect and there shall be no defaults thereunder, including in respect of all payment obligations in accordance with this Term Sheet.

    vi. All payments due and owing from the Petition Date to the Closing under the Frankfurt Leases and the SIM USA FFS Leases shall be paid in full in accordance with this Term Sheet.

    vii. All right, title and interest of the SIM Industries A320 FFSs shall have been transferred from the Debtors to the Lessor as described in this Term Sheet and in the form attached hereto as **Exhibit C**.

    viii. Company (and/or NewCo, as applicable) and the Lessor shall have executed a 10-year operational lease for each of the SIM Industries A320 FFSs as described in this Term Sheet and in the form attached hereto as **Exhibit D**.

    ix. Company and the Lessor shall have entered into the Servicing Agreement.

    x. Company and the Lessor shall have entered into the amendments and/or restatements to the leases as described

|  | in this Term Sheet and in the form attached hereto as **Exhibit B**. |
|  | xi. The Lease Transactions and all transactions contemplated in this Term Sheet shall have been consummated in a manner consistent with this Term Sheet. |
|  | xii. All outstanding costs, fees and expenses of the Lessor incurred in connection with the Lease Transactions through and including the Closing shall have been paid in full in cash, including the reasonable and documented fees and expenses of Freshfields US LLP ("**Freshfields**"), Lemstra Van der Korst N.V. ("**LVDK**"), Baker & McKenzie LLP ("**Baker McKenzie**") in relation to the Lease Transactions, and Potter Anderson & Corroon ("**PAC**") as local counsel, in each case, that are due and owing after receipt of the applicable invoices consistent with their respective engagement letters. |
| **Amendments:** | This Term Sheet may not be modified, amended, or supplemented in any manner except in writing signed by each of the Parties hereto. |
| **Reservation of Rights:** | If the Closing does not occur in accordance with this Term Sheet, or if this Term Sheet is terminated in accordance with the terms set forth herein for any reason, each Party fully reserves any and all of the rights and remedies available against any Party. Except as expressly provided in this Term Sheet, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of the Lessor to protect and preserve its rights, remedies, and interests, including its claims against the Company (or its respective affiliates or subsidiaries) or its full participation in any bankruptcy case filed by the Debtors. This Term Sheet is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Term Sheet and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of the Lease Transactions and/or the payment of damages, indemnification and reimbursement to which any Party may be entitled to under this Term Sheet. This Term Sheet shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. The Parties deny any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert. |

| Non-Severability: | The Parties hereto agree that the Lease Transactions must be approved by the Bankruptcy Court in their entirety on the terms contained herein. |
| | If, for any reason, the Bankruptcy Court does not approve each of the foregoing Lease Transactions on the terms contained herein, the Closing will not occur and none of the Parties will have any obligation to consummate any Lease Transactions or take any other actions as contemplated hereby; *provided, however*, that, if the Bankruptcy Court does not approve the payment of the Lease Cure Payment, (a) the Frankfurt Leases and the Frankfurt Lease Obligations will continue in full force and effect until such time as the Lease Cure Payment has been paid to the Lessor under the Frankfurt Leases and (b) the Lessor shall still execute the Servicing Agreement on the terms set above. |

## GENERAL PROVISIONS

| Board Role: | FUDB Management or its designee (identified in its sole discretion) will, within thirty (30) days from the date hereof, elect to either (a) be appointed to the Company's (or NewCo's) board of managers or directors, as applicable (the "**Board**"), with the same rights and responsibilities as the other members of the Board, or (b) receive board observer rights to attend the Company (or NewCo's) Board meetings. FUDB Management will receive all Board papers, meeting notes and meeting agendas (other than matters pertaining exclusively to the SIM Leases (as amended) or any sale of the Company or any of its subsidiaries or strategic transactions, such as joint ventures, involving the Company or its subsidiaries, whether by merger, consolidation, sale or assets, sale of equity or otherwise) simultaneously with other Board members and will at all times be invited and enabled to observe meetings of the Board in person or via video connection. FUDB Management will not receive any compensation in connection with its Board member position or Board observer rights and will in all cases constitute a minority of the managers or directors serving on the Board. Notwithstanding the foregoing, the foregoing rights will terminate upon such time as the Lenders, in the aggregate, hold less than (a) 50.1% of the Company's (or NewCo's or any successor thereto by way of merger, consolidation, amalgamation or otherwise) issued and outstanding equity and a manufacturer of flight simulators holds any portion of the balance or (b) 35% of the Company's (or NewCo's or any successor thereto by way of merger, consolidation, amalgamation or otherwise) issued and outstanding equity and no portion of the balance is held by a manufacturer of flight simulators. |

