**<u>EXHIBIT A</u>**

(DIP Term Sheet)

*Execution Version*

# AVENGER FLIGHT GROUP, LLC

## Senior Secured Superpriority DIP Financing Term Sheet

THIS TERM SHEET (INCLUDING ALL SCHEDULES, ANNEXES AND EXHIBITS HERETO, THE "<u>TERM SHEET</u>") DESCRIBES THE PRINCIPAL TERMS AND CONDITIONS OF A PROPOSED SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT FACILITY TO BE PROVIDED BY THE DIP LENDERS (AS DEFINED BELOW) TO AVENGER FLIGHT GROUP, LLC (THE "<u>BORROWER</u>") IN CONNECTION WITH THE CASES (THE "<u>CHAPTER 11 CASES</u>") FILED BY THE BORROWER AND CERTAIN OF ITS DIRECT AND INDIRECT SUBSIDIARIES (COLLECTIVELY, THE "<u>DEBTORS</u>" OR THE "<u>COMPANIES</u>") IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "<u>BANKRUPTCY COURT</u>") PURSUANT TO CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (AS AMENDED, THE "<u>BANKRUPTCY CODE</u>") ON FEBRUARY 11, 2026 (THE "<u>PETITION DATE</u>"). THE DIP FACILITY (AS DEFINED BELOW) IS BEING PROVIDED BY THE DIP LENDERS IN RELIANCE UPON THE PROSECUTION AND CONSUMMATION OF THE 363 SALE PROCESS (AS DEFINED BELOW).

THIS TERM SHEET IS BEING PROVIDED ON A CONFIDENTIAL BASIS AND IT, ALONG WITH ITS CONTENTS AND EXISTENCE, MAY NOT BE DISTRIBUTED, DISCLOSED, OR DISCUSSED WITH ANY OTHER PARTY BUT MAY BE FILED WITH THE BANKRUPTCY COURT IN CONNECTION WITH THE CHAPTER 11 CASES. THIS TERM SHEET IS NOT AN OFFER FOR THE PURCHASE, SALE, OR SUBSCRIPTION OR INVITATION OF ANY OFFER TO BUY, SELL, OR TO SUBSCRIBE FOR ANY SECURITIES. THE TERMS AND CONDITIONS SET FORTH IN THIS TERM SHEET DO NOT CONSTITUTE OR CREATE AN AGREEMENT, OBLIGATION, OR COMMITMENT OF ANY KIND BY OR ON BEHALF OF ANY PARTY, UNLESS AND UNTIL THE INTERIM ORDER (AS DEFINED BELOW) IS ENTERED IN THE CHAPTER 11 CASES BY THE BANKRUPTCY COURT.

| | |
|---|---|
| *Borrower:* | Avenger Flight Group, LLC, as debtor and debtor-in-possession under the Bankruptcy Code. |
| *Guarantors:* | Each of (a) the other Credit Parties (as defined in the Prepetition Credit Agreement (as defined below)), (b) any other subsidiary or affiliate of the Borrower that has commenced a bankruptcy case related to the Chapter 11 Cases, and (c) any other subsidiary of the Borrower, currently party to the Prepetition Credit Agreement (collectively, the "<u>Guarantors</u>" and, together with the Borrower, the "<u>DIP Loan Parties</u>").[1] |
| *Prepetition Credit Agreement:* | The Borrower is a party to that certain Credit Agreement, dated as of June 25, 2021 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition Credit Agreement</u>")[2], by and |

---

[1]  The Guarantors shall include: Avenger Flight Group Topco, LLC, AFG Dallas, LLC, AFG Dallas III, LLC, AFG Dallas IV, LLC, AFG Orlando, LLC, AFG Sanford, LLC, Avenger Flight Training, LLC, PAPI Flight Training, LLC, AFG FLL, LLC, AFG Sim Holding Corp., AFG EU Operations Corp., Avenger Flight Group Europe, Corp., AFG LATAM Holding Corp., AFG Latam SIM Holdings, LLC, AFG Latam SIM Holding III, LLC, AFG Latam SIM Holdings IV, LLC, AFG Mexico Corp., Avenger Flight Group Mexico II, S. de R.L. de C.V., AFG Latam, LLC, and AFG Latam SIM Holdings II, LLC.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Prepetition Credit Agreement.

<table>
<tr><td></td><td>among, <em>inter alia</em>, the Borrower, Avenger Flight Group Topco, LLC ("<u>Holdings</u>"), together with certain subsidiaries of Holdings, as guarantors, the lenders from time to time party thereto (the "<u>Prepetition Term Loan Lenders</u>"), and Wilmington Trust, National Association, as Administrative Agent and Collateral Agent (the "<u>Prepetition Agent</u>" and, together with the Prepetition Term Loan Lenders, the "<u>Prepetition Secured Parties</u>").  The debt facilities outstanding under the Prepetition Credit Agreement consist of (a) First Out Term Loans in an aggregate principal amount of not less than $149,275,017.35 (together with all accrued and unpaid interest, fees, expenses and other amounts), (b) Sixteenth Amendment Incremental Term Loans in an aggregate principal amount of not less than $2,208,720.84 (together with all accrued and unpaid interest, fees, expenses and other amounts) and (c) Second Out Term Loans in an aggregate principal amount of not less than $121,567,749.92 (together with all accrued and unpaid interest, fees, expenses and other amounts) (collectively, the "<u>Prepetition Term Loans</u>").  The Prepetition Term Loans include not less than $8,013,535.57 in principal amount outstanding as of the Petition Date of bridge financing provided in September and December 2025 (together with all accrued and unpaid interest, fees, expenses and other amounts) (collectively, the "<u>Bridge Loans</u>").</td></tr>
<tr><td><em>DIP Facility:</em></td><td>A senior secured superpriority debtor-in-possession multi-draw term loan credit facility (the "<u>DIP Facility</u>" and the obligations thereunder, the "<u>DIP Obligations</u>"), consisting of (a) new money commitments in an aggregate principal amount of up to $14,500,000 (the "<u>DIP Term Loan Commitments</u>" and the loans pursuant thereto, the "<u>DIP Term Loans</u>"), of which up to $8,000,000 of the DIP Term Loan Commitments shall be funded upon or following entry of the interim order approving the DIP Facility, which order shall be satisfactory to the Required DIP Lenders (as defined below) (the "<u>Interim Order</u>") and the remainder of the DIP Term Loan Commitments being funded upon or following entry of the final order approving the DIP Facility, which order shall be satisfactory to the Required DIP Lenders (the "<u>Final Order</u>", and together with the Interim Order, the "<u>DIP Orders</u>"), (b) immediately upon entry of the Interim Order, a deemed "roll-up" on a cashless basis of $6,000,000 of the Bridge Loans held by the DIP Lenders (or their affiliates) on a <em>pro rata</em> basis according to their DIP Term Loan Commitments, in each case, to be deemed incurred as of the date of entry of the Interim Order (the "<u>Interim Roll-Up Loans</u>" and the obligations thereunder, the "<u>Interim Roll-Up Obligations</u>"), and (c) immediately upon entry of the Final Order, a deemed "roll-up" on a cashless basis of an additional $23,000,000 of the Prepetition Term Loans held by the DIP Lenders (or their affiliates) on a <em>pro rata</em> basis according to their DIP Term Loan Commitments, in each case, to be deemed incurred as of the date of entry of the Final Order (the "<u>Final Roll-Up Loans</u>" and together with the Interim Roll-Up Loans, the "<u>Roll-Up Loans</u>" and the obligations thereunder, the "<u>Final Roll-Up Obligations</u>" and together with the Interim Roll-Up Obligations, the "<u>Roll-Up Obligations</u>"; the Roll-Up Loans, collectively with the DIP Term Loans, the "<u>DIP Loans</u>"); <em>provided</em> that after giving effect to the principal balance of all DIP Term Loans, the aggregate principal balance of all DIP Term Loans shall not exceed the DIP Term Loan Commitment;</td></tr>
</table>

*provided*, *further*, that no DIP Lender shall be obligated to make DIP Term Loans in an amount in excess of the portion of the DIP Term Loan Commitment set forth next to such DIP Lender's name in the table set forth on Exhibit A hereto.