| | |
|---|---|
| **Operational Advice and Marketing Support:** | Following the Closing, the Lessor will at times and for durations as may be reasonably acceptable to the Lessor, and at its own cost, (a) visit the Company's (or NewCo's) facilities in the United States and abroad and consult with the Company (or NewCo) regarding operational cost reductions and (b) upon the request of the Company (or NewCo), travel in February and March 2026 with the Company's (or NewCo's) marketing staff and/or senior leadership to meet with current and prospective customers with the goal of increasing the Company's (or NewCo's) revenues. |
| | The Parties further agree that SIM has no management obligations or equity interests in NewCo or the Company, and that NewCo and, as applicable, the Company, shall hold the Lessor and all of its affiliated companies and subsidiaries, as well as all agents, directors, officers, owners, advisors, professionals etc. of the Lessor and of its affiliated companies and subsidiaries, harmless from any claims or liabilities (other than for fraud, gross negligence, or willful misconduct) that may arise in connection with any such meetings, conversations or information provided by the Lessor during such meetings, and that the Lessor has no obligation or responsibility to provide any cost savings for the Company and/or NewCo, increase the Company's and/or NewCo's revenues, or otherwise provide any improvements in the Company's and/or NewCo's performance and/or relationships with customers. Each of NewCo, the Company and the Lenders supports the Lessor's participation in those activities and in this regards waives any claims (other than for fraud, gross negligence, or willful misconduct) against the Lessor and its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, affiliates, shareholders, agents, participants, subsidiaries, parents, successors, designees, and assigns. |
| | Nothing contained in this Term Sheet shall permit the Company or NewCo to offset, suspend or otherwise fail to fully and timely perform any obligation owed to the Lessor as a result of a breach of the Lessor of the agreements contained in this section titled "Operational Advice and Marketing Support". |
| **Fee Reimbursement:** | At Closing, the Company shall pay or reimburse all accrued reasonable and documented legal fees of Freshfields, LVDK, Baker & McKenzie in relation to the Lease Transactions, and PAC as local counsel, in each case, through and including the Closing. Beginning two weeks after the interim approval of the DIP Facility, and until the Closing, Freshfields, LVDK, and Baker McKenzie shall provide the Company and the Lenders (email to counsel being sufficient) with bi-weekly updates on all accrued fees and expenses to date and, upon request from either of the |