The deemed proceeds of the Roll-Up Loans shall be applied on a cashless, dollar-for-dollar basis to refinance, exchange, and replace an amount of the Prepetition Term Loans held by the DIP Lenders (or their affiliates), with such refinancing occurring in the following order of priority: (i) *first*, to Obligations due in respect of the Sixteenth Amendment Incremental Term Loans, (ii) *second*, to Obligations due in respect of the Fifteenth Amendment Incremental Term Loans, (iii) *third*, to Obligations due in respect of the remaining First Out Term Loans, and (iv) *finally*, to Obligations due in respect of the Second Out Term Loans, in each of (i) through (iv) first to Obligations constituting accrued and unpaid interest and then to Obligations constituting unpaid principal.

The proceeds of the DIP Term Loans shall be funded into a deposit account of the Borrower.  Such account shall be subject to the DIP Liens (as defined below) in favor of the DIP Agent, which shall be automatically perfected pursuant to the DIP Orders and shall be subject to a deposit account control agreement satisfactory to the DIP Agent if required by the DIP Agent (at the direction of the Required DIP Lenders (as defined below)).

| | |
|---|---|
| *DIP Loan Documentation:* | At the option of the Required DIP Lenders (as defined below), the DIP Loan Parties shall execute definitive financing documentation with respect to the DIP Facility, including, without limitation, a credit agreement (the "<u>DIP Credit Agreement</u>"), guarantees and security documents, in each case, satisfactory in form and substance to the Required DIP Lenders and the DIP Loan Parties (collectively, the "<u>DIP Documents</u>").   The provisions of the DIP Documents shall, upon execution, supersede the provisions of this Term Sheet; *provided* that if the Required DIP Lenders determine not to require the DIP Loan Parties to execute DIP Documents, the provisions of this Term Sheet and the DIP Orders shall govern the DIP Facility.   The provisions of the DIP Documents shall be consistent with this Term Sheet and the DIP Orders.<br><br>The DIP Credit Agreement shall contain representations and warranties, conditions precedent, affirmative and negative covenants, indemnities, events of default, and remedies in form and substance substantially similar to the Prepetition Credit Agreement (with such modifications as are (i) set forth herein, and (ii) usual and customary for DIP financings of this type). Other DIP Documents, such as transaction documents, subordination agreements, intercreditor agreements, and other material agreements, shall be, in each case, usual and customary for DIP financings of this type and in form and substance substantially similar to the applicable documents entered into in connection with the Prepetition Credit Agreement.<br><br>The definition of "<u>Required DIP Lenders</u>" (or any equivalent term with respect to the DIP Facility) shall refer to DIP Lenders (as defined below) |

| | |
|---|---|
| | holding at least a majority in principal amount of the outstanding DIP Loans and unfunded DIP Term Loan Commitments. |
| *DIP Lenders:* | The Prepetition Term Loan Lenders who elect to provide DIP Term Loan Commitments (the "<u>DIP Lenders</u>"). All Prepetition Term Loan Lenders (or their affiliates) will be offered the right to participate in the DIP Facility *pro rata* with their holdings under the Prepetition Credit Agreement. |
| *DIP Agent:* | Wilmington Trust, National Association (in such capacity, the "<u>DIP Agent</u>" and, together with the DIP Lenders, the "<u>DIP Secured Parties</u>").<br><br>In connection with the DIP Documents or the Term Sheet, as applicable, the DIP Agent shall be entitled to all of the rights, protections, immunities and indemnities set forth in **Exhibit C** hereto.<br><br>The DIP Agent may be removed or replaced in accordance with the terms set forth in Section 1.5 of **Exhibit C**. |
| *Interest Rate:* | <u>DIP Term Loans</u>: Term SOFR+ 9.00% per annum, compounded monthly, paid in kind.<br><br><u>Roll-Up Loans</u>: Term SOFR + 9.50% per annum, compounded monthly, paid in kind.<br><br>As soon as practicable after 10:00 a.m. (Eastern Standard Time) on each Interest Rate Determination Date, the DIP Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to each of the SOFR Loans for which an interest rate is then being determined and shall promptly give notice thereof in writing to the Borrower and each DIP Lender.<br><br>Interest payable shall be computed on the basis of a year of three hundred sixty (360) days, in each case for the actual number of days elapsed in the period during which it accrues. In computing interest on any DIP Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan, as the case may be, shall be excluded; provided, if a Loan is repaid on the same day on which it is made, one (1) day's interest shall be paid on that Loan.<br><br>Interest on each DIP Loan shall accrue and shall be payable in kind by being capitalized to the principal balance of the DIP Loans on each Interest Payment Date.<br><br>Upon the expiration of any Interest Period applicable to any SOFR Loan, such SOFR Loan shall automatically continue as a SOFR Loan.<br><br>"<u>Business Day</u>" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close and when used in |

connection with a SOFR Loan, shall also be a U.S. Government Securities Business Day.

"Floor" means a rate of interest equal to 1.00%.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank and any group or body charged with setting financial accounting or regulatory capital rules or standards).

"Interest Payment Date" means (a) the last Business Day of each calendar month, commencing the first calendar month after entry of the Interim Order, and (b) the Maturity Date.

"Interest Period" means, in connection with a SOFR Loan, an interest period of one (1) month, commencing on the date the applicable DIP Loan is advanced or rolled-up in accordance with the DIP Orders; provided, that (i) the initial Interest Period for such SOFR Loan will run from the date the DIP Loan was made to the next succeeding Interest Payment Date, and each Interest Period thereafter will run for one (1) month, (ii) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day, (iii) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (iv) of this definition, end on the last Business Day of a calendar month, and (iv) no Interest Period shall extend beyond the Maturity Date.

"Interest Rate Determination Date" means, with respect to any Interest Period, the date that is two (2) Business Days prior to the first day of such Interest Period.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Loan" means a DIP Loan that bears interest at a rate based on Term SOFR.