| | |
|---|---|
| | Company or the Lenders, summaries (redacted for attorney-client privilege) for such accrued legal fees. |
| | To the extent that this Term Sheet is terminated in accordance with the termination provisions provided for herein, the Company's reimbursement obligations under this section shall survive with respect to any and all fees and expenses earned or incurred on or before the date of termination. |
| **Information Sharing:** | The Debtors shall, to the extent legally permissible under applicable confidentiality obligations and commercially practicable, provide the Lessor with drafts of any document to be filed by the Debtors with the Bankruptcy Court that could reasonably be expected to have a material adverse effect on the Lease Transactions and/or be the proximate cause preventing the ability of the Company or any other party to fulfill its obligations under, and consummate, the Lease Transactions ("**Material Documents**") three (3) business days in advance of Debtors filing such document; *provided, that,* if it is not legally permissible or commercially practicable to provide Lessor with drafts of Material Documents three (3) business days in advance of filing, the Debtors will provide drafts of such documents to the Lessor as soon as reasonably practicable before filing. The terms of such Material Documents shall be reasonably acceptable to the Lessor and the Required Lenders; *provided, however*, that nothing herein shall prevent the Debtors from filing any Material Document or taking any other action they deem necessary or advisable to satisfy or otherwise comply with their fiduciary obligations and duties. |
| **Covenant to Support Restructuring Transactions:** | The Parties agree that they will (a) act in good faith and (b)(i) use commercially reasonable efforts to support the Restructuring Transactions, which, for the avoidance of doubt, include the Lease Transactions, the Sale, and the approval of the DIP Facility, both before and during the Chapter 11 Cases, (ii) vote and exercise any powers or rights available in support of the foregoing, and (iii) not file or support any other Party in the filing, any motion, objection, pleading, or other document with the Bankruptcy Court or any other court that, in whole or in part, could adversely affect the Lease Transactions; *provided, however*, that, if any Party takes action that is materially inconsistent with the terms of this Term Sheet, then the other Parties shall be relieved of the obligations set forth in this section. |
| **Independent Status:** | Notwithstanding anything herein to the contrary, the Company acknowledges and agrees that Lessor, which includes, without limitation, SIM International B.V., and Avenger Flight Group Germany GmbH are not, and have never been, affiliates or partners. |

*[Signature Pages Follow]*

14

This Term Sheet has been duly executed by the duly authorized representatives of the Parties on the date set forth above:

**AVENGER FLIGHT GROUP, LLC**

By: _____
Name: Elsa Gagnon
Title:

**AVENGER FLIGHT GROUP GERMANY GMBH**

By: _____
Name: Elsa Gagnon
Title:

**AVENGER FLIGHT GROUP ESPAÑA, SL**

By: _____
Name: Elsa Gagnon
Title:

**AFG DALLAS III, LLC**

By: _____
Name: Elsa Gagnon
Title:

**AFG DALLAS IV, LLC**

By: _____
Name: Elsa Gagnon
Title:

**AFG DALLAS, LLC**

By: _____
Name: Elsa Gagnon
Title:

**AFG EU OPERATIONS CORP**

By: _____
Name: Kyle Hunter
Title:

**AFG FLL, LLC**

By: _____
Name: Elsa Gagnon
Title:

**AFG LATAM HOLDING CORP.**

By: _____
Name: Elsa Gagnon
Title:

**AFG LATAM SIM HOLDINGS II, LLC**

By: _____
Name: ELSA GAGNON
Title:

**AFG LATAM SIM HOLDINGS III, LLC**

By: _____
Name: Elsa Gagnon
Title:

**AFG LATAM SIM HOLDINGS IV, LLC**

By: _____
Name: ELSA GAGNON
Title:

**AFG LATAM SIM HOLDINGS, LLC**

By: _____
Name: Elsa Gagnon
Title:

**AFG MEXICO CORP**

By: _____
Name: Elsa Gagnon
Title:

**AFG SANDFORD, LLC**

By: _____
Name: Elsa Gagnon
Title:

**AVENGER FLIGHT GROUP EUROPE, CORP.**

By: _____
Name: Elsa Gagnon
Title:

**AVENGER FLIGHT TRAINING, LLC**

By: _____
Name: Elsa Gagnon
Title:

**PAPI FLIGHT TRAINING, LLC**

By: _____
Name: Elsa Gagnon
Title:

**AFG LATAM, LLC**

By: _____
Name: Elsa Gagnon
Title:

**AFG ORLANDO, LLC**

By: _____
Name: Elsa Gagnon
Title:

**AFG SIM HOLDING CORP**

By: _____
Name: Elsa Gagnon
Title:

**AVENGER FLIGHT GROUP TOPCO, LLC**

By: _____
Name: Elsa Gagnon
Title:

**AVENGER FLIGHT GROUP MEXICO II, S. DE R.L. DE CV**

By: _____
Name: Elsa Gagnon
Title:

**AVENGER FLIGHT GROUP COLOMBIA S.A.S**

By: _____
Name: Elsa Gagnon
Title:

**AVENGER MEXICO MANAGEMENT, S. DE R.L. DE C.V.**

By: _____
Name: Elsa Gagnon
Title:

**AVENGER FLIGHT GROUP MEXICO, S. DE R.L. DE C.V.**

By: _____
Name: Elsa Gagnon
Title:

**FTD ASSET ESPAÑA, S.L.**

By: _____
Name: Elsa Gagnon
Title:

**AFG FTD GERMANY GMBH**

By: _____
Name: Elsa Gagnon
Title:

**AVENGER FLIGHT GROUP INDIA PVT. LTD.**

By: _____
Name: Elsa Gagnon
Title:

**AVENGER FLIGHT GROUP ITALIA, S.R.L.**

By: _____
Name: Elsa Gagnon
Title:

**AVENGER FLIGHT GROUP ISRAEL HOLDINGS LTD.**

By: _____
Name: Elsa Gagnon
Title:

**AVENGER FLIGHT GROUP 737 LTD.**

By: _____
Name: Elsa Gagnon
Title:

**SIM INTERNATIONAL B.V.**

By: *Frank Uit den Bogaard*
FUDB Management B.V.
Name: Frank Uit den Bogaard
Title: Director

**SIM INTERNATIONAL LEASE B.V.**

By: *Frank Uit den Bogaard*
FUDB Management B.V.
Name: Frank Uit den Bogaard
Title: Director

**SIM INTERNATIONAL LEASE I B.V.**

By: *Frank Uit den Bogaard*
FUDB Management B.V.
Name: Frank Uit den Bogaard
Title: Director

**SIM INTERNATIONAL LEASE II B.V.**

By: *Frank Uit den Bogaard*
FUDB Management B.V.
Name: Frank Uit den Bogaard
Title: Director

**SIM INTERNATIONAL LEASE III B.V.**

By: *Frank Uit den Bogaard*
FUDB Management B.V.
Name: Frank Uit den Bogaard
Title: Director

**SIM INTERNATIONAL LEASE IV B.V.**

By: *Frank Uit den Bogaard*
FUDB Management B.V.
Name: Frank Uit den Bogaard
Title: Director

**SIM INTERNATIONAL LEASE VII B.V.**

By: *Frank Uit den Bogaard*
FUDB Management B.V.
Name: Frank Uit den Bogaard
Title: Director

**SIM INTERNATIONAL LEASE VIII B.V.**

By: *Frank Uit den Bogaard*
FUDB Management B.V.
Name: Frank Uit den Bogaard
Title: Director