"Term SOFR" means, for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business

| | |
|---|---|
| | Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; <u>provided</u>, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day; <u>provided</u>, further, that if Term SOFR as so determined shall ever be less than the Floor, then Term SOFR shall be deemed to be the Floor. <br><br> "<u>Term SOFR Administrator</u>" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the DIP Agent in its reasonable discretion). <br><br> "<u>Term SOFR Reference Rate</u>" means the forward-looking term rate based on SOFR. <br><br> "<u>U.S. Government Securities Business Day</u>" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities. |
| *Default Rate:* | At all times following the occurrence and during the continuance of an Event of Default and notice from the Required DIP Lenders to the Borrower and DIP Agent, principal, interest, and all other amounts due on the DIP Loans shall bear interest at a rate equal to 2.00% per annum in excess of the interest rate set forth under "Interest Rate" above. |
| *Mechanics for DIP Term Loans:* | Amounts repaid on the DIP Term Loans may not be reborrowed. <br><br> Whenever the Borrower desires that the DIP Lenders make a DIP Term Loan, the Borrower shall deliver to the DIP Agent a fully executed Funding Notice with respect to such DIP Term Loan, no later than 11:00 a.m. ET four (4) business days prior to the requested funding date for such draw (or such later time as the Required DIP Lenders and the DIP Agent may agree). Except as otherwise provided herein, any Funding Notice for any DIP Loans that are SOFR Loans shall be irrevocable on and after the related Interest Rate Determination Date, and the Borrower shall be bound to make a borrowing in accordance therewith. <br><br> Notice of receipt of each Funding Notice in respect of each DIP Loan, together with the amount of each DIP Lender's DIP Term Loan Commitment percentage thereof and the applicable interest rate, shall be |

provided by the DIP Agent to each applicable DIP Lender in writing with reasonable promptness.

Each DIP Lender shall make its DIP Term Loan Commitment percentage of the requested DIP Term Loan available to the DIP Agent not later than 11:00 a.m. on the applicable date the DIP Term Loan was requested to be made by wire transfer of same day funds in Dollars at the account designated by the DIP Agent in writing.  Except as provided herein, upon satisfaction or waiver of the applicable conditions precedent specified herein, the DIP Agent shall make the proceeds of such DIP Loan available to the Borrower on the applicable date by causing an amount of same day funds in Dollars equal to the proceeds of all DIP Loans received by the DIP Agent in connection with the DIP Loan borrowing from the DIP Lenders to be credited to the account of the Borrower.

"Funding Notice" means a notice in form and substance substantially similar to Exhibit 2.1 of the Prepetition Credit Agreement (with such modifications as are (i) set forth herein, and (ii) usual and customary for DIP financings of this type).

| | |
|---|---|
| *Security and Priority:* | The DIP Secured Parties shall be granted, pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected, post-petition first-priority security interests and liens (the "DIP Liens") on all tangible, intangible, real and personal property of the DIP Loan Parties (including, without limitation, all prepetition and post-petition property and assets of the DIP Loan Parties and all equity interests owned by the DIP Loan Parties), and all other property of the DIP Loan Parties of whatever kind, nature, or description, whether acquired or created prepetition or post-petition to secure the DIP Obligations, and the proceeds, rents, profits, and offspring of each of the foregoing (the "DIP Collateral"), other than contracts, leases and licenses solely to the extent a lien is not permitted by law to attach to such property, in which case the proceeds of such contracts, leases, and other licenses shall be DIP Collateral; *provided, however,* the DIP Liens shall be subject to validly perfected, enforceable, and non-avoidable liens existing as of the Petition Date to which the liens securing the obligations under the Prepetition Credit Agreement were subject or which are listed on a schedule to the DIP Orders (the "Prepetition Permitted Liens") and shall be in accordance with the relative lien priorities set forth in **Exhibit C** to the DIP Order (the "Lien Priority Exhibit").<br><br>Notwithstanding the foregoing, the DIP Liens shall not extend to, and the DIP Collateral shall not consist of, avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents, but (subject to entry of the Final Order) shall include the proceeds therefrom ("Avoidance Proceeds").<br><br>For the avoidance of doubt, the DIP Liens shall prime and be senior to the liens of the Prepetition Term Loan Lenders.  The DIP Liens granted under Section 364(d)(1) of the Bankruptcy Code shall not be *pari passu* with, or subordinated to, any other liens or security interests (whether currently |

|   | |
|---|---|
| | existing or hereafter created), subject in each case only to the Carve-Out, the Prepetition Permitted Liens (if any), and the relative lien priorities set forth in the Lien Priority Exhibit.

All DIP Obligations shall also constitute allowed superpriority administrative expense claims (the "<u>Superpriority Claims</u>") in the Chapter 11 Cases and shall have priority over all other claims and administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.  However, the Superpriority Claims shall be subject to the Carve-Out (as defined below) and shall not be payable from Avoidance Proceeds pending entry of the Final Order.

The DIP Liens shall be effective and automatically perfected by the Interim Order and the Final Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements.  Notwithstanding the foregoing, the DIP Loan Parties shall take all action that may be reasonably necessary or desirable, or that the Required DIP Lenders or the DIP Agent may reasonably request, to at all times maintain the validity, perfection, enforceability, and priority of the security interests and liens of the DIP Agent in the DIP Collateral, or to enable the DIP Agent to protect, exercise, or enforce its rights hereunder, under the DIP Orders, and in the DIP Collateral. |
| *Carve-Out:* | The "Carve-Out" shall be, collectively: (a) all statutory fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee (the "<u>U.S. Trustee</u>") pursuant to 28 U.S.C. §1930(a), (b) all reasonable fees and expenses incurred by a trustee, if any, under section 726(b) of the Bankruptcy Code in an aggregate amount not exceeding $25,000, (c) subject in all cases to the Approved Budget (as defined below) and to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees, disbursements, costs, and expenses (including any restructuring, sale, success, or other transaction fee allowed and payable by the Debtors to Seabury Aviation Partners pursuant to that certain engagement letter dated December 19, 2025, and excluding any restructuring, sale, success, or other transaction fee of any other investment bankers or financial advisors retained by the Debtors or any official committee of unsecured creditors appointed in the Chapter 11 Cases (the "<u>UCC</u>") pursuant to section 327, 328, 363, or 1103 of the Bankruptcy Code at any time before or on the first business day following delivery by the Required DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders) of a Carve-Out Trigger Notice (as defined below), and (d) professional fees of the Debtors not to exceed $150,000 and professional fees of the UCC (if any) not to exceed $50,000, in each case incurred after the first business day following delivery by the Required DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders) of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise.

On a weekly basis, budgeted fees, costs and expenses of professionals retained by the Debtors and the UCC, if any, shall be funded into a |