**SIM INTERNATIONAL LEASE XV B.V.**

By: _Frank Uit den Bogaard_

FUDB Management B.V.
Name: Frank Uit den Bogaard
Title: Director

**SIM INTERNATIONAL TRAINING GERMANY B.V.**

By: _Frank Uit den Bogaard_

FUDB Management B.V.
Name: Frank Uit den Bogaard
Title: Director

**FFS LEASE B.V.**

By: _Frank Uit den Bogaard_

FUDB Management B.V.
Name: Frank Uit den Bogaard
Title: Director

**MARATHON DISTRESSED CREDIT FUND, L.P.**, as a Lender

By: Marathon Asset Management L.P., its Investment Manager

By: _____
Name: Jamie Raboy
Title: Authorized Signatory

**MARATHON STEPSTONE MASTER FUND, L.P.**, as a Lender

By: Marathon Asset Management L.P., its Investment Manager

By: _____
Name: Jamie Raboy
Title: Authorized Signatory

**MCSP SUB, LLC**, as a Lender
By: Marathon Asset Management L.P., its Investment Manager

By: _____
Name: Jamie Raboy
Title: Authorized Signatory

**MARATHON DISTRESSED CREDIT MASTER FUND**, as a Lender
By: Marathon Asset Management L.P., its Investment Manager

By: _____
Name: Jamie Raboy
Title: Authorized Signatory

**EVERGREEN CREDIT OPPORTUNITIES LLC**, as a Lender

By: Cercano Management LLC, its
Investment Manager

By: _____

Name: Albert Hwang

Title: Executive Vice President

**ALCOF III NUBT, L.P.**, as a Lender
By: Arbour Lane Fund III GP, LLC,
Its General Partner

By:_____*Dan Galanter*_____
Name: Dan Galanter
Title: Manager

**ALCOF III UBT, L.P.**, as a Lender
By: Arbour Lane Fund III GP, LLC,
Its General Partner

By:_____*Dan Galanter*_____
Name: Dan Galanter
Title: Manager

**MIDOCEAN TACTICAL SOLUTIONS
FUND LP**, as a Lender

By: MidOcean Credit Fund Management
LP, as Portfolio Manager

By: Ultramar Credit Holdings, Ltd., its
General Partner

By: _____
Name: Damion Brown
Title: Chief Operating Officer

**CONFIDENTIAL COMMUNICATION; FOR DISCUSSION PURPOSES ONLY**
**SUBJECT TO FRE 408 AND SIMILAR PROTECTIONS**

## SCHEDULE I TO TERM SHEET

**Treatment of Simulators as per the Lease Transactions, each of which shall occur or be consummated at, and is subject to, Closing:**

| Simulator | Jurisdiction | Lessee or Owner Debtor or Non-Debtor | Treatment | Additional Terms |
|---|---|---|---|---|
| A330 SIM FFS (serial # 31043) | Germany | Non-Debtor | Assumed and Assigned to SIM Germany or Terminated | Subject to payment of Lease Cure Payment |
| A320 SIM FFS (serial # 11143) | Germany | Non-Debtor | Assumed and Assigned to SIM Germany or Terminated | Subject to payment of Lease Cure Payment |
| A320 SIM FFS(serial # 11123) | Germany | Non-Debtor | Assumed and Assigned to SIM Germany or Terminated | Subject to payment of Lease Cure Payment |
| Boeing 737NG SIM FFS (serial #21022) | Israel | Non-Debtor | Terminated | |
| Airbus A320 SIM FFS (serial # 11049) | Spain | Non-Debtor | Remain in full force and effect | |
| Airbus A330 SIM FFS (serial # 31019) | Spain | Non-Debtor | Remain in full force and effect | |
| Airbus A330 SIM FFS (serial # 31039) | Spain | Non-Debtor | Remain in full force and effect | |
| B737NG SIM FFS (serial # 08/5) | Spain | Non-Debtor | Remain in full force and effect | |
| A320 SIM FFS (serial # 11060) | United States | Debtor | Assumed and assigned to NewCo | Subject to the terms set forth in Part E of the Lease Transactions |
| A320 SIM FFS (serial # 11071) | United States | Debtor | Assumed and assigned to NewCo | Subject to the terms set forth in Part E of the Lease Transactions |

**CONFIDENTIAL COMMUNICATION; FOR DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408 AND SIMILAR PROTECTIONS**

| Simulator | Jurisdiction | Lessee or Owner Debtor or Non-Debtor | Treatment | Additional Terms |
|---|---|---|---|---|
| A320 SIM FFS (serial # 11102) | United States | Debtor | Assumed and assigned to NewCo | Subject to the terms set forth in Part E of the Lease Transactions |
| A320 SIM FFS (serial # 11059) | United States | Debtor | Assumed and assigned to NewCo | Subject to the terms set forth in Part E of the Lease Transactions |
| SIM Industries A320 FFS (serial # 12-6) | United States | Debtor | Right, title and interest transferred to Lessor and leased back to Company | Subject to the terms set forth in Part F of the Lease Transactions |
| SIM Industries A320 FFS (serial # 10-3) | United States | Debtor | Right, title and interest transferred to Lessor and leased back to Company | Subject to the terms set forth in Part F of the Lease Transactions |
| SIM Industries A320 FFS (serial # 13-06) | United States | Debtor | Right, title and interest transferred to Lessor and leased back to Company | Subject to the terms set forth in Part F of the Lease Transactions |
| SIM Industries A320 FFS (serial # 13-07) | United States | Debtor | Right, title and interest transferred to Lessor and leased back to Company | Subject to the terms set forth in Part F of the Lease Transactions |