<table>
<tr><td></td><td>segregated escrow account held in trust in an amount as set forth in the Approved Budget (the "<u>Professional Fee Reserve</u>").  Amounts funded into the Professional Fee Reserve shall be considered used by the Debtors at such time as they are deposited into the Professional Fee Reserve for distribution to professionals in accordance with orders of the Bankruptcy Court and the Approved Budget.  Any amounts remaining in the Professional Fee Reserve after payment of allowed fees and expenses in accordance with the Approved Budget shall be DIP Collateral.<br><br>"<u>Carve-Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the Required DIP Lenders) to the Debtors' lead counsel, the U.S. Trustee, and lead counsel to the UCC (if any), which notice may only be delivered following the occurrence and during the continuation of an event of default under the DIP Facility.</td></tr>
<tr><td><em>Maturity Date:</em></td><td>The earliest to occur of (a) the 90th day following the Petition Date, (b) the 30th day following the Petition Date if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (c) the date a sale of all or substantially all of the assets of the Debtors is consummated, (d) the termination of the Asset Purchase Agreement (as defined below) for a material breach thereof by any seller thereunder without the prior written consent of the Required DIP Lenders, (e) the effective date of a plan of reorganization or liquidation, (f) entry of an order by the Bankruptcy Court approving (i) a motion seeking conversion or dismissal of the Chapter 11 Cases or (ii) a motion seeking the appointment or election of a trustee, a responsible officer, or examiner with enlarged powers relating to the operation of the Debtors' business, and (g) the date any or all of the DIP Obligations are accelerated in accordance with the DIP Orders.</td></tr>
<tr><td><em>Fees and Expenses; Indemnity:</em></td><td>(i) An upfront fee of 2.00% on the principal amount of the DIP Term Loan Commitments (the "<u>Upfront Fee</u>") payable in kind; and (ii) an exit fee of 2.00% on the principal amount of the DIP Term Loan Commitments, payable on the Maturity Date, payable in kind (the "<u>Exit Fee</u>" and, together with the Upfront Fee, the "<u>DIP Financing Fees</u>").  The Borrower shall also pay to the DIP Agent, for its own account, the fees (the "<u>Agency Fees</u>") in the amounts and at the times set forth in that certain agency fee letter, dated as of the date hereof, between the Borrower and the DIP Agent.  The DIP Financing Fees and the Agency Fees shall be fully earned upon entry of the Interim Order.  The DIP Financing Fees shall be payable to each DIP Lender ratably.<br><br>The Debtors shall reimburse the DIP Agent and the DIP Lenders for reasonable and documented fees, costs and expenses incurred in connection with the DIP Facility and the Chapter 11 Cases, including, without limitation, the reasonable and documented fees, costs and expenses of (a) counsel to the DIP Agent (limited to one lead counsel and one local counsel), (b) counsel to the DIP Lenders (limited to one lead counsel and one local counsel for the DIP Lenders taken as a whole), (c) one financial advisor to the DIP Lenders taken as a whole, and (d) specialty or local counsel to the DIP Lenders taken as a whole in each</td></tr>
</table>

| | |
|---|---|
| | relevant jurisdiction, whether incurred on a prepetition or postpetition basis, which shall be payable by Borrower within ten (10) days after notice thereof absent objection and without the requirement for Bankruptcy Court approval.  A copy of the summary invoice shall be provided to counsel to the Debtors, the U.S. Trustee, and counsel to the UCC, if any.<br><br>The Debtors shall indemnify and hold harmless the DIP Agent and each DIP Lender (and each of their respective directors, officers, members, employees, advisors and agents) against any loss, liability, cost, or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction).<br><br>No DIP Financing Fees shall be earned on account of any of the Roll-Up Loans. |
| *Releases* | The DIP Orders shall contain releases and exculpations for the DIP Agent, each DIP Lender, the Prepetition Agent, and the Prepetition Term Loan Lenders (in each case, in any capacity), in form and substance satisfactory to each such party, respectively, including, without limitation, releases from any avoidance actions, in each case subject to the challenge period for parties other than the DIP Loan Parties provided in the DIP Orders. |
| *Borrowing Conditions:* | The obligation of the DIP Lenders to fund DIP Term Loans shall be conditioned upon the satisfaction (or waiver in writing (email being sufficient) by the Required DIP Lenders) of the conditions precedent set forth below:<br><br>(i) the Debtors shall have timely delivered to the DIP Lenders the Approved Budget or any update thereto required to be delivered in accordance with this Term Sheet and the DIP Orders and such other information (financial or otherwise) as may be reasonably requested by the Required DIP Lenders;<br><br>(ii) no Debtor has failed to disclose any material assumptions with respect to the Approved Budget;<br><br>(iii) the Debtors shall have delivered to the DIP Agent and the DIP Lenders a notice of borrowing in connection with such draw request no later than 11:00 a.m. ET four (4) business days prior to the requested funding date for such draw (or such later time as the Required DIP Lenders and the DIP Agent may agree);<br><br>(iv) the Interim Order or Final Order, as applicable, shall have been entered by the Bankruptcy Court in the Chapter 11 Cases (after a hearing on notice to all parties having or asserting a lien on all or any portion of the DIP Collateral), which Interim Order shall not have been reversed, modified, amended, stayed, vacated, or subject to a stay pending appeal, in each case, without the prior |

written consent of the Required DIP Lenders (email being sufficient) and the Debtors shall be in compliance in all respects with the Interim Order or Final Order, as applicable;

(v) each of the representations and warranties contained in the DIP Documents shall be true and correct in all material respects on and as of the date of such borrowing (other than any such representations and warranties that are made as of a specific date, which shall be true and correct in all material respects as of such date) (without duplication of any materiality qualifiers with respect to any such representation or warranty already qualified by materiality or Material Adverse Effect);

(vi) no default or event of default under the DIP Orders, this Term Sheet, or the DIP Documents shall have occurred and be continuing;

(vii) none of the Bankruptcy Cases shall have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

(viii) no trustee under chapter 7 or chapter 11 of the Bankruptcy Code shall have been appointed in any of the Bankruptcy Cases;

(ix) there has been no challenge to the rights, liens, or claims of any of the DIP Secured Parties or the Prepetition Secured Parties, nor has there been any reduction or adverse effect of the rights, liens, or claims of any of the DIP Secured Parties;

(x) the Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the "first day" motions, orders and related pleadings (including a cash management order encompassing the cash management arrangements currently in place under the Prepetition Credit Agreement) and all pleadings which relate to the DIP Facility shall have been reviewed in advance by each DIP Lender and shall be satisfactory in form and substance to Required DIP Lenders;

(xi) with respect to the DIP Term Loan Commitments being made available upon entry of the Final Order (the period during which such DIP Term Loan Commitments are being made available, hereinafter referred to as the "Final Availability Period"), the entry of the Final Order shall have occurred;

(xii) during the Final Availability Period, the Final Order and cash management order (each, as acceptable to the Required DIP Lenders) shall be in full force and effect and, with respect to each, shall not have been reversed, vacated, stayed, or subject to appeal, and shall not have been amended, restated, amended and restated, supplemented, or otherwise modified without the prior written consent of the Required DIP Lenders;

11

|  | (xiii) the Debtors shall be in compliance with the Interim Order and the Final Order, as applicable; |
|--|--|
|  | (xiv) the Required DIP Lenders shall be satisfied that the liens and security interests of the DIP Agent have been perfected in the DIP Collateral and shall constitute first-priority liens (subject only to the relative lien priorities set forth in the Lien Priority Exhibit); |
|  | (xv) the Debtors shall have insurance (including, without limitation, commercial general liability and property insurance) with respect to the DIP Collateral in such amounts and scope as is reasonably acceptable to the Required DIP Lenders (which shall be deemed satisfied if such insurance as required by the Prepetition Credit Agreement remains in place); |
|  | (xvi) upon entry of the Interim Order, the entry into this Term Sheet shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently; |
|  | (xvii) the DIP Lenders shall have received a copy of the fully-executed Asset Purchase Agreement (as defined below), which shall be in form and substance consistent with the terms hereof and otherwise acceptable to the Required DIP Lenders; and |
|  | (xviii) all applicable Milestones that are required to be complied with prior to or concurrently with the entry of the Interim Order or the Final Order, as applicable, and each draw shall have been complied with (or waived in writing (email being sufficient) by the Required DIP Lenders). |
| *Material Adverse Effect:* | "Material Adverse Effect" means a material adverse effect on any of (a) the operations, assets, liabilities, or condition (financial or otherwise) of the DIP Loan Parties taken as a whole, (b) the ability of the DIP Loan Parties taken as a whole to perform any of their obligations under this Term Sheet, the DIP Orders, or the DIP Documents to which they are a party, (c) the legality, validity, or enforceability of the DIP Documents, (d) the rights and remedies (taken as a whole) of the DIP Agent or any DIP Lender under the DIP Documents, or (e) the validity, enforceability, or priority of the liens or security interests purported to be created by this Term Sheet, the DIP Documents, or the DIP Orders, as applicable; provided that, solely for purposes of clause (a) above, (i) the effect of the filing of the Bankruptcy Cases and the events and conditions related to and/or leading up thereto and/or typically resulting from the filing of cases under chapter 11 of the Bankruptcy Code, (ii) any actions required to be taken under this Term Sheet, the DIP Documents, or the DIP Orders, (iii) any matters disclosed in this Term Sheet or the DIP Documents (including any schedules thereto and any disclosure letter) and/or publicly disclosed in any first day pleadings or declarations in the Bankruptcy Cases, and (iv) any matters that affect the commercial aviation simulation and training industry generally and that are not disproportionately adverse |

| | |
|---|---|
| | to the DIP Loan Parties, in each case, shall be disregarded in determining whether a "Material Adverse Effect" has occurred. |
| *Budget:* | The Debtors shall prepare and deliver to the DIP Lenders and DIP Agent a 13-week cash flow forecast beginning with the week which includes the Petition Date through the thirteenth (13th) week thereafter showing anticipated receipts and disbursements in form and substance acceptable to the Required DIP Lenders (the "Initial Budget"), it being agreed that the Initial Budget attached to the Interim Order is in form and substance acceptable to the Required DIP Lenders.  The Debtors may propose updates to the Initial Budget or any subsequent budget as needed, in all cases subject to the approval of the Required DIP Lenders (as updated, the "Updated Budget").    The Debtors shall report weekly on actual performance versus the Approved Budget (as defined below); provided that for purposes of compliance with this Term Sheet and the DIP Orders, operating    disbursements,    capital    expenditures,    non-operating disbursements (including professional fees of the Debtors and the UCC, if any (including any holdback)) shall be tested on a line-by-line basis and receipts shall be tested on an aggregate basis, in each case, over the first two weeks from the Petition Date, then the first three weeks from the Petition Date, and then on a rolling four-week basis and subject to a 15% permitted variance (a "Permitted Variance"); provided further that to the extent (i) the Debtor's actual operating disbursements or actual capital expenditures are less than the projected disbursements provided for such line items in the Approved Budget or (ii) the Debtors' actual receipts are greater than the projected receipts provided on an aggregate basis in the Approved Budget, such positive variance may be rolled forward to succeeding weeks (limited to the applicable line item with respect to positive variances in clause (i)) for purposes of compliance with this Term Sheet and the DIP Orders; provided further that any such rolled forward positive variance shall only be applied once.

For the avoidance of doubt, there shall be an Event of Default upon the expiration of the Approved Budget then in effect.

"Approved Budget" means, initially, the Initial Budget, and, thereafter, the most recent Updated Budget accepted by the Required DIP Lenders in writing (email being sufficient).

All relief sought by the Debtors pursuant to the "first day" pleadings (including any interim or final orders) shall be consistent in all respects with the Approved Budget.  Any relief sought, granted, or implemented that is inconsistent in any respect with the Approved Budget shall constitute an Event of Default. |
| *Milestones:* | The Debtors shall conduct the 363 Sale Process and the Chapter 11 Cases in accordance with the milestones set forth on **Exhibit B** hereto (each, a "Milestone") and unless waived, modified, or extended in writing by the Required DIP Lenders, the failure of the Debtors to meet the Milestones |

| | |
|---|---|
| | by the applicable specified deadlines set forth therefor shall constitute an Event of Default. |
| *363 Sale Process:* | The Debtors shall consummate a sale process with respect to all or substantially all of their assets pursuant to Section 363 of the Bankruptcy Code (a "<u>Sale</u>").  In connection with the Sale, the Debtors and one or more affiliates of the DIP Lenders (including any acquisition vehicle formed in connection with a credit bid or other designee) (the "<u>Stalking Horse Purchaser</u>") will enter into an asset purchase agreement (the "<u>Asset Purchase Agreement</u>") in form and substance satisfactory to the Required DIP Lenders.<br><br>The process set forth above, including the designation of the Stalking Horse Purchaser, shall collectively be referred to as the "<u>363 Sale Process</u>". |
| *363 Credit Bid:* | The Interim Order shall provide that the DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition Agent (at the direction of the Required Lenders (as defined in the Prepetition Credit Agreement)) shall be permitted to credit bid, pursuant and subject to section 363(k) of the Bankruptcy Code or applicable law, the DIP Term Loans and any Prepetition Term Loans, as applicable, in connection with any sale or disposition of assets in the Chapter 11 Cases.<br><br>The Final Order shall provide that the DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition Agent (at the direction of the Required Lenders (as defined in the Prepetition Credit Agreement)) shall be permitted to credit bid (pursuant to section 363(k) of the Bankruptcy Code or applicable law) the DIP Loans (including the Roll-Up Loans) and any Prepetition Term Loans (and any other applicable obligations) held by the DIP Lenders in connection with any sale or disposition of assets in the Chapter 11 Cases (including any deposit in connection with such sale) and shall not be prohibited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code. |
| *Use of Proceeds:* | Proceeds of the DIP Facility will be used in compliance with the terms of the Approved Budget (a) to pay transaction costs, fees, and expenses which are incurred in connection with the DIP Facility, (b) to pay professional fees of the Debtors and their estates and the UCC in accordance with the Approved Budget, and (c) for working capital and other general corporate purposes of the Debtors, all subject to certain restrictions to be set forth in the Interim Order or Final Order, as applicable, and the DIP Documents.<br><br>The deemed proceeds of the Roll-Up Loans shall be used to refinance an equal amount on a cashless dollar-for-dollar basis of the Prepetition Term Loans held by the DIP Lenders (or their affiliates) reducing the amount of the "Obligations" (as defined under the Prepetition Credit Agreement, the "<u>Prepetition Term Loan Obligations</u>") by such amount. |

14

| | |
|---|---|
| *Adequate Protection:* | As adequate protection for any diminution of the Prepetition Secured Parties' interest in the "Collateral" (as defined in the Prepetition Credit Agreement) including without limitation any diminution resulting from the subordination of existing liens to the DIP Liens and/or the Debtors' use of cash collateral pursuant to the DIP Orders, the Prepetition Agent shall receive, for the benefit of the Prepetition Secured Parties, the adequate protection granted to the Prepetition Secured Parties (A) pursuant to the DIP Orders (which shall include, without limitation, (i) monthly payments of the reasonable fees, costs, and expenses of the Prepetition Secured Parties (including professional fees), (ii) replacement liens on the DIP Collateral that shall be junior only to the liens as expressly set forth in the Lien Priority Exhibit, (iii) superpriority administrative expense claims with priority over any and all administrative expenses, whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(a) of the Bankruptcy Code, other than the superpriority administrative expense claims of the DIP Secured Parties and the Carve-Out and which shall not be payable from Avoidance Proceeds pending entry of the Final Order, and (iv) an acknowledgement of the unconditional right to credit bid the Prepetition Term Loan Obligations as further set forth in this Term Sheet), and (B) as otherwise required by the Bankruptcy Court pursuant to sections 361, 507, 363(e) and 364(d)(1) of the Bankruptcy Code or otherwise. |
| *Marshalling; 552(b) Waiver and Waiver of 506(c) Claims:* | Waivers of the equitable doctrine of "marshalling", surcharge claims for necessary costs and expenses of preserving or disposing of property securing an allowed secured claim pursuant to section 506(c) and the section 552 "equities of the case" exception, all as set forth in the Final Order. |
| *Mandatory Prepayments:* | Subject only to the application of proceeds of DIP Collateral in accordance with the relative lien priorities set forth in the Lien Priority Exhibit, the Debtors shall pay or prepay the DIP Loans and all other DIP Obligations (together with a cash reserve established by the DIP Agent to cover asserted contingent and indemnity obligations in an amount directed by the Required DIP Lenders) until such obligations are paid in full immediately (and upon at least (3) business days' prior written notice to the DIP Agent or such shorter notice as may be agreed by the DIP Agent in its reasonable discretion) as follows:<br><br>(i)  100% of the net cash proceeds of any sale or disposition of all or substantially all of Debtors' assets pursuant to Section 363 of the Bankruptcy Code (other than a Sale to the Stalking Horse Purchaser pursuant to the Asset Purchase Agreement) simultaneous with the consummation thereof, after funding the Carve-Out and reserving proceeds sufficient to pay (a) undisputed, accrued, unpaid, and allowed administrative expenses (as of the closing of such sale) to the extent set forth in the Approved Budget and (b) an amount negotiated in good faith by the Required DIP Lenders and the Debtors that is necessary to fund costs for the wind-down of Debtors' bankruptcy estate following the closing of such sale or disposition of all or |

substantially all of Debtors' assets;

(ii) 100% of the net cash proceeds of any other sale or other disposition by any Debtor of any assets, in a single transaction or series of related transactions (except for (a) de minimis asset sales approved by an order of the Bankruptcy Court that is in form and substance acceptable to the Required DIP Lenders or (b) sale of goods or services in the ordinary course of business);

(iii) 100% of the net cash proceeds of all assets being sold or assigned pursuant to (a) that certain Purchase Agreement for B787 Simulator entered into on December 11, 2025 by and between Avenger Flight Group Israel Holdings Ltd. and El Al Israel Airlines Ltd. ("El Al"), (b) that certain Reimbursement Agreement Relating to the 787 Boeing Data and Other Licenses entered into as of December 11, 2025 by and between Avenger Flight Group, LLC and El Al, and (c) any other related agreement; and

(iv) 100% of the net cash proceeds of extraordinary receipts (including tax refunds, indemnity payments, and insurance proceeds not included as proceeds of asset dispositions but excluding sales tax receipts contemplated to be received by the Debtors as set forth in the Approved Budget) by the Debtors.

Any amounts so paid or prepaid may not be reborrowed. No reinvestment of the proceeds of any extraordinary receipts, asset sales, or other proceeds described above shall be permitted without the prior written consent of the Required DIP Lenders.

Mandatory payments or prepayments and proceeds of DIP Collateral received by the Debtors outside the ordinary course of business will be applied in the following order of priority (unless otherwise determined by the DIP Lenders), after giving effect to the Carve-Out, the relative lien priorities set forth in the Lien Priority Exhibit, and any other payments required pursuant to the DIP Orders:

(1) first, to pay all documented out-of-pocket expenses of the DIP Agent as permitted hereunder;

(2) second, to pay all documented out-of-pocket expenses of the DIP Lenders as permitted hereunder;

(3) third, to pay an amount equal to all accrued and unpaid interest owing to the DIP Lenders holding DIP Term Loans;

(4) fourth, to repay any principal amounts outstanding in respect of the DIP Term Loans (including any amounts and interest that have been added to the principal balance);

(5) fifth, to pay an amount equal to all accrued and unpaid interest owing to the DIP Lenders holding Roll-Up Loans;

|  | (6) <u>sixth</u>, to repay any principal amounts outstanding in respect of the Roll-Up Loans (including any amounts and interest that have been added to the principal balance); |
|  | (7) <u>seventh</u>, all other amounts owing to the DIP Lenders and the DIP Agent; and |
|  | (8) <u>last</u>, the balance, if any, after all of the DIP Obligations have been paid in full, to the Borrower subject in all respects to the rights, liens, and claims of the Prepetition Secured Parties. |
|  | Notwithstanding the forgoing, any prepayment made pursuant to romanette (ii) or (iii) above shall be applied to the Roll-Up Obligations or to the Prepetition Term Loan Obligations as determined by the Required DIP Lenders and pursuant to direction provided to the DIP Agent and/or the Prepetition Agent, as applicable. |
| *Events of Default:* | Each of following shall constitute an "<u>Event of Default</u>": |
|  | (i)   the entry of an Interim Order or Final Order in form and substance that is not acceptable to the Required DIP Lenders; |
|  | (ii)  failure by any Debtor to be in compliance in all respects with the provisions of this Term Sheet, the DIP Documents, and/or the DIP Orders; |
|  | (iii) the reversal, modification, amendment, stay, reconsideration, or vacatur (or any request therefor made by the Debtors) of a DIP Order, without the prior written consent of the Required DIP Lenders; |
|  | (iv)  failure of any of the Milestones to be satisfied by the Specified Deadline (as defined below); |
|  | (v)   failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality, in all respects) when made; |
|  | (vi)  the filing of any application by the Debtors (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Obligations in full in cash upon entry of the order approving such financing) for the approval of (or an order is entered by the Court approving) any claim arising under Section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest, or other lien in the Chapter 11 Cases which is *pari passu* with or senior to the DIP Liens, excluding liens arising under the DIP Orders or pursuant to any other financing agreement made with the prior written consent of the Required DIP Lenders; |
|  | (vii) the commencement of any action or the filing of any pleading by the Debtors or other person against the DIP Agent or any DIP Lender or |

|  | any of their respective agents and employees to subordinate or avoid any liens granted in connection with the DIP Orders; |
|--|--|
|  | (viii) (1) the Debtors file a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement, or otherwise modify any DIP Order, the DIP Documents, or this Term Sheet or to disallow the DIP Obligations, in whole or in part, or (2) any material provision of the DIP Orders, the DIP Documents, or this Term Sheet or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the DIP Orders), shall for any reason cease to be valid and binding (without the prior written consent of the Required DIP Lenders); |
|  | (ix) the filing with the Bankruptcy Court of a motion seeking approval of a sale under Section 363 (other than approval of a Sale pursuant to the terms of the Asset Purchase Agreement) or a plan of reorganization or liquidation in the Chapter 11 Cases that, in any such case, does not provide for indefeasible payment in full in cash to the DIP Agent and the DIP Lenders of the DIP Loans, the DIP Obligations, and all other amounts outstanding under the Term Sheet, the DIP Documents, and the DIP Orders on closing of such sale or the effective date of such plan, without the prior written consent of the Required DIP Lenders; |
|  | (x) the appointment in the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of the Debtors (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code); |
|  | (xi) the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Cases with respect to any portion of the DIP Collateral exceeding $150,000 in value in the aggregate without prior written consent of the Required DIP Lenders; |
|  | (xii) the failure to pay principal, cash interest (subject to a three (3) business day grace period, solely with respect to cash interest) or other DIP Obligations in full when due, including without limitation, on the Maturity Date; |
|  | (xiii) the payment of, or application by the Debtors for authority to pay, any prepetition claim without prior written consent of the Required DIP Lenders other than amounts set forth in the Approved Budget (subject to any Permitted Variances); and |
|  | (xiv) the failure to comply with the Approved Budget (subject to any Permitted Variances). |
| *Remedies Upon Event of Default:* | Upon the occurrence and during the continuance of any Event of Default, subject to five (5) days' notice to counsel to the Debtors during which the Debtors may seek an emergency hearing before the Bankruptcy Court (the |

"Remedies Notice Period"), the DIP Agent may (and, at the direction of the Required DIP Lenders, shall) take all or any of the following actions without further order of or application to the Bankruptcy Court, and notwithstanding the automatic stay:

(a)   declare all DIP Obligations (including principal of, and accrued interest on, any outstanding DIP Loans) to be immediately due and payable;

(b)   terminate any further commitment to lend to the Borrower;

(c)   exercise rights and remedies pursuant to the terms of the DIP Orders, or applicable law (including, without limitation, direct the Debtors (or file a motion in the name of the Debtors)), (i) to enforce the terms and provisions of the Term Sheet or the DIP Documents, (ii) to collect accounts receivable, without setoff by any account debtor, including to direct the Debtors to collect such account receivables for the benefit of the DIP Secured Parties, (iii) to sell or otherwise dispose of any or all of the DIP Collateral on terms and conditions reasonably acceptable to the Required DIP Lenders pursuant to Sections 363, 365, and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct the Debtors (or file a motion in the name of the Debtors) to assume and assign any unexpired lease or executory contract included in the DIP Collateral to the Required DIP Lenders' designee(s) in accordance with and subject to Section 365 of the Bankruptcy Code) and (iv) enter into the premises of any Debtor in connection with the orderly sale or disposition of the DIP Collateral (including, without limitation, complete any work in process); *provided* that the Debtors shall take all action that is reasonably necessary to cooperate with the DIP Agent in the DIP Agent's exercise of its rights and remedies and facilitate the realization upon the DIP Collateral by the DIP Agent (at the direction of the Required DIP Lenders); and/or

(d)   after the expiration of the Remedies Notice Period (unless otherwise prohibited by the Bankruptcy Court during the Remedies Notice Period) and without further notice or further court order and without seeking further relief from the automatic stay under section 362 of the Bankruptcy Code, the Debtors, at the election of the Required DIP Lenders, shall facilitate a strict foreclosure under UCC section 9-620 as adopted by New York by transferring ownership and title to the DIP Collateral (as may be specified by the DIP Agent at direction of Required DIP Lenders) in full or partial satisfaction of the DIP Obligations.

| | |
|---|---|
| *Rates; General Provisions Regarding Payments; Tax Treatment; Yield Protection; Notices; Assignments; Waiver of* | 1.5 (Rates), 2.13 (General Provisions Regarding Payments), 2.18 (Tax Treatment), 2.19 (Inability to Determine Rates), 3 (Yield Protection), 11.1 (Notices; Effectiveness; Electronic Communications), 11.2(c) (Reimbursement by Lenders), 11.5(a)–(c) (Successors and Assigns Generally; Assignments by Lenders; Register), 11.10 (Severability), 11.14 (Waiver of Jury Trial); 11.17 (Counterparts; Integration; Effectiveness), |

| *Jury Trial; Counterparts; Electronic Execution of Assignments and Other Documents* | 11.19 (Electronic Execution of Assignments and Other Documents) of the Prepetition Credit Agreement are hereby incorporated (with such modifications as are (i) set forth herein, and (ii) usual and customary for DIP financings of this type); *provided that* the consent of the Borrower (or any other DIP Loan Party) shall not be required at any time with respect to the provisions of Section 11.5(a)–(c) incorporated herein by reference. |
|---|---|
| *Counterparts*: | This Term Sheet may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Term Sheet by electronic imaging means (e.g. "pdf" or "tif" format) shall be effective as delivery of a manually executed counterpart of this Term Sheet. |
| *Amendments and Waivers:* | No provision of this Term Sheet or any other DIP Document may be amended other than by an instrument in writing signed by (i) the Required DIP Lenders, (ii) the DIP Agent, and (iii) the Debtors. |
| | Notwithstanding the foregoing, any amendment, consent, waiver, supplement or modification to this Term Sheet or any other DIP Documents that has the effect of (i) increasing the DIP Term Loan Commitments of any DIP Lender (other than as expressly provided herein), (ii) decreasing the amount of or postponing the payment of any scheduled principal, interest or fees payable to any DIP Lender (other than as expressly provided herein), (iii) altering the pro rata nature of disbursements by or payments to DIP Lenders or the application of prepayments in this Term Sheet, (iv) amending or modifying the definition of "Required DIP Lenders" or any provision of this section "Amendments and Waivers", (v) releasing all or substantially all of the Guarantors of the DIP Obligations, or (vi) releasing all or substantially all of the DIP Collateral other than in connection with a disposition approved by an order of the Bankruptcy Court with the prior written consent of the Required DIP Lenders, in each case, shall require the written consent of each DIP Lender directly and adversely affected thereby. |
| *Governing Law/ Jurisdiction:* | State of New York, except as governed by the Bankruptcy Code. |
| | The Bankruptcy Court shall have exclusive jurisdiction over any matters arising out of this Term Sheet. |
| | In the event of a conflict or any inconsistency between the terms of this Term Sheet and the DIP Orders, the terms of the DIP Orders shall control. |

IN WITNESS WHEREOF, the parties have executed this Term Sheet as of the date first set forth above.

**MARATHON DISTRESSED CREDIT FUND, L.P.**, as a DIP Lender

By: Marathon Asset Management L.P., its Investment Manager

By: _____
Name: Jamie Raboy
Title: Authorized Signatory

**MARATHON STEPSTONE MASTER FUND, L.P.**, as a DIP Lender

By: Marathon Asset Management L.P., its Investment Manager

By: _____
Name: Jamie Raboy
Title: Authorized Signatory

**MCSP SUB, LLC**, as a DIP Lender
By: Marathon Asset Management L.P., its Investment Manager

By: _____
Name: Jamie Raboy
Title: Authorized Signatory

**MARATHON DISTRESSED CREDIT MASTER FUND**, as a DIP Lender
By: Marathon Asset Management L.P., its Investment Manager

By: _____
Name: Jamie Raboy
Title: Authorized Signatory

**EVERGREEN CREDIT OPPORTUNITIES LLC**, as a DIP Lender

By: Cercano Management LLC, its
Investment Manager

By: _____

Name: Albert Hwang

Title: Executive Vice President

[*Signature Page to Term Sheet*]

**ALCOF III NUBT, L.P.**, as a DIP Lender
By: Arbour Lane Fund III GP, LLC, Its
General Partner

By: *Dan Galanter*
Name: Dan Galanter
Title: Manager

**ALCOF III UBT, L.P.**, as a DIP Lender
By: Arbour Lane Fund III GP, LLC, Its
General Partner

By: *Dan Galanter*
Name: Dan Galanter
Title: Manager

[*Signature Page to Term Sheet*]

**MIDOCEAN TACTICAL SOLUTIONS
FUND LP**, as a DIP Lender

By: MidOcean Credit Fund Management
LP, as Portfolio Manager

By: Ultramar Credit Holdings, Ltd., its
General Partner

By: _____
Name: Damion Brown
Title: Chief Operating Officer

[*Signature Page to Term Sheet*]

**DIP AGENT:**

**WILMINGTON TRUST, NATIONAL ASSOCIATION**,
as DIP Agent

By:_____
Name:     Andrew Lennon
Title:      Vice President

IN WITNESS WHEREOF, the parties have executed this Term Sheet as of the date first set forth above.

**AVENGER FLIGHT GROUP, LLC**, a Florida limited liability company, as Borrower

By:_____
Name: Elsa Gagnon
Title: SVP & General Counsel

**AFG DALLAS, LLC**, a Florida limited liability company, as a Guarantor

By:_____
Name: Elsa Gagnon
Title: Manager

**AVENGER FLIGHT TRAINING, LLC**, a Florida limited liability company, as a Guarantor

By:_____
Name: Elsa Gagnon
Title: Manager

**PAPI FLIGHT TRAINING LLC**, a Florida limited liability company, as a Guarantor

By:_____
Name: Elsa Gagnon
Title: Manager

**AFG MEXICO CORP**, a Florida corporation, as a Guarantor

By:_____
Name: Elsa Gagnon
Title: SVP

**AVENGER FLIGHT GROUP MÉXICO II, S. DE R.L. DE C.V.**, a Mexican *sociedad de responsabilidad limitada de capital variable*, as a Guarantor

By:_____
Name: Elsa Gagnon
Title: Legal Representative

**AFG SIM HOLDING CORP.**, a Florida corporation, as a Guarantor

By:_____
Name: Elsa Gagnon
Title: Director

**AFG EU OPERATIONS CORP.**, a Florida corporation, as Guarantor

By: _____
Name: Kyle Hunter
Title: Director

**AVENGER FLIGHT GROUP EUROPE, CORP**, a Florida corporation, as Guarantor

By: _____
Name: Elsa Gagnon
Title: Director

**AFG LATAM HOLDING CORP**, a Florida corporation, as Guarantor

By: _____
Name: Elsa Gagnon
Title: Director

**AFG LATAM, LLC**, a Florida limited liability company, as Guarantor

By: _____
Name: Elsa Gagnon
Title: Manager

**AFG LATAM SIM HOLDINGS, LLC**, a Florida limited liability company, as Guarantor

By: _____
Name: Elsa Gagnon
Title: Manager

**AFG LATAM SIM HOLDINGS III, LLC**, a Florida limited liability company, as Guarantor

By: _____
Name: Elsa Gagnon
Title: Manager

**AFG LATAM SIM HOLDINGS IV, LLC**, a Florida limited liability company, as Guarantor

By: _____
Name: Elsa Gagnon
Title: Manager

**AFG LATAM SIM HOLDINGS II, LLC**, a Florida limited liability company, as Guarantor

By: _____
Name: Elsa Gagnon
Title: Manager

**AFG DALLAS III, LLC**, a Florida limited liability company, as a Guarantor

By: _____
Name: Elsa Gagnon
Title: Manager

**AFG DALLAS IV, LLC**, a Florida limited liability company, as a Guarantor

By: _____
Name: Elsa Gagnon
Title: Manager

**AFG FLL, LLC**, a Florida limited liability company, as a Guarantor

By: _____
Name: Elsa Gagnon
Title: Manager

**AFG ORLANDO, LLC**, a Florida limited liability company, as a Guarantor

By: _____
Name: Elsa Gagnon
Title: Manager

**AFG SANFORD, LLC**, a Florida limited liability company, as a Guarantor

By: _____
Name: Elsa Gagnon
Title: Manager

**AFG FLIGHT GROUP TOPCO, LLC**, a Florida corporation, as a Guarantor

By: _____
Name: Elsa Gagnon
Title: Manager

## EXHIBIT A

**(DIP Commitment Schedule)**

| DIP Lender | DIP Term Loan Commitment |
|---|---|
| ALCOF III NUBT, L.P. | $3,662,700.00 |
| ALCOF III UBT LP | $996,150.00 |
| Evergreen Credit Opportunities LLC | $2,159,050.00 |
| Marathon Distressed Credit Fund LP | $951,200.00 |
| Marathon Distressed Credit Master Fund | $5,014,100.00 |
| Marathon Stepstone Master Fund LP | $401,650.00 |
| MCSP Sub LLC | $622,050.00 |
| MidOcean Tactical Solutions Fund LP | $693,100.00 |
| **Total** | **$14,500,000.00** |

## **EXHIBIT B**

### **(Milestones)**

The Debtors shall conduct the Chapter 11 Cases in accordance with the following milestones (each, a "<u>Milestone</u>") and unless waived, modified, or extended in writing (email being sufficient) by the Required DIP Lenders, the failure of the Debtors to meet Milestones by the applicable specified deadlines set forth therefor (the "<u>Specified Deadline</u>") shall constitute an Event of Default:

(a)    no later than February 11, 2026, the Companies shall have commenced the Chapter 11 Cases;

(b)    no later than the Petition Date, the DIP Loan Parties shall have executed the Asset Purchase Agreement;

(c)    no later than one (1) business day after the Petition Date, the Debtors shall file with the Bankruptcy Court a motion, in form and substance acceptable to the Required DIP Lenders and the Debtors, seeking approval of (i) a Sale (the "<u>Sale Motion</u>" and, the transaction in respect thereof, the "<u>Sale Transaction</u>"), (ii) entry into the Asset Purchase Agreement attached to the Sale Motion, pursuant to which the Stalking Horse Purchaser will purchase substantially all assets of the Debtors free and clear of all liens, claims, interests and encumbrances, subject only to higher or otherwise better offers, and (iii) bidding procedures (the "<u>Bidding Procedures Motion</u>") in connection with the 363 Sale Process;

(d)    no later than three (3) business days after the Petition Date, the Interim Order approving the DIP Facility shall be entered by the Bankruptcy Court;

(e)    no later than thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered (i) an order establishing bidding procedures consistent with the Bidding Procedures Motion (such order, the "<u>Bidding Procedures Order</u>"), which order shall be acceptable in form and substance to the Required DIP Lenders and (ii) the Final Order approving the DIP Facility;

(f)    no later than fifty (50) calendar days after the Petition Date, the Debtors shall have held an auction, if applicable, in connection with the 363 Sale Process for which the Debtors received qualified bids;

(g)    no later than fifty-five (55) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving the sale in connection with the 363 Sale Process (the "<u>Sale Order</u>"), which order shall be satisfactory in form and substance to the Required DIP Lenders; and

(h)    no later than sixty (60) calendar days after the Petition Date, the Debtors shall have consummated the Sale Transaction in connection with the 363 Sale Process for which the Court has entered a Sale Order in accordance with such Sale Order that results in net proceeds allocated to the DIP Collateral sufficient to repay the DIP Obligations in full in cash or such other consideration acceptable to the Required DIP Lenders